IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

**No. 23-2963**

_____

**HENRY UNSELD WASHINGTON**

**v.**

**ROBERT GILMORE, ET. AL**

**T. S. OSWALD,**

**Appellant**

_____

**APPENDIX VOLUME II**

_____

APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ENTERED OCTOBER 2, 2023

MICHELLE HENRY
*Attorney General*

BY: HOWARD G. HOPKIRK
*Senior Deputy Attorney General*

Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
Phone: (717) 783-1478
FAX: (717) 772-4526

J. BART DELONE
*Chief Deputy Attorney General*
*Chief, Appellate Litigation Section*

DATE: March 27, 2024

# TABLE OF CONTENTS

## VOLUME II

Amended Complaint (Doc. #78)..........................................................App. 52-91_

Amended Answer to Amended Complaint of DOC Defendants
   (Doc. #115) .......................................................................App. 92-97
_
Trial Transcript 6/12/2023 (Doc. #276) ...........................................App. 98-147__

Trial Transcript 6/13/2023 (Doc. #277) ...........................................App. 148-260_

Jury Instructions (6/13/2023) (referenced in (Doc. #255) ..............App.261-277 __

## CERTIFICATE OF SERVICE

I, Howard G. Hopkirk, Senior Deputy Attorney General, do hereby certify

that I have this day served the foregoing Appendix Volume II on the following:

Via ECF

Samuel Weiss, Esq.
Rights Behind Bars
416 Florida Avenue NW
Unit 26152
Washington, DC 20001
(Counsel for Appellant)

By:    /s/ Howard Hopkirk
       HOWARD HOPKIRK
       Senior Deputy Attorney General


Four copies of the Appendix were also sent by first class mail to the Clerk of the

United States Court of Appeals for the Third Circuit in Philadelphia, Pennsylvania.

/s/ Howard G. Hopkirk

HOWARD G. HOPKIRK
Senior Deputy Attorney General


DATE: March 27, 2024

**FILED**
JAN 31 2017
CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

HENRY UNSELD WASHINGTON
IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HENRY UNSELD WASHINGTON } CIVIL ACTION NO: 2:15-CV-1031
                    PLAINTIFF } (JUDGE, LENIHAN)
          V.                  } AMENDED COMPLAINT
ROBERT D. GILMORE, WARDEN, Defendants, et al. }
T. SHAWLEY, WARDEN'S ASSISTANT; S. B. DURCO, RHU

COMMANDER; P. E. BARKEFELT, RHU LIEUTENANT; A. J. MORRIS, LIEUTENANT; C. WILLIAMS, LIEUTENANT; G. CRABLE, SERGEANT; J. M. SMITH, SERGEANT-ROBERT NELSON, CORRECTIONS OFFICER; T. S. OSWALD, CORRECTIONS OFFICER; T. I. BENNETT, PROPERTY OFFICER/CORRECTIONS OFFICER; L. COMER, CORRECTIONS OFFICER; R. HENDRICKS, CORRECTIONS OFFICER; J. CODDY, CORRECTIONS OFFICER; J. HEBETER, CORRECTIONS OFFICER; D. FARRIER, CORRECTIONS OFFICER; M. STUMP, CORRECTIONS OFFICER; G. TAIT, CORRECTIONS OFFICER; J. D. SUHAN, CORRECTIONS OFFICER; IRMA VIHLIDAL, HEALTH CARE ADMINISTRATOR; B. JIN, MEDICAL DIRECTOR; M. PARK, DOCTOR; P. DASCANI, DOCTOR; M. COMER, P.A.; E. MATTES, P.A.; E. MWAURA, P.A.; P. DENNISON, CORRECTIONS OFFICER.

I. JURISDICTION

1. THIS CIVIL ACTION IS AUTHORIZED BY 42 U.S.C. SECTION 1983 TO REDRESS THE DEPRIVATION, UNDER COLOR OF STATE LAW, OF RIGHTS SECURED BY THE CONSTITUTION OF THE UNITED STATES, THE COURT HAS JURISDICTION UNDER 28 U.S.C. SECTION 1331 AND 1343 (A)(3), PLAINTIFF WASHINGTON, SEEKS DECLARATORY RELIEF PURSUANT TO 28 U.S.C. SECTION 2201 AND 2202, PLAINTIFF'S CLAIMS FOR INJUNCTIVE RELIEF ARE AUTHORIZED BY 28 U.S.C. SECTION 2283 + 2284 AND RULE 65 OF FRCP. THE WESTERN DISTRICT OF PENNSYLVANIA, THIRD CIRCUIT IS AN APPROPRIATE VENUE UNDER 28 U.S.C, SECTION 1391 (b)(2) bECAUSE IT IS WHERE THE EVENTS GIVING RISE TO THIS CLAIM OCCURRED.

II. PLAINTIFF

2. PLAINTIFF, HENRY UNSELD WASHINGTON, IS AND WAS AT ALL TIMES MENTIONED THEREIN A PRISONER OF THE STATE OF PENNSYLVANIA IN THE CUSTODY OF THE

AC:2:15-CV-1031                    ①

PENNSYLVANIA DEPARTMENT OF CORRECTIONS, AT THE TIME OF THE ACTIONS CITED IN THIS LEGAL ACTION PLAINTIFF AT ALL TIMES HOUSED IN THE RHU AT SCI GREENE, IN WAYNESBURG, GREENE COUNTY, PA., PLAINTIFF, A DARK SKIN BLACK MALE IN A STATE OF RAPID FAILING HEALTH, WITH DEMENTIA; CURRENTLY CONFINED IN SCI-SOMERSET, IN SOMERSET, PA.

III. DEFENDANTS

3. DEFENDANT, ROBERT GILMORE, IS THE WARDEN OF SCI-GREENE, HE IS LEGALLY RESPONSIBLE FOR THE OVERALL OPERATION OF SCI-GREENE, AND FOR THE WELFARE OF ALL INMATES AT THAT PRISON.

4. DEFENDANT, MS. SHAWLEY, SHE IS THE WARDEN'S ASSISTANT, SHE IS LEGALLY RESPONSIBLE FOR THE GRIEVANCE SYSTEM, AND FOR THE WELFARE OF ALL INMATES IN THAT PRISON.

5. DEFENDANT, S. P. DURCO, IS THE RHU COMMANDER, HE IS LEGALLY RESPONSIBLE FOR THE OPERATION OF THE RHU OF SCI-GREENE, AND FOR THE WELFARE OF ALL INMATES IN THE RHU AT SCI-GREENE.

6. DEFENDANT, BARKEFELT, IS THE RHU LIEUTENANT OF SCI-GREENE. HE IS SECOND IN COMMAND AND LEGALLY RESPONSIBLE FOR THE OPERATIONS OF THE RHU, AND INMATES WELFARE IN THAT PRISON.

7. DEFENDANT, MORRIS IS THE RHU LIEUTENANT, HE IS LEGALLY SECOND IN RESPONSIBILITY FOR THE OPERATION OF THE RHU OF SCI-GREENE, AND FOR THE WELFARE OF ALL INMATES IN THAT RHU

8. DEFENDANT, WILLIAMS IS THE RHU LIEUTENANT AT SCI-GREENE, HE IS LEGALLY SECOND FOR THE RESPONSIBILITY OF ALL INMATES, AND THE OPERATIONS IN THAT RHU

9. DEFENDANT, CRABLE IS THE BLOCK SERGEANT OF G-UNIT, HE IS LEGALLY RESPONSIBLE FOR THE OPERATIONS OF G UNIT, RHU AT SCI-GREENE, AND FOR THE WELFARE OF ALL INMATES IN G-UNIT

10. DEFENDANT, SMITH IS G-BLOCK SERGEANT OF SCI-GREENE RHU, HE IS LEGALLY RESPONSIBLE FOR THE OPERATIONS OF G-BLOCK AND FOR THE WELFARE OF ALL INMATES IN THAT BLOCK

11. DEFENDANT, NELSON IS A CORRECTIONS OFFICER OF THE PA, D.O.C. WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT, HELD THE RANK OF BLOCK OFFICER (PROMOTED TO SERGEANT) AND WAS ASSIGNED TO SCI-GREENE.

12. DEFENDANT, OSWALD IS A CORRECTIONS OFFICER OF THE PA, D.O.C. WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT, HELD THE RANK OF G BLOCK OFFICER-N-SERGEANT, AND WAS ASSIGNED TO SCI-GREENE

13. DEFENDANT, BENNETT, IS A CORRECTIONS OFFICER OF THE PA DOC, WHO AT ALL TIMES MENTIONED IN THIS COMPLAINT HELD THE RANK OF PROPERTY OFFICER AND WAS ASSIGNED TO SCI-GREENE

14. DEFENDANT, MS. COMER IS A PA, SHE IS LEGALLY RESPONSIBLE PRESCRIBING MEDICIES FOR RHU INMATES AT SCI-GREENE, WHO AT ALL TIMES MENTIONED IN THIS COMPLAINT WAS PA ASSIGNED SCI-GREENE RHU

AC: 2:15-CV-1031

②

15. DEFENDANT, HENDRICKS IS A CORRECTIONS OFFICER OF THE PA. DOC WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT, HELD THE RANK OF BLOCK OFFICER AND WAS ASSIGNED TO SCI-GREENE

16. DEFENDANT, CADDY IS A CORRECTIONS OFFICER OF THE PA. DOC WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT HELD RANK OF POD OFFICER OF GA AND WAS ASSIGNED TO SCI-GREENE

17. DEFENDANT, HEGETER IS A CORRECTIONS OFFICER OF THE PA. DOC WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT HELD THE RANK OF G POD OFFICER, AND WAS ASSIGNED TO SCI-GREENE

18. DEFENDANT, FARRIER IS A CORRECTIONS OFFICER OF THE PA DOC WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT, HELD THE RANK OF RHU OFFICER AND WAS ASSIGNED TO SCI-GREENE

19. DEFENDANT, STUMP IS A CORRECTIONS OFFICER OF THE PA DOC WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT, HELD THE RANK OF RHU OFFICER AND WAS ASSIGNED TO SCI-GREENE.

20. DEFENDANT, MS. TAIT IS A CORRECTIONS OFFICER OF THE PA DOC WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT, HELD THE RANK G POD OFFICER AND WAS ASSIGNED TO SCI-GREENE

21. DEFENDANT, SUHAN IS A CORRECTIONS OFFICER OF THE PA DOC WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT, HELD THE RANK G-BLOCK OFFICER/SERGEANT AND WAS ASSIGNED TO SCI-GREENE

22. DEFENDANT, DENNISON IS A CORRECTIONS OFFICER OF PA DOC WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT, HELD THE RANK OF GB BLOCK OFFICER, AND WAS ASSIGNED TO SCI-GREENE.

23. DEFENDANT, VIHLIDAL IS HEALTH CARE ADMINISTRATOR, SHE IS LEGALLY RESPONSIBLE FOR OPERATION OF MEDICAL DEPARTMENT, AND FOR THE MEDICAL CARE OF ALL INMATES IN SCI-GREENE

24. DEFENDANT, JIN, IS MEDICAL DIRECTOR OF SCI-GREENE. HE IS LEGALLY RESPONSIBLE FOR THE OPERATION OF MEDICAL CARE FOR ALL INMATES AT SCI-GREENE RHU

25. DEFENDANT, PARK IS A DOCTOR AT SCI-GREENE. HE IS LEGALLY RESPONSIBLE FOR MEDICAL CARE FOR RHU INMATES, AND HE WAS ASSIGNED TO SCI-GREENE RHU

26. DEFENDANT, DASCANI IS A DOCTOR AT SCI-GREENE. HE IS LEGALLY RESPONSIBLE FOR THE MEDICAL CARE OF ALL RHU INMATES, AND WAS ASSIGNED TO SCI-GREENE RHU

27. DEFENDANT, MR. COMER IS A CORRECTIONS OFFICER OF THE PA DOC WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT, HELD THE RANK GA POD OFFICER, AND WAS ASSIGNED TO SCI-GREENE

28. DEFENDANT, MATTES IS A PA AT SCI-GREENE, SHE IS LEGALLY RESPONSIBLE FOR THE MEDICAL CARE FOR ALL RHU INMATES, AND WAS ASSIGNED TO SCI-GREENE RHU

29. DEFENDANT, MWAURA IS A PA. AT SCI-GREENE, SHE IS LEGALLY RESPONSIBLE FOR THE MEDICAL CARE OF ALL RHU INMATES, AND WAS ASSIGNED TO SCI-GREENE RHU

Washington000054

③

30. ALL DEFENDANTS ARE EMPLOYED AT SCI-GREENE; AND HAVE THIS MAILING ADDRESS : 175 PROGRESS DRIVE, WAYNESBURG, PA, 15370-8082

31. EACH DEFENDANT IS SUED INDIVIDUALLY AND IN HIS (OR HER) OFFICIAL CAPACITY. AT ALL TIMES MENTIONED IN THIS COMPLAINT EACH DEFENDANT ACTED UNDER THE COLOR OF STATE LAW.

## IV. STATEMENT OF CLAIM

32. DEFENDANTS VIOLATED PLAINTIFF FIRST AMENDMENT RIGHT : CONGRESS SHALL MAKE NO LAW RESPECTING AN ESTABLISHMENT OF RELIGION, OR PROHIB- ITING THE FREE EXERCISE THEREOF; OR ABRIDGING THE FREEDOM OF SPEECH, OR OF THE PRESS, OR THE RIGHT OF THE PEOPLE PEACEFULLY TO ASSEMBLE, AND TO PE- TITION THE GOVERNMENT FOR A REDRESS OF GRIEVANCESS

33. PLAINTIFF FIRST AMENDMENT RIGHT FREE SPEECH; TO PETITION THE GOVERN- MENT FOR AN REDRESS OF GRIEVANCES; AND THE FREE EXERCISE OF RELIGION WAS PROHIBITED

34. PLAINTIFF FOREGOING FIRST AMENDMENT RIGHTS WERE VIOLATED BY DEFEND- ANTS, R. GILMORE, T. SHAWLEY, S.P. DURCO, P.E. BARKEFELT, A. J. MORRIS, C. WILL- IAMS, G, CRABLE, J. M. SMITH, R. NELSON, T.S. OSWALD, L. COMER, T. I. BENNETT, R. HENDRICKS, J. CODDY, J. HEGETER, D. FARRIER, M. STUMP, G. TAIT, J. D. SUHAN, P. DENNISON, I. VIHLIDAL, B. JIN, M. PARK, P. DASCANI, M. COMER, E. MATT- ES, E. MWAURA.

35. PLAINTIFF EFFORTS TO PURSUE LEGAL ACTION OF PETITION TO REDRESS GRIEVANCES WERE HINDERED, ~~STYMIED~~ STYMIED -N- SEVERELY SLOWED, CAUSING PLAINTIFF CLAIM, WASHINGTON V. ~~FOLINO~~ FOLINO; 2:11-CV-1046 TO FAIL.

36. DEFENDANTS ACTIONS WOULD LIKELY HAVE DETERRED A REASONABLE PERSON FROM PURSUING THEIR RIGHTS UNDER THESE CONDITIONS

37. DEFENDANTS, ALL STATE ACTORS SUBJECTED PLAINTIFF TO ADVERSE ACTIONS

38. THE CONDUCT WHICH CAUSED DEFENDANTS ADVERSE REACTIONS AGAINST PLAINTIFF WERE PLAINTIFF ATTEMPT TO ACCESS THE COURT TO ADJUDICATE ON GOING CIVIL RIGHTS CONCERNS PROTECTED UNDER FIRST, EIGHT, AND FOURTEENTH AMEND- MENTS THE U.S. CONSTITUTION

AC: 2:15-CV-1031

(4)

39. PLAINTIFF CONDUCT OF PURSUING HIS CONSTITUTIONAL RIGHTS WAS REASONABLE

40. DEFENDANTS ACTIONS WERE DIRECTLY IN RESPONSE TO PLAINTIFF ATTEMPT TO PURSUE HIS CONSTITUTIONAL RIGHTS.

41. A CAUSAL LINK EXISTS BETWEEN PLAINTIFF PURSUIT OF HIS CONSTITUTIONAL RIGHTS AND THE ADVERSE ACTIONS TAKEN BY DEFENDANTS AS DEMONSTRATED BY THE PROXIMITY OF THE ACTIONS TO PLAINTIFF PURSUANT OF HIS RIGHTS AND THE DECLARATION MADE BY DEFENDANTS

42. PLAINTIFF ABILITY TO ADVANCE HIS CONSTITUTIONAL RIGHTS WAS INHIBITED IN THE FORM OF HIS INABILITY TO FULLY ENGAGE HIS RELIGION, AS WELL AS PURSUE JUSTICE FOR HIS CIVIL RIGHTS VIOLATIONS WITHOUT FEAR OF CRUEL-N-UNUSUAL PUNISHMENT.

43. PLAINTIFF REPORTS OF 1st, 8th, AND 14th AMENDMENT VIOLATIONS LED TO PROLONGED SOLITARY CONFINEMENT, WORSENING PLAINTIFF HEALTH CAUSING A SUBTANTIAL RISK THAT HE WILL BE SUBJECTED TO GREATER HARM IN THE FUTURE.

44. PLAINTIFF ~~EXISTED~~ EXISTED IN A PERPETUAL CYCLE OF DESIRING TO SEEK A REMEDY TO THE VIOLATIONS OF HIS RIGHTS, AS WELL AS A REMEDY HIS IMMEDIATE MEDICAL AND PHYSCIAL NEEDS, BUT SEEKING SUCH REMEDIES EXACERBATES ABUSES HE ENDURED CAUSING THE PROBLEM TO WORSEN.

45. PLAINTIFF, AN INDIGENT INMATE WAS DENIED WRITING PAPER WHICH CAUSED PLAINTIFF TO DRAFT HIS PLEADINGS TO WASHINGTON V. FOLINO, 2:11-CV-1046, IN TINY PRINT, TWO LINES PER SPACE TO PRESERVE SPACE DUE TO DENIAL OF WRITING PAPER, THIS REASON WAS THE BASIS FOR PLAINTIFF LEGAL ACTION BEING DISMISSED BY THE DISTRICT-N-3RD CIRCUIT.

46. PLAINTIFF RIGHTS OF ACCESS TO COURT, AND FREE SPEECH WERE STIFFLED ON MORE THAN ONE OCCASION BY CONDUCT BY DEFENDANT UNDER THE COLOR OF STATE LAW

47. PLAINTIFF IS A MEMBER OF THE CHILDREN OF THE SUN CHURCH, WHO'S BELIEF DICTATES A DAILY STUDY FOUR DIFFERENT SPIRITUALLY INSPIRED AFROKENTRIK BOOKS, OR LITERATURE ON A DAILY BASIS WAS DENIED SUCH BOOKS-N- LITERATURE.

48. IN A PRIOR SETTLEMENT AGREEMENT DEFENDANTS AGREED TO PROVIDE PLAINTIFF WITH HIS RELIGIOUS LITERATURE NEED TO CONDUCT THE DAILY RITUALS OF HIS RELIGION.

49. DEFENDANTS CONSISTENTLY DENIED PLAINTIFF ACCESS TO HIS OWN RELIGIOUS LITERATURE

ATURE ON A WEEKLY BASIS, ALWAYS CONDUCTED ON 2-10 SHIFT

50. DESPITE DEFENDANTS REQUIREMENT TO USE THE LEAST RESTRICTIVE MEANS IN RE-
GARDS TO ANY ENFORCEMENT UPON PLAINTIFF RELIGIOUS NEEDS, DEFENDANTS RE-
PEATLY DENIED PLAINTIFF ACCESS TO HIS OWN RELIGIOUS LITERATURE ~~BEFEO~~ WH-
ICH MADE THE PRACTICE OF HIS RELIGIOUS BELIEFS IMPOSSIBLE

51. DEFENDANTS OPENLY PROFESSED REGULARLY THAT PLAINTIFF HAVING SUED TH-
THEM PERSONALLY, SCI-GREENE DOC STAFF-N-MEDICAL PROFESSIONALS, OR THEIR
FAMILY MEMBERS, AND PLAINTIFF CONTINUOUS COMMUNICATIONS WITH AUTH-
ORITIES IS THE REASON WHY THEY DENIED PLAINTIFF THE PRACTICE OF HIS RELIG-
IOUS BELIEFS

52. DEFENDANTS MORE THAN ONCE, WHILE HOLDING PLAINTIFF OUT GOING LEGAL MAIL IN
HAND DECLARED TO PLAINTIFF THAT DUE TO HIS ONGOING LITIGATIONS AGAINST
DEFENDANTS HIS OUT GOING LEGAL MAIL WOULD BE DESTROYED, THEN PLAINTIFF OB-
SERVED DEFENDANTS RIP PLAINTIFF OUT GOING MAIL INTO SMALL PIECES AND THROW
IT IN THE TRASH CAN, DEFENDANT, GILMORE WAS AT PLAINTIFF DOOR WHEN THIS OC-
CURRED, AND HE DEONT ATTEMPT TO PREVENT IT

53. DEFENDANTS BARKEFELT, DURCO-N-MORRIS, CAME TO PLAINTIFF CELL UNREQUESTED,
SEPARATELY WITH PIECES OF PLAINTIFF OUT GOING MAIL IN HAND WHICH PLAINTIFF
HAD PLACED IN THE OUTGOING MAIL MOMENTS EARLIER, THEN RIPPED PLAINTIFF
MAIL INTO TINY PIECES, (ALSO DEFENDANT, P. DENNISON)

54. DEFENDANTS KNOWLEDGE OF PLAINTIFF ONGOING LITIGATION AGAINST THEM PERSONALLY OR
FELLOW SCI-GREENE STAFF, MEDICAL PROFESSIONALS, OR FAMILY MEMBERS WAS COMMON
ENOUGH SO DEFENDANTS OFTEN QUOTED THEM ACCORDING TO LEAD DEFFENDANT-N-CORRECT
DOCKET NUMBERS, e.g. <u>WASHINGTON</u> V. <u>FOLINO</u>, 2:11-CV-1046; <u>WASHINGTON</u> V. <u>FOLINO</u>,
NO. 644 AD 2014; <u>WASHINGTON</u> V. <u>GRACE</u>, 455 F. APPX 166 (3rd CIR., 2011); <u>WASH-
INGTON</u> V. <u>KLEM</u>, 497 F. 3d 272 (3rd CIR. 2007)

55. DEFENDANTS IN THEIR PERSONAL GREETINGS REFERRED TO PLAINTIFF A PAPER
PUSHER. A REFERENCE TO PLAINTIFF LITIGATIONS

56. DEFENDANTS WORDS TO PLAINTIFF WHILE IN THE MIDS VIOLATING HIS FIRST,
EIGHTH, AND FOURTEENTH AMENDMENT; THEIR ACTIONS WERE IN RESPONSE TO PL-
AINTIFF COMMUNICATING WITH AUTHORITIES; SUING US; YOU'RE SUING US, SO
WHAT DO YOU EXPECT; ATTACKED THE RHU FAMILY, WHEN PLAINTIFF SUED ONE

AC: 2:~~08~~15-CV-1031

Washington000057

(6)

HE HAD SUED THEM TOO; YOU'RE SUING MY FAMILY MEMBER; HE'S ONLY PROT-
ECTING FAMILY

57. EACH DEFENDANT PROFESSED REPEATEDLY-N-OPENLY THAT PLAINTIFF CONTINUOUS COMM-
UNICATIONS WITH AUTHORITIES, HAVING PETITIONED THE GOVERNMENT FOR A REDRESS
OF GRIEVANCES, i.e. SUING THEM, PURSUIT OF JUSTICE FOR DEFENDANTS VIOLATING
PLAINTIFF CIVIL RIGHTS; WAS THE MOTIVE FOR THEIR ADVERSE ACTIONS

58. DEFENDANTS R. GILMORE, T. SHAWLEY, S.P. DURCO, P.E. BARKEFELT, A.J. MORRIS, C.
WILLIAMS, G. CRABLE, J.M. SMITH, R. NELSON, T.S. OSWALD, L. COMER, T.I. BENNETT,
R. HENDRICKS, J. CODDY, J. HEBETER, D. FARRIER, M. STUMP, B. TAIT, J.O. SUHAN,
P. DENNISON, I. VIHLIDAL, B. JIN, M. PARK, P. DASCANI, M. COMER, E. MATTES,
E. MWAURA; VIOLATED PLAINTIFF RIGHT OF EQUAL PROTECTION UNDER
THE FOURTEENTH AMENDMENT, WHICH STATES, ALL PERSONS BORN OR NATURALIZED
IN THE UNITED STATES, AND SUBJECT TO THE JURISDICTION THEREOF, ARE CITIZENS OF THE
STATE WHEREIN THEY RESIDE. NO STATE SHALL MAKE OR ENFORCE ANY LAW WHICH SHALL
ABRIDGE THE PRIVILEGES OR IMMUNITIES OF CITIZENS OF THE UNITED STATES; NOR
SHALL ANY STATE DEPRIVE ANY PERSON OF LIFE, LIBERTY, OR PROPERTY, WITHOUT DUE
PROCESS OF LAW; NOR DENY TO ANY PERSON WITHIN ITS JURISDICTION THE EQUAL PRO-
TECTION OF LAWS.

59. DEFENDANTS, ALL STATE AGENTS, ACTED UNDER THE COLOR OF STATE LAW, DENIED
PLAINTIFF THE EQUAL PROTECTION OF THE LAW, PROVIDED UNDER 1st, 8th, AND 14th
AMENDMENTS, WHERE PLAINTIFF WAS DENIED THE SAME TREATMENT AS OTHERS.

60. DEFENDANTS CONSISTENLY PROVIDED ALL OTHER RHU INMATES ON SICK CALL, ESPECIAL-
LY WHITE INMATE MEDICAL CARE, SUCCESSFULLY PER THE CONSTITUTION, WHILE
CONDUCTING THE SAME EVENT, BASED ON NON-MEDICAL REASONS, DEFENDANTS DE-
NIED PLAINTIFF THE SAME CONSTITUTIONALLY PROTECTED RIGHT

61. DEFENDANTS CONSISTENTLY SINGLED PLAINTIFF OUT TO SUBJECT TO THEIR ABUSE.
THESE ARE ABUSES DEFENDANTS READILY WOULD OF, OR REASONABLY SHOULD HAVE
FORESEEN WOULD VIOLATE PLAINTIFF CONSTITUTIONAL PROTECTED RIGHTS. WHITE IN-
MATES WERE NOT SUBJECTED TO THESE ABUSES. DEFENDANTS, REPEATEDLY PROFESSED THEIR
ABUSE TO PLAINTIFF. WAS CONNECTED TO PLAINTIFF ONGOING LITIGATION AGAINST THEM

PERSONALLY, FELLOW SCI-GREENE DOC STAFF-N-MEDICAL PROFESSIONALS, OR FAMILY MEMBER, e.g. SUING ME-N-MEMBERS OF THE RHU AND MEDICAL STAFF; PENALIZE PLAINTIFF FOR SUING THEM

62. DEFENDANTS CONSISTENTLY PROVIDED THE OTHER INMATES IN SOLITARY CONFINEMENT THEIR FIRST, AND EIGHTH AMENDMENT RIGHTS, AND WHILE CONDUCTING THE SAME EVENT DEFENDANT BASED ON NON MEDICAL, OR NON PENOLOGICAL INTEREST DENIED PLAINTIFF THE SAME FIRST, AND EIGHTH AMENDMENT RIGHTS, ESPECIALLY IF THE OTHER INMATE WAS WHITE

63. DEFENDANTS, I, VIHLIDAL, B, JIN, M, PARK, P, DASCANI, M, COMER, E, MATTES, E, MWAURA, P, DENNISON, J, M, SMITH, R, NELSON, T, S, OSWALD, D, CARRIER, M, STUMP, AND J, D, SUHAN, VIOLATED PLAINTIFF EIGHTH AMENDMENT, WHICH STATES: EXCESSIVE BAIL SHALL NOT BE REQUIRED, NOR EXCESSIVE FINES IMPOSED, NOR CRUEL-N-UNUSUAL PUNISHMENT INFLICTED.

64. DEFENDANTS, ALL STATE AGENTS ACTED UNDER THE COLOR OF STATE LAW CONSISTENTLY INFLICTED CRUEL AND UNUSUAL PUNISHMENT UPON PLAINTIFF

65. DEFENDANTS VIOLATED PLAINTIFF EIGHTH AMENDMENT RIGHT TO BE FREE OF CRUEL N-UNUSUAL PUNISHMENT WHEN DEFENDANTS PHYSICALLY-N-SEXUALLY ASSAULTED, AND [INSERTED FINGER INTO PLAINTIFF RECTUM MORE THAN ONCE] SEXUALLY HARASSED PLAINTIFF DURING SICK CALL VISITS, AND ESCORTING PLAINTIFF. AND CAUSED PSYCHOLOGICAL DAMAGES.

66. DEFENDANT, DURING AN INSTANCE WHEN PLAINTIFF WAS EXPERIENCING HEART ATTACK SYMPTOMPS DEFENDANT, STATED TO PLAINTIFF, WHAT YOU NEED IS A GOOD SCREWING, CAUSED PSYCHOLOGICAL DAMAGES.

67. DEFENDANTS, TOUCHED PLAINTIFF UNWANTEDLY, AND BANTERED FOR SEX, AND LEFT PLAINTIFF NUDE FACE DOWN ON THE FLOOR, AND CAUSED PSYCHOLOGICAL DAMAGE

68. DEFENDANTS, WHILE PLAINTIFF WAS IN NEED OF IMMEDIATE MEDICAL CARE LEFT PLAINTIFF IN THE NUDE-N-SPRAWLED OUT ON THE FLOOR AS DEFENDANTS WALKED AWAY LAUGHING

69. DEFENDANT, WHILE PLAINTIFF WAS EXPERIENCING EMERGENCY MEDICAL NEED REQUESTED SEX DESPITE PLAINTIFF BEGGING FOR MEDICAL CARE, AND CAUSED PSYCHOLOGICAL DAMAGES

70. PLAINTIFF HAS SEVERAL HEALTH PROBLEMS THAT ON GOING FOR YEARS, AND FOR THE PURPOSE OF THIS LEGAL ACTION WILL BE REFERRED TO AS CHRONIC AILMENT THROUGHOUT, i.e. NON STOP EXCRUCIATING PAINFUL INTESTINAL GRIPE AND EXTREME DISCOMFORT, DIFFICULTY BREATHING, SPEAKING, REMAINING UPRIGHT, REMAINING AWAKE, NEAR BLIND IN

RIGHT EYE, DEMENTIA, SWOLLEN ANKLES, DIARRHEA CAUSED BY FOOD SERVED TO INMATES, EXTREME DRY SKIN, DRIPPING SEMEN, MEMORY LOSS, CONTINUOUS NOSE BLEEDS-N-FATIGUE, TESTOSTERONE DEFIENCY, URETHRAL STRICTURE, IRREVERSIBLE FOOT FUNGUS, DEFORMED FINGERS-N-ELBOWS, INTENSE CHEST PAIN, TROUBLE CONCENTRATING, ACCORDING TO DEFENDANTS PLAINTIFF EXPERIENCED TWO HEART ATTACKS, etc,

71, DEFENDANTS DECLARED PLAINTIFF NEEDED IMMEDIATE EMERGENCY MEDICAL CARE, THEN ACTED WITH DELIBERATE INDIFFERENCE, AT ALL TIMES MENTIONED IN THIS COMPLAINT, REFERRING TO WORDS DECLARED BY THAT MEDICAL PROFFESIONALS AT ALL TIMES RELEVANT TO THIS CASE

72, AT ALL TIMES REVELANT TO THIS CASE DEFFENDANTS DENIED PLAINTIFF MEDICAL CARE HAVING NOT TOUCHED PLAINTIFF PHYSICALLY, NOT EVEN A CURSORY EXAM OF BLOOD PRESURE, TEMPERATURE, HEART RATE, BREATHENG PATTERN-N-PUPIL DILATION; NO LAB TEST OF BLOOD, URINE OR STOOL SAMPLE, OR PAP SMEAR

73, AT ALL TIMES REVELANT TO THIS CASE DEFFENDANTS, B, JIN, E, MWAURA, E, MATTES AND P. DASCANI RESPOND TO PLAINTIFF PLEAS FOR IMMEDIATE MEDICAL CARE BY RAISING THEIR MIDDLE FINGER THEN WALKED AWAY

74, AT ALL TIMES REVELANT TO THIS CASE DEFFENDANTS, I. VIHLIDAL, B, JIN, M, PARK, P. DASCANI, M, COMER, E, MWAURA PROFESSED CONTINUOUSLY THAT THEIR ACTIONS WEARE DONE TO PLAINTIFF TO PENALIZE PLAINTIFF FOR SUING THEM PERSONALLY, AND OR FOR SUING SCI-GREENE DOC STAFF-N-MEDICAL PROFESSIONALS, AND HIS CONTINUOUS COMMUNICATIONS WITH AUTHORITIES,

75, OVER A SIX YEARS SPAN PLAINTIFF HAD EXPERIENCED A SUBSTANTIAL-N-RAPID LOSS OF WEIGHT ASSOCIATED TO HIS ONGOING FAILING HEALTH, ISSUES

76, DEFENDANTS ACKNOWLEDGED PLAINTIFF HEALTH NEEDS WARRANTED IMMEDIATE MEDICAL CARE, AND CHOSE TO IGNORE THEM. ONE DEFENDANT TOLD PLAINTIFF DIRECTLY THAT HE IS NOT GOING TO WASTE TIME ON HELPING PLAINTIFF

77, DEFENDANT, B, JIN HAS HAD SEVERAL ISSUES WITH PLACENTIFF IN THE PAST, INSISTED ON BEING THE ONLY MEDICAL DOCTOR TO RESPOND TO ALL OF PLAINTIFF REQUEST FOR MEDICAL CARE, DESPITE PLAINTIFF MANY REQUEST THAT DEFENDANT, JIN NOT, MORE THAN ONCE DEFENDANT, JIN TOUCHED PLAINTIFF INAPPROPRIATTELY, AND MADE OFFENSIVE SEXUAL COM-

MENT TO PLAINTIFF, OTHER INMATES IN SOLITARY CONFINEMENT WERE TREATED BY MEDICAL STAFF OTHER THAN DEFENDANTS, JIN, M, PARK UPON REQUEST, ESPECIALLY WHITE INMATES, BUT PLAINTIFF REQUEST WERE ROUTINELY DENIED

78. DEFENDANTS, DURING FEW SICK CALL, WHERE PLAINTIFF WAS EXPERIENCING HEALTH SYMPTOMS THAT WOULD REQUIRE EMERGENCY MEDICAL CARE DEFENDANTS, B, JIN, AND P, DASCANI INSTRUCTED PLAINTIFF TO REMOVE ALL CLOTHING AND DO SEXUAL POSES, AND CAUSED PSYCHOLOGICAL DAMAGES

79. PLAINTIFF ALREADY FRAGILE MEDICAL STATE WAS EXACERBATED BY THE LACK OF INTER- VENTION BY DEFENDANTS, R, GILMORE, T, SHAWLEY, AND I, VIHLIDAL, WHOM WERE EACH MADE AWARE DURING SEPARATE INTERVIEWS WITH PLAINTIFF, CONCERNING DENIAL OF FREE EXERCISE OF RELIGION, MEDICAL CARE -N- SEXUAL ABUSES BY DOC STAFF-N-MEDICAL PROFESSIONALS, AWARE OR REA- SONABLY SHOULD HAVE BEEN AWARE, BUT ACTED WITH DELIBERATE INDIFFERENCE IN THEIR REFUSAL TO INTERVENE OR PREVENT

80. DEFENDANTS. AT TIMES ACTED AS PARTY TO THE ABUSE AND CONDUCTED IT, BOTH THROUGH TH- EIR ~~ACTIONS~~ INACTIONS-N-ENCOURAGEMENT

81. AT ALL TIMES RELEVANT TO THIS COMPLAINT, UNLESS STATED OTHERWISE, 1st, 4th, AND 8th AMENDMENT VIOLATIONS OCCURRED IN THE RHU, IN REFERENCE TO LOCATION

82. AT ALL TIMES RELEVANT TO THIS COMPLAINT SICK CALL IS ALWAYS A EARLY MORN- ING EVENT, AND PLAINTIFF HOUSING UNIT WAS THE LAST TO RECEIVE A WALL CLOCK SO TH- ROUGH OUT, THIS LEGAL ACTION A, M, WILL DESIGNATE SICK CALL TIME OF OCCURRANCES,

83. AT ALL TIMES RELEVANT TO THIS COMPLAINT DURING EACH SICK CALL PLAINTIFF WAS EXPERIENCING NON STOP EXCRUCIATING PAIN-N-EXTREME DISCOMFORT.

84. AT ALL TIMES RELEVANT TO THIS COMPLAINT DEFENDANTS DENIAL OF MEDICAL CARE, FREE SPEECH -N- EQUAL PROTECTION WAS DONE BASED ON NON MEDICAL, AND NON PENOLOGICAL REASONS

85. DEFENDANT, D, FARRIER -M,M, STUMP, T,S, OSWALD, WHILE ESCORTING PLAINTIFF TO HIS SELL CELL RUBBED PLAINTIFF BUTT- INSERTED HIS FINGER INTO PLAINTIFF RECTUM ON THREE SEPARATE OCCASIONS OCK IN AN UNWELCOMED WAY, AND MADE LEWD MOANING SOUNDS IN PLAINTIFF EAR, SIMULAT- ING AN ORGASM, AND CAUSED PSYCHOLOGICAL DAMAGES

86. AT ALL TIMES RELEVANT TO THIS COMPLAINT, DEFENDANTS AT TIMES DID VISIT PLAINTIFF THE MEDICAL CARE PROVIDED WAS NOT UP TO OBLIGATIONS ESTABLISHED UNDER THE EIGHT AMEND- MENT

Washington000061

AC: 2:15-CV-1031            (10)

## V. STATEMENT OF FACTS

COUNT ONE : CRUEL-N-UNUSUAL PUNISHMENT, AND EQUAL PROTECTION

87. PLAINTIFF ALLEGES AND INCORPORATE BY REFERENCE PARAGRAPHS 1-86

88. ON OR NEAR 7.8.13, SICK CALL, DEFENDANT, DR. B. JIN DELIBERATE INDIFFERENCE TO PLAIN-TIFF CHRONIC AILMENTS (SEE, 38,46,59-62,64,68-72,74,76,81,84,86) DEFENDANT, JIN WALKED AWAY WHILE PLAINTIFF WAS CLUTCHING HIS CHEST WITH BOTH HANDS-N-GASPING FOR AIR.

89. ON OR NEAR 7.8.13, SAME EVENT, DEFENDANT, DR. JIN, HAVING SUCCESSFULLY PROVIDED MEDICAL CARE TO OTHER INMATE, PLAINTIFF WAS DENIED THE SAME CARE. DEFENDANT, JIN RESPONSE TO PLAINTIFF SERIOUS MEDICAL NEEDS (SEE,63-66, 73, 77, 82,83) AND BEGIN TO MIMICK KISSING PLAINT-IFF WHILE DEFENDANT, JIN RUBBED HIS PENIS, VIOLATED PLAINTIFF RIGHTS, CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT-N-EQUAL PROTECTION PER EIGHTH-N-FOURTEENTH AMENDMENTS, PSYCHOLOG-ICALLY DAMAGED

90. ON OR NEAR 7.26.13, SICK CALL, DEFENDANT, DR, B, JIN. DELIBERATE INDIFFERENCE TO PLAINT-IFF PAIN-N-DISCOMFORT-N-CHRONIC AILMENTS (SEE, 38, 46, 59-62, 64, 69-72, 74,76, 81, 84, 86) (ALSO SEE, 63,65, 66,68,73,77, 82,83) RESPONSE, HE WAS GOING TO GIVE PLAINTIFF A GOOD FUCKING. VIOLATED PLAINTIFF RIGHTS, CON-STITUTED CRUEL-N-UNUSUAL PUNISHMENT UNDER EIGHTH AMENDMENT, AND CAUSED PSYCHOLO-GICAL DAMAGE

91. ON OR NEAR 8.23.13, SICK CALL, DEFENDANT, DR, B, JIN DELIBERATE INDIFFERENCE TO PLAINTIFF PAIN-N-DISCOMFORT. DECLARED PLAINTIFF NEEDED HIM TO GIVE PLAINTIFF A GOOD FUCKING. THOSE WORDS WERE SPOKE WHILE DEFENDANT JIN WAS HOLDING HIS PENIS IN HAND. (SEE, 38, 44,59-66, 68-74, 76, 77, 81-84, 86) VIOLATED PLAINTIFF RIGHTS, CONSTITUTED CRUEL-N-UNUSUAL PUNISH-MENT PER EIGHTH AMENDMENT, AND CAUSED PSYCHOLOGICAL DAMAGE

92. ON OR NEAR 8.29.13, SICK CALL, DEFENDANT, DR, M, PARK DELIBERATE INDIFFERENCE TO PLAINT-IFF PAIN-N-SUFFERING RESPONSE WAS TO (SEE, 38, 46,59-64, 70-72, 74-76, 81-84, 86) WALK AWAY LEAVING PLAINTIFF ON THE FLOOR GASPING FOR AIR, VIOLATED PLAINTIFF RIGHTS AND CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT UNDER EIGHTH AMENDMENT

93. ON OR NEAR 9.5.13, SICK CALL, DEFENDANT, DR, B, JIN DELIBERATE INDIFFERENCE TO PLAINTIFF CH-RONIC AILMENTS CAUSING PAIN-N-DISCOMFORT TO SUCH DEGREE PLAINTIFF LEANED ON THE WALL TO REMAIN UP RIGHT (SEE, 38, 46, 59-62, 64, 68, 70-73, 74, 74-76, 81-84, 86) DEFENDANT, JIN WALKED AWAY CLAPPING-N-SINGING. VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

94. ON OR NEAR 9.26.13, SICK CALL, DEFENDANT, DR, B, JIN DELIBERATE INDIFFERENCE TO PLAINT-

IFF PAIN-N-████████ DISCOMFORT WHEREBY PLAINTIFF HAD TO CRAW TO THE DOOR. DEFENDANT, JIN WALKED AWAY LEAVING PLAINTIFF ON HIS KNEES GASPING FOR AIR, HAVING ALREADY SAID TO PLAINTIFF, OH, SUGAR YOU SICK, I GIVE YOU SOME DICK, AND YOU'LL FELL BETTER (SEE, 38, 46, 59-62, 64, 69-72, 74-78, 81-84, 86, 63, 65-68) VIOLATED PLAINTIFF RIGHTS, CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT, AND CAUSED PSYCHOLOGICAL DAMAGE

95. ON OR NEAR 12, 17, 13, SICK CALL; DEFENDANT, DR. B. JIN DELIBERATE INDIFFERENCE TO PLAINTIFF PAIN-N-DISCOMFORT DUE TO CHRONIC AILMENTS WALKED AWAY AFTER HAVING INSTRUCTED PLAINTIFF TO REMOVE ALL CLOTHING-N-LITE FACE DOWN ON THE FLOOR; <ins>LYING NUDE ON THE FLOOR</ins> PLAINTIFF CLUTCHING HIS CHEST, MOUTH AGAPED FOR AIR (SEE, 38, 46, 59-72, 74-78, 81-84, 86) VIOLATED PLAINTIFF RIGHTS, CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT; AND CAUSED PSYCHOLOGICAL DAMAGE

96. ON OR NEAR 12, 17, 13, SICK CALL, SAME EVENT, DEFENDANT, DR, JIN, B; DELIBERATE INDIFFERENCE TO PLAINTIFF SERIOUS MEDICAL NEEDS WAS TO INSTRUCT PLAINTIFF TO TURN HIS BACK TO DEFENDANT, JIN, BEND AT THE WAIST WHILE USING BOTH HANDS TO SPREAD THE CHEEKS OF HIS BUTTOCK, DEFENDANT, JIN BEGUN TO MAKE SOUNDS AS IF HE WAS EXPERIENCING AN ORGASM, OH, MAMA, PLAINTIFF SANKED TO THE FLOOR (SEE, 38, 46, 59-72, 74-78, 81-84, 86) VIOLATED PLAINTIFF RIGHTS, CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHT AMENDMENT; AND CAUSED PSYCHOLOGICAL DAMAGE.

97. ON OR NEAR 12, 19, 13, SICK CALL; DEFENDANT, DR, B, JIN; DEFENDANT, JIN DELIBERATE INDIFFERENCE TO PLAINTIFF PAIN-N-DISCOMFORT, WHICH DEFENDANT, JIN DECLARED NEEDED IMMEDIATE EMERGENCY MEDICAL CARE, THEN INSTRUCTED PLAINTIFF TO REMOVE ALL CLOTHING, PULL BACK THE FORESKIN OF HIS PENIS, DEFENDANT, JIN SAID WHISPERING TO PLAINTIFF, OH HONEY, OH, HONEY; AND MIMICKED KISSING PLAINTIFF, AND RUBBING HIS OWN PENIS (SEE, 38, 46, 59-72, 74-78, 81-84, 86).

98. ON OR NEAR 12, 19, 13, SAME EVENT; DEFENDANT, DR, B, JIN, WALKED AWAY HOLDING HIS PENIS IN HAND LEAVING PLAINTIFF IN THE NUDE SLUMPED AGAINST THE DOOR IN PAIN-N-DISCOMFORT (SEE, 38, 46, 59-72, 74-78, 81-84, 86) STRUGGLING TO BREATHE VIOLATED PLAINTIFF RIGHTS, CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT; AND CAUSED PSYCHOLOGICAL DAMAGE

99. ON OR NEAR 12, 47, 13, SICK CALL; DEFENDANT, DR, JIN, B.; DELIBERATE INDIFFERENCE TO PLAINTIFF CHRONIC, AILMENTS DEFENDANT, JIN ALREADY DECLARED WARRANTED IMMEDIATE MEDICAL CARE, DEFENDANT, JIN, REFERRING TO PLAINTIFF AS, BABY, INSTRUCTED PLAINTIFF TO REMOVE ALL CLOTHING (SEE, 38, 46, 59-72, 74-78, 81-84, 86), SAID TO PLAINTIFF, BABY, ARE YOU READY FOR DADDY TO GIVE

AC:2:15-CV-P83
Washington000063

(12)

YOU A GOOD FUCKING, YOU'LL FEEL BETTER VIOLATED PLAINTIFF RIGHTS, CONSTITUTED CRUEL-N-UN-

USUAL PUNISHMENT PER EIGHTH AMENDMENT, AND CAUSED PSYCHOLOGICAL DAMAGES.

100. ON OR NEAR 1,9,14, SICK CALL, DEFENDANT, DR. M, PARK, DELIBERATE INDIFFERENCE TO PLAINTIFF PAIN-

N-DISCOMFORT CAUSED BY CHRONIC AILMENTS DEFENDANT, PARK DECLARED NEEDED IMMEDIATE EM-

ERGENCY CARE (SEE, 38, 46, 59-62, 70-72, 74-76, 81-84, 86) HAVING A SCALPEL IN HAND, HE INSTRUCTED PL-

AINTIFF TO COME TO THE DOOR, SAID TO PLAINTIFF FIRST CHANCE HE GET HE WAS GOING TO SLIT

PLAINTIFF THROAT, VIOLATED PLAINTIFF RIGHTS, CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT-N-

CAUSED PSYCHOLOGICAL DAMAGE

101. ON OR NEAR 1.24.14, SICK CALL, DEFENDANT, DR. B, JIN, DELIBERATE INDIFFERENCE TO PLAINT-

IFF PAIN-N-DISCOMFORT INSTRUCTED PLAINTIFF TO COME TO THIS DOOR, DEFENDANT, JIN EYES SPARKLED

WITH WILD EXCITEMENT, HE ASKED PLAINTIFF TO SHOW HIM HIS ASSHOLE, PLEASE SWEETHEART, DE-

FENDANT, JIN OBSERVED PLAINTIFF SINK TO THE FLOOR IN PAIN HOLDING HIS CHEST, PANTING, BEGG-

ING (SEE, 38, 46, 59-72, 74-77, 81-84, 86) DEFENDANT, JIN FOR MEDICAL CARE, DADDY WANT TO SEE YOUR

ASSHOLE, BABY, THEN WALKED AWAY LEAVING PLAINTIFF SPRAWLED OUT ON THE FLOOR, VIOLATED PLAINT-

IFF RIGHTS, CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT, PER EIGHTH AMENDMENT, AND CAUSED PSYCHOL-

OGIST DAMAGES

102. ON OR NEAR 2.21.14, SICK CALL, DEFENDANT, MS, M, COMER, PACS DELIBERATE INDIFFERENCE TO PL-

AINTIFF PAIN-N-DISCOMFORT, PROCLAIMED PLAINTIFF NEEDED IMMEDIATE EMERGENCY MEDICAL

CARE (SEE, 38, 46, 59-62, 64, 68, 70-72, 74-76, 81-84, 86) THEN WALKED AWAY LEAVING PLAINTIFF

BEGGING HER FOR MEDICAL CARE AS HE IS STRUGGLED TO BREATHE VIOLATED PLAINTIFF RIGHTS, CON-

STITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT, AND CAUSED PSYCHOLOGICAL DAM-

AGE

103. ON OR NEAR 4, 30, 14, SICK CALL, DEFENDANT, DR. B, JIN, DELIBERATE INDIFFER-

ENCE TO PLAINTIFF INABILITY TO RAISE HIS VOICE ABOVE A WHISPER, AND PAIN-N-DISCOMFORT IN-

STRUCTED PLAINTIFF TO REMOVE HIS CLOTHING, SHOW DEFENDANT, JIN THE HEAD OF HIS PENIS, AS DE-

FENDANT, JIN WET HIS LIPS-N-GAWKING AT THE SIGHT OF PLAINTIFF PENIS WHILE DEFENDANT,

JIN RUBBED HIS OWN CHEST-N-MADE SOUNDS LIKEN TO A FEMALE EXPERIENCING AN ORGASM,

104. ON OR NEAR 4, 30, 14, SAME EVENT, DEFENDANT, DR. JIN, DELIBERATE INDIFFERENCE TO PLEASE SER-

IOUS MEDICAL NEEDS (SEE, 38, 46, 59-72, 74-78, 81-84, 86) WALKED AWAY HOLDING HIS PENIS IN

HAND LEAVING PLAINTIFF IN THE NUDE, STRUGGLING TO SPEAK, VIOLATED PLAINTIFF RIGHTS CONSTIT-

UTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT, AND CAUSED PSYCHO-

LOGICAL DAMAGE

AC: 15-Washington 000064

(13)

105. On or near 5.2,14, sick call, defendant, Dr. M. Park deliberate indifference to plaintiff pain-n-discomfort, and chronic ailment (see, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) walked away leaving plaintiff gasping for air (see, 75, 76, 68) on hands-n-knees due to lack of strenth, begging for medical care violated plaintiff rights and constituted cruel-n-unusual punishment, per eighth amendment, and caused psychological damage

106. On or near 5.12,14, sick call, defendant, Dr. M. Park, deliberate indifferenc to plaintiff chronic ailments-n-pain and discomfort (see, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) walked away leaving plaintiff on the floor wedged between, the door-n-door frame begging for medical care, mouth agape struggling to breathe violated plaintiff rights, and constituted cruel-n-unusual punishment per eight amendment

107. On or near 5.16.14, sick call, defendant, Dr. M. Park deliberate indifference to plaintiff chronic ailment, whereby plaintiff so weak plaintiff used walls to remain standing. Defendant, Park walked away (see, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) leaving plaintiff too weak to stand without the aid of the walls, begging for medical care violated plaintiff rights, and constituted cruel-n-unusual punishment per eighth amendment

108. On or near 5.27.14, sick call, defendant, Dr. M. Park deliberate indifference to plaintiff chronic ailments, barely audible, unable to stand; on his knees resting on the side of the bed begging for medical care (see, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) defendant, Park walked away leaving plaintiff on his knees begging for medical care violated plaintiff rights-n-constituted cruel-n-unusual punishment per eighth amendment

109. On or near 6.12,14, sick call, defendant, Dr. M. Park deliberate indifference to plaintiff chronic ailments, i.e, serious medical needs (see, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) walked away leaving plaintiff in agonizing pain-n-discomfort violated plaintiff rights-n-constituted cruel-n-unusual punishment per eighth amendment

110. On or near 6.13,14, sick call, defendant, Dr. B. Jin deliberate indifference to plaintiff serious medical needs, having collapsed, while on the floor struggling to get to his feet, defendant, Jin said to plaintiff, show me your black ass, I want to see your ass, mimicking kissing plaintiff (see, 38, 46, 59-73, 74-78, 81-84, 86) walked away as plaintiff was falling back to the floor in a state of pain-n-discomfort, struggling to breathe, begging for medical care, violated plaintiff rights, constituted cruel-n-unusual

AC: 2:15-CV-1031

Washington000065

PUNISHMENT PER EIGHTH AMENT, AND CAUSED PSYCHOLOGICAL DAMAGE

111. ON OR NEAR 6.23.14; SICK CALL; DEFENDANT, DR. M. PARK DECLARED PLAINTIFF NEEDED IMMEDIATE EMERGENCY MEDICAL CARE, THEN RESPONDED WITH DELIBERATE INDIFFERENCE TO PLAINTIFF SERIOUS MEDICAL NEEDS (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) WALKED AWAY LEAVING PLAINTIFF EXPERIENCING CHEST PAIN, STRUGGLING TO BREATHE, AND IN PAIN-N-DISCOMFORT VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER 8th AMEND.

112. ON OR NEAR 6.26.14; SICK CALL; DEFENDANT, DR. M. PARK DELIBERATE INDIFFERENCE TO WITNESSING PLAINTIFF COLLAPSE WHILE EXPLAINING THE SOURCE OF HIS ON GOING PAIN-N-DISCOMFORT (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) WALKED AWAY LEAVING PLAINTIFF LYING FACE DOWN ON THE FLOOR GASPING FOR AIR-N-PLEADING FOR MEDICAL CARE, VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

113. ON OR NEAR 6.27.14; SICK CALL; DEFENDANT, DR. M. PARK DELIBERATE INDIFFERENCE TO PLAINTIFF EXPERIENCING PAIN-N-DISCOMFORT TO THE EXTENT PLAINTIFF HAD TO USE THE WALL-N-DOOR FRAME TO REMAIN UPRIGHT, (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) WALKED AWAY LEAVING PLAINTIFF BEGGING FOR MEDICAL CARE VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER 8th AMENDMENT

114. ON OR NEAR 7.11.14; SICK CALL; DEFENDANT, DR. PARK, M.; DELIBERATE INDIFFERENCE TO PLAINTIFF INABILITY TO STAND UPRIGHT, PAIN-N-DISCOMFORT CAUSED BY CHRONIC AILMENTS, DEFENDANT, PARK WALKED AWAY (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) LEAVING PLAINTIFF CLINGING TO WALLS-N-DOOR FRAME TO REMAIN UPRIGHT, HAVING MOUTH AGAPED TO BREATHE, PLEADING FOR MEDICAL CARE VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT,

115. ON OR NEAR 7.14.14; SICK CALL; DEFENDANT, DR. M. PARK DELIBERATE INDIFFERENCE TO PLAINTIFF UNABLE TO STAND UPRIGHT-N CHRONIC AILMENTS WALKED AWAY LEAVING PLAINTIFF STRUGGLING TO REMAIN UPRIGHT, IN PAIN-N-DISCOMFORT BEGGING FOR MEDICAL CARE VIOLATED PLAINTIFF RIGHTS-N- (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER 8th AMD,

116. ON OR NEAR 7.18.14; SICK CALL; DEFENDANT, DR. M. PARK DELIBERATE INDIFFERENCE TO WITNESSING PLAINTIFF COLLAPSE WHILE EXPLAINING CHRONIC AILMENTS, AND PAIN-N-DISCOMFORT (SEE, 38, 46, 59-64, 70-74, 74-76, 81-84, 86) WALKED AWAY LEAVING PLAINTIFF BEGGING FOR PAIN MEDICINE, WHICH FELL ON DEAF EARS, PLAINTIFF ON HANDS-N-KNEES VIOLATED PLAINTIFF RIGHTS,-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENTS.

117. ON OR NEAR 7.21.14; SICK CALL; DEFENDANT, DR. M. PARK, DELIBERATE INDIFFERENCE

Washington00008

TO PLAINTIFF LOSS OF EYE SIGHT IN RIGHT EYE, AND DRIPPING SEMEN, WALKED AWAY LEAVING

PLAINTIFF WITH NO EYESIGHT IN RIGHT, DRIPPING SEMEN, PANTING FOR AIR, BEGGING FOR

MEDICAL CARE WHILE IN PAIN-N-DISCOMFORT (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) VI-

OLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT, PER EIGHTH AMEND.

118. ON OR NEAR 7, 24, 14, 'SICK CALL' DEFENDANT, DR, M, PARK DELIBERATE INDIFFERENCE TO

PLAINTIFF CHRONIC AILMENTS, WHEREBY PLAINTIFF SO WEAK BARELY ABLE TO STAND, ST-

RUGGLING TO BREATHE, DEFENDANT, PARK WITNESSED PLAINTIFF CLUTCHING HIS DOOR FR-

AME TO AVOID FALLING TO THE FLOOR DUE TO LACK OF STRENGTH

119. ON OR NEAR 7, 24, 14, SAME EVENT, DEFENDANT, DR, M, PARK RESPONDED TO PLAINTIFF

SERIOUS MEDICAL NEEDS BY WALKING AWAY LEAVING PLAINTIFF IN PAIN-N-DISCOM-

FORT (SEE, 38, 46, 59-62, 70-72, 74-76, 81-84, 86) VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED

CRUEL-N-UNUSUAL PUNISHMENT PER EIGHT AMENDMENT

120. ON OR NEAR 7, 25, 14, 'SICK CALL' DEFENDANT, DR. M, PARK DELIBERATE INDIFFERENCE TO

HIS HAVING DISCOVERED PLAINTIFF ON THE FLOOR TOO WEAK TO GET TO HIS FEET, DEFEND-

ANT, PARK (SEE, 38, 46, 59-62, 70-72, 74-76, 81-84, 86) WALKED AWAY WHILE PLAINTIFF ON THE FLOOR,

MOUTH AGAPED, STRUGGLING TO BREATHE-N-SPEAK IN PAIN-N-DISCOMFORT VIOLATED PLAINTIFF

RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENT

121. ON OR NEAR 8, 7, 14, SICK CALL' DEFENDANT, DR, B, JIN DELIBERATE INDIFFERENCE TO PLAINT-

IFF, TOO WEAK TO STAND UPRIGHT, HAVING TO WALK BENDING AT THE WAIST TO COME TO DOOR TO BE

SEEN BY DEFENDANT, JIN CONCERNING CHRONIC AILMENTS (SEE, 38, 46, 59-73, 74-78, 81-84, 86)

122. ON OR NEAR 8, 7, 14, SAME EVENT' DEFENDANT, DR, B, JIN INSTRUCTED PLAINTIFF TO REMOVE ALL

CLOTHING, GET ON HIS KNEES, SPREAD THE CHEEKS OF HIS BUTTOCK; OH! MAN LOOK AT THAT PUSSY, STRUGG-

LING TO GET HIS CLOTHING BACK ON PLAINTIFF LOSS HIS BALANCE-N-FELL IN THE CORNER OF THE WALL-

N-THE DOOR, DEFENDANT, JIN SAID, MY GOODNESS WHAT A GORGEOUS SHAPED ASS, I WILL PUT MY DICK

IN YOUR ASSHOLE, AND YOU'LL BE JUST FINE. DEFENDANT, JIN WALKED AWAY LEAVING PLAINTIFF TOO WEAK

TO PULL <sup>UP</sup> HIS JUMPSUIT, UNABLE TO STAND UPRIGHT, NEAR BLIND IN RIGHT EYE, BEGGING <sup>FOR</sup> MEDICAL CARE, IN A

PAIN-N-DISCOMFORT, VIOLATED PLAINTIFF RIGHTS-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER

EIGHT AMENDMENT, AND CAUSED PSYCHOLOGICAL DAMAGE

123. ON OR NEAR 8, 8, 14, SICK CALL' DEFENDANT, DR, M, PARK DELIBERATE INDIFFERENCE TO HIS DIS-

COVERY OF PLAINTIFF LYING AGAINST THE WALL, TOO WEAK TO STAND, STRUGGLING TO SPEAK, WALKED

A WAY (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) LEAVING PLAINTIFF BEGGING FOR MEDICAL CARE VIOLAT-ED PLAINTIFF RIGHTS -N- CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHT AMENDMENT

124. On or near 8.25.14, SICK CALL; DEFENDANT, F. MATTES, PACS, DELIBERATE INDIFFERENCE TO PLAINTIFF, SO WEAK HE HAD TO CRAWL TO THE DOOR DUE TO CHRONIC AILMENTS (SEE, 38, 46, 59-62, 64, 68-77, 81-84, 86) WALKED AWAY LEAVING PLAINTIFF IN PAIN -N- DISCOMFORT, TOO WEAK TO RISE TO HIS FEET, NEAR BLIND IN RIGHT EYE -N- STRUGGLING TO BREATHE VIOLATED PLAINTIFF RIGHTS -N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

125. On or near 9.8.14, SICK CALL; DEFENDANT, F. MATTES, PACS. DELIBERATE INDIFFERENCE TO PLAINT-IFF ONLY ABLE TO STAND BENDING AT THE WAIST, AND GASPING FOR AIR, AND CHRONIC AILMENTS (SEE, 38, 46, 59-62, 64, 68-77, 81-84, 86) WALKED AWAY LEAVING PLAINTIFF IN PAIN -N- DIS COMFORT BEGGING FOR MEDICINES TO RELIEVE PAIN, VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSHAL PUNISHMENT PER 8th. AMENDMENT

126. On or near 9.15.14, SICK CALL; DEFENDANT, DR. M. PARK, DELIBERATE INDIFFERENCE TO PLAINTIFF HAVING TO REST ON ONE KNEE TO BREATHE. DEFENDANT, PARK EXCLAIMED, HE WILL NOT PROVIDE PLAINTIFF MEDICAL CARE BECAUSE HE WANTED PLAINTIFF TO SUFFER. (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) DEFENDANT, PARK WALKED AWAY LEAVING PLAINTIFF STRUGGLING TO BREATHE, AND IN PAIN -N- DISCOMFORT, VIOLATED PLAINT-IFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

127. On or near 9.19.14, SICK CALL; DEFENDANT, DR. P. DASCANI DELIBERATE INDIFFERENCE TO PLAINTIFF LOSS OF EYE SIGHT IN RIGHT EYE, UNABLE TO EAT WITHOUT EXPERIENCING A FIT OF DIARRHEA -N- CHRONIC AILMENTS. (SEE, 38, 46, 59-66, 68-76, 81-84, 86) DEFENDANT, DASCANI EXCLAIMED, IT IS A WASTE OF TIME FOR PLAINTIFF TO TELL HIM HIS MEDICAL NEEDS. DEFENDANT, DASCANI RESPONSE TO PLAINTIFF SERIOUS MEDICAL NEEDS WERE TO INSTRUCT PLAINTIFF TO REMOVE ALL CLOTHING, GET ON HIS KNEES AND SPREAD THE CHE-EKS OF HIS BUTTOCKS, DEFENDANT, DASCANI EXCLAIMED, OH! MAN, LOOK AT THAT PUSSY.

128. On or near 9.19.14, SAME EVENT; DEFENDANT, DR. P. DASCANI, FURTHER INSTRUCTED PLAINTIFF TO PLACE BOTH HANDS ON THE WALL, FEET WIDE APART, AND HOLD HIS BUTTOCK OUT-N-UPWARD, NOW SHAKE THAT ASS CHOCOLATE MAMA, OH, WHAT A VOLUPTUOUS ASS," WHISPERED DEFENDANT, DASCANI, AS IF HE WAS IN A ST-ATE OF PASSION. THEN WALKED AWAY HOLDING HIS PENIS IN HAND LEAVING PLAINTIFF BEGGING FOR CARE IN PAIN -N- DIS COMFORT VIOLATED PLAINTIFF RIGHTS, CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENOMENT, AND CAUSED PSYCHOLOGICAL DAMAGE.

129. On or near 9.22.14, SICK CALL; DEFENDANT, DR. M. PARK DELIBERATE INDIFFERENCE TO PLAINTIFF LOSS OF EYE SIGHT IN RIGHT EYE, AND CHRONIC AILMENTS (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86)

DEFENDANT, PARK WALKED AWAY AS PLAINTIFF BEGGED FOR MEDICINE TO RELIEVE THE PAIN, STRUGGLING TO BREATHE -N- NO SIGHT IN RIGHT EYE, VIOLATED PLAINTIFF RIGHTS -N- CONSTITED CRUEL -N- UNUSUAL PUNISHMENT PER EIGHT AMENDMENT

130. ON OR NEAR 9.26.14; SICK CALL; DEFENDANT, DR, M. PARK. DELIBERATE INDIFFERENCE TO PLAINTIFF LOSS OF EYESIGHT IN RIGHT EYE -N- CHRONIC AILMENTS; DEFENDANT, PARK WALKED AWAY LEAVING PLAINTIFF BLIND IN RIGHT EYE (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) STRUGGLING TO SPEAK, BEGGING FOR MEDICINE TO EASE THE PAIN VIOLATED PLAINTIFF RIGHTS -N- CONSTITUTED CRUEL -N- UNUSUAL PUNISHMENT PER 8th AMENDMENT

131. ON OR NEAR 9.29.14; SICK CALL; DEFENDANT, DR, M. PARK DELIBERATE INDIFFERENCE TO PLAINTIFF REOCCURRING TEMPORARY LOSS OF EYESIGHT -N- CHRONIC AILMENT, DEFENDANT, PARK DECLARED, THEY COULDN'T PAY ME TO PROVIDE YOU MEDICAL CARE. RESPONSE TO PLAINTIFF LOSS OF EYESIGHT IN RIGHT EYE, WAS TO LAUGH UNCONTROLLABLY; STATED: I AM GLAD; WALKED AWAY (SEE, 38, 46, 59-62, 70-72, 74-76, 81-84, 86) LEAVING PLAINTIFF BLIND IN RIGHT EYE, UNABLE TO EAT WITHOUT EXPERIENCING FITS OF DIARRHEA, IN PAIN-DISCOMFORT, BEGGING FOR MEDICAL CARE VIOLATED PLAINTIFF RIGHTS -N- CONSTITUTED CRUEL -N- UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

132. ON OR NEAR 10.3.14; SICK CALL; DEFENDANT, DR, M. PARK. DELIBERATE INDIFFERENCE TO PLAINTIFF DRIPPING SEMEN TO SUCH EXTENT PLAINTIFF PANT LEG WAS SOAKED IN SEMEN AND DRAINING INTO HIS SHOE, AND CHRONIC AILMENTS (SEE, 38, 46, 59-84, 70-72, 74-76, 81-84, 86) DEFENDANT, PARK RESPONDED, I WISH YOU WOULD HURRY UP -N- DIE, I WILL NOT GIVE YOU MEDICAL CARE; AND SPOKE OF GIVING PLAINTIFF A DEADLY DISEASE. DEFENDANT, PARK WALKED AWAY LEAVING PLAINTIFF IN PAIN -N- DISCOMFORT VIOLATED PLAINTIFF RIGHTS -N- CONSTITUTED CRUEL -N- UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

133. ON OR NEAR 10.17.14; SICK CALL; DEFENDANT, DR, M. PARK DELIBERATE INDIFFERENCE TO PLAINTIFF INABILITY TO SEE OUT OF RIGHT EYE, AND CHRONIC AILMENT, DEFENDANT, PARK EXCLAIMED, I KNOW YOU HAVE LIFE THREATENING HEALTH PROBLEMS, BUT I DON'T GIVE A DAMN IF THEY CAUSE YOUR DEATH, I WILL NOT PROVIDE YOU MEDICAL CARE, SO STOP ASKING (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84) WALKED AWAY LEAVING PLAINTIFF IN PAIN -N- DISCOMFORT, BEGGING FOR PAIN MEDICATION VIOLATED PLAINTIFF RIGHTS -N- CONSTITUTED CRUEL -N- UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT.

134. ON OR NEAR 10.20.14; SICK CALL; DEFENDANT, DR, M. PARK DELIBERATE INDIFFERENCE TO PLAINTIFF'S NEAR BLINDNESS IN RIGHT EYE, AND CHRONIC AILMENTS; AND WALKED AWAY AS PLAINTIFF BEGGED (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) FOR MEDICATION FOR PAIN VIOLATED PLAINTIFF RIGHTS AND CONSTITUTED CRUEL -N- UNUSUAL PUNISHMENT PER EIGHTH AMENDMENTS

Washington000069

135 On or near 10.24.14, 'SICK CALL', DEFENDANT, DR. P. DASCANI DELIBERATE INDIFFERENCE TO PLAINTIFF, UNABLE TO EAT, TOO WEAK TO STAND, AND CHRONIC AILMENTS, DEFENDANT, DASCANI EXCLAIMED, ASK ME AGAIN-N-AGAIN, I STILL WILL NOT PROVIDE YOU MEDICAL CARE, DEFENDANT, DASCANI RESPONSE TO PLAINTIFF SERIOUS MEDICAL NEEDS WERE TO INSTRCT PLAINTIFF TO REMOVE ALL CLOTHING, AND GET ON HIS KNEES (SEE 38, 46, 59-76, 78, 81-84, 86)

136. On or near 10.24.14, SICK CALL, DEFENDANT, DR. P. DASCANI, SAME EVENT, DEFENDANT, DASCANI FURTHER INSTRUCTED PLAINTIFF, SHOW ME THAT ASS, 'OH! OH! WHAT A SHAPELY ASS, THOSE WORD SPOKEN WITH EXCITEMENT AS DEFENDANT, DASCANI RUBBED HIS PENIS. PLAINTIFF SAID THIS IS SERIOUS, NO, YOU SHOW ME THAT ASS, DEFENDANT, DASCANI SNAPPED, PLAINTIFF SANKED TO THE FLOOR DUE TO LACK OF STRENGTH, BEGGING FOR MEDICAL CARE, DEFENDANT, DASCANI WALKED AWAY LEAVING PLAINTIFF ON THE FLOOR NUDE, GASPING TO BREATHE, WEAK-N-DEHYDRATED, VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT, PER EIGHT AMENDMENT, CAUSED PSYCHOLOGICAL DAMAGE

137. On or near 11.7.14, SICK CALL, DEFENDANT, E. MATTES, PACS, DELIBERATE INDIFFERENCE TO PLAINTIFF UNABLE TO EAT WITHOUT CAUSING FITS OF DIARRHEA, WEAK-N-DEHYDRATED, AND CHRONIC AILMENTS (SEE, 38, 46, 59-64, 70-76, 81-84, 86) DEFENDANT, MATTES WALKED AWAY WHILE PLAINTIFF IN PAIN-N-DISCOMFORT, BEGGING FOR MEDICINE TO EASE THE PAIN— VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

138. 11.14.14, SICK CALL, DEFENDANT, DR. M. PARK DELIBERATE INDIFFERENCE TO PLAINTIFF TOE NAILS OOZING PUS-N-BLOOD, NEAR BLIND IN RIGHT EYE, AND CHRONIC AILMENTS (SEE 38, 46, 59-64, 70-72, 74-76, 81-84, 86) DEFENDANT, PARK STATED, YOU'RE SHIT OUT OF LUCK IF YOU ARE EXPECTING ME TO HELP YOU, YOU CAN DIE FOR WHAT I CARE. WALKED AWAY FROM PLAINTIFF IN PAIN-N-DIS COMFORT BEGGING FOR PAIN MEDICATION VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENT

139. On or near 11.24.14, 'SICK CALL', DEFENDANT, DR. P. DASCANI DELIBERATE INDIFFERENCE TO PLAINTIFF, BOTH ANKLES SWOLLEN TO EXTENT PLAINTIFF FORCED TO WALK WITH PAIN, AND CHRONIC AILMENTS, RESPONDED BY INSTRUCTING PLAINTIFF TO GET NAKED-N-HOLD HIS ASS HIGH IN THE AIR, DEFENDANT, DASCANI PLACED HIS FACE AGAINST THE WINDOW, OOMPHED, AHED-N-OHO WHFEED (SEE, 38, 46, 59-64, 65-76, 78, 81-84, 86), WALKED AWAY FROM PLAINTIFF IN THE NUDE, ANKLE SWOLLEN FAR BEYON THEIR SIZE MAKING IT PAINFUL FOR PLAINTIFF TO STAND-N-TO WALK, IN PAIN-N-DIS COMFORT, BEGGING FOR MEDICATION FOR PAIN VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT

Washington000070

PER EIGHT AMENDMENT, AND CAUSED PSYCHOLOGICAL DAMAGE

140. ON OR NEAR 12.9.14, SICK CALL, DEFENDANT, DR. M. PARK DELIBERATE INDIFFERENCE TO DISCH-ARGE OF PUS-N-BLOOD FROM PLAINTIFF RIGHT EYE-N-NO SIGHT IN RIGHT, AND CHRONIC AILMENTS (SEE, 38, 46, 57-64, 70-72, 74-76, 81-84, 86) PLAINTIFF BEGGED FOR EYE DROPS-N-MEDICINES FOR PAIN, DEFENDANT, PARK WALKED AWAY VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

141. ON OR NEAR 12.10.14, SICK CALL, DEFENDANTS, E. MWAURA-N-E. MATTES, BOTH PACS, DELIBER-ATE INDIFFERENCE TO PLAINTIFF UNABLE TO SEE OUT OF RIGHT EYE WHICH DISCHARGED PUS AND BLOOD, ANKLES SWOLLEN TO TWICE THEIR SIZE MAKING STANDING-N-WALKING PAINFUL, BOTH DEFENDANTS ACTED-N-SPOKE IN UNISON (SEE, 38, 46, 57-64, 70-76, 81-84, 86)

142. ON OR NEAR 12.10.14, SAME EVENT, DEFENDANTS, E. MWAURA-N-E. MATTES, BOTH PACS DECLARED, YOU THINK YOU'RE EXPERIENCING PAIN-N-DISCOMFORT UNREMITTEN DUE TO INTESTINAL GRIPE-N-DIA-RRHEA JUST WAIT UNTIL WE START. PLAINTIFF REQUESTED EYE DROPS-N-PAIN MEDICINES, REPEATED-LY, BOTH WALKED AWAY WITH THE MIDDLE OF BOTH HAND RAISED VIOLATED PLAINTIFF RIGHTS-N-CONSTIT-UTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

143. ON OR NEAR 12.15.14, SICK CALL, DEFENDANT, DR. M. PARK DELIBERATE INDIFFERENCE TO PLAINT-IFF HAVING ONLY LITTLE EYESIGHT IN RIGHT EYE DISCHARGING PUS-N-BLOOD, AND CHRONIC AILMENTS, DE-CLARED HE WOULDN'T PROVIDE PLAINTIFF MEDICAL CARE EVEN IF IT WOULD PREVENT PLAINTIFF DEATH. (SEE, 38, 46, 57-64, 70-72, 74-76, 81-84, 86) DEFENDANT, DR. PARK WALKED AWAY AS PLAINTIFF REQUEST-ED EYE DROPS-N-PAIN MEDICINES SEVERAL TIMES, STILL IN PAIN-N-DISCOMFORT VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT RIGHTS PER EIGHTH AMENDMENT

144. ON OR NEAR 12.17.14, SICK CALL, DEFENDANTS, E. MATTES-N-E. MWAURA, BOTH PACS, DELIBERATE INDIFFERENCE, WHERE BOTH ACTED-N-SPOKE IN UNISON, PLAINTIFF IN TEARS AS HE PLEADED TO DEFEND-ANTS, MATTES-N-MWAURA NOT TO PRESCRIBE A DIET THAT WOULD EXACERBATE PLAINTIFF INTESTINAL GRIPE. WITHOUT PLAINTIFF CONSENT DEFENDANTS, MATTES-N-MWAURA PRESCRIBED A DIET WHICH PLAINTIFF HAD BEGGED THEM NOT TO DO SO; WHICH CAUSED PLAINTIFF TO EXPERIENCE AN EXACERBATION OF INTESTINAL GRIPE-N-OCCURRANCES OF VIOLENT DIARRHEA-N-CHRONIC AILMENTS (SEE, 38, 46, 57-64, 69-76, 81-84, 86)

145. ON OR NEAR 12.17.14, SICK CALL, SAME EVENT, DEFENDANTS, E. MATTES-N-E. MWAURA, BOTH PACS, DE-CLARED, WE KNOW YOU ARE CURRENTLY RECEIVING THE DIET WE PRESCRIBED FOR YOU & YOU ARE EXPERIENC-ING EVEN MORE PAIN BECAUSE OF IT, THAT'S GOOD, THAT IS THE PURPOSE OF PRESCRIBING THIS PARTICULAR DIET. FOR YOU, DEFENDANTS, MATTES-N-MWAURA WALKED AWAY AS PLAINTIFF BEGGED THEM TO DISCON-

TINUE THIS DIET, LAUGHING AS THE WENT LEAVING PLAINTIFF IN PAIN-N-DISCOMFORT TO SUCH EXTENT HE WAS UNABLE TO UPRIGHT HIMSELF, DUE TO THIS DIET VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT.

146. ON OR NEAR 12.22.14, SICK CALL, DEFENDANTS, DR. P. DASCANI-N-E. MWAURA, PACS, BOTH ACTED-N-SPOKE IN UNISON, DELIBERATE INDIFFERENCE TO PLAINTIFF TO PLAINTIFF CHRONIC AILMENTS, PLAINTIFF BE ASSED DEFENDANT DE DASCANI-N-MWAURA, BOTH, FOR MEDICINE TO RELIEVE PAIN. BOTH DEFENDANTS, DASCANI-N-MWAURA, DECLARED PLAINTIFF NEEDED IMMEDIATE EMERGENCY MEDICAL CARE, YEA, SO WHAT YOU WON'T GET ANY FROM US (SEE, 38, 46, 57-64, 70-73, 74-76, 81-84, 86)

147. ON OR NEAR 12.22.14, SICK CALL, SAME EVENT, DEFENDANTS, DR. P. DASCANI-N-E. MWAURA, PACS, WALKED AWAY LEAVING PLAINTIFF IN-PAIN-N-DISCOMFORT, BOTH USED THE MIDDLE FINGER OF BOTH HANDS HELD UP TO PLAINTIFF FACE, WITH A TWISTING MOTION VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

148. ON OR NEAR 12.23.14, SICK CALL, DEFENDANTS, MS. E, MWAURA, PACS, N-DR, B, JIN DELIBERATE INDIFFERENCE TO PLAINTIFF PAIN-N-DISCOMFORT CAUSED BY CHRONIC AILMENTS, BOTH DEFENDANTS, JIN-N-MWAURA DECLARED, WHOOPFE DO, WE KNOW YOU'RE IN PAIN-N-SUFFERING, THAT'S EXACTLY WHAT WE WANT (SEE, 38, 46, 59-64, 69-76, 81-84, 86). DEFENDANTS, MWAURA-N-JIN, BOTH WALKED AWAY WITH THE MIDDLE FINGER OF BOTH HAND HELD UP TO PLAINTIFF VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

149. ON OR NEAR 12.19.14, SICK CALL, DEFENDANT, DR. M. PARK, DELIBERATE INDIFFERENCE TO PLAINTIFF, WHO WHILE IN THE PROCESS OF BEGGIN FOR MEDICINE FOR PAIN RELIEF, COLLAPSE WITH DEFENDANT, PARK LOOKING ON. (SEE, 38, 46, 59-64, 70-73, 74-76, 81-84, 86) DEFENDANT, PARK WALKED AWAY LEAVING PLAINTIFF SPRAWLED OUT ON THE FLOOR FACE DOWN GASPING FOR AIR VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT.

150. ON OR NEAR 12.30.14, SICK CALL, DEFENDANT, DR. M. PARK DELIBERATE INDIFFERENCE TO PLAINTIFF LACK OF STRENGTH WHEREBY PLAINTIFF HAD TO COME TO HIS DOOR BY PLACING HIS HANDS ON THE WALL, AND CHRONIC AILMENTS, DEFENDANT, PARK ASKED PLAINTIFF WAS HE CAPABLE OF DOING SO WITHOUT PLACING HIS HANDS ON THE WALL, PLAINTIFF SAID NO, I AM TOO WEAK (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) DEFENDANT, PARK WALKED AWAY LEAVING PLAINTIFF IN PAIN-N-DISCOMFORT VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT, PER EIGHTH AMENDMENT

151. ON OR NEAR 1.7.15; SICK CALL; DEFENDANT, DR. M. PARK DELIBERATE INDIFFERENCE TO PLAINT-IFF BARELY ABLE TO WALK TO THE DOOR DUE TO CHRONIC AILMENTS (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) DEFENDANT, PARK WALKED AWAY LEAVING PLAINTIFF IN PAIN-N-DIS COM-FORT. VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER 8th AMEND.

152. ON OR NEAR 1.8.15; SICK CALL; DEFENDANT, DR. M. PARK, DELIBERATE INDIFFERENCE TO PLAINTIFF STRUGGLING TO BREATHE, UNABLE TO EAT WITHOUT INCURRING FITS OF VIOLENT DIARRHEA, CHRONIC AILMENT CAUSING PAIN-N-DIS COMFORT (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) WALKED AWAY LEAVING PLAINTIFF IN PAIN-N-DIS COMFORT VIOL-ATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER 8th AMENDMENT.

153. 1.14.15; SICK CALL; DEFENDANTS, DR. M. PARK DELIBERATE IN DIFFERENCE TO PL-AINTIFF CHRONIC AILMENTS, INABILITY TO EAT WITHOUT INCURRING FITS OF VIOLENT DIARRHEA CAUSING PAIN-N-DISCOMFORT. (SEE, 38, 46, 59-64, 70-72, 74-76, 81-84, 86) WALKED AWAY LEAVING PLAINTIFF IN PAIN-N-DISCOMFORT VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CR-UEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

154. ON OR NEAR 1.21.15; SICK CALL; DEFENDANT, PACS, E. MWAURA DELIBERATE INDIFFER-ENCE TO PLAINTIFF PAIN-N-DISCOMFORT CAUSED BY INTESTINAL GRIPE MAKING SLEEP NEAR NON EXISTENCE FOR PAST FOUR STRAIGHT DAYS; PAIN SO GREAT PLAINTIFF HAD DIFFICULTY STAND-ING WITHOUT AID OF LEANING AGAINST THE DOOR-N-WALLS; AND CHRONIC AILMENTS. (SEE, 38, 46, 57-64, 70-76, 81-84, 86) WHE PLAINTIFF REQUESTED MEDICINE FOR PAIN RELIEF DE-FENDANT, MWAURA LAUGHED; STATED, YOU'RE IN PAIN, AND I'M GLAD OF IT, WALKED AWAY US-ING THE MIDDLE FINGER OF BOTH HAND RAISED VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT, PER EIGHTH AMENDMENT

155. ON OR NEAR 1.28.15; SICK CALL; DEFENDANT, PACS. E. MWAURA DELIBERATE INDIFFERENCE TO PL-AINTIFF TOENAILS OOZING PUS-N-BLOOD WHEREBY STAINED THROUGH SOCKS-N-SNEAKERS; AND CHRONIC AILMENTS (SEE, 38, 46, 57-64, 70-76, 81-84, 86) CAUSING PAIN-N-DISCOMFORT. DEFENDANT, MWAURA WALKED AWAY WITH MIDDLE FINGER OF HAND RAISED LEAVING PLAINTIFF WITH INFECTED TOE NAILS-N-NO MEDICINE FOR PAIN. VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUS-UAL PUNISHMENT PER EIGHTH AMENDMENT

156. ON OR NEAR 2.4.15; SICK CALL; PACS, DEFENDANT, E. MATTES DELIBERATE INDIFFERENCE TO PLAINTIFF INTESTINAL GRIPE CAUSING PAIN-N-DISCOMFORT TO SUCH DEGREE PAIN-

Washington 000

TIFF FORCED ~~████~~ TO WALK BENDING AT THE WAIST, AND CHRONIC AILMENT (SEE, 38, 46, 57-64, 70-76 81-84, 86) IN THE MIDS OF SHARING THIS INFORMATION WITH DEFENDANT, ~~████~~ MATTES PLAINTIFF COLLAPSED AS SHE LOOKED ON. DEFENDANT, MATTES WALKED AWAY LEAVING PLAINTIFF IN PAIN-N-DISCOMFORT, UNABLE TO GET UP FROM THE FLOOR, UNABLE TO EAT WITHOUT INCURRING FITS OF VIOLENT DIARRHEA, AND MEDICINE FOR PAIN, VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

157. ON OR NEAR 2.18.15, SICK CALL, PACS. DEFENDANT, E. MATTES, DELIBERATE INDIFFERENCE TO PLAINTIFF BLINDNESS IN RIGHT EYE, UNCHAINED DIARRHEA, AND CHRONIC AILMENTS CAUSING PAIN-N-DISCOMFORT (SEE, 38, 46, 57-64, 70-76, 81-84, 86) DEFENDANT, MATTES DECLARED, SHE WANTED PLAINTIFF TO CONTINUE EXPERIENCING PAIN; BEGIN TO LAUGH UNCONTROLLABLY, SAID, YES YOU'RE IN PAIN, THAT'S JUST WHAT I WANT IS YOU SUFFERING IN UNREMITTEN PAIN; SHOUTED, I WILL SEE TO IT THAT YOU CONTINUE TO BE IN PAIN VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

158. ON OR NEAR 2.18.15, SICK CALL, SAME EVENT, PACS, DEFENDANT, E. MATTES, WALKED AWAY HOLDING UP THE MIDDLE FINGER OF BOTH HAND UP TO PLAINTIFF, LEAVING PLAINTIFF WITHOUT MEDICINE FOR PAIN VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

159. ON OR NEAR 2.23.15; SICK CALL; DEFENDANT, PACS, E. MWAURA, DELIBERABE INDIFFERENCE TO PLAINTIFF PAIN-N-DISCOMFORTS THROUGHOUT DIGESTIVE TRACT, AND CHRONIC AILMENT (SEE, 38, 47, 57-64, 70-76, 81-84, 86) DEFENDANT, MWAURA DECLARED TO PLAINTIFF, YOU CAN DIE FOR WHAT I CARE, I AM GLAD YOU'RE IN PAIN. PLEASE, PLEASE, PLAINTIFF ASKED OVER-N-OVER FOR PAIN MEDICATION. DEFENDANT, MWAURA, EXTENDING THE MIDDLE FINGER OF BOTH HAND AS SHE WALKED AWAY LEAVING PLAINTIFF IN PAIN-N-DISCOMFORT VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

160. ON OR NEAR 3.3.15, SICK CALL, DEFENDANT, E. MATTES, PACS. DELIBERATE INDIFFERENCE TO PLAINTIFF STRUGGLING TO BREATHE, CHEST PAIN, AND CHRONIC AILMENTS (SEE, 38, 46, 57-64, 70-76, 81-84, 86) CAUSING PAIN-N-DISCOMFORT, DEFENDANT, MATTES WALKED AWAY HOLDING UP THE MIDDLE FINGER OF EACH HAND IN PLAINTIFF FACE VIOLATED PLAINTIFF RIGHTS CONSTITUTED CRUEL-N-UNUSUAL RIGHTS PER EIGHTH AMENDMENT

161. ON OR NEAR 3.17.15, SICK CALL; DEFENDANT, PACS, E. MATTES DELIBERATE INDIFF-

FERENCE TO PLAINTIFF PAINFUL INTESTINAL GRIPE SO INTENSED AWAKEN FROM HIS SLEEP, AND CHRONIC AILMENTS CAUSING PAIN-N-DISCOMFORT, (SEE, 38, 46, 57-64, 70-76, 81-84, 86) DEFENDANT, MATTES RESPONSE, YOU CAN'T SLEEP DUE TO PAIN, OH! I JUST LOVE IT. PLAINTIFF REQUESTED MEDICINE FOR PAIN, DEFENDANT, MATTES RESPONDED, BY HOLDING UP THE MIDDLE FINGER OF BOTH HAND SCREAMED TO PLAINTIFF, SIT ON IT AND ROTATE, WALKED AWAY LEAVING PLAINTIFF IN UNREMITTING PAIN VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER 8th AMENDMENT

162. ON OR NEAR 3, 31, 15, SICK CALL; DEFENDANT, PACS. E. MATTES DELIBERATE INDIFFEREN-CE TO PLAINTIFF CHRONIC AILMENTS CAUSING PAIN-N-DISCOMFORT (SEE, 38, 46, 57-64, 70-76, 81-84, 86) DEFENDANT, MATTES WALKED WITH THE MIDDLE FINGER OF BOTH HAND HELD UP, SHOUTED, GET ON IT, LEAVING PLAINTIFF TOO WEAK TO STAND UPRIGHT, VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

163. ON OR NEAR 4.6.15, SICK CALL, DEFENDANT, PACS, MS, E, MWAURA, DELIBERATE INDIFFERENCE TO PLAINTIFF PAIN-N-DISCOMFROT CAUSED BY INTESINAL GRIPE TO SUCH DEGREE PLAINTIFF COULD ONLY STAND BENDING AT THE WAIST (SEE, 38, 46, 57-64, 70-76, 81-84, 86) DEFENDANT, MWAURA BEGIN TO LAUGH, THEN PROCLAIM, THAT'S EXACTLY WHAT I WANT YOU TO EXPERIENCE, IS PAIN. I WANT YOUR ASSHOLE TO DROP OUT, WALKED AWAY LEAVING PLAINTIFF IN UNREMITTING PAIN VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER 8th AMEND.

164. ON OR NEAR 4.21.15, SICK CALL, DEFENDANT, PACS. E, MWAURA, DELIBERATE INDIFFER-ENCE TO PLAINTIFF, WHO'S ANKLES SWOLLEN TO SUCH DEGREE WALKING WAS PAINFUL,-N-ONLY STAND FOR SHORT SPURTS (SEE, 38, 46, 57-64, 70-76, 81-84, 86) DEFENDANT, MWAURA RESPONES, IT'S GOOD TO KNOW YOU'RE IN PAIN, THAT MAKES MY DAY. PLAINTIFF REQUEST FOR MEDICINE FOR PAIN, DEFENDANT, MWAURA RESPONDED BY HOLDING UP THE MIDDLE FINGER OF BOTH HAND, YELLED, SIT ON IT, WALKED AWAY VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

165. ON OR NEAR 5.12.15, SICK CALL, DEFENDANT, PACS, E, MATTES DELIBERATE INDIFFERENCE TO PLAINTIFF RIGHT EYE DISCHARGING PUS-N-BLOOD, AND NO EYESIGHT IN RIGHT EYE; AND CH-RONIC AILMENTS (SEE, 38, 46, 57-64, 70-76, 81-84, 86) DEFENDANT, MWAURA STATED, SHE COULD NOT CARE LESS ABOUT PLAINTIFF RIGHT EYE DISCHARGING PUS-N-BLOOD, AND NO SIGHT, AND PLAINTIFF SHOULD BE BLIND IN BOTH EYES. WHEN PLAINTIFF REQUESTED EYEDROPS DEFEND-ANT MATTES USING THE MIDDLE FINGER OF BOTH, AND SAID TO PLAINTIFF THESE ARE FOR YOU,

Washington00075

(24)

WALKED AWAY, VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISMENT PER EIGHTH AMENDMENT

166. ON OR NEAR 5.26.15, DEFENDANT, PACS, E. MATTES, SICK CALL, DELIBERATE INDIFFERENCE TO PLAINTIFF DRIPPING SEMEN TO SUCH DEGREE THE CROUCH OF PLAINTIFF JUMPSUIT-N-DOWN THE FRONT OF BOTH LEG WERE SOAKED IN SEMEN (SEE, 38, 46, 57-64, 70-76, 81-84, 86). PLAINTIFF REQUEST FOR MEDICINE TO STOP THE DRIPPING OF SEMEN DEFENDANT, MATTES DECLARED, SHE WANTED PLAINTIFF PENIS TO ROT-N-FALL OFF, HELD UP THE MIDDLE FINGER OF BOTH HAND, THEN WALKED AWAY LEAVING PLAINTIFF AS SHE FOUND HIM, VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

167. ON OR NEAR 6.9.15, SICK CALL, DEFENDANT, PACS, E. MATTES, DELIBERATE INDIFFERENCE TO PLAINTIFF CHRONIC AILMENTS CAUSING PAIN-N-DISCOMFORT (SEE, 38, 46, 57-64, 70-76, 81-84, 86) DEFENDANT, MATTES WALKED AWAY WITH THE MIDDLE FINGER OF BOTH HAND HELD HIGH, YELLED TO PLAINTIFF, ROTATE ON IT, VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

168. ON OR NEAR 6.24.15, SICK CALL, DEFENDANT, PACS, E. MWAURA, DELIBERATE INDIFFERENCE TO PLAINTIFF PAIN-N-DISCOMFORT CAUSED BY CHRONIC AILMENTS (SEE, 38, 46, 57-64, 70-76, 81-84, 86) DEFENDANT, MWAURA WALKED AWAY WITH THE MIDDLE FINGER OF BOTH HAND HELD HIGH, YELLED, SIT ON IT, VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

169. ON OR NEAR 7.8.15, SICK CALL, DEFENDANT, PACS, E. MWAURA, DELIBERATE INDIFFERENCE TO PLAINTIFF REPEATED REQUEST FOR MEDICINE FOR PAIN-N-DISCOMFORT CAUSED BY CHRONIC AILMENTS (SEE, 38, 46, 57-64, 70-76, 81-84, 86) DEFENDANT, MWAURA WALKED AWAY WITH THE MIDDLE FINGER OF BOTH HAND UP FOR PLAINTIFF TO SEE VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

170. DURING NEAR THE TIME SPAN OF SEPTEMBER 2013 THROUGH DECEMBER 2013, SERVING THE BREAKFAST MEAL DELIBERATE INDIFFERENCE, DEFENDANT G. BLOCK OFFICER, P. DENNISON HABITUALLY SHOOK PLAINTIFF TRAY OF FOOD, LIKEN TO SOMEONE SHAKING THEIR MEDICINE PER INSTRUCTIONS, SHAKE WELL BEFORE USING, CAUSING ALL THE FOOD TO MIX TOGETHER. THIS WAS DONE EACH TIME DEFENDANT DENNISON WAS ASSIGNED TO SERVE BREAKFAST ON G. D. POD. THIS WAS NOT A ONE TIME OCCURRENCE, OR MISHAP.

AC: 2:15-CV-1031

(25)

171. ~~████████~~ DURING THE SEPTEMBER-DECEMBER 2013, SAME EVENT, DEFENDANT, G BLOCK OFFICER, P. DENNISON DELIBERATE INDIFFERENCE TO PLAINTIFF HEALTH-N-SAFETY, ACT OF (SEE, 38, 46, 52, 56-59, 61-64, 70, 75, 80, 81, 84) CAUSING PLAINTIFF FOOD TO MIX TOGETHER, EVEN AFTER PLAINTIFF CONTINUOUSLY ASKED DEFENDANT NOT TO DO SO. PLAINTIFF, WHO HAS A DIGESTIVE PROBLEM, DUE TO DEFENDANT, DENNISON'S ACT, EXPERIENCED PAIN-N-DISCOMFORT THROUGHOUT HIS INTESTINAL TRAT FOR 4-6 HOURS, VIOLATED PLAINTIFF-RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

172. DURING SEPTEMBER — DECEMBER 2013, SERVING THE NOON MEAL, DEFENDANT, G BLOCK OFFICER, P. DENNISON DELIBERATE INDIFFERENCE TO PLAINTIFF HEALTH-N-SAFETY. EACH DAY DEFENDANT, DENNISON WAS ASSIGNED TO SERVE THE NOON MEAL ON B-D POD WOULD ~~████~~ SHAKE PLAINTIFF FOOD LIKENED TO FOLLOWING INSTRUCTIONS TO SHAKE WELL. EACH OCCURRENCE CONSISTED OF MORE THAN FIVE SECONDS DONE WITH VIGOR. DEFENDANT, DENNISON CONDUCTED THIS ACT HABITUALLY, THIS WAS NOT MISHAPS (SEE, 38, 46, 52, 56-59, 61-64, 70, 75, 80, 81, 84)

173. DURING SEPTEMBER-DECEMBER 2013, SAME EVENT, DEFENDANT, G BLOCK OFFICER, P. DENNISON DELIBERATE IN DIFFERENCE TO PLAINTIFF HEALTH-N-SAFETY, CAUSED ALL OF THE FOOD TO MIX UP TOGETHER, EVEN PLAINTIFF CONTINUOUSLY REQUEST HE NOT DO SO, ██ CAUSING PLAINTIFF, WHO HAS DIGESTIVE PROBLEMS TO EXPERIENCE PAIN-N-DISCOMFORT THROUGHOUT HIS DIGESTIVE TRACT FOR 4-6 HOURS VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT

174. ON OR NEAR 8.1.13, ESCORT TO VISIT; DEFENDANTS, G BLOCK SERGEANT, AND BLOCK OFFICER, J.M. SMITH-N-T.S. OSWALD DELIBERATE INDIFFERENCE TO PLAINTIFF SAFETY-N-HEALTH, WHERE PLAINTIFF WAS HAVING A BOWEL MOVEMENT DEFENDANTS, SMITH-N-OSWALD CAME TO PLAINTIFF DOOR, GD-3 CELL (SEE, 38, 46, 56-59, 61-65, 67, 80, 81, 84, 85)

175. ON OR NEAR 8.1.13, SAME EVENT; DEFENDANTS. SGT. SMITH-N-OFF. OSWALD GAVE A DIRECT ORDER TO REMOVE HIMSELF FROM THE COMODE WITHOUT CLEANING HIMSELF, REMOVE ALL OF HIS CLOTHING, OR THEY WERE GOING TO DENY PLAINTIFF HIS PERSONAL LEGAL VISIT, BOTH INSTRUCTED PLAINTIFF LIE FACE DOWN ON THE FLOOR-N-SPREAD THE CHEEKS OF HIS BUTTOCK, THEN SHAKE HIS ASS, BOTH ARE 6-2 OFFICERS, THIS OCCURRED ON 6-2 SHIFT; VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT, AND CAUSED PSYCHOLOGICAL DAMAGES

176. ON OR NEAR 8.1.13, ESCORT TO VISIT, DEFENDANTS, G BLOCK OFFICER-N-BLOCK SERGEANT, T.S. OSWALD-N-J.M. SMITH, DELIBERATE INDIFFERENCE TO PLAINTIFF SAFETY-N-HEALTH

WHILE ESCORTING PLAINTIFF TO-N-FROM A LEGAL VISIT WHERE ~~CRINOZA~~ ENROUTE DEFENDANT, OS-WALD MASSAGED-PLAINTIFF ARM-N-MIMICKED THE SOUNDS OF A WOMAN EXPERIENCING A OR-GASM, PRESSING HIS ERECT PENIS AGAINST PLAINTIFF THIGH, AND INSERTED HIS FINGER INTO PLAIN-TIFF RECTUM. PLAINTIFF TOLD DEFENDANT, OSWALD TO STOP, DEFENDANT, SMITH WITNESSED DE-FENDANT, OSWALD ILLEGAL ACTION, FAILED TO CORRECT THAT MISCONDUCT, AND ENCOURGING THE CON-TINUATION OF THE MSIES CONDUCT, DEFENDANT SMITH IS ALSO VIOLATING PLAINTIFF RIGHTS PER EIGHTH AMENDMENT (SEE, 38, 46, 56-59, 61-64, 65, 67, 80, 81, 84, 85)

177. ON OR NEAR 8, 1, 13, ESCORTING TO VISIT; SAME EVENT, DEFENDANTS, 8BLOCK OFFICERS-N-SER-GEANT, T.S. OSWALD-N-J.M. SMITH; BOTH VIOLATED PLAINTIFF RIGHTS-N-CONSTUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT; CAUSED PSYCHOLOGICAL DAMAGE.

178. ON OR NEAR 8, 1, 13, WHILE PLACING PLAINTIFF IN THE VISITING BOOTH; DEFENDANTS, J, M, SMITH, AND T.S. OSWALD, 8BLOCK SERGEANT-N-OFFICER DELIBERATE INDIFFERENCE TO PL-ANTIFF SAFETY-N-HEALTH, WHEREBY DEFENDANT, OSWALD HAVING CONTROL OF PLAINTIFF HANDS-CUFFED ATTACHED TO A TETHER PULLED BACK AS DEFENDANT, SMITH USED THE END OF HIS RIOT STICK TO ~~N~~ INSERT INTO PLAINTIFF RECTUM (SEE, 38, 46, 56-59, 61-64, 65, 67, 80, 81, 84, 85) VIOLATED PLAINTIFF RIGHTS, CAUSED PSYCHOLOGICAL DAMAGE-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT, PER EIGHTH AMENDMENT

179. ON OR NEAR 8, 1, 13, ESCORT TO CELL; DEFENDANTS, 8BLOCK SGT, J, M. SMITH-N-OFFICER, T, S, OS-WALD ACTIONS BY MASSING PLAINTIFF ARM, MIMICKING THE SOUND OF A WOMAN EXPER-IENCING A ORGASM, PRESSING HIS ERECT PENIS AGAINST PLAINTIFF THIGH; AS DEFEND-ANT, SMITH USED THE TIP OF HIS RIOT STICK TO CONTENUOUSLY POKE INTO PLAINTIFF REC-TUM; AND DEFENDANT, OSWALD MORE THAN ONCE INCERTED HIS FINGER INTO PLAINT-IFF RECTUM, VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHM-ENT PER EIGHTH AMENDMENT; CAUSED PSYCHOLOGICAL DAMAGE (SEE, 38, 46, 56-59, 61-65, 67, 89 81, 85)

180. ON OR NEAR 8, 1, 13, SAME EVENTS; DEFENDANTS, OFFICER, T, S, OSWALD-N- SGT, J, M. SM-ITH BOTH, WHILE ENROUTE TO THE RHU VISITING ROOM -N- ENROUTE BACK TO PLAINTIFF CELL, 60-3; CONTINUOUSLY REFERRED TO PLAINTIFF AS HONEY, SWEETHEART, AND BABY, PLAINTIFF REPEAT-ELY TOLD BOTH DEFENDANT, SMITH-N-OSWALD TO STOP TALKING TO HIM-N-TOUCHING HIM LIKE THAT, BOTH CONTINUED, VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISH-(SEE, '38, 46, 56-59, 61-65, 67, 80, 81, 85) MENT PER EIGHTH AMENDMENT; AND CAUSED PSYCHOLOGICAL DAMAGES

Washington0000010

181. On or near 12.17.13, unrequested interview, RHU staff, R. Nelson, who assigned to another block, used his authority, came to plaintiff cell unrequested, BD 3; gave plaintiff direct orders to remove all clothing, with wild excitement in his voice, defendant, Nelson said, oh what a voluptuous ass, sweetheart, occurred during the A.M.; caused psychological damage, violated plaintiff rights-n-constituted cruel-n-unusual punishment per Eighth Amendment.

182. On or near 1.14.14, random stop; defendant, RHU officer, J.D. Suhan, assigned to separate block, use his authority, came to plaintiff cell, BD3 unrequested, during the A.M. shift (see, 38,46, 46-59, 61-65, 67, 80, 81, 84) gave plaintiff direct orders to remove all clothing, to turn his back to defendant, Suhan, to make his buttock jump; get on his knees-n-use both hand to spread the cheeks of his buttock.

183. On or near 1.14.14, same event; defendant, RHU officer, J.D. Suhan, defendant, Suhan continuous sighed, ooh weed, ahed, breathing hard; referring to plaintiff as darling, sugar, honey, repeated over-n-over. Defendant, Suhan, stated, he wanted to later fantasize about having sex with plaintiff being on his knees using both hand to spread the cheeks of his buttocks so this would give him a clear view of plaintiff rectum, defendant, Suhan walked away leaving plaintiff nude, still on knees positioning his buttock for defendant, Suhan to obtain his most desired view of plaintiff rectum. Violated plaintiff rights-n-constituted cruel-n-unusual punishment per Eighth Amendment; and caused psychological damages. T.S. Oswald

184. On or near 4, 2.15; escort from shower; defendant, GBlock sergeant, used his authority to squeeze, rub-n-massage plaintiff arm while mimicking sounds of a female experiencing an orgasm, referring to plaintiff as chocolate cakes, squeezed plaintiff buttock, stated, soft as cotton, then inserted his finger into plaintiff rectum. Plaintiff told defendant, Oswald to keep his hands off of him, violated plaintiff rights-n-constituted cruel-n-unusual punishment, per 8th Amendment; caused psychological damage.

185. On or near 7.14.15, escort to R-n-D; defendants, D. Farrier-n-M. Stump, both RHU officer, used their authority to rub, massage plaintiff arm-n-mimick sounds of a woman experiencing a orgasm (see, 38,46, 56-59, 61-65, 67, 80, 81, 84, 85) plaintiff told them to stop, defendants, Farrier-n-Stump referred to plaintiff as darling-n-

HONEY BUNCH, BOTH CAUSING THEIR ERECT PENIS TO CONTACT PLAINTIFF BODY; VIOLATED PLAINTIFF

RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT, AND CAUSED PSY-
CHOLOGICAL DAMAGE

COUNT TWO: PROHIBITING FREE EXERCISE OF RELIGION, FREE SPEECH, TO PETIT-

ION THE GOVERNMENT FOR A REDRESS OF GRIEVANCES,

186. PLAINTIFF ALLEGES AND INCORPORATE BY REFERENCE PARAGRAPHS 1-185

187. ON OR NEAR 7.13.13; WEEKLY WORSHIP; DEFENDANTS, T. I. BENNETT, G BLOCK PROPERTY OFF-

ICERS-N-R. HENDRICKS, G BLOCK OFFICER, USED THEIR AUTHORITY TO DENY PLAINTIFF WEEK-
(SEE, 32-34, 36-42, 45-51, 56-59, 61, 62, 64, 81)
LY RELIGIOUS PROPERTY BY USING THE MOST RESTRICTIVE MEANS, VIOLATED PLAINTIFF RI-

GHTS-N-CONSTITUTED DENIAL OF FREE EXERCISE OF RELIGION-N-FREE SPEECH PER 1st AMEND,
CAUSING INJURY TO PLAINTIFF 1ST AMENDMENT RIGHTS.
188. ON OR NEAR 7.20.13, WEEKLY WORSHIP; DEFENDANT G BLOCK PROPERTY OFFICER, T. I. BEN-

NETT, 2-10 SHIFT, USE OF THE MOST RESTRICTIVE MEANS, USED HIS AUTHORITY TO DECLARE

HE WAS NOT PROVIDING PLAINTIFF ACCESS TO RELIGIOUS LITERATURE (SEE, 32-34, 36-42, 45-51,

56-59, 61, 62, 64, 81) NEEDED TO CONDUCT HIS WEEKLY WORSHIP VIOLATED PLAINTIFF RIGHTS-
CAUSING INJURY TO PLAINTIFF 1ST AMENDMENT RIGHTS
N-CONSTITUTED VIOLATIONS OF FREE EXERCISE OF RELIGION-N-FREE SPEECH PER 1st AMENDMENT.

189. ON OR NEAR 8.3.13; WEEKLY WORSHIP; DEFENDANT, G BLOCK PROPERTY OFFICER, T. I. BENNETT US-

ED HIS AUTHORITY TO DENY PLAINTIFF WEEKLY RELIGIOUS WORSHIP-N-THE LEAST RESTRICTIVE
(SEE, 32-34, 36-42, 45-51, 56-59, 61, 62, 64, 81)
MEANS, VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED FREEDOM OF SPEECH-N-FREE EXERCISE

OF RELIGION VIOLATIONS PER FIRST AMENDMENT, CAUSING INJURY TO PLAINTIFF 1st AMEND-
MENT RIGHTS
190. ON OR NEAR 8.10.13; WEEKLY WORSHIP; DEFENDANT, T. I. BENNETT, PROPERTY OFFICER OF G BLOCK,

USED HIS AUTHORITY TO DENY PLAINTIFF WEEKLY WORSHIP BY USING THE MOST RESTRICTIVE
(SEE, 32-34, 36-42, 45-51, 56-59, 61, 62, 64, 81)
MEANS, VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED VIOLATIONS OF FREE EXERCISE OF RELIGION-

FREE SPEECH PER FIRST AMENDMENT, CAUSING INJURY TO PLAINTIFF FIRST AMENDMENT RIGHTS

191. ON OR NEAR 5.2.14; WEEKLY WORSHIP; DEFENDANT, T. I. BENNETT, G BLOCK PROPERTY OFFIC-
ER USED HIS AUTHORITY TO
USE OF THE MOST RESTRICTIVE MEANS DENIED PLAINTIFF WEEKLY WORSHIP VIOLATED

PLAINTIFF RIGHTS-N-CONSTITUTED VIOLATIONS OF FREE EXERCISE OF RELIGION-N-FREE SPEECH PER
(SEE, 32-34, 36-42, 45-51, 56-59, 61, 62, 64, 81)
FIRST AMENDMENT, CAUSING INJURY TO PLAINTIFF FIRST AMENDMENT RIGHTS

192. ON OR NEAR 5.10.14; WEEKLY WORSHIP; DEFENDANT, GA POD OFFICER, L. COMER USED HIS AUTH-

ORITY TO DENY PLAINTIFF THE LEAST RESTRICTIVE MEANS-N-WEEKLY WORSHIP VIOLATED PLAINT-

IFF RIGHTS-N-CONSTITUTED VIOLATIONS OF FREE EXERCISE OF RELIGION-N-FREE SPEECH PER

SEE, 32-34, 36-43, 45-51, 56-59, 61, 63, 64 (81)
FIRST AMENDMENT, CAUSING INJURY TO PLAINTIFF FIRST AMENDMENT RIGHTS.

193. ON OR NEAR 5.17.14, WEEKLY WORSHIP; DEFENDANT, GA POD OFFICER: L. COMER USED HIS AU-THORITY TO DENY PLAINTIFF WEEKLY WORSHIP-N-THE USE OF LEAST RESTRICTIVE MEANS. (SEE, 32-34, 36-43, 46-51, 54-59, 61, 63, 64, 81) VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED VIOL-ATIONS OF FREE EXERCISE OF RELIGION-N-FREE SPEECH, CAUSING INJURY TO PLAINTIFF FIRST AMENDMENT RIGHTS

194. ON OR NEAR 7.5.14, WEEKLY WORSHIP; DEFENDANT, J. CODDY, GA POD OFFICER USED HIS AUTH-ORITY TO DENY PLAINTIFF WEEKLY WORSHIP-N-THE LEAST RESTRIVE MEANS VIOLATED (SEE, 32-34, 36-43, 46-51, 54-59, 61, 63, 64, 81) PLAINTIFF RIGHTS-N-CONSTITUTED VIOL-ATIONS OF FREE EXERCISE OF RELIGION-N-FREE SPEECH PER FIRST AMENDMENT, CAUS-ING PLAINTIFF INJURY TO PLAINTIFF FIRST AMENDMENT RIGHTS

195. ON OR NEAR 4.19.15, WEEKLY WORSHIP; DEFENDANT, G. TAIT, GA POD OFFICER USED HER AUTHORITY TO DENY PLAINTIFF WEEKLY WORSHIP BY USING THE MOST RESTRICTIVE MEANS, (SEE, 32-34, 36-43, 46-51, 54-59, 61, 63, 64, 81) VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED VIOLATIONS OF FREE EXERCISE OF RELIGION-N-FREE SPEECH PER FIRST AMENDMENT, CAUS-ING PLAINTIFF INJURY TO PLAINTIFF AMENDMENT RIGHTS.

196. ON OR NEAR 4.19.15, WEEKLY WORSHIP; DEFENDANT, C. WILLIAMS, RHU LIEUTEN-ANT BY WITNESSING, STANDING-N-LOOKING ON WITHIN A THREE FOOT RADIUS, WHEN DEFEND-ANT, G. TAIT CONDUCTED THE ILLEGAL ACTIONS OF DENYING PLAINTIFF WEEKLY WORSHIP-N-THE LEAST RESTRICTIVE MEANS (SEE, 32-34, 36-43, 46-51, 54-59, 61, 63, 64, 80, 81) DID NOTHING TO CORR-ECT THE MISCONDUCT, DECLARED, I GAVE HER DIRECT ORDERS TO DO EXACTLY WHAT SHE'S DOING.

197. ON OR NEAR 4.19.15, SAME INTENT, DEFENDANT, C. WILLIAMS, RHU LIEUTENANT, BY WITNESS-ING DEFENDANT, G. TAIT ILLEGAL ACTION, FAILING TO CORRECT THAT MISCONDUCT AND ENCOURAGING THE CONTINUATION OF THE MISCONDUCT, DEFENDANT, WILLIAMS IS ALSO VIOLATING PLAINTIFF RI-GHTS AND CONSTITUTED VIOLATIONS OF FREE EXERCISE OF RELIGION-N-FREE SPEECH PER FIRST AMENDMENT, CAUSING PLAINTIFF INJURY TO PLAINTIFF FIRST AMENDMENT RIGHTS

198. ON OR NEAR 5.24.15, WEEKLY WORSHIP; DEFENDANT, G. CRABLE, A BLOCK SERGEANT'S SERG-EANT, AND J. HESSTER, GA POD OFFICER USED THEIR AUTHORITY ACTED IN CONCERT TO DENY PL-AINTIFF WEEKLY WORSHIP-N-THE LEAST RESTRICTIVE MEANS (SEE, 32-34, 36-43, 46-51, 54-59, 61, 63, 64, 80, 81) VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED VIOLATIONS OF FREE EXER-CISE OF RELIGION-N-FREE SPEECH PER FIRST AMENDMENT, CAUSING PLAINTIFF INJURY

TO HIS FIRST AMENDMENT RIGHTS

199. DURING THE FALL OF 2010 - JANUARY 2015, P.E. BARKEFELT, RHU LIEUTENANT USED HIS AUTHORITY TO DENY PLAINTIFF A INDIGENT INMATE, HIS INDIGENT PACKAGE, WHICH CONSIST OF 50 SHEETS OF WRITING PAPER TWICE EACH MONTH, EACH INDIGENT INMATE IS ENTITLED TO A INDIGENT PACKAGE PER DOC POLICY DC-ADM 803, THIS OCCURRED WHILE PLAINTIFF WAS DRAFTING HIS PLEADING TO <u>WASHINGTON</u> V. <u>FOLINO</u>, 2:11-CV-1046, DEFENDANT BARKEFELT DENIAL OF INDIGENT PACKAGE FORCED PLAINTIFF DRAFT HIS PLEADING IN SMALL PRINT TWO LINES PER SPACE, WAS DISMISSED VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED DENIAL OF ACCESS TO COURT-N-TO FREE SPEECH PER FIRST AMENDMEND RIGHTS, CAUSING PLAINTIFF INJURY TO HIS 1ST AMEND.

200. BEGINNING FALL OF 2010 - JANUARY 2015, SAME EVENT, DEFENDANT, P.E. BARKEFELT, RHU LIEUTENT USED HIS AUTHORITY TO DENY PLAINTIFF INDIGENT PACKAGE TWICE EACH MONTH, HINDERED, STYMIED AND CAUSED (SEE, 32-42, 45, 46, 52-59, 61, 62, 79-81) PLAINTIFF TO SUBMIT A AMENDED COMPLAINT NOT IN COMPLIANCE TO FRCP 8 VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED DENIAL OF ACCESS TO COURT-N-FREE SPEECH, AND TO PETITION THE GOVERNMENT FOR A REDRESS OF GRIEVANCES PER FIRST AMENDMENT, CAUSING PLAINTIFF INJURY TO HIS FIRST AMENDMENT RIGHTS.

201. JANUARY 2013, INDIGENT PACKAGE, DEFENDANT, A.J. MORRIS, RHU LIEUTENANT USED HIS AUTHORITY DENIED PLAINTIFF WRITING PAPER ENTITLED TO INDIGENT INMATES HINDERED, STYMIED-N-PROVENTED PLAINTIFF ABILITY TO SUBMIT PLEADING OF <u>WASHINGTON</u> V. <u>FOLINO</u>, 2:11-CV-1046 IN COMPLIANCE TO FRCP 8, WHERE PLAINTIFF WAS FORCED TO DRAFT PLEADING IN SMALL PRINT TWO LINES PER SPACE WAS DISMISSED BY DISTRICT-N-APPEALS COURTS. (SEE, 32-42, 45, 46, 52-59, 61, 62, 79-81) VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED DENIAL OF ACCESS TO COURT, FREE SPEECH-N-TO PETITION THE GOVERNMENT FOR A REDRESS OF GRIEVANCES PER FIRST AMENDMENT, CAUSING PLAINTIFF INJURY TO HIS 1st AMEND.

202. JANUARY 2013 - JULY 14, 2015, RANDOM INTERVIEWS, DEFENDANTS, A.J. MORRIS, RHU LIEUTENANT, AND R. GILMORE, WARDEN USED THEIR AUTHORITY ON SEVERAL OCCASIONS, AND MORE THAN ONCE, BOTH CAME TO PLAINTIFF RHU CELL, HAVING PLAINTIFF TIMELY SUBMITTED GRIEVANCES-N-REQUEST TO STAFF IN HAND DEFENDANT, MORRIS RIPPED THOSE DOCUMENTS INTO SMALL PIECES, AND PLACED THEM IN TRASH BARREL. DEFENDANT, GILMORE STANDING NEXT TO DEFENDANT, MORRIS, APPLAUDED LOUDLY, SMILE DEFENDANT, GILMORE GAVE DEFENDANT, MORRIS A HIGH FIVE, AS BOTH WALKED AWAY (SEE, 32-42, 45, 46, 52-59, 61, 62, 78-91)

203. JANUARY 2013 - JULY 14, 2015, SAME EVENT, DEFENDANTS, R. GILMORE, WARDEN,

(31)

A.J. MORRIS VIOLATED PLAINTIFF RIGHTS. BY WITNESSING DEFENDANT MORRIS ILLEGAL ACT-ION, FAILING TO CORRECT THAT MISCONDUCT, AND ENCOURAGING THE CONTINUATION OF THE MIS-CONDUCT, DEFENDANT, GILMORE IS ALSO VIOLATING PLAINTIFF RIGHTS ~~OFFICE~~ -N- CONSTI-TUTED DENIAL OF FREE SPEECH PER FIRST AMENDMENT, CAUSING PLAINTIFF INJURY TO HIS FIRST AMENDMENT RIGHTS

204. JANUARY 2011 - JULY 2014, CONFIDENTIAL INTERVIEWS, DEFENDANTS, S.P. DURCO, RHU COM-MANDER, AND R. GILMORE, WARDEN, CAME TO PLAINTIFF CELL IN THE RHU UNANN-OUNCE, MORE THAT TWO OCCASIONS DEFENDANT, DURCO CAME ALONE, AND ONCE ACCOM-PANIED BY DEFENDANT, GILMORE. DEFENDANTS, DURCO-N- GILMORE HAVING PLAINT-IFF TIMELY SUBMITTED GRIEVANCE-N-REQUEST TO STAFF IN HAND, A.M, OCCURRENCE

205. JANUARY 2011 - JULY 2014, SAME EVENT, DEFENDANTS, S.P. DURCO, RHU COMMAND-ER-N-R. GILMORE WARDEN, BOTH DECLARED THAT PLAINTIFF WAS NEVER GOING TO SEE THESE GRIEVANCES-N-REQUEST TO STAFF A GAIN, DEFENDANT, GILMORE, SAID TO DEFENDANT DURCO, "WAY TO GO", BOTH WALKED AWAY HOLDING PLAINTIFF GRIEVANCES-N-REQUEST TO STAFF IN HAND, AND PLAINTIFF SAW NEVER ~~THESE~~ DOCUMENTS AGAIN

206. JANUARY 2011 - JULY 2014, SAME EVENT, DEFENDANT, S.P. DURCO, RHU COMMANDER-N-R. GILMORE, WARDEN ACTIONS TOWARD PLAINTIFF FOR EXERCISING HIS RIGHT TO SEEK REDRESS FROM THE PRISON THROUGH (SEE, 32-42, 45, 46, 52-59, 61, 62, 79-81) USE OF THE PRISON GRIEVANCE SYSTEM, DEFENDANTS, DURCO-N-GILMORE ARE RETALING AG-AINST PLAINTIFF UNLAWFULLY, IN VIOLATION OF PLAINTIFF RIGHTS UNDER THE FIRST AN AMENDMENT. THESE ILLEGAL ACTIONS ARE CAUSING PLAINTIFF INJURY TO HIS 1st AMENDMENT RIGHTS

207. JANUARY 2018 - JULY 14, 2015, ASSIGNED GRIEVANCE TRACKING NUMBER, DEFENDANT, T. SHAWLEY, A.M. OCCURRENCE. DENIED PLAINTIFF TIMELY SUBMITTED GRIEVANCES A GRIEVANCE TRACKING NUMBER. DURING MORE THAN ONE CONFIDENTIAL INTERVIEW AT PLAINTIFF RHU CELL, CONCERNING PLAINTIFF NOT RECEIVING THE PINK COPY OF TIMELY SUBMITTED GRIEVANCES, APPEALS, AND INDIGENT PACKAGE (SEE, 32-42, 45, 46, 52-59, 61, 62)

208. ~~...~~ SAME EVENT ~~...~~ DEFENDANT, SHAWLEY DECLARED ~~...~~ SHE WAS FULLY AWARE OF ALL OF THESE THINGS, AND THAT SHE WAS NOT GOING TO RETURN PLAINTIFF TIMELY SUBMITTED GRI-EVANCES-N-APPEALS. DEFENDANT, T. SHAWLEY RESPONSE TO PLAINTIFF FOR EXERCISE OF HIS RIGHT TO SEEK REDRESS (SEE, 79-81) FROM THE PRISON THROUGH USE OF THE PRISON

AC: 2:15-CV-1031

GRIEVANCE SYSTEM, DEFENDANT, SHAWLEY IS RETALIATING AGAINST PLAINTIFF UNLAWFUL-LY INVIOLATION OF PLAINTIFF RIGHTS PER FIRST AMENDMENT, THESE ILLEGAL ACTIONS ARE CAUSING PLAINTIFF INJURY TO HIS FIRST AMENDMENT RIGHTS

209. AUGUST 2009 - JULY 14, 2015; UNREQUESTED CONFIDENTIAL INTERVIEWS; DEFENDANT, I. VIHLIDAL, CHCA, ON THREE SEPARATE OCCASIONS SUMMONED PLAINTIFF TO COME BEFORE HER IN THE RHU CONFERENCE ROOM; DEFENDANT, I, VIHLIDAL DELIBERATE IN-DIFFERENCE TO PLAINTIFF RIGHT EYE DISCHARGING PUS-N-BLOOD, AND NO EYESIGHT IN RIGHT EYE, EX-PERIENCED CHEST PAIN. (SEE, 32-42, 45, 46, 52-59, 61, 62, 79-81)

210. AUGUST 2009 - JULY 14, 2015; SAME EVENTS; DEFENDANT, I, VIHLIDAL DELIBERATE INDIFF-ERENCE, ON ONE OCCASION WHERE PLAINTIFF UNABLE TO STAND-N-STRUGGLE TO BREA-THE, DEFENDANT, VIHLIDAL, DECLARED: WHILE HOLDING COPIES OF SEVERAL OF PLAINTIFF GRIEVANCES IN HAND; PLAINTIFF NEEDED IMMEDIATE EMERGENCY MEDICAL CARE, THEN STATED GET ON THIS WALKED AWAY WITH THE MIDDLE FINGER OF BOTH HAND EXTENDED, LEAVING PLAINTIFF LYING ON THE FLOOR; VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED CRUEL-N-UNUSUAL PUNISHMENT PER EIGHTH AMENDMENT (SEE, 32-46, 52-64, 68, 70, 71, 74-76, 79-81)

211. APPROXIMATELY JANUARY 2013 - JULY 14, 2015, 90 DAY CONFIDENTIAL INTERVIEWS; DEFEND — WARDEN ANT, R. GILMORE, DELIBERATE INDIFFERENCE TO PLAINTIFF SUMMONED BEFORE DEFENDANT, GILMORE, MORE THAN ONCE PLAINTIFF WAS AIDED TO RHU CONFERENCE ROOM BY RHU STAFF DUE TO CHRONIC AILMENT; DURING ONE INTERVIEW PLAINTIFF COLLAPSED, THE PUR-POSE OF THESE INTERVIEWS WERE CONCERNS OF PLAINTIFF GRIEVANCES-N-REQUEST TO STAFF WHICH DEFENDANT, GILMORE ALWAYS HELD IN HAND (SEE, 32-46, 52-64, 68, 70, 71, 74-76, 79-81)

212. JANUARY 2013 - JULY 14, 2015, SAME ISSUES; DEFENDANT, GILMORE, WARDEN, DELIBERATE INDIFFERENCE TO PLAINTIFF FAILING HEALTH DECLARED PLAINTIFF NEEDED IMMEDIATE EM-ERGENCY CARE, THEN WALKED AWAY WITH THE MIDDLE FINGER OF BOTH HAND EXTENDED, SHOUTED, THIS IS FOR YOU; LEAVING PLAINTIFF, ONCE, ON THE FLOOR. VIOLATED PLAINT-IFF RIGHTS-N-CONSTITUTED VIOLATIONS OF FREE SPEECH, AND CRUEL-N-UNUSUAL PUNISH-MENT PER 1st, AND 8th AMENDMENT; AND CAUSING PLAINTIFF INJURY TO HIS FIRST AMENDMENT RIGHTS

213. IN EACH INSTANCE RELEVANT TO FOREGOING; DEFENDANTS, I, VIHLIDAL, CHCA. ACTION ALL OCCURRED DURING THE A.M., (SEE, 209, 210) BY THREATENING PLAINTIFF WITH PHYSICAL VIOLENCE FOR EXERCISE OF HIS RIGHT TO SEEK REDRESS FROM THE PRISON THROUGH USE-

AC:2:15-CV-1031

OF THE PRISON GRIEVANCE SYSTEM, DEFENDANT, VIHLIDAL IS RETALIATING AGAINST PLAINTIFF UN-LAWFULLY, IN VIOLATION OF PLAINTIFF RIGHTS PER THE FIRST AMENDMENT. THESE ILLEGAL ACTIONS ARE CAUSING PLAINTIFF INJURY TO HIS FIRST AMENDMENT RIGHTS.

# COUNT THREE: EQUAL PROTECTION

214. PLAINTIFF ALLEGES AND INCORPORATES BY REFERENCE PARAGRAPHS 1 THROUGH-213,

215. DEFENDANTS, R.D. GILMORE, TRACY SHAWLEY, S.P. DURCO, P.E. BARKEFELT, A.J. MORRIS, C. WILLIAMS, G. CRABLE, J.M. SMITH, R. NELSON, T.S. OSWALD, L. COMER, T.I. BENNETT, R. HENDRICKS, J. CODDY, J. HEGETER, A. FARRIER, M. STUMP, B. TAIT, J.D. SUHAN, I. VIHLIDAL, B. JIN, M. PARK, P. DASCANI, M. COMER, F. MATTES, ELON MWAURR, P. DENNISON VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED VIOLATION OF EQUAL PROTECTION UNDER FOURTEENTH AMENDMENT (SEE, 33, 43, 58-62, 77, 81, 84)

216. AT ALL TIMES RELEVANT TO THIS COMPLAINT DEFENDANTS. C. WILLIAMS, RHU LIEUTENANT, G. CRABLE, GBLOCK SERGEANT, T.I. BENNETT, R. HENDRICKS, J. CODDY, J. HEGETER, B. TAIT, L. COMER, ALL GBLOCK STAFF, SUCCESSFULLY PROVIDED THE OTHER G-BLOCK INMATES THE NEEDED LITERATURE TO PRACTICE THEIR RELIGIOUS BELIEF, WHILE CONDUCTING THE SAME EVENT, BASED ON NON PENOLOGICAL REASONS DENIED PLAINTIFF THE SAME RIGHTS BY USING THE MOST RESTRICTIVE MEANS, VIOLATED PLAINTIFF RIGHTS (SEE, 32-34, 36-42, 45-51, 54, 58, 62, 81, 56-57, 59) CONSTITUTED DENIAL OF EQUAL PROTECTION PER FOURTEENTH AMENDMENT. (SEE, 43, 58-62.

217. AT ALL TIMES RELEVENT, DEFENDANT, R. GILMORE, WARDEN; T. SHAWLEY, GRIEVANCE COORDINATOR; S.P. DURCO, RHU COMMANDER; P.E. BARKEFELT, RHU LIEUTENT; A.J. MORRIS, RHU LIEUTENANT; P. DENNISON, GBLOCK OFFICERS USED THEIR AUTHORITY TO SECURE ACCESS TO THE COURT, FREE SPEECH, DOC GRIEVANCE SYSTEM DC-ADM 804; OUTGOING MAIL SUCCESSFULLY FOR ALL OTHER G-BLOCK INMATES (SEE, 32-42, 43, 58-62, 77, 81, 84), DENIED PLAINTIFF THE SAME RIGHT, WHILE CONDUCTING THE SAME EVENT

218. SEPTEMBER 2013 THROUGH DECEMBER 2013; CONCERNING #170-173 ABOVE, DEFENDANT, P. DENNISON, G-BLOCK OFFICER, PROVIDED THE OTHER INMATES ON THIS POD, UNTAMPERED BREAKFAST-N-NOON MEAL BASED ON NON-PENOLOGICAL REASON HE DENIED PLAINTIFF THE SAME; WHILE

CONDUCTING THE SAME ACTIVITY VIOLATED PLAINTIFF RIGHTS-AND CONSTITUTED VIOLATION OF PLAINEFF EQUAL PROTECTION PER FOURTEENTH AMENDMENT (SEE, 33, 43, 58-62, 77, 81, 84)

219. SEPTEMBER 2013 THROUGH DECEMBER 2013, SAME OCCURRENCE; #170-173 ABOVE, DEFENDANT, P. DENNISON CONTENUEOUSLY INTERCEPTED PLAINTIFF TIMELY SUBMITTED GRIEVANCES CONCERNING DEFENDANT, DENNISON SHAKING PLAINTIFF BREAKFAST-N-NOON MEALS CAUSING ALL FOOD TO MIX UP CASING PLAINTIFF TO EXPERIENCE PAIN-N-DISCOMFORT IN HIS DIGESTIVE TRACT. (SEE, 32-46, 52-59, 61, 62, 79-81)(84)

220. SEPTEMBER 2013 – DECEMBER 2013, SAME OCCURRENCE; CONCERNING #170-173 ABOVE, DEFENDANT, P. DENNISON, B-BLOCK OFFICER, ARRIVED AT PLAINTIFF CELL, B-3, DURING THE A.M. THREATENED TO PHYSICALLY HARM PLAINTIFF IF PLAINTIFF WERE TO SUBMIT A FIFTH GRIEVANCE AGAINST HIM, THEN RIPPED THE FOUR GRIEVANCES PLAINTIFF ALREADY SUBMITTED, INTO SMALL PIECES. (SEE, 32-46, 52-59, 61, 62, 79-81)

221. SEPTEMBER 2013 – DECEMBER 2013, SAME OCCURRENCE; CONCERNING #170-173, ABOVE, BY THREATENING PLAINTIFF WITH PHYSICAL VIOLENCE FOR EXERCISE OF HIS RIGHT TO SEEK REDRESS FROM THE PRISON THROUGH USE OF THE PRISON GRIEVANCE SYSTEM, DEFENDANT DENNISON IS RETALIATING AGAINST PLAINTIFF UNLAWFULLY, IN VIOLATION OF PLAINTIFF RIGHTS PER THE FIRST AMENDMENT. THESE ILLEGAL ACTIONS ARE CAUSING PLAINTIFF INJURY TO HIS FIRST AMENDMENT RIGHTS, AND EQUAL PROTECTION PER FOURTEENTH AMENDMENT (SEE, 32-46, 52-59, 61, 62, 79-81)(84)

222. AT ALL TIMES RELEVANT DEFENDANTS, B. JIN, M. PARK, P. DASCANI, M. COMER, E. MATTES, E. MWAURA USED THEIR AUTHORITY TO SUCCESSFULLY PROVIDE ALL OTHER B BLOCK INMATES MEDICAL CARE, WHILE CONDUCTING THE SAME ACTIVITY PLAINTIFF WAS DENIED MEDICAL CARE BASED ON NON MEDICAL REASONS VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED VIOLATION OF PLAINTIFF EQUAL PROTECTION PER FOURTEENTH AMENDMENT (SEE, 32-46, 52-49, 61, 62, 79-81)(84)(77)

223. AT ALL TIMES, RELEVANT DEFENDANTS J.M. SMITH, R. NELSON, T.S. OSWALD, D. FARRIER, M. STUMP, J.D. SUHAN USED THEIR AUTHORITY TO TARGET PLAINTIFF BASED NON PENO-
P. DENNISON
LOGICAL REASONS, TO ACT WITH DELIBERATE INDIFFERENCE TO PLAINTIFF SAFETY-N-
INMATES
HEALTH; WHILE SUCCESSFULLY PROVIDING ALL OTHER BBLOCK SAFETY, VIOLATED PLAINT-
(SEE, 33, 43, 58-62, 77, 81, 84)
IFF RIGHTS CONSTITUTED EQUAL PROTECTION VIOLATION PER FOURTEENTH AMENDMENT

AC: 2:15-CV-1031

324. AT ALL TIMES RELEVANT DEFENDANTS, R. GILMORE, T. SHAWLEY, S. P. DURCO, P.E. BARKE-FELT, A.J. MORRIS, C. WILLIAMS, I, VIHLIDAL, USED THEIR AUTHORITY TO TREAT PLAINTIFF DIFFERENT FROM THE WAY OTHER G BLOCK INMATES WERE TREATED BY DEFENDANTS, AND SINGLED OUT PLAINTIFF FROM ALL OTHER G BLOCK INMATES, WHILE SUCCESSFULLY PROVID-ING ALL OTHER G BLOCK INMATES WITH A CARE DENIED TO PLAINTIFF BASED ON NON PENOLOGICAL-N-NON MEDICAL REASONS VIOLATED PLAINTIFF RIGHTS-N-CONSTITUTED A VIOLATION OF PLAINTIFF EQUAL PROTECTION PER FOURTEENTH AMEND-MENT (SEE, 33, 43, 53-62, 77, 81, 84)

325. THE PLAINTIFF HAS NO PLAIN, ADEQUATE OR COMPLETE REMEDY AT LAW TO REDRESS THE WRONGS DESCRIBED HERE. PLAINTIFF HAS BEEN AND WILL CONTINUE TO BE IRREPAR-IABLY INJURED BY THE CONDUCT OF THE DEFENDANTS UNLESS THIS COURT GRANTS THE DE-CLARATORY AND INJUCTIVE RELIEF WHICH PLAINTIFF SEEKS.

# VI. ██████ ███ █████████ INJURY

226. PLAINTIFF ALLEGE AND INCORPORATE BY REFERENCE PARAGRAPHS 1-225.

227. PLAINTIFF LOST REWARDS IN THE AFTERLIFE, LACK OF PRAISE-N-WORSHIP WAS THE CAUSE.

228. PLAINTIFF CONTINUOUSLY EXPERIENCE DREAMS OF BEING GANG RAPED BY PA, DOC ST-AFF-N-MEDICAL PROFESSIONAL LEAVING PLAINTIFF RECTUM SO TORN-N-TATTERED PLAINTIFF INCAPABLE OF EXPERIENCING A NORMAL BOWEL MOVEMENT, PLAINT-IFF OFTEN AWAKEN FROM HIS SLEEP BY THE TERROR WITHIN THESE DREAMS, PLAIN-TIFF CONTINUOUSLY EXPERIENCE VISIONS OF THE SAME. WHAT FOLLOWS IS PLAINTIFF IS STRUCK WITH A NEAR UNCONTROLLABLE FEAR TO HAVE OTHERS NEARBY, A FRIEDLY PAT ON THE BACK OR A EMBRACE ARE LIKENED TO THINGS PLAINTIFF MAKE AN EX-TRA EFFORT TO AVOID.

229. HEART FAILURE

230. DISMISSAL OF WASHINGTON V. FOLIND, 2:11-CV-1046, IN U.S. DISTRICT COURT

231. AFFECTS OF DIGESTIVE DISORDER, i.e. PERICARDITIS, VISION PROBLEMS, LOSS OF MUSCULAR PHYSIQUE, MEMORY LOSS, LOSS OF STAMINA, ENERGY, CONCETRATION, CIRCULATION,

232. PSYCHOLOGICAL DAMAGE

233. EATING ████████████ A

AC: 2:15-CV-1031

(36)

234. NEAR BLIND IN RIGHT EYE
235. LOSS THE ABILITY TO EAT-N-DIGEST VARIOUS FOODS
236. INABILITY TO RAISE VOICE ABOVE A WHISPER
237. IRREVERSIBLE FOOT FUNGUS, WHICH ENTAILS ALL TOENAILS ON BOTH FEET ARE BLACK, BOTH FEET COVERED IN SKIN SO DRY IT'S LIKENED TO ALLIGATOR HIDE, AND LARGE CALLOUSES
238. DETERIORATION OF MUSCLES
239. DEFORMED ANKLES, ELBOWS, FINGERS
240. URETHRAL STRICTURE
241. SLEEP APNEA
242. DUE TO DENIAL OF MEDICAL CARE ALL TIMES RELEVANT THE FOREGOING WILL INEVITABLY GET WORST, AND PROBABLY CAUSE PREMATURE DEATH OR PERMANENT DISABILITY

# VII. PREVIOUS LAWSUITS

243. PLAINTIFF ALLEGE AND INCORPORATE BY REFERENCE PARAGRAPHS 1-242

244. WASHINGTON V. KLEM, 497 F.3d 272 (3rd CIR 2007)

245. IN ACCORDANCE TO MEMORANDUM ORDER, DATED 6,7,16, DOC #55, P.4, WHERE IT STATES: PLAINTIFF SHOULD INFORM THE COURT OF ANY AND ALL PREVIOUSLY FILED CASES THAT INCLUDE SOME OF THE SAME FACTS AND EVENTS HE RELIES ON FOR THE THIS CASE. ESTELLE V. GAMBLE, 429 U.S, 97,103 (1976); FARMER V. BRENNAN, 511 U.S, 825, 826 (1994); ROUSE V. PLANTIER, 182 F.3d 192, 197 (3rd CIR 1999); SCHWENK V. HARTFORD, 204 F.3d 1187, 1196-97 (9th CIR 2000); KEMNER V. HEMPHILL, 199 F.SUPP 2d, 1264 (N.D. FLA. 2002); HARRISON V. INSTITUTIONAL BANK OF INVESTIGATIONS NO, C 07-1894, 2010 U.S. DIST. LEXIS 14944 (N.C. CA. FEB. 22, 2010); PONTON V. BAILEY, 2006 WL 3498309, *4 (W.D. PA. DEC. 4, 2006); BULLOCK V. HORN, 2000 WL 1839171, *4 (M.D. PA. OCT. 31, 2000); KINZEY V. BEARD, 2006 WL 2829000 *10 (M.D. PA. SEPT. 1, 2006); ELWOOD V. RANT, 2006 WL 2439887 *2 (N.D. IND. SEPT. 12, 2006); JOHNSON V. AVERY, 383 U.S. 483 (1969); BOUND V. SMITH, 430 U.S. 817 (1997); LEWIS V. CASEY, 518 U.S. 343 (1996)

# VIII. EXHAUSTION OF ADMINISTRATIVE REMEDIES

246. PLAINTIFF ALLEGE AND INCORPORATE BY REFERENCE PARAGRAPHS 1-245
247. PLAINTIFF HAS EXHAUSTED ALL AVAILABLE REMEDIES, DEFENDANTS CONTINUOUS COMMINDEFRED PLAINTIFF TIMELY SUBMITTED GRIEVANCES -N- APPEALS AND NOT RESPOND TO GRIEVANCES, PLAINTIFF RESUBMITTED GRIEVANCES THREE - FOUR TIMES TO NO AVAIL, PLAINTIFF HAS EXHAUSTED ALL AVAILABLE REMEDIES CONCERNING ALL RELEVANT ISSUES TO THIS LEGAL ACTION, AND THUS THROUGH THE COURT IS PLAINTIFF ONLY AVENUE FOR ADEQUATE REMEDY

# IX. REQUEST FOR RELIEF

248. PLAINTIFF ALLEGE AND INCORPORATE BY REFERENCE PARAGRAPHS 1-247
249. ALTERNATIVE DISPUTE RESOLUTION: ADR PER CIVIL JUSTICE REFORM ACT OF 1990
250. ALTERNATIVE DISPUTE RESOLUTION: ADR PER CIVIL JUSTICE REFORM ACT OF 1990 CONCERNING FREEDOM OF RELIGION ONLY (SEE, 187-198)
251. IMMEDIATE LASER SURGERY AT WILL'S EYE CLINIC IN PHILADELPHIA
252. IMMEDIATE MEDICAL CARE BY OPHTHALMOLOGISTS, LARYNGOLOGISTS, CARDIOLOGISTS, GASTROENTEROLOGISTS, UROLOGISTS, DERMATOLOGISTS, PODIATRISTS, AND ALL OTHER SPECIALISTS, CONDUCTED AT JOHNS HOPKINS UNIVERSITY HOSPITAL.
253. IMMEDIATE PLACEMENT AS A PATIENT IN JOHN HOPKINS UNIVERSITY HOSPITAL AND REMAIN THERE UNDER THE CARE OF SPECIALISTS UNTIL PLAINTIFF IS CONVINCED ALL OF HIS HEALTH PROBLEMS HAVE BEEN CURED OR CORRECTED
254. ALL SICK CALL, DOCTOR VISITS, MEDICINES FREE OF CHARGE
255. PLAINTIFF CHOICE OF DIET SUPPLEMENTS PERMANENT
256. DOCTOR VISITS THREE DAYS PER WEEK WITHOUT HAVING TO SUBMIT A SICK CALL REQUEST;
257. EACH SICK CALL REQUEST RESPONDED TO THE NEXT DAY WITH CARE THAT MEETS THE REQUIREMENT OF THE EIGHTH AMENDMENT.
258. NO LIMIT ON IN-CELL AND R-N-D STORAGE SPACE
259. IN ALL PRISON IN THE PA, DOC WHERE PLAINTIFF IS HOUSED (INCLUDING OUT PATIENT PROGRAMS, HALF WAY HOUSES-N-MENTAL INSTITUTIONS) SHALL PROVIDE PLAINTIFF SPACE, A SPECIFIC

AC: 2:15-CV-1031

DAY OF THE WEEK AND TIME FOR WEEKLY WORSHIP SERVICES - STUDY GROUPS, AND SELF EN-HANCEMENT AWARENESS, ALL CONSISTING OF 120 MINUTES PER SESSION; ANNUAL CELEBRATION, OBSERVATION, AND FESTIVITIES THAT ARE RECOGNIZED BY THE CHILDREN OF THE SUN CHURCH, i.e. THE ENTIRE BLACK HISTORY MONTH (FEBRUARY); ENTIRE KWANZZA SEASON, i.e. DECEMBER 26-JANUARY 1st, MAY 25th: AFRICAN LIBERATION DAY; JUNETEENTH; NAKUMBIKAY DAY; NOVEMBER 11th; AND ANNUAL PICNIC, PLAINTIFF RELIGIOUS SERVICES ARE GROUNDED IN THE TEACHINGS OF THE CHILDREN OF THE SUN CHURCH. . . . CHILDREN OF THE SUN CHURCH BE PEMITTED TO SPONSOR A SALE ONCE EVERY THIRTY DAYS WHEREIN THE CHILDREN OF THE SUN CHURCH RECEIVES ONE HUNDRED PERCENT OF THE PROCEEDS, TOTAL FREEDOM TO INVITE AS SPEAKER FOR WORSHIP SERVICES -N- FESTIVITIES, PER PLAINTIFF PERSONAL CHOICE.

260. PERMANENT FACILITATOR FOR CHRISTIAN BLACK STUDIES, LEADER OF CHILDREN OF THE SUN CHURCH WORSHIP SERVICES, AND SELF ENHANCEMENT AWARENESS GROUP WITH A THE HIGH-EST POSSIBLE PAY RATE FOR EIGHT HAUS DAILY -N- SEVEN DAYS

261. A DECLARATION THAT THE ACTS AND OMISSIONS DESCRIBED HEREIN VIOLATED PLAINTIFF RIGHTS UNDER PA. CONSTITUTION, ARTICLE 1 § 26; AND FIRST, EIGHTH-N-FOURTEEN AMENDMENTS

262. REINSTATEMENT OF WASHINGTON V. FOLINO, 2:11-CV-1046, TO ACTIVE DOCKET

263. PRELIMINARY AND INJUNCTIVE RELIEF

264. COMPENSATORY DAMAGES IN THE AMOUNT OF $500,000 AGAINST EACH JOINTLY AND SEVERALLY

265. COMPENSATORY DAMAGES FOR PSYCHOLOGICAL OR EMOTIONAL INJURY PER 42 USC § 1997e(e) WH-ERE IT STATES: COMMISSION OF A SEXUAL ACT AS DEFINED IN SECTION 2246 OF TITLE 14 U.S.C., 18 USCS. 2241 (A) SEXUAL ACT (C) THE PENETRATION HOWEVER SLIGHT OF THE ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~ ANUS OR GENITAL OPENING OF ANOTH-ER BY A HAND OR FINGER OR BY OBJECT WITH AN INTENTION TO ABUSE, HUMILIATE, HARASS, DE-GRADE, OR AROUSE, OR GRATIFY THE SEXUAL DESIRE OF ANY PERSON (SEE 176, 178, 179) (84)

(3) THE TERM "SEXUAL CONTACT" MEANS THE INTENTIONAL TOUCHING EITHER DIR-ECTLY OR THROUGH THE CLOTHING OF GENATALEA, ANUS, BREAST, BREAST, INNER THIGH OR BUTTOCKS OF ANY PERSON WITH AN INTENTION TO ABUSE, HUMILIATE, HARASS, DEGRADE, OR AR-OUSE, OR GRATIFY THE SEXUAL DESIRES OF ANY PERSON

266. PUNITIVE DAMAGES IN THE AMOUNT OF $1,500,000 AGAINST EACH DEFENDANT

267. A JURY TRIAL ON ALL ISSUES TRIABLE XINRY

268. PLAINTIFF'S COSTS IN THIS SUIT

269. ANY ADDITIONAL RELIEF THIS COURT DEEMS JUST, PROPER, AND EQUITABLE

X. DECLARATION OF HENRY UNSELD WASHINGTON

270. PLAINTIFF REALLEGE AND INCORPORATE PARAGRAPHS 1 - 269, BY REFERENCE

271. HENRY UNSELD WASHINGTON HEREBY DECLARES:

272. I, HENRY UNSELD WASHINGTON, AM THE PLAINTIFF IN THE ABOVE CAPTIONED, CURR-ENTLY HOUSED AT SCI-SOMERSET.

273. ON OR NEAR THE LAST WEEK OF JULY 1997, SCI-GREENE DOC STAFF USED THREE FOOT BATONS TO VICIOUSLY BEAT ME TO THE GROUND, PRESSED A STEEK ACROSS MY THROAT, FORCEFULLY IN-SERTED MY RECTUM, DENIED MEDICAL CARE FOUR STRAIGHT DAYS IN A FREEZING COLD CELL WHILE BLEEDING FROM THE MOUTH -N- RECTUM

274. IN MY ENDING ATTEMPT TO OBTAIN JUSTICE FOR THE FOREMENTIONED ABUSE; AND MED-ICAL CARE I BEGIN, CONTINUE TO DATE; MAILING LETTER TO PEOPLE OF INFLUENCE e.g. POPE JOHN PAUL, MOTHER TERESA, WINNIE -N-NELSON MANDELLA, BILL -N-HILLARY CLIN-TON, GEORGE W. BUSH, MICHELLE -N-BARACK OBAMA, PRESIDENT -N-VICE-PRESIDENT, ELECT DONALD J. TRUMP -N-MIKE PENNCE, PA. GOVERNOR'S US. -N- STATE SENATOR, U.S. CONG-RESSMEN- STATE REPRESENATIVES, PA LEGISLATIVE BLACK CAUCUS -N- U.S. CONGRESSION-AL BLACK CAUCUS, BLACK ELECTED OFFICAL -N-PUBLIC FIGURES -N-BLACK SPORTS FIGURES.

275. I ALSO CONTACTED LORRETTA LYNCH, JANET RENO, ERIC HOLDER, NUMEROUS FAMOUS LAWYERS, e.g. JOHNNIE COCHRAN, JEFFREY FIEGER, ROY BLACK, WILLIAM KUNSTER, RON KUBY, GLORIA ALRED, BRET BROTE, COUNTLESS OTHERS

276. THE CAUSED MARTIN HORN, JEFFREY BEARD, JOHN WHEZEL AND DOC STAFF, CENTRAL OFF MEDICAL PROFESSIONALS COUNSELOR UNIT MANAGERS, RETALIATED AGAINST ME IN THE MAST VICIOUS WAYS, INCLUDING THE MAIL INSPECTOR SUPERVISOR, STILL ON GOING AT, SCI-SOMERSET TO DATE!

AC: 2:15-CV-1031

Washington000089

(38)

277. ON OR NEAR 8.18.09, FOR THE SECOND TIME PLAINTIFF WAS TRANSFERRED INTO SCI-GREENE, (SEE, ¶¶ 91, 93-99, 101, 103, 104, 110, 121, 123, 127, 135, 174-185)
AND ASSIGNED TO A CELL IN THE RHU, WHAT FOLLOWED WAS A REIGN OF HIDEOUS SEXUAL-N-PHYSICAL ASSAULTS, AND "SEX HARASSED BY DOCTORS: BYUNAHAK JIN, P. DASCANI, DOC STAFF: J.D. SUHAN, R. NELSON, T.S. OSWALD, D. FARRIER, M. STUMP, J, M. SMITH

278. DEFENDANTS, R. GILMORE, MS. T. SHAWLEY, S. R. DURCO, P.E. BARKEFELT, A.J. MORRIS, C. WILLIAMS, B. CRABLE, J.M. SMITH, R. NELSON, T.S. OSWALD, L. COMER, T.I. BENNETT, R. HENDRICKS, J. CODDY, J. HEBET, D. FARRIER, M. STUMP, G. TAIT, J.D. SUHAN, I. VYTHLLOAL, B. JIN, N. PARK, P. DASCANI, M. COMER, E. MATTES, E. MWAHRA, P. DENNISON CONTINUOUSLY DECLARED 4-5 TIMES PER 8-HOURS SHIFT FROM 4-6 DIFFERENT DEFENDANTS ON A DAILY BASIS; THEY WERE PENALIZING ME FOR MY HAVING SUED THEM PERSONALLY, THEIR FELLOW SCI-GREENE DOC STAFF MEMBERS-N-

MEDICAL PROFESSIONALS, AND FOR MY CONTINUOUS COMMUNICATIONS WITH AUTHORITIES, i.

e., THE COURT, PA. DOC CENTRAL OFFICE, AND FILING GRIEVANCES CONCERNING THEIR CON- (SEE, 87-224)

TINUOUS RETALIATIONS AGAINST PLAINTIFF, AND THE DOJ.

279. EACH DEFENDT, SOME ONCE OR TWICE, OTHERS ROUTINELY ON A DAILY BASIS UNTIL 7.14.15, TAUNTED ME WITH THEIR BRAGGING-N-BOASTING ABOUT HAVING PENALIZED ME i.e. "SEXUALLY-N-PHYSICALLY ASSAULTED"-N-"SEXUALLY HARASSED" ME, EVEN WHILE I EXHIBITED CLASSIC HEART ATTACK SYMPTOMS, DENIAL OF MEDICAL CARE-ACCESS TO COURT-TO OUTGOING MAIL-REQUEST TO STAFF, DC ADM 804 INMATE GRIEVANCE SYSTEM, COMMANDEERING MY OUTGO-ING MAIL, TIMELY SUBMITTED GRIEVANCES; RIPPING MY TIMELY FILED GRIEVANCES INTO SMALL PIECES WHILE STANDING BEFORE ME, DESTRUCTION OF MY PERSONAL PROPERTY; ENTERING MY CELL WHILE I AM IN THE SHOWERS, OR THE FEW TIMES I WAS ALLOWED OUTDO EXERCISE, THEN RE-MOVE THE INMATE COPY OF ANY-N-ALL GRIEVANCES HAVING NOT BEEN ASSIGNED A GRIEVANCE TRACKING NUMBER, KNOWINGLY PRESCRIBE FOODS THEY KNEW WOULD EXACERBATE MY INTEST-INAL GRIPE, (SEE, PRSSTM; 88-91, 93-99, 101, 103, 104, 110, 121, 122, 127, 135, 136, 139, 142, 144, 145, 174-185, 199-213, 217-21)

280. THESE WERE NOT JUST INDIVIDUALS BLOWING OFF STEAM, EACH SCI-GREENE DOC STAFF MEM-BERS AND MEDICAL PROFESSIONAL CITED IN THIS LEGAL ACTION FOLLOWED UP THEIR THREATS WITH ACTIONS SEVERAL TIMES OVER (PRISSIM AT 87-224)

281. I HAVE EXHAUSTED ALL AVAILABLE REMEDIES PURSUANT TO DC-ADM 804 INMATE GRIEVANCE SYSTEM, i.e., NUMEROUS TIMES I REFILED GRIEVANCE THREE-FOUR TIMES, BECAUSE THE INITIAL GRIEVANCES, ALTHOUGH TIMELY FILED WAS NOT RESPONDED TO, WHICH MEANS MY TIMELY FILED GR-IEVANCE WERE NEVER ASSIGNED A GRIEVANCE TRACKING NUMBER (SEE, 199-213, 217-221)

282. I EVEN FILED MORE THAN FOUR GRIEVANCES CONCERNING MY TIMELY FILED GRIEVANCES NOT BEING RESPONDED TO, WHAT FOLLOWED WAS I DIDN'T RECEIVE A RESPONSE TO EITHER THOSE TIMELY FIL-ED GRIEVANCE, TOO.

283. MORE THAN ONCE I SUBMITTED REQUEST TO GRIEVANCE COORDINATOR, TO AVAIL; AND DURING MORE THAN ONE CONFIDENTIAL INTERVIEW WITH GRIEVANCE COORDINATOR, I INQUIRED AS TO WHY MY TIMELY SUBMITTED GRIEVANCES WERE NOT BEING RESPONDED TO, AND NO GRIEVANCE NUMBER WAS NOT BEING ASSIGNED LIKE-SHE DOES WITH GRIEVANCES FILED BY OTHER INMATES, WH-AT WAS HER RATIONALE FOR NOT SENDING MY MONTHLY INDIGENT PACKAGE (SEE, 207, 208)

284. EACH TIME THE GRIEVANCE COORDINATOR, DEFENDANT, MS. T. SHAWLEY TOLD ME SHE WAS FULLY AWARE OF MY LITANY OF GRIEVANCES, SHE WAS NOT RETURNING THE INMATE COPY OF MY TIMELY FILED GRIEVANCE TO ME; WAS NOT ASSIGNING A GRIEVANCE TRACKING NUMBER TO ANY OF THOSE GRIEVANCES, OR APPEALS; AND I WOULDN'T GET MY INDIGENT PACKAGE; BECAUSE THIS WAS HER WAY OF PENALIZING ME FOR MY SUING HER, AND SCI-GREENE DOC STAFF-N-MEDICAL PROFESSION-ALS, AND MY CONTINUOUS COMMUNICATIONS WITH AUTHORITIES (SEE, 32-54 46, 50-53, 55-57, 61, 74)

285. MORE THAN A DOZEN TIME CPT. S.R. DURCO, RHU COMMANDER, CAME TO MY CELL (ON AT LEAST ONE OCC-ASION, ACCOMPANIED BY R. GILMORE, WARDEN) UNREQUESTED, WHILE HOLDING SEVERAL OF MY OUT-GOING TIMELY SUBMITTED GRIEVANCES IN HAND, DECLARED THAT HE WAS GOING TO PENALIZE ME BY DESTROYING THESE TIMELY SUBMITTED GRIEVANCES, THEN RIPPED THESE GRIEVANCES INTO SMALL PIECES, ACCORDING TO HIM HE DID SO BECAUSE I WAS SUING HIM, SCI-GREENE DOC STAFF-N-MEDI-CAL PROFESSIONALS, AND FOR CONTINUOUS COMMUNICATIONS WITH AUTHORITIES (SEE, 52, 53, 199-214)

286. P.E. BARKEFELT, RHU LIEUTENT, WHO PROVIDE WRITING PAPER TO INDIGENT INMATES; I AM A INDIG-ENT INMATE; THIS IS DONE TWICE EACH MONTH, HE CONTINUOUSLY DENIED ME MY INDIGENT WRITING PAPER WHICH DENIED MY ACCESS TO COURT, WHEREIN I WAS FORCED TO DRAFT MY PLEADINGS TO WASHINGTON, FOLLELNO, 2:11-CV-1246, IN TINY PRINT, TWO LINES INSIDE OF ONE SPACE, WHICH HIND-

FERED, STYMIED-N-PREVENTED ME FROM SUBMITTING A COMPLAINT IN COMPLIANCE TO FRCP 8 (SEE, 32-44, 45, 46, 51)

287. A. J. MORRIS, THE RHU LIEUTENANT PROCURED THE PROCESS OF OUT-GOING GRIEVANCES, ON MORE THAN A FEW TIMES! A. J. MORRIS, CAME TO PLAINTIFF CELL, (ON ONE OF THOSE OCCASIONS) A, BILMORE ACCOMPANIED A. J. MORRIS) HOLDING SEVERAL OF MY TIMELY FILED GRIEVANCES IN HAND, DECLARED HE WAS PENALIZING ME FOR SUING HIM, SCI-GREENE DOC STAFF-N-MEDICAL PROFESSIONALS, AND FOR MY CONTINUOUS COMMUNICATIONS WITH AUTHORITIES, THE RIPPED PLAINTIFF TIMELY FILED GRIEVANCES INTO SMALL PIECES, AND PLACED THEM INTO A TRASH BARREL (SEE, 52, 53)

288. I DID EVERYTHING WITH REASON TO EXHAUST ALL AVAILABLE REMEDIES PER DC-ADM 804 INMATE GRIEVANCE SYSTEM, SCI-GREENE DOC STAFF CONSISTENTLY-N-CONTINUOUSLY DENIED ME ACCESS TO THE GRIEVANCE BY SELECTIVELY DESTROYING-N-COMMANDEERING MY TIMELY FILED GRIEVANCES THEREFORE, IF A VIOLATION WAS NOT ADDRESSED WITH THE GRIEVANCE, IT IS BECAUSE I WAS NOT ALLOWED TO FILE A GRIEVANCE. EVEN THOUGH I ATTEMPTED TO DO SO THREE-FIVE TIMES, PLUS I WAS DENIED FOOD-N-AT TIMES ALSO WATER FOR MY FILING GRIEVANCES, (SEE 35-44, 45, 46, 51-57, 268-275)

289. I HAVE DEMENTIA, EVEN THOUGH I HAVE FILED MORE THAN THREE LAWSUIT ALREADY THEY HAVE FAILED DUE TO LACK OF LEGAL SKILLS. I HAVE SUFFERED FROM HIDEOUS RACIALLY MOTIVATED SAVAGE RETALIATORY ACTS, AND ONCE AGAIN MORE-N-MORE IT SEEMS THOSE WHOM PSYCHOLOGICALLY DAMAGE-N-PHYSICALLY DAMAGED MY LIFE WILL NOT BE HELD RESPONSIBLE DUE TO MY LACK OF EDUCATION, MENTAL HEALTH-N-LACK OF LEGAL SKILLS . . . I AM A INDIGENT INMATE, BOTH PARENTS NOW DECEASED, I AM POOR, THEREFORE, I AM UNABLE TO HIRE AN ATTORNEY

290. TO DATE! MY HEALTH IS RAPIDLY FAILING I SUBMIT 2-3 SICK CALL REQUEST ON A WEEKLY BASIS, WHEREBY RARELY ARE MY SICK CALL REQUEST RECOGNIZED, AND I A MOCKED DURING THE FEW TIMES I'M SEEN. WHAT FOLLOWS IS EVEN SCI-SOMERSET MEDICAL PROFESSIONALS TO DATE ARE DENYING ME MEDICAL CARE THAT IS REQUIRED BY THE EIGHTH AMENDMENT, STILL NEAR BLIND IN RIGHT EYE, SO WEAK THAT WALKING IS TIRESOME, UNABLE TO SPEAK ALOUD, URETHRAL STRICTURE, etc., WITHOUT THE HELP OF THE COURT I WILL DIE BROKE, BLIND, HUNGRY, FULL BLOWN DEMENTIA DUE TO COUNTLESS SEXUAL-N-PHYSICAL ASSAULTS AND SEXUAL HARASSMENT CARRIED (SCI-SOMERSET) DOC-N-MEDICAL PROFESSIONALS ACTING ON BEHALF OF SCI-GREENE DOC STAFF-N-MEDICAL PROFESSIONALS) OUT BY SCI-GREENE DOC STAFF AND MEDICAL PROFESSIONALS. (SEE, 36-44, 50-86)

291. I WAS CONSISTENTLY SINGLED OUT BY SCI-GREENE (TO DATE! SCI-SOMERSET) DOC STAFF AND MEDICAL PROFESSIONALS, FOR MOCKERY, VICIOUS ACTS OF BARBARIC SEXUAL-N-PHYSICAL ABUSES, SEXUAL HARASSMENT, DENIAL OF BASIC HUMAN NEEDS-N-RELIGION PRACTICE. (SEE, 32-290 PASSIM)

## VERIFICATION

I HAVE READ THE FOREGOING COMPLAINT-N-DECLARATION AND HEREBY VERIFY THAT THE MATTERS ALLEGED THERE IN ARE TRUE, EXCEPT AS TO MATTERS ALLEGED ON INFORMATION AND BELIEF, AND AS TO THOSE, I BELIEVE THEM TO BE TRUE, I CERTIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT EXECUTED AT SCI-SOMERSET, SOMERSET, PA, ON JANUARY 23, 2016

DATED: 1.23.17

"RESPECTFULLY SUBMITTED"
s/ Henry Unseld Washington
HENRY UNSELD WASHINGTON
AM-3086
PRO SE

Washington000091
AC:2:15-CV-1031

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HENRY UNSELD WASHINGTON,          :
                                  :
              Plaintiff,          :
                                  :     Civil Action No. 15-1031
        v.                        :     Magistrate Judge Lenihan
                                  :
ROBERT D. GILMORE, et al,         :     *Electronically Filed*
                                  :     **JURY TRIAL DEMANDED**
              Defendants.         :
                                  :

## DOC DEFENDANTS' AMENDED ANSWER TO SECOND AMENDED COMPLAINT

AND NOW come DOC defendants Oswald, Smith, Farrier, Stump *and*

*Vihlidal*[1], by their attorney, Mary Lynch Friedline, Senior Deputy Attorney

General, and submit the following Answer to Plaintiff's Second Amended

Complaint (ECF 76):

## FIRST DEFENSE

Defendants incorporate herein by reference the District Court's Amended

Memorandum Order (ECF 100) adopting the Report and Recommendation dated

3/31/17 (ECF 96). By that Order, the Court dismissed all of plaintiff's claims

against the DOC defendants with the exception of his claims for alleged sexual

---

[1] *While preparing disclosures as directed by the Court, counsel just realized that Defendant CHCA Vihlidal was still a party to the case (see R&R at ECF 96, where Vihlidal was kept in the case along with the medical defendants). This was inadvertent and counsel apologizes to plaintiff and to the Court for her oversight. Counsel is thus filing an Amended Answer, with the only change being to include CHCA Vihlidal and to address the only allegations remaining against her - at ¶209 and 210, limited to the 2-year time frame specified in the R&R.*

harassment/assault in violation of the Eighth Amendment against Oswald, Smith, Farrier and Stump at ¶¶ 174-80, 184 and 185, and certain claims against CHCA Vihlidal at ¶¶209-210 (limited to the 2013-2015 time frame). Defendants deny that they engaged in any improper conduct with plaintiff and specifically deny his claims of sexual harassment or assault. Further, CHCA Vihlidal does not provide clinical medical treatment and was not deliberately indifferent to any serious medical need plaintiff may have had; further, plaintiff was being followed by medical and mental health staff and receiving appropriate treatment. Further, his outrageous claims against the medical staff for sexual and other misconduct were frivolous.

In light of the Court's Order granting defendants' Motions and limiting the claims, defendants are only responding to the allegations directed to them in the following paragraphs, as highlighted in the R&R at ECF 96.

10, 12, 18, 19.    Admitted only that these defendants (Smith, Oswald, Farrier and Stump) were all employed by SCI-Greene at the time of the events alleged. The remaining averments are conclusions of law to which no response is required.

23.    Admitted only that defendant Vihlidal was the CHCA at SCI-Greene. The remaining averments are denied. Moreover, plaintiff's legal conclusion that defendant was "legally responsible" for operation of the medical department and for the care provided to inmates is false and contrary to the law.

174-180.    Denied.

184-185.    Denied.

2

209-210.    Denied.

To the extent there are factual allegations directed to these defendants in any other paragraphs of plaintiff's Second Amended Complaint, those allegations are denied.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's Second Amended Complaint fails to state a claim on which relief may be granted.

### THIRD AFFIRMATIVE DEFENSE

Defendants' actions and decisions with respect to plaintiff were based upon legitimate penological interests, and at no time did the defendants engage in sexual harassment against plaintiff or sexually assault him; nor did they use excessive force or act with deliberate indifference toward plaintiff.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff failed to properly exhaust his remedies under the PLRA and has procedurally defaulted.

### FIFTH AFFIRMATIVE DEFENSE

To the extent that plaintiff seeks relief from any defendant in his official capacities for claims in the nature of a constitutional violation, such relief is barred by the Eleventh Amendment.

### SIXTH AFFIRMATIVE DEFENSE

At no time have defendants, either individually or in concert with others, deprived or sought to deprive the plaintiff of any rights, privileges or immunities secured to him by the Constitution or laws of the United States.

3

Washington000094

## SEVENTH AFFIRMATIVE DEFENSE

Defendants were at all times acting in good faith and in an objectively reasonable manner and did not violate any clearly established federal right of plaintiff. Therefore, they are entitled to qualified immunity and/or qualified good faith immunity from civil damages.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff suffered no actual injury as required under the PLRA and is limited to nominal damages, if any.

## NINTH AFFIRMATIVE DEFENSE

To the extent that plaintiff asserts state law claims, they are barred by the Pennsylvania Sovereign Immunity Act.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claim for punitive damages is barred under the PLRA.

## ELEVENTH AFFIRMATIVE DEFENSE

Defendant Vihlidal was not deliberately indifferent to a serious medical need; rather, plaintiff was being followed by the medical staff and received appropriate care and treatment.

WHEREFORE, Defendants request that plaintiff's Second Amended Complaint be dismissed with prejudice.

A JURY TRIAL IS HEREBY DEMANDED.

4

Washington000095

Respectfully submitted,

JOSH SHAPIRO
Attorney General

By:     /s/ Mary Lynch Friedline
        MARY LYNCH FRIEDLINE
        Senior Deputy Attorney General
        PA ID. #47046

OFFICE OF ATTORNEY GENERAL
564 Forbes Avenue, Manor Complex
Pittsburgh, PA 15219

February 22, 2018

5

Washington000096

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2018, I electronically filed the

foregoing DOC Defendants' **Amended ANSWER TO SECOND AMENDED**

**COMPLAINT** with the Clerk of Court using the CM/ECF system. This document

will be mailed via U.S. mail to the following non CM/ECF participants:


**HENRY UNSELD WASHINGTON**
AM-3086
S.C.I. Somerset
1600 Walters Mill Rd
Somerset, PA 15510

By:    /s/ Mary Lynch Friedline
        MARY LYNCH FRIEDLINE
        Senior Deputy Attorney General


Office of Attorney General
564 Forbes Avenue
Manor Complex
Pittsburgh, PA 15219

6

Washington000097

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3     HENRY UNSELD WASHINGTON,

4              Plaintiff,
         vs.                          Civil No. 15-1031
5
      J.M. SMITH, T.S. OSWALD,
6     D. FARRIER, AND M. STUMP.

7              Defendants.
                                 _ _ _
8

9     Transcript of Jury Trial Excerpts of Opening Statements,
      Henry Unseld Washington and Judgment of Acquittal Motion on
10    June 12, 2023, in the United States District Court, Pittsburgh,
      Pennsylvania, before The Honorable Cathy Bissoon, District
11    Judge.

12

13    APPEARANCES:

14    For the Plaintiff:    Pro Se

15    For the Defendants:   Scott A. Bradley, Esquire
                            Amelia Jean Goodrich, Esquire
16                          Pennsylvania Office of Attorney General
                            Civil Litigation
17                          1251 Waterfront Place
                            Suite Mezzanine Level
18                          Pittsburgh, PA 15222

19    Court Reporter:       Sharon Siatkowski, RMR, CRR, CBC, CRI
                            700 Grant Street, Suite 5300
20                          Pittsburgh, Pennsylvania 15219
                            412.773.3623
21

22

23

24    Proceedings recorded by mechanical stenography; transcript
      produced by computer-aided transcription.
25
```

```
1                          I N D E X

2   Proceeding                                        Page

3
    OPENING STATEMENT
4       By Mr. Washington                                4
        By Mr. Bradley                                   4
5
    WITNESS:
6
    HENRY UNSELD WASHINGTON
7       Direct Examination by Mr. Washington            12
        Cross-Examination by Mr. Bradley                19
8       Redirect Examination by Mr. Washington          41

9   JUDGMENT OF ACQUITTAL MOTION                        43
        By Mr. Bradley
10
    JUDGEMENT OF ACQUITTAL RULING                       44
11      By Judge Bissoon

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                         - - -
 3              (In open court, 2:23 p.m.)
 4         THE COURT:  All right.  As we discussed previously,
 5    we'll be doing opening statements from your desk right in front
 6    of you.
 7              Will you be doing the opening statements, Mr. Bradley?
 8         MR. BRADLEY:  Yes, Your Honor.
 9         THE COURT:  I think we're ready.  Are you ready,
10    Mr. Washington?
11         MR. WASHINGTON:  I guess so.
12         MR. BRADLEY:  Your Honor.
13         THE COURT:  All right.
14         MR. BRADLEY:  Excuse me.
15         THE COURT:  Yes.
16         MR. BRADLEY:  Are we able to move the podium?  It's
17    sort of in the line of sight.
18         THE COURT:  Yeah.  Just roll it over to the corner.
19    Maybe even in this corner over here, Jamille, if you can do
20    that.  It might be -- it might be plugged.  Just make sure it's
21    not plugged.
22         THE COURT:  Okay.  You can get the jury.
23         (Pause.)
24         (Jury panel enters.)
25         THE COURT:  Please be seated.  I think I neglected to
```

```
 1    mention to Jurors Number 9, 10, and 11 that you are now Jurors
 2    Number 5, 6, 7, 8.  All right.  Very good.
 3            All right.  Mr. Washington, are you ready to start
 4    with your opening statement?
 5            MR. WASHINGTON:  I guess so.
 6            THE COURT:  Just speak directly into that microphone
 7    in front of you so that everybody can hear you.
 8            MR. WASHINGTON:  What the evidence will show here is
 9    that I was sexually assaulted and the motive was not penological
10    interest.  It was tended to be more humiliation or either some
11    type of sexual gratification.  Looking to humiliate me more than
12    anything else.
13            And these were not routine duties.  This was not a
14    part of their duty.  This was not a part of the officers' duty.
15    Uh-huh.
16            This occurred on three different dates but it was more
17    than three acts, that's what I wanted to correct.
18            THE COURT:  Okay.  Thank you, Mr. Washington.
19    Mr. Bradley.
20            MR. BRADLEY:  May it please the Court.
21    Mr. Washington.  Ladies and gentlemen of the jury.  The saying
22    goes, there are two sides to every story.  This is our first
23    opportunity to tell you the other side of the story in this
24    case.
25            Good afternoon.  Although we met earlier today, let me
```

1   formally introduce myself and Ms. Goodrich.  My name is Scott

2   Bradley.  I'm a deputy attorney general with the Pennsylvania

3   Office of Attorney General.  And, again, with me is Deputy

4   Attorney General Amy Goodrich.  It is our honor and privilege to

5   represent the Defendants in this case:  Corrections Officers

6   Timothy Oswald, Justin Smith, David Farrier, and Michael Stump.

7   We will be representing these individuals and advocating on

8   their behalf in this matter.

9           I wanted to take this opportunity to introduce

10  ourselves and the officers we represent in this case.  As Judge

11  Bissoon just explained before lunch, because Mr. Washington

12  bears the burden of proof in this case, he will present his case

13  first.  So this is our chance to provide you, the jury, with a

14  preview of the case we intend to present.

15          However, before I begin, there are two points I want

16  to emphasize as you hear the evidence in this case.  First, in

17  the field of corrections, officers and guards are permitted

18  under the law to, in certain circumstances, place their hands on

19  the inmates in their custody and control.  It can be for

20  purposes of conducting a search, for maintaining control over

21  the inmate during an escort from one place to another, and even

22  for using physical force to maintain order and discipline within

23  the prison.

24          The limits of this entitlement is established by the

25  Eighth Amendment.  Now, most of you have probably heard the

1   phrase "cruel and unusual punishment."  This comes from the
2   Eighth Amendment, and it prohibits force or conduct beyond that
3   which is reasonably required and a good faith effort to maintain
4   or restore discipline or, as Judge Bissoon explained before
5   lunch, for a legitimate, law enforcement, or penological
6   purpose.

7          With regard to claims of sexual abuse or harassment,
8   our courts have held that sexual assault meets the standard of
9   impermissible punishment under the Eighth Amendment because
10  sexual assault cannot and does not serve legitimate governmental
11  objectives, which leads to the second and perhaps more important
12  point.

13         Although prisoners do forfeit certain rights upon
14  incarceration, they do not forfeit basic human rights, including
15  the right to be free from sexual abuse or sexual assault by the
16  guards.  So we're not here to tell you that to sexually harass
17  or sexually abuse an inmate would not violate the constitution
18  of the Eighth Amendment.  Of course, it would.  And each of
19  these officers will testify from that stand that it would.
20  However, what they will also tell you is that they unequivocally
21  did not sexually abuse or sexually assault Mr. Washington, as he
22  claims.

23         The opening statements should tell the story of the
24  case.  They say that the essential elements of the story are the
25  so-called five Ws:  who, what, where, when, and why.  Using

1   these questions as a guide, this is the Defendants' case.  And

2   we'll start with the easy questions:  who, where, and when.

3           Obviously, we have the Plaintiff, Mr. Washington, and

4   you have heard briefly from him regarding his allegations.

5   There are four Defendants in this case related to three separate

6   incidents put forth by Mr. Washington.

7           At the time in question, all four officers were

8   employed by the Pennsylvania Department of Corrections and

9   except for Michael Stump, all of them still are.  All four were

10  working as corrections officers at the State Correctional

11  Institution at Greene.

12          Now, in the course of this trial, you're going to hear

13  some acronyms and abbreviations, such as SCI for State

14  Correctional Institution, DOC for Department of Corrections, CO

15  for corrections officers.  We'll try our best to identify those

16  acronyms as the testimony goes forward.

17          You will hear testimony from the witness stand from

18  each of the officers regarding their respective interactions

19  with Mr. Washington, and each will tell you about their service

20  with the Department of Corrections, they'll tell you about the

21  education, the training they received over the years to enable

22  them to perform the duties and responsibilities required of them

23  as corrections officers.

24          When did it happen?  Plaintiff has identified three

25  separate incidents occurring on August 1, 2013; April 2, 2015;

1   and July 14, 2015.

2         Where did it happen?  At the relevant time,

3   Mr. Washington was confined at the State Correctional

4   Institution at Greene, or SCI-Greene, which is located in

5   Waynesburg, down in Greene County, about an hour south if you're

6   on I-79.

7         I'm going to combine the last two, what and why,

8   because essentially that's what you're here to decide.  As you

9   have heard, Mr. Washington alleges that on each of these dates,

10  August 1, 2013, April 2nd and July 14th of 2015, his Eighth

11  Amendment rights were violated when these officers sexually

12  abused and sexually assaulted him.  This is the part of the

13  story you'll have to eventually decide.  You'll have to

14  determine whether Mr. Washington was subjected to sexual

15  harassment or sexual assault by Officers Oswald and Smith on

16  August 1st, by Officer Oswald on April 2nd, and by Officers

17  Farrier and Stump on July 14th.  However, each of these officers

18  will again take the witness stand and categorically deny that

19  they sexually harassed or sexually assaulted Mr. Washington on

20  any occasion.

21        Now, one of the most basic common, fundamental,

22  repetitive jobs of a corrections officer is escorting an inmate

23  from one place to another within the institution.  It is my

24  understanding that Mr. Washington claims that each of these

25  incidents occurred in the course of an escort from one place to

1    another.

2         I mentioned this because, over the years of their

3    careers, these officers have engaged in hundreds, if not

4    thousands, of inmate escorts from one place to another.  One

5    thing I can tell you is that these do not occur in a vacuum;

6    they take place from one part of the prison to another.  There

7    is never a time when during these escorts the officers and

8    inmates will be alone with the inmate.

9         As I said, this is the part of the story that will

10   ultimately be up to you, the jury, to determine.  As you heard

11   from Mr. Washington, he alleges that he was sexually harassed

12   and abused by these officers on the dates identified.  You must

13   decide whether these officers caused a violation of

14   Mr. Washington's rights under the Eighth Amendment.

15        Ladies and gentlemen, your service in this case

16   exemplifies the need for juries in the American civil justice

17   system.  This isn't a whodunit or some other mystery.  We know

18   who is involved and we know what each side claims.  However, as

19   I have said, this is a story with two different sides.  Your

20   task is to determine which side is telling the truth.  Indeed,

21   on the critical issues where there is disagreement, you will be

22   called upon to resolve the conflicts and testimony in rendering

23   a verdict.  This is the classical function of juries in our

24   system, to determine the facts of the case by evaluating and

25   determining the credibility of witnesses.  We will address this

1    in more detail in our closing.

2            At this point, I just wanted to stress the importance

3    of your service in this case.  Not just to the parties who have

4    a personal stake in the outcome of this case but also, in a

5    larger sense, to the historical traditions of the American jury

6    system.

7            Finally, although I have briefly outlined the defense

8    position for you, because of the trial process, because

9    Mr. Washington bears the burden, you will hear from him first

10   before you hear our side of the story.  I know you'll keep an

11   open mind and wait until you hear both sides of this story

12   before coming to a judgment in this case.

13           I thank you for your attention to this point.  And I

14   am assured that each of you will fulfill your oaths as jurors to

15   fairly hear and try this case.  Thank you.

16           THE COURT:  Okay.  Thank you, Mr. Bradley.  Before we

17   start testimony, we are going to take a little bit of a break

18   just to get situated.  So I'm going to ask the jurors to convene

19   in the jury room briefly and we will invite you back out

20   momentarily.

21           All rise for the jury.

22       (Jury exits courtroom.)

23           THE COURT:  Mr. Washington, if you're going to be the

24   witness, I'd like to get you up in the witness box.

25           And you can feel free to move a chair there if you all

```
1    need to be close by.

2              MR. WASHINGTON:  Now?

3              THE COURT:  If that's how you're going to proceed.

4    You're going to be witness, the first witness, the only witness?

5              MR. WASHINGTON:  I'm the only witness I got.

6              THE COURT:  All right.  Well then, it will be you.

7              Have you decided whether you're going to proceed by

8    asking yourself questions, or are you just going to speak about

9    what happened?

10             MR. WASHINGTON:  I'm going to try and tell as best I

11   can what happened.

12             THE COURT:  Very good.  Okay.

13             Jamille, we'll just swear him in seated.

14             MR. WASHINGTON:  I don't want to hit these buttons by

15   mistake here.

16             THE COURT:  You don't want to do that.  That's not

17   going to be any good.  Move it up and down.

18             When I say "all rise," Mr. Washington, you need not

19   rise, okay, unless you want to, stay seated so they don't see

20   you in shackles.

21             MR. WASHINGTON:  I better get up now.

22             THE COURT:  Okay.

23        (Jury enters courtroom.)

24             THE COURT:  Jamille, if you can swear in

25   Mr. Washington.
```

1           THE DEPUTY CLERK:  You may have a seat, sir.  Would

2  you please raise your right hand.

3           (Administration of the oath.)

4           THE CLERK:  Thank you, sir.  You can put your hand

5  down.  Can you please state and spell your name for the record,

6  sir?

7           MR. WASHINGTON:  My name is Henry Unseld Washington.

8           THE COURT:  Okay.  And just so the jury's aware,

9  Mr. Washington will be his first witness here today.  And so

10  we'll turn the floor over to him.

11           HENRY UNSELD WASHINGTON, the Plaintiff herein, having

12  been first duly sworn, testified in the narrative as follows:

13                      DIRECT EXAMINATION

14           THE WITNESS:  Well, I would like to say that during

15  the course of being housed at SCI-Greene RHU, which is the

16  restricted housing unit, the first incident happened.  I'm using

17  the toilet, and two officers come to my door in the midst of me

18  using the toilet and ordered me to remove myself from the toilet

19  because I had a legal visit.

20           Now, I wasn't allowed to clean my rear end.  I was

21  told to get immediately up or else my visit would be canceled.

22  This is a legal visit.  And I was told to expose my rear end

23  without having cleaned myself and all and put on my jumpsuit.

24           Now, once I got outside the cell, one of the officers

25  started to rub and touch me in a very sexual manner.  And

1  there's something they call a tether that was hooked to my

2  handcuffs.  I was being escorted to the visiting room.  Not only

3  this touching -- and I'm not talking about just my arms or

4  placing your hand on me -- this was rubbing and touching my back

5  and placing your hands on my rear end.

6        And at the same time, I -- it appeared that these were

7  needles or either a pin or some type of object that every time I

8  tried to move, I'd get stuck with this object.  Now, usually

9  these officers carried nightsticks or what you would call a riot

10 stick.  They keep shoving me along with the stick, and it's not

11 just my arm or anything; all of it tended to be on my rear end,

12 trying to insert it into my rectum.  And if I tried to move, I

13 was jerked with the tether or poked with a pin.  I said it was a

14 pin but it was a sharp object.  I don't know which it was.

15        And once I got to the visiting room, when I stepped

16 inside the booth, someone taken -- insert their finger into the

17 cleavage of my buttocks.  And so I jumped, and they snatched the

18 tether back.  Once they closed the door to the visiting room

19 door, someone took the tether -- and the person I believe was

20 doing this was Mr. Oswald -- he pulls it so tight that it caused

21 my arms to come through the wicket.

22        The other gentleman with him, which was a sergeant,

23 has a stick and started to prod me like I was an animal.  And

24 they did it so vigorously that it was pretty much -- it touched

25 my testicles.

Washington000110

1        And I don't know if all of you are aware, but a tender

2  spot on most men is their testicles.  And it pretty much made me

3  so weak that I went to the floor and could not get up.

4        They opened the door to the visiting room to take the

5  handcuffs and tethers off, and I still couldn't get up on the

6  seat for more than, I would say, at least 20 minutes.

7        And on the way back, some of the same things happened:

8  the sticking me and prodding me and acting as though I'm some

9  type of prostitute, calling me names, and specifically would

10  infer to a black person.  And I'm not talking about a racial

11  slur.  I mean honey and sugar and this type of -- blackberry

12  and, you know, that type of stuff.

13        And this went on -- I'd say I got stuck more than four

14  times on the way to and probably about ten times on the way

15  back.  And according to them, they were punishing me for a lot

16  of stuff that I had said to people, like Mother Teresa and to a

17  lot of elected officials around the country because I was -- the

18  way I was being treated --

19        MR. BRADLEY:  Your Honor, I object.  This goes beyond

20  the scope.

21        THE COURT:  Yes.  If you can stick to the allegations

22  in the case.  It's about what happened to you, not what you

23  believe the motivation was.

24        THE WITNESS:  Well, all right.  I did -- all of this,

25  I'm saying, is in the complaint.  All of it.

```
1              THE COURT:  Okay.  No one will have your complaint, so
2    you need to testify.
3              THE WITNESS:  All right.  You know, they took my
4    paperwork away from me.  But it was in the complaint.
5              Listen, according to them -- I didn't make it up.
6    According to them, they were penalizing me for doing that.
7              And when I got back to my cell, I could sense blood
8    running down the back of my leg.  And my crotch was all soaked
9    with blood.  So I wanted to see medical but they wouldn't allow
10   me to see them.  And I hit the emergency button, but nobody ever
11   responded.  So it appears that they had put my emergency button
12   on mute.
13             This was such a humiliating thing for me that I pretty
14   much lost my mind there.  I mean, even today I'm affected by
15   this.  I pretty much go through psychological changes.  Even
16   today I don't like for people to touch me or embrace me or stand
17   near me because it appears I may be going by the same thing.
18   And it's not uncommon for me to -- to envision that this is
19   happening to me over and over and over again.
20             Now, to say this is three different incidents is an
21   understatement.  This is several events that happened in one
22   day.
23             Now, the next one was -- and let me make it clear,
24   these are not officers that was working the pod that I was on.
25   They came from another pod to do this escorting.  And it
```

1   appeared that I was targeted by them because they didn't work

2   this pod, although they were familiar with me.

3          Now, the next -- the next allegation I'd like to make

4   is, once again, a sergeant.  One of the guys that was in the

5   first event had became a sergeant.  The sergeants don't usually

6   do showers.  This is during showers that all of a sudden he

7   appears.  And he wasn't assigned to the block.  How did he get

8   over there?  I don't know.  But he come to get me from the

9   shower and right away he starts.  And I'm saying, "Don't touch

10  me."

11         He's touching me and all up and down my back and

12  across my rump and all up on me, making sounds like a lady.

13  Calling me his blackberry and sweet dark sugar and all this

14  stuff.  Making noise.

15         And escorting me to my cell, I'm trying to get away

16  from him because the last thing you want is someone to see you

17  being treated like if somebody's having sex with you.  So by the

18  time I get to my cell, for, like, maybe the third time, he takes

19  a full hand on my rump in the palm of his hand.  So I'm jumping

20  because I'm trying to keep away from him.  They got a tether

21  they hold to you where you can't go so -- so far.  So he's

22  saying, "Oh, it's soft as cotton," talking about rubbing my rear

23  end and squeezing my rear end.

24         And as I get inside the door, he takes and shoves his

25  finger into my buttocks.  You know, as if he's trying to insert

1   his finger into my rectum.  So he's going to spray me if I run

2   to the back of the cell.  Plus, he has a tether on me.

3          So when I go to get out -- put my hand through the

4   wicket to get them -- for the handcuffs off, he starts again.

5   He ain't trying to get the handcuffs off.  He wants to poke me

6   in the rectum.

7          So that's pretty much the way that that second event

8   happened.  And that was one of the guys that was involved in the

9   first event.  He had became a sergeant then.

10         Now, as you can see, those -- that's more than one act

11  that occurred there in that second date there.

12         Now, I was about to leave.  I hadn't seen these people

13  in, I'd say, a few months.  I don't know exactly but it was more

14  than a few months.  Guys come to my cell.  It might have been,

15  like, 4:30 in the morning.  I'm being transferred to another

16  prison.  They going to fix me.  They going to give me something

17  to leave with.  Take this with you.

18         They start touching me.  And every stop we make, they

19  stand up against me making their -- you know, their penis rub up

20  against my leg and my thighs.  I don't want that to happen, so

21  I'm trying to get away from them.  But there's only so much you

22  can do.  And you don't want to get sprayed or beat up with

23  sticks.

24         And this happened.  And I think we may have at least

25  four stops, if not six stops.  And so the same thing kept

1   happening.  They wanted to touch me.  And so with my hands

2   behind my back, they want to stand up so close that my hands are

3   going to touch their penis.  So I don't want that to happen.

4           And it ain't just -- these were not coincidences.  And

5   these are not the routines that any officer is taught to do for

6   the role of an officer.  And these are not stuff that every

7   inmate go through.  According to these individuals, and they did

8   this more than once, this were to teach me a lesson.  This was

9   something to take with me.

10          When we got to the R&D, you had to wait until they

11  opened the doors.  There they go again, up against me.  And they

12  going so hard that they squirted something on my hand.  When I

13  say "squirted something on my hand," I'm talking about semen.

14  And once I got inside, and I'm doing all I can to keep from

15  breaking down crying at the time, I took what I could and

16  cleaned my hands and put it on my sock.

17          I had this sock in my property up until July of just

18  past.  I don't know where my property is now and I don't know if

19  the sock is still in there.  I kept complaining, complaining

20  trying to get it, but nobody would give me my property.

21          Now, that's -- that's the situation there.  I don't

22  know how to explain it to you any different.  But believe me, I

23  spoke to psychiatrists, psychologists, and everything about it.

24  And the way they're talking, I'm going to be going through it --

25  that's never going to leave my mind.  It's not going to leave my

```
1    mind.
2              I'm not proud to say it, but yes, I was treated very
3    bad and humiliated.  It's terrible.
4              THE COURT:  Okay.  Is that all, Mr. Washington?
5              THE WITNESS:  I don't know much else to say, Miss.
6              THE COURT:  Okay.  All right.  Any cross-examination?
7              MR. BRADLEY:  Yes, Your Honor.
8                          CROSS-EXAMINATION
9    BY MR. BRADLEY:
10        Q.   Good afternoon, Mr. Washington.  In the first
11   incident, which has been identified as August 1, 2013, what
12   housing unit were you in?
13        A.   I believe it was -- the housing unit, you speaking of
14   block, right?  This is the RHU.
15        Q.   I'm sorry.  What was the designation of the block?
16        A.   I believe this was G block.
17        Q.   And you indicated that when you were in G block you
18   wore a jumpsuit?
19        A.   Yeah.  They -- they make everybody wear jumpsuits.
20        Q.   And is that a one-piece piece of clothing?
21        A.   Yeah.  You -- it's all made of one piece.  You have to
22   step in and then button it up.
23        Q.   And you said you were going for a legal visit that
24   day.  Where was the legal visit?  Within the institution, where
25   was the legal visit?
```

1      A.    It was part of RHU.  They got their own little special

2   area where they go for the legal visits.

3      Q.    Did you have to leave G block itself to get to the

4   visiting area?

5      A.    I would say so.  I wouldn't envision that to be

6   G block.  And plus, this has been more than a couple of days

7   ago.  So I don't remember exactly where it was.

8      Q.    Do you recall having to leave G block, though?

9      A.    Well, yeah.  You -- they don't give you the visit

10  right there at your door.  So yes.

11     Q.    And I apologize.  I have to make a record.  So some of

12  these questions may seem simple or obvious.  But I'm just asking

13  to create the record.

14           So do you recall what time of day this was?

15     A.    I do not.  But I can tell you that I -- from

16  remembering, they don't start visiting until 8:00.  And I think

17  they only last them until 4:00 or 3:30 or something like -- I

18  think that's between those times.

19     Q.    On the housing units, do you understand that the

20  officers that work there work in shifts?

21     A.    Do -- officers, yeah.  I think they got three shifts.

22     Q.    Do you know what the times of those shifts are?

23     A.    I believe this is the same way across the state:  6:00

24  to 2:00 and 2:00 to 10:00 and 10:00 to 6:00.

25     Q.    And that would be 6:00 a.m. to 2:00 p.m.?

```
1        A.    Oh, I believe there's -- yes.

2        Q.    And then 2:00 p.m. to 10:00 p.m.?

3        A.    Yes.

4        Q.    And then 10:00 p.m. to 6:00 a.m.?

5        A.    I believe that's the way it works.

6        Q.    Do you recall on this first incident on what shift it

7   occurred?

8        A.    If I had to say, I would say it was the first shift.

9        Q.    And that would be the 6:00 to 2:00 shift?

10       A.    Yes.  I believe that's the shift it was on.

11       Q.    And do you recall back in 2013 how many corrections

12   officers worked on the 6:00 to 2:00 shift in G block?

13       A.    I -- I never took record of that.  No, I haven't.

14       Q.    Is it fair to say there were more than two?

15       A.    I'm pretty sure there was more than two people.

16       Q.    And do you recall how many inmates were housed in

17   G block on that day in 2013?

18       A.    No, I don't remember.  But I wasn't the only one on

19   the block.

20       Q.    And I believe your testimony was that as soon as you

21   came outside your cell, these two officers started to rub and

22   touch you outside your cell; is that correct?

23       A.    That is very correct.

24       Q.    Now from what I understand, you've testified to they

25   take you from G block over to the building with the visiting
```

```
 1  room; is that correct?

 2       A.   Yes.  Yes.

 3       Q.   Do you recall how you went -- once you leave G block,

 4  are you outside in the open air?

 5       A.   No.  I don't remember going outside of -- of a

 6  building.  I don't remember that.

 7       Q.   Are there hallways and tunnels from one --

 8       A.   I'm pretty sure there was hallways.

 9       Q.   Do you recall passing anyone as the officers were

10  escorting you?

11       A.   No.  All these acts were done out of camera, out of

12  sight of camera.  And I don't remember anyone near us.

13       Q.   Now, as I understand it, when you get to the visiting

14  room, there is a door.

15            And you've mentioned a wicket.  Can you tell the jury

16  what a wicket is?

17       A.   I'll do what I can to describe it.  It's usually a

18  hole cut in the door to either -- to both handcuff and

19  unhandcuff people.  And they usually use that slot to feed

20  people when they got the door closed.

21       Q.   So it's an opening inside a door through which they

22  can either place handcuffs on, remove handcuffs, pass food in,

23  if it's a cell, that type of thing?

24       A.   Yes.

25       Q.   And was there a wicket in the door for the visiting
```

```
1    area?
2         A.    Oh, yes.
3         Q.    And as I understand it, there's -- the visiting room
4    consists of two parts with a plastic screen in between two
5    parts; is that correct?
6         A.    Oh, you mean as far as between the visitor and the --
7    and the inmate?
8         Q.    Yes.
9         A.    Yeah.   There's some type of dividing, maybe plexiglass
10   or something like that.
11        Q.    And you're put in the one side, and then your visitor
12   is put on the other side; is that correct?
13        A.    Yes.
14        Q.    So did anything happen before you were placed in your
15   part of the visiting room?   Just outside the visiting room door,
16   was any of this conduct going on at that time?
17        A.    Yes.   And -- and as I stepped inside, some more.  They
18   was -- as I got ready to stick my hand through the wicket there,
19   they pulled -- pulled me through there, pretty much.
20        Q.    Is your testimony there was just the two officers that
21   were escorting you.   Is that correct?
22        A.    Yes.
23        Q.    Nobody else was involved?
24        A.    If they were, I didn't realize it.
25        Q.    Did both of them have the nightsticks you were
```

1  referring to?

2       A.   Both had nightsticks.   And they also had a pen or a

3  needle.   I'm not really sure what it was.

4       Q.   And were at times -- did you feel both nightsticks at

5  the same time?

6       A.   It's hard to say.   But I know they kept shoving me

7  along and shoving me in my buttocks with it.   It's hard for me

8  to say if they both touched me at the same time.

9       Q.   You indicated that when you returned to your cell, you

10 noted that you were bleeding?

11      A.   Yes.

12      Q.   And you indicated that they wouldn't allow you to go

13 to medical; is that correct?

14      A.   Nobody.   That's right.

15      Q.   When you talk about them pushing the nightstick into

16 your buttocks, was it against your bare skin, or was it through

17 the jumpsuit?

18      A.   Well, it was -- I had my jumpsuit on, sir.

19      Q.   So they never made physical contact with your skin?

20      A.   I would say that's an incorrect assessment there.   If

21 you stick or are pushing a stick through a guy's jumpsuit, of

22 course you going to make contact with their skin.

23      Q.   Are you saying the nightstick was directly against

24 your skin, or the jumpsuit was in between?

25      A.   They were -- I had my jumpsuit on, sir.   So it had to

```
1    be the nightstick.
2         Q.   And your testimony today is that that caused bleeding
3    from your rectum?
4         A.   I was bleeding because they're sticking me with, I'm
5    not sure if it's needles or a pin.  And by prying me with the
6    nightstick caused me to be bleeding from my penis because they
7    did something to my testicles.
8         Q.   Mr. Washington, do you recall giving a prior
9    deposition in this matter?
10        A.   I know that someone came to -- to ask me about that.
11   And if that's what you're speaking of, a deposition, yes.
12        Q.   I believe that took place on May 3, 2018, at SCI-
13   Somerset?
14        A.   I don't know the date, sir.
15        Q.   And there was an attorney from the attorney general's
16   office present.  Do you recall that?
17        A.   I don't know who these people were, sir.
18        Q.   But they asked you questions about your case; is that
19   correct?
20        A.   From -- they were questioning me about a lot of
21   things.
22        Q.   And did you answer truthfully to those questions?
23        A.   I did it the best I could.
24        Q.   Now, the second incident, is that -- you talked about
25   the showers.  Were you being taken to the showers or from the
```

1    showers?

2         A.    I was -- I was being taken out of the shower, sir.

3         Q.    Okay.  And just so the jury understands -- well, let's

4    start back.  What housing unit were you in for the second

5    incident?

6         A.    I was on G.  G unit.

7         Q.    And the cells in G unit, there's no shower in the

8    cell; is that correct?

9         A.    Everyone takes a shower in one designated spot.  It's

10   not in his cell.

11        Q.    Okay.  And I believe it was your testimony that as you

12   were brought back and placed into your cell, that the officer

13   was going to remove your handcuffs.  But he kept poking you from

14   behind with his hands; is that correct?

15        A.    There's something that happened prior to that, but

16   that did happen.

17        Q.    And at that point, you were in the cell; is that

18   correct?

19        A.    I had stepped inside the cell.

20        Q.    And did he close the door?

21        A.    Not -- not prior to sticking his finger in my

22   buttocks.

23        Q.    So he didn't do that through the wicket.  He did that

24   through the open door?

25        A.    No.  He did it more than once.  When he got ready to

 1  take my handcuffs off, he did it again.  And there's a few

 2  things that happened before that.

 3      Q.   I'm just trying to understand that point where he's

 4  returned you to the cell.

 5           Are you saying that before he closed the door, he was

 6  reaching in and inserting his finger into your rectum?

 7      A.   When I got -- when I got to the cell, the door's open.

 8  When I stepped inside, he poked me.  All right.  I jumped and I

 9  started to move away, but you know you can't go but so far when

10  they got that tether on you.  And plus, I don't want to get

11  sprayed and beat up with sticks.  Now, that part happened before

12  he closed the door.

13      Q.   Okay.  Now he's closed the door.  And he's going to

14  remove the handcuffs; is that correct?

15      A.   Yes.  When I stuck my hand through to get my -- the

16  handcuffs off, he poked me again.

17      Q.   So at that point, did he reach in through the wicket

18  into your cell through the closed door?

19      A.   Yes.  But this isn't -- it applied -- it sounded

20  though you implying this is a long ways.  This is right up

21  against the door.

22      Q.   Now, I'm just trying to be clear on what your claim

23  is.  And your claim is that he reached in through the wicket and

24  attempted, or did, insert his finger into your rectum?

25      A.   Oh, he did that, yes.

Washington000124

1    Q.   And then I believe you just said he did it again after

2  he removed the handcuffs?

3    A.   Well, that is -- I thought that's what you was asking

4  there in the last question.  Yes, he did it.

5    Q.   So where were your hands after they removed the

6  handcuffs?

7    A.   Well, after he removed the handcuffs, I went over to

8  the -- I got out of the way.  I moved away.  I'm humiliated.  I

9  pretty much -- hey, it did me in.  I needed to see the psych.

10    Q.   The last incident, you indicated that you were being

11  transferred from SCI-Greene?

12    A.   Yes.

13    Q.   And at that point, what housing unit were you in at

14  SCI-Greene?

15    A.   I was on G.

16    Q.   Still on G block.

17         And the officers that you claim assaulted you, are

18  they the ones that brought you out of your cell that morning?

19    A.   The people -- yes.  Those are the people that come to

20  my door.

21    Q.   And so these officers came to your cell in G block,

22  placed you in handcuffs, and took you from there to, I believe

23  you mentioned R&D?

24    A.   Yes.

25    Q.   And what is R&D?

1      A.    I believe R&D would mean those are receiving and

2 delivering or receiving and departure.  I'm not positive which

3 one it means.

4      Q.    Now, again, this is one of those questions that I'm

5 just trying to build the record and help the jury understand the

6 situation because they've never been to SCI-Greene.

7           How far is R&D from SCI-Greene?

8      A.    That's all the -- that's all the same prison.

9      Q.    I understand that.  But I mean, G block is in one part

10 of the prison.  Is R&D right next door, or do you have to go

11 some distance to get to R&D?

12      A.    G block is part of the RHU.  And R&D, I would say if

13 you're going a straight route, it would probably take you five

14 minutes.  But if you waiting for doors and stuff like that, it

15 can take maybe 20.

16      Q.    And you mentioned the doors.  I assume that within a

17 prison, as you go from one door to the next, it's locked and you

18 have to wait for someone to open it?

19      A.    From what I remember, they had sliding doors.  But

20 either way, you've got to wait for somebody to open them.

21      Q.    Are those the four to six stops you were talking about

22 in your testimony, that on each of the four to six stops that

23 they would abuse you?

24      A.    Abuse is an understatement.  Yes.

25      Q.    And is it your testimony that at this point the

```
1    officer -- at least one of the officers exposed his penis and
2    either placed it against your hands or against your body?
3         A.   Yes.
4         Q.   And he did so to the point that he squirted semen on
5    your hands?
6         A.   He sure did.
7         Q.   And at what point in the escort from G block to R&D
8    did this occur?
9         A.   We were waiting for the doors to open at R&D.
10        Q.   So this was the final stop?
11        A.   Yeah.
12        Q.   Once you got to R&D, were there other inmates being
13   transferred that morning?
14        A.   There probably were, but there was none standing there
15   by where we were.
16        Q.   Well, how many doors are there to R&D?
17        A.   I'm talking from memory here.  But you had to wait for
18   one door to open and then you step inside and there's another
19   door.
20        Q.   Well, which door were you in front of when this
21   occurred?  I thought you said it was the last door before R&D.
22        A.   We were still outside on -- we was outside R&D by
23   then.
24        Q.   Were you outside the first door to R&D or the second
25   door to R&D?
```

```
 1        A.     We were outside the whole building, which is the first
 2   door.
 3        Q.     Do you know what I mean by the term "white shirt"?
 4        A.     Penitentiary language, I believe that means a
 5   lieutenant or a captain.
 6        Q.     It's sometimes called "white hats"?
 7        A.     Those are both penitentiary terms.
 8        Q.     Were there any lieutenants or captains in R&D when you
 9   went in?
10        A.     Usually they come with the group, but they don't
11   follow every inmate everywhere.
12        Q.     Once you get to R&D, are there lieutenants or captains
13   there?
14        A.     I don't remember them being there.
15        Q.     Were there other corrections officers there?
16        A.     They were the ones that opened the door for us to --
17   to get in.  I believe they're -- I don't think you can -- some
18   of the doors at midnight are operated by guards over in the
19   medical department.  I believe I'm remembering that's the way it
20   is.  This was, like, prior to 5:00.
21        Q.     5:00 in the morning?
22        A.     Yes.
23        Q.     So this would have been the 10:00 to 6:00 shift?
24        A.     Yes.
25        Q.     10:00 p.m. to 6:00 a.m.
```

```
 1              Do you know if there were cameras on the doors so that
 2    somebody that's in charge of opening the doors can see if
 3    there's people waiting to go through the doors?
 4         A.    There are supposed to be.  But usually, if the inmate
 5    is saying something and it's on camera, they won't -- they say
 6    the camera wasn't working.
 7              I asked for films of this and they claim no film on
 8    it.
 9         Q.    But you understand, there are cameras there that are
10    recording -- maybe not recording is the right word.  But there
11    are cameras that have that view so somebody can see if
12    somebody's waiting to go through that door?
13         A.    That's misleading.  There are cameras that have the
14    capability of doing that.  But if the inmate got something that
15    actually happened, that they going to say the camera wasn't
16    working.
17         Q.    Okay.  But as far as you know, the camera was working;
18    right?
19         A.    No, I don't know if the camera was working.
20         Q.    Prior to going to SCI-Somerset, did you go to the
21    medical department at SCI-Greene in preparation for your
22    transfer?
23         A.    I don't remember going to no medical department.
24         Q.    How about when you got to SCI-Somerset, did you go to
25    the medical department there?
```

Washington000129

| 1 | A. | Once you get to the SCI -- once you get to any prison |

1      A.    Once you get to the SCI -- once you get to any prison

2  on transfer, they want to know do you have any chronic ailments

3  and stuff like that.

4      Q.    So once you got to SCI-Somerset, somebody from the

5  medical department spoke to you; is that correct?

6      A.    They do -- I think they do that with everybody.  Yeah.

7      Q.    And they asked you a bunch of questions?

8      A.    They want to know if you -- what kind of medication

9  you're taking and stuff like that.

10      Q.    And do you recall that happening when you went to

11  SCI-Somerset on July 14, 2015?

12      A.    Every -- they do that to everyone every time you being

13  transferred.  I believe that's what they do.

14      Q.    Okay.  Now I need you to -- I understand that's what

15  always happens.  I need to know if that's what happened on

16  July 14, 2015, when you went to SCI-Somerset.

17      A.    Listen.  I'm trying to explain it to you as best I

18  can.  As far as I know, they do that to everybody at every

19  transfer.

20      Q.    Did they do that to you on July 14, 2015?

21      A.    I heard you say that about two or three times already,

22  and I'm trying to tell you they do that to everybody --

23      Q.    But if they --

24      A.    -- every time.

25      Q.    I'll move on.

```
 1              MR. BRADLEY:  Your Honor, I need about five minutes to
 2   set up an exhibit.
 3              THE COURT:  Okay.  We'll take our afternoon break
 4   here.  We'll take about a ten-minute break here.
 5              All rise for the jury.
 6         (Jury exits courtroom.)
 7              THE COURT:  You can be seated.  We'll take ten
 8   minutes.
 9              Mr. Washington, if you'd like a ten-minute break as
10   well, feel free.
11              We'll stand in recess.
12              THE WITNESS:  Should I remain in the seat?
13              THE COURT:  If you need to take a break to go to the
14   bathroom, now would be a good time to do it.
15              THE MARSHAL:  Do you have to go to the bathroom?
16              THE WITNESS:  No, I don't.
17              THE COURT:  It's up to you, guys.  You can stay there
18   if you'd like.
19         (Whereupon, a recess was taken.)
20              THE COURT:  Do we have our exhibit?
21              MR. BRADLEY:  We do, Your Honor.  Unfortunately, the
22   Internet and computers are not cooperating.
23              THE COURT:  Okay.
24              MR. BRADLEY:  But I can use the ELMO.
25              THE COURT:  All right.  Very good.  And you're just
```

```
 1   going to use the ELMO, is that what you're doing?

 2              MR. BRADLEY:  Yes.  Your Honor, I'm going to present

 3   prior testimony that we believe is inconsistent with his

 4   testimony.  So at this point, this would not go to the jury.

 5   This would just be on the witness display.

 6              THE COURT:  Well, I mean, if you're doing it to

 7   refresh his recollection, I would ask that you show it to him

 8   first.

 9              MR. BRADLEY:  Yes, of course.

10              THE COURT:  Before you publish it to the jury.

11              MR. BRADLEY:  Of course, yes.

12              THE COURT:  Okay.  Very good.  Okay.

13         (Jury enters courtroom.)

14              THE COURT:  You can be seated.  Everything okay back

15   in the jury room with you guys?  Do you have coffee and all

16   that?

17         (Jury nods affirmatively.)

18              THE COURT:  Great.  You can continue, Mr. Bradley.

19              MR. BRADLEY:  Thank you.  Your Honor, may I approach

20   the ELMO?

21              THE COURT:  Yes.

22   BY MR. BRADLEY:

23         Q.   Mr. Washington, we had talked before about the

24   deposition you gave at SCI-Somerset back in 2018.

25              Do you recall me asking you about a deposition you
```

```
1    gave?
2         A.    If you're speaking of a few minutes ago, yes.
3         Q.    Yes.
4              So I'm going to show you a couple of pages from that
5    so you can look at it.  I want you to start at page 109.
6              THE COURT:  If you can not publish it to the jury.  If
7    you want to show it to him, you can approach him and show it to
8    him.
9              MR. BRADLEY:  I'm sorry.
10        (Document handed to the witness.)
11   BY MR. BRADLEY:
12        Q.    If you could read to yourself from pages 109
13   through 112.  And let me know when you're --
14        A.    Is there any particular part you want me to read?
15        Q.    From page 109 through page 112.  Just so you see
16   everything that's there.
17        (Witness reading document.)
18             THE COURT:  Have you read those pages now,
19   Mr. Washington?
20             THE WITNESS:  I didn't hear you.
21             THE COURT:  Did you finish reading those pages?
22             THE WITNESS:  Give me a few more seconds.
23             THE COURT:  Okay.
24        (Short pause.)
25             THE WITNESS:  Yes.  I'm done with them.
```

```
 1              THE COURT:  Okay.  Questions?
 2   BY MR. BRADLEY:
 3       Q.   Mr. Washington, you would agree this part of the
 4   deposition was asking about the incident on August 1, 2013;
 5   correct?
 6       A.   What I can agree to is what's read here.  I don't know
 7   if this is accurate or not.
 8       Q.   But if you look at page 109, it has the date
 9   August 1st; is that correct?
10       A.   I'm looking to see if it says that.  But it got
11   page 109.
12       Q.   On line 5.
13       A.   I don't -- yes.  It does say that, on that date on
14   August 1st, yes.
15       Q.   Okay.  And your testimony here today was that you
16   suffered bleeding as a result of the incident on August 1st;
17   correct?
18       A.   That's right.
19       Q.   And you were asked back at your deposition in 2018,
20   did you have bleeding as a result of this, referring to the
21   incident on August 1st.
22            What was your answer to that question back in 2018?
23       A.   What line are we seeing?
24       Q.   We're on page 111 now at line 18.
25       A.   Page 111.
```

1    Q.    Page 111, at lines 18 to 20.

2    A.    You're -- you're omitting something.  You are

3  saying did you -- you're asking me if it was my rectum bleeding.

4  And I think I made that in my testimony saying I wasn't bleeding

5  from the rectum.  I was bleeding from my penis and bleeding from

6  pin sticks on my buttocks.

7    Q.    You would agree with me that nowhere in that

8  deposition does that mention pin sticks or bleeding from the

9  penis or testicles or anything of that nature?

10   A.    No one asked me about that.  I agree with you, but no

11 one asked me about that.

12   Q.    Well, the question was, "Did you have bleeding as a

13 result of this?"  What was your response to that question?

14   A.    I -- let me go farther.  I'll try to be clear here.

15 It's asking me if I was bleeding from the rectum.  And I think,

16 in my testimony a few minutes ago, I even said I wasn't bleeding

17 from the rectum.

18   Q.    But you claim you are bleeding.  You were bleeding

19 that day?

20   A.    Bleeding from my penis and the pin sticks on my

21 buttocks.

22   Q.    And in these questions, nowhere do you say that you

23 were bleeding from your penis or your testicles?

24   A.    You make a good point.  But you are not referring

25 to -- nobody asked me that.

1     Q.   Well, as I read the question, "Did you have bleeding

2  as a result of this?"  It doesn't say rectum or penis or

3  anything else.  It says, "Do you have bleeding as a result of

4  this?"

5     A.   You make a good point.  I -- me and you in agreement

6  on that.  But they're not asking me did I have bleeding from my

7  penis or was my buttocks bleeding.  And earlier the thing was

8  did -- was your rectum bleeding.  And I made the testimony that

9  I wasn't bleeding from the rectum.

10         MR. BRADLEY:  Your Honor, may I publish the document?

11         THE COURT:  No.  I mean, if you have some specific

12  questions about it.  We don't typically publish that.  If you

13  have some questions, you can feel free to ask him.

14  BY MR. BRADLEY:

15     Q.   In the next question, it's asking you about in your

16  complaint, you didn't complain to medical about being poked in

17  the rectum, did you?

18     A.   I want to say it now if I didn't say it earlier.  They

19  wouldn't allow me to see medical.  They wouldn't allow that.

20     Q.   You're saying the COs wouldn't allow you to see

21  medical; correct?

22     A.   The people that pulled me in the cell wouldn't allow

23  me to see medical.  I pushed the emergency button.  Nobody would

24  answer.  It appears that that button was on mute because I kept

25  doing it.  And it pretty much -- I pretty much was zoned out.  I

1   was humiliated and was hurt psychologically.

2       Q.   Now, in your answer to that question on page 112 at

3   line 2 to line 5, you don't say anything about the COs not

4   letting you see medical, do you?

5       A.   There -- here's my answer.  The question is, medical,

6   being poked in the rectum, did you?  First, I want to say again,

7   I don't know if all of this is accurate.  But they way it's read

8   here, it doesn't ask did you -- this is not asking about what

9   happened in my cell at the RHU.

10          You got me -- I don't know if I said it.  But my

11  complaint -- but I did not -- I don't remember.

12          And medical, I'm telling you, don't come.  That's what

13  I was trying to infer to you.  I'm hitting the button there,

14  nobody come.  The button is on mute.  I asked to see medical.

15  Nobody would let me see medical.  They wouldn't allow it.

16      Q.   Well, in the answer you gave in 2018, you said medical

17  doesn't come, regardless of whether they're called.  And today

18  you're saying the COs didn't call.

19      A.   No, no.  You -- you saying that.  I didn't say that.

20  You saying that.

21          I -- I asked to see medical.  They wouldn't allow me

22  to see medical.  I hit the button to let the controls know that

23  I need to see medical.  They put it on mute.  And it's obvious

24  why they did it.  They wouldn't allow me to see medical.  They

25  never came.  I'm yelling for medical, they never come.  You

1    can't -- you can't stay on the door and just keep yelling.   Then
2    you get beat up.
3                MR. BRADLEY:   No further questions, Your Honor.
4                THE COURT:   Okay.   Now, Mr. Washington, is there
5    anything that you'd like to say in your own case that reverts
6    back to anything Mr. Bradley may have asked you?
7                THE WITNESS:   Yes.
8                          REDIRECT EXAMINATION
9                THE WITNESS:   I -- I don't have a copy of this.   This
10   is my first time seeing this.   And my stuff is -- is being
11   denied to me by the very same people that I got -- I'm suing.
12   And nowhere are we speaking of these -- these questions is
13   similar to what the answer would be.
14               Like, for instance, "Were you bleeding from the
15   rectum?"   Well, no, I wasn't bleeding from the rectum.   I said
16   that.   But these questions are, "Were you bleeding?"   That skips
17   a whole sentence there.
18               And no, they wouldn't let me see medical.   I don't
19   know if I'm explaining it clear here, but that's the best that I
20   can give you clearly.   They wouldn't allow me to see medical.
21   And I'm bleeding from my buttocks.   And I'm bleeding from my
22   penis from them prying against my testicles.
23               THE COURT:   Anything else, Mr. Washington?
24               THE WITNESS:   Not that I can think of, Miss.
25               THE COURT:   Okay.   Any recross, Mr. Bradley?

```
 1                   MR. BRADLEY:  No, Your Honor.  Thank you.

 2                   THE COURT:  Okay.  Well, ladies and gentlemen, we're

 3       very close to the 4:00 hour now.  It seems like this is probably

 4       a good time to break for the evening.

 5                   Please remember all of my cautionary notes from

 6       before.  Please do not talk to anybody about this case.  If you

 7       go home and you have a significant other or family at home,

 8       please just tell them that I'm a very mean person and I'm not

 9       allowing you to speak about this case.  You can talk to them

10       until the cows come home once you're done with deliberations.

11       But until then, please do not talk to each other and please do

12       not talk to anyone else about the case.

13                   Also again, I'll remind you, please do not try to

14       investigate anything on your own.  Do not try to do any research

15       on your own.  Again, everything you learn about this case

16       happens in this courtroom and this courtroom only.  Okay?

17                   I'd like for you all to be here at 8:45 tomorrow if

18       that works for everybody.  Is that okay?  All right.  Excellent.

19       8:45 tomorrow.  Have a great night.

20                   All rise for the jury.

21              (Jury exits courtroom.)

22                   THE COURT:  All right.  Mr. Washington can step down.

23       Take a minute.

24                   MR. WASHINGTON:  I'm going to leave this paper up

25       here.
```

1          THE COURT:  Yeah.  They'll grab it from you.  They'll
2     grab it from there.  Thank you.
3          (Short pause.)
4          THE COURT:  Everybody else can be seated.  Now, if I
5     understood you correctly before, Mr. Washington, am I correct
6     that you were the only witness that you intended to call?
7          MR. WASHINGTON:  Yeah.  I wasn't -- I wasn't allowed
8     to contact any other inmates to ask them did they see it.
9          THE COURT:  Okay.  All right.  And so are you
10    suggesting then that you're resting your case with what you've
11    just presented?
12         MR. WASHINGTON:  I don't have anything else.  They
13    tell me they ain't got no film.
14         THE COURT:  All right.  I will entertain at this point
15    any motions from the Defendants.
16         Mr. BRADLEY:  Thank you, Your Honor.  We would move
17    for a judgment of acquittal of all Defendants, particularly
18    Farrier, Smith, and Stump.  There was nowhere during
19    Mr. Washington's testimony that he identified any of the
20    Defendants.  There was a vague reference to he thinks it might
21    have been Oswald, but there was no identification of any of the
22    Defendants.  All four Defendants are sitting here in the
23    courtroom.  Not once was there an identification made of any of
24    the officers involved in the incidents he described.  He didn't
25    discuss them by name in the course of each of the incidents.

1   And for that reason, we believe that there's an insufficiency of
2   evidence in this case.

3   THE COURT:  Okay.  Mr. Washington, essentially, what
4   Mr. Bradley's suggesting is that you at no point identified
5   Officers Farrier, Smith, and Stump during your testimony in this
6   case.  You did make a reference to Officer Oswald being one of
7   the participants in this.  But at no point did you identify any
8   of the other officers as having violated your constitutional
9   rights.  So I'll ask you if you have any response to that.

10  MR. WASHINGTON:  In my complaint, every one of these
11  are identified.  And during my testimony and his questioning, he
12  didn't ask did this one do that or ask for me to name either one
13  of them.  And plus, I think I specifically said it was one of
14  the sergeants that came to the door and one of them was
15  escorting me to the visiting room.

16  And if you want me to take the stand again and give
17  you these names, but the names are in the complaint.  And
18  they're here listed on this paper (indicating).  They wouldn't
19  be listed on the -- on the heading of this caption unless they
20  were cited for some reason there in the complaint.

21  THE COURT:  Well, as I mentioned to you when you were
22  on the stand, the complaint is not evidence in this case and
23  it's not a part of the record that goes to the jury.  And a
24  description of one of the sergeants does not provide any
25  specificity as to who the individuals were that were involved in

1    this case.

2            I did carefully listen to your testimony to see

3    whether at any point you would identify any of the officers who

4    were not mentioned at all, Officer Smith, Officer Stump, and

5    Officer Farrier, and you did not.

6            I'll allow the case to proceed against Officer Oswald

7    only at this point.  There's been no identification of the other

8    officers involved here.  There was no discussion of what their

9    involvement was, who they were.  No mention of their names even.

10   And so -- or certainly nothing that pointed out who they were in

11   the context of even sitting in the courtroom, that this was the

12   person who did X here.

13           You bear the burden of proof as to those issues.  You

14   did not meet your burden with respect to those issues; and

15   therefore, the action will be dismissed as to Officers Stump,

16   Smith, and Farrier.

17           So the only remaining action will be as to Officer

18   Oswald.  And we'll pick that up again tomorrow.  But that is

19   accurate.

20           MR. WASHINGTON:  Do I get a chance to say something

21   else?

22           THE COURT:  You can say what you'd like to, sure.

23           MR. WASHINGTON:  Well, no one asked me to -- you know

24   I'm a pro se litigator.

25           THE COURT:  The Defendant doesn't have to ask you

```
 1   anything.  They could just sit there.  It's your burden of
 2   proof.
 3              MR. WASHINGTON:  But I don't see this in any
 4   instructions or anything that I have to point them out.  There's
 5   only one reason they was -- my complaint cites them.
 6              THE COURT:  Your complaint is -- as I said to you on
 7   the stand, your complaint is not evidence in this case.
 8              MR. WASHINGTON:  You didn't -- I don't remember you
 9   saying it while I was on the stand.
10              THE COURT:  Well, I did.  Yes.  But nevertheless, it's
11   your burden of proof.  This jury comes in, you provide them
12   evidence.  They don't know the complaint.  They've never read
13   the record.  They're not supposed to do that, in fact.  As I
14   told them, they can only consider what happens in this
15   courtroom.
16              MR. WASHINGTON:  Do I get a chance to amend -- you do
17   get a chance to amend your complaint.  Do I get to amend my
18   testimony?
19              THE COURT:  No.  You put on your case.  You just told
20   me your case is over.  That's your case.
21              MR. WASHINGTON:  I didn't -- this was said before
22   you --
23              THE COURT:  Yes, because you have the burden of
24   proving your case.
25              MR. WASHINGTON:  All right.  But if you let me know --
```

| | |
|---|---|
| 1 | THE COURT:  I told you right out of the gate that it |
| 2 | is not up to me to give you instructions or to serve as your |
| 3 | lawyer in this case.  I told you that specifically this morning. |
| 4 | MR. WASHINGTON:  Yes, ma'am, you said all of those |
| 5 | things.  But now you're letting the villains -- you letting -- |
| 6 | you're letting the villains get away on a technicality there. |
| 7 | They're getting away on a technicality. |
| 8 | They poked with me needles. |
| 9 | THE COURT:  Well, I understand what you're suggesting, |
| 10 | and certainly, it was your burden to demonstrate that these four |
| 11 | gentlemen over here did something to you. |
| 12 | And what I'm telling you right now is you may have |
| 13 | suggested that one person may have acted in that fashion towards |
| 14 | you, but you never even mentioned the other three. |
| 15 | MR. WASHINGTON:  And -- all right.  It's just that -- |
| 16 | I don't think you would allow me to get away if they didn't name |
| 17 | me.  I just -- this is terrible that they're getting away with |
| 18 | having violated me and you're letting them get away with a |
| 19 | technicality. |
| 20 | And nobody asked me -- like, I understood what you |
| 21 | said to me.  It ain't their job to say this one did it to me. |
| 22 | THE COURT:  It's absolutely not their job; correct. |
| 23 | MR. WASHINGTON:  All right.  But had you -- if you |
| 24 | gave me an instruction that I must point them out, I would have |
| 25 | done that. |

1          THE COURT:  It's not up to me to give you that

2  instruction.

3          MR. WASHINGTON:  They're getting away with doing that

4  to me.  And I'm sure they're laughing under their breaths of

5  having humiliated me.

6          THE COURT:  Well, your case proceeds against Officer

7  Oswald and Defendant will put on their case tomorrow in that

8  regard.

9          But Defendants are correct; at no point during your

10  time this afternoon did you present any evidence against the

11  remaining three officers in this case.

12          MR. WASHINGTON:  I want to preserve this as far as my

13  appeal rights.  Is this going to be -- I'm not -- I don't want

14  there to be a point where I get to appeal and they say you

15  didn't bring this up.

16          THE COURT:  Your objection to this is noted and you've

17  raised it.  But again, yeah.  I mean, I'll tell you this right

18  now.  I went back to the office and I thought you hadn't at all

19  ever mentioned the names of those three individuals.

20          MR. WASHINGTON:  I don't have a counselor.  You

21  wouldn't let me have a counselor.  They would have -- they would

22  have helped me.  I'm not -- I'm not -- I'm a pro se litigator,

23  and I have dementia.  He's letting them get away with this.

24          THE COURT:  All right.  Well, we'll continue our trial

25  tomorrow.  Officers Stump, Farrier, and Smith will be dismissed

```
1    from the case.  I will inform the jury of that.  And so the case
2    will proceed against Officer Oswald.  Okay.
3            MR. BRADLEY:  Thank you, Your Honor.
4            THE COURT:  All right.  Anything else about what we're
5    doing tomorrow?
6            MR. WASHINGTON:  They letting them get away with that.
7            THE COURT:  If not, we'll stand in recess.
8            Before we actually -- I did want to let everybody know
9    that we will be looking at the final jury instructions tomorrow.
10   David, if you wouldn't mind printing up a copy so that perhaps
11   Mr. Washington is able to take it with him.
12           And keep in mind, Mr. Washington, the way the jury
13   instructions are currently structured, the draft that we're
14   going to give you does include Officers Smith, Farrier, and
15   Stump, although those references will be removed once the jury
16   does get that.  I guess that's for everybody's purposes, okay,
17   just because we haven't had a chance to revise those.
18           MR. BRADLEY:  Understood.
19           THE COURT:  Okay.  All right.  We stand in recess.
20           (Proceedings adjourned at 4:07 p.m.)
21                           - - -
22
23
24
25
```

```
 1                        C E R T I F I C A T E

 2

 3            I, SHARON SIATKOWSKI, RMR, CRR, CBC, CRI, certify that the
       foregoing is a correct transcript from the record of proceedings in the
 4     above-entitled matter.

 5     s/Sharon Siatkowski
       SHARON SIATKOWSKI, RMR, CRR, CBC, CRI
 6     Official Court Reporter

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Washington000147

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3       HENRY UNSELD WASHINGTON,

 4               Plaintiff,
         vs.                              Civil No. 15-1031
 5
         J.M. SMITH, T.S. OSWALD,
 6       D. FARRIER, AND M. STUMP.

 7               Defendants.
                                     - - -
 8

 9       Transcript of Jury Trial Excerpts of Timothy Oswald and Henry
         Unseld Washington on June 13, 2023, in the United States
10       District Court, Pittsburgh, Pennsylvania, before
         The Honorable Cathy Bissoon, District Judge.
11

12
         APPEARANCES:
13
         For the Plaintiff:      Pro Se
14
         For the Defendants:     Scott A. Bradley, Esquire
15                               Amelia Jean Goodrich, Esquire
                                 Pennsylvania Office of Attorney General
16                               Civil Litigation
                                 1251 Waterfront Place
17                               Suite Mezzanine Level
                                 Pittsburgh, PA 15222
18
         Court Reporter:         Sharon Siatkowski, RMR, CRR, CBC, CRI
19                               700 Grant Street, Suite 5300
                                 Pittsburgh, Pennsylvania 15219
20                               412.773.3623

21

22

23
        Proceedings recorded by mechanical stenography; transcript
24      produced by computer-aided transcription.

25
```

Washington000148

1 | I N D E X

2 | Proceeding                                                      Page

3 |

4 | WITNESSES:

5 | TIMOTHY OSWALD
  |    Direct Examination By Ms. Goodrich                             7
  |    Cross-Examination By Mr. Washington                           44
6 |    Redirect-Examination By Ms. Goodrich                          76
  |    Recross-Examination By Mr. Washington                         81

7 | HENRY UNSELD WASHINGTON                                         103
8 |    Rebuttal by Mr. Washington

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Washington000149

```
1                      P R O C E E D I N G S

2                            - - -

3              (In open court, 9:33 a.m.)

4              (Jury not present.)

5              THE COURT:  All right.  Welcome back, everyone.  Just

6    a few matters of housekeeping and one thing I did want to

7    address very clearly on the record as well today.

8              With respect to what the jury will be told, given that

9    Defendants Stump, Farrier, and Smith have been dismissed from

10   the litigation, this is my intention:  I will tell them

11   Plaintiff has rested his case and Defendants' lawyers will now

12   present the defense's case.  Defendants Stump, Farrier, and

13   Smith are no longer a part of this case.  You are not to

14   consider yourselves with why that is or let that factor into

15   your decision-making.  Plaintiff's claims against Defendant

16   Oswald are the only claims remaining in this case - - - --

17             Any issue with that?

18             MR. BRADLEY:  I think you said "consider."  I think

19   you meant concern.

20             THE COURT:  -- I'm sorry?

21             MR. BRADLEY:  When you -- you said the jury should not

22   consider themselves.

23             THE COURT:  I said you are not to concern yourselves

24   with why that is.

25             MR. BRADLEY:  Yes.  That was my understanding of the
```

```
1    intent.  Yes, that's fine.
2               THE COURT:  Okay.  You look -- it's not fine with you?
3               MS. GOODRICH:  Oh, no, that is fine with me, Your
4    Honor.
5               THE COURT:  Okay.
6               MS. GOODRICH:  I did want to clarify one point on that
7    with regard to the three separate incidents that were presented
8    by Plaintiff.  We had the August 1, 2013, which I believe is the
9    only one in which he mentioned Lieutenant Oswald.  Is that the
10   only incident that's being presented?
11              THE COURT:  I did not understand -- what Plaintiff
12   said was that it was the same individual who had been involved
13   in the August 1st event, or whatever the date was in August.
14   While it is very scant in terms of the evidence, I think that's
15   enough to put the April 2, 2015, event that Plaintiff had
16   alleged in his complaint before the jury.  So both of those
17   would be the events before the jury.
18              MS. GOODRICH:  Thank you.
19              THE COURT:  And so the July 14th events would not be
20   presented at all to the jury.
21              And you should also know, and we've gone through the
22   final jury instructions and made alterations based upon what
23   transpired yesterday, there is a discussion in the materials of
24   the allegations against Defendants -- well, all of the
25   Defendants.  My inclination is to remove that completely.  Those
```

1    were based upon the information that was contained in the

2    complaint.

3                And to be honest, the information that was presented

4    by Mr. Washington yesterday is at odds with the information that

5    is in the complaint. And so the Court is not inclined to put a

6    thumb on the scale as to what the allegations are in this case,

7    and that will be left to the jury to decide what Mr. Washington

8    has alleged in the case. And he can speak -- he has already

9    spoken to that about what that is.

10               So I will talk a little bit more about the final jury

11   instructions later. But just so that's clear, the Court's not

12   going to go into a discussion about what the allegations of the

13   complaint were because they are, in my mind, vastly at odds with

14   what Mr. Washington described yesterday on the stand. Okay.

15   But, again, we'll talk about the final jury instructions later.

16               Any issue with the description that I'll offer to the

17   jury, Mr. Washington? And just so it's clear, I'm offering this

18   description to the jury so that they don't infer from the

19   absence of Defendants Stump, Farrier, and Smith that somehow

20   they were successful in some way. I don't want to tell them why

21   they're not in the case any longer. I don't want to tell them

22   that they have been dismissed because that will somehow

23   impact -- I don't want to impact your case against Defendant

24   Oswald. Do you understand?

25               MR. WASHINGTON: Yeah.

```
 1                    THE COURT:  Okay.
 2               MR. WASHINGTON:  Let me get a pen.
 3               THE COURT:  Oh, he has no pen.
 4           (Pen provided to Mr. Washington.)
 5               THE COURT:  Thank you.  The other thing I wanted to
 6     make clear on the record, only because Mr. Washington raised it
 7     yesterday, is that somehow he was -- I denied him a lawyer in
 8     this case.  I wanted to emphasize for the record that certainly
 9     this case would have been easier tried with a lawyer present.
10     The Court tried for many, many months to secure a lawyer for
11     Mr. Washington and was unable to find anyone willing to take
12     Mr. Washington's case.  And so I just wanted to make that point
13     very clear on the record.  Certainly, it was not for the want of
14     trying over several months, just so that's clear.
15                    All right.  Defendant ready to proceed?
16               MS. GOODRICH:  Yes, Your Honor.
17               THE COURT:  All ready, Mr. Washington?
18               MR. WASHINGTON:  Ready as I can get.
19               THE COURT:  All right.  Excellent.  All right.  We're
20     ready, Jamille.
21           (Jury enters courtroom.)
22               MR. WASHINGTON:  You sure I can write with this
23     (indicating)?  This is the type we have in the prison.  It don't
24     write good.  I won't be able to write with this.
25               THE COURT:  Good morning, ladies and gentlemen.  I
```

```
 1    appreciate your attention here today.

 2             A couple things I wanted to mention to you.  Plaintiff

 3    has rested his case and Defendants' lawyers will now present

 4    defense's case.  As I emphasized throughout the trial, this case

 5    is not over until I tell you it's over.  So wait for that.

 6             Defendants Stump, Farrier, and Smith are no longer a

 7    part of this case.  You're not to concern yourselves with why

 8    that is or let that factor into your decision-making.

 9    Plaintiff's claims against Defendant Oswald are the only claims

10    remaining in this case.

11             And so with that, I'm going to turn it over to the

12    Defendants to present their case.  Call your first witness.

13             MS. GOODRICH:  Your Honor, we call Timothy Oswald.

14             THE CLERK:  Good morning, sir.  Can you please raise

15    your right hand.

16             TIMOTHY OSWALD, a witness herein, having been first

17    duly sworn, was examined and testified as follows:

18             THE DEPUTY CLERK:  Thank you, sir.  Could you please

19    have a seat and please state and spell your name for the record.

20             THE WITNESS:  My name is Timothy Oswald.  Spelled

21    T-i-m-o-t-h-y, common spelling.  Last name O-S-W-A-L-D.

22             THE COURT:  You can proceed.

23                         DIRECT EXAMINATION

24    BY MS. GOODRICH:

25        Q.   All right.  Lieutenant Oswald, you were here
```

1   yesterday; correct?

2        A.   Yes, ma'am.

3        Q.   And did you hear the Plaintiff's testimony?

4        A.   I did.

5        Q.   You heard what he's accused you of doing?

6        A.   I have.

7        Q.   Did you do any of those things?

8        A.   No, I don't --

9             THE COURT:  If you can speak directly into that mic.

10            THE WITNESS:  I'm sorry, Judge.

11            No, I did not.

12   BY MS. GOODRICH:

13       Q.   You can pull the microphone closer to you.

14       A.   How's that?

15            THE COURT:  Perfect.  Thank you.

16       Q.   And you do understand that if you had done any of

17   those things, that would have violated the Eighth Amendment?

18       A.   I certainly do.

19       Q.   Would it also violate the Department of Corrections'

20   Code of Ethics?

21       A.   Yes.

22       Q.   I want to back up a little bit.  How are you currently

23   employed?

24       A.   How am I currently employed?

25       Q.   Yes.

```
 1         A.    I am still employed with the Department of
 2    Corrections.   I'm currently the critical incident manager at
 3    SCI-Greene.    It's a lieutenant position.
 4         Q.    How long have you been employed by the Department of
 5    Corrections?
 6         A.    Eighteen years.
 7         Q.    Eighteen years.
 8               Have you always been a lieutenant?
 9         A.    No, I have not.
10         Q.    How did you start?
11         A.    I started in 2005 as a corrections officer trainee.
12    It's a year-long training program.   At the conclusion of that
13    year, I was promoted to Corrections Officer 1.   I was in that
14    role for eight or nine years.   Then I was promoted to sergeant.
15    I was in that role for five years.   And then I was promoted to
16    a -- to a lieutenant position.   And then two years in that role
17    I was appointed to my current position, which is appointed by
18    the superintendent.
19         Q.    Eighteen years; has that been your whole career or did
20    you have a job before?
21         A.    I had, you know, jobs in high school, a gas station
22    person, fast food.   After high school, I enlisted in the Air
23    Force.   I was a military policeman.   And when I got out of the
24    Air Force, I did industrial X-ray work on nondestructive
25    testing, pipelines, and just other general industrial things.
```

1     Q.    And do you recall in what capacity you were working,

2  what your rank was in August of 2013?

3     A.    2013, CO-1.  But -- yeah, I was probably an officer

4  then.

5     Q.    With the Department of Corrections?

6     A.    Yes, ma'am.

7     Q.    And can you tell me about what your job duties would

8  have been in that position?

9     A.    Just general security needs.  In that role of a

10  restricted housing unit, escort duties.  A lot of escort duties,

11  actually.  Cell searches.  You know, attending to the general

12  needs of inmates housed on the unit in a security fashion.

13     Q.    Do you remember if you had a regular assignment or

14  post at that time?

15     A.    I -- I -- not a hundred percent.  I could have been

16  assigned to a housing unit permanently, which is -- it's not,

17  you know, a permanent job, you know.  But they usually leave the

18  same people in the same positions as they get more familiar with

19  them, you know, just so things run a little bit more smoothly.

20     Q.    Did you have a usual shift that you worked?  Actually,

21  let me back up.

22     A.    Yes.

23     Q.    Are there regular shifts that a corrections officer

24  works?

25     A.    Yes.  Those are defined by what we call bids.

```
1          Q.    Okay.

2          A.    There's, you know, if you desire and you have the

3   seniority, you have enough seniority to get a 6:00 to 2:00 bid

4   or a 10:00 to 2:00 bid, those are more preferable, mostly the

5   daylight one, which I probably would have had at the time.

6          Q.    Prior to this case, were you familiar with

7   Mr. Washington?

8          A.    Yes.

9          Q.    So would it be safe to say you had interacted with him

10  in the prison setting?

11         A.    That's fair.

12         Q.    Do you recall if you were, in fact, working on

13  August 1st of 2013?

14         A.    If the roster says I was, I was.   I don't remember off

15  the top of my head, but I probably was.

16         Q.    Do you know where Mr. Washington was housed in 2013?

17  I believe you testified to it yesterday.   If you recall.

18         A.    Yeah, G block, what was brought up.   That's probably

19  accurate.

20         Q.    So is G Block a unit that you would have typically

21  been working on in August of 2013?

22         A.    Yeah.   During that time, I was pretty much assigned to

23  RHU housing units.

24              THE COURT:   Lieutenant, before you start, if you could

25  just let Ms. Goodrich ask her question before you answer.   The
```

```
1    court reporter can only take down one voice at a time.
2                 THE WITNESS:   I'm sorry, Your Honor.
3    BY MS. GOODRICH:
4         Q.    So you heard Plaintiff's testimony yesterday.  He
5    testified that you came to his cell on August 1st of 2013 to
6    escort him to a legal visit.  Is that the type of escort that
7    you would typically have been doing in that role as a CO?
8         A.    Yes, it would have been.
9         Q.    Do you know if you did, in fact, escort Plaintiff to a
10   legal visit on that date?
11        A.    It's possible.  Most likely I did.
12        Q.    Okay.  When you transport an RHU inmate to a visit
13   with outside visitors, is there a certain procedure that you
14   need to follow?
15        A.    Yes, there is.
16        Q.    Can you walk me through that procedure a little bit?
17        A.    I absolutely can.  The lawyer would enter the
18   administration building.  So it would be the visitor --
19        Q.    I'm going to stop you, actually.
20        A.    Okay.  I just figured you wanted to go through the
21   whole thing.
22        Q.    Let me clarify.  I guess, what would the procedure be
23   for removing the inmate from the cell?
24        A.    Once the phone call would be received to the housing
25   unit, usually through the sergeant, that would be given -- a
```

1  direction would be given to prep the inmate for the visit,

2  which, you want me to explain that?

3     Q.   Yeah.  So, how do you -- how do you prep them for the

4  visit?

5     A.   After being told, you know, this inmate has to go here

6  for a visit, we would proceed to the pod, go to the cell door

7  and inform the inmate that he has a visit, a legal visit in this

8  case.  And sometimes they refuse.  A majority of the time they

9  don't, you know, because it's legal in nature.  So these are

10 things that aren't often refused.

11        So if a -- so if the inmate would agree to go to

12 visit, a strip search is necessary for an RHU inmate to exit his

13 cell, which would have been conducted at that time.  Prior to

14 the -- yes, I'm sorry.

15    Q.   If an inmate is on the toilet when you arrive at their

16 cell, how do you handle that situation?

17    A.   I would inform them of the reason why I was there and,

18 you know, give them the appropriate amount of time to, you know,

19 clean yourself and get ready.

20    Q.   Did you hear Mr. Washington testify yesterday that you

21 told him if you did not get off the toilet you would cancel his

22 legal visit?

23    A.   I did.

24    Q.   Is there any circumstance under which you would tell

25 an inmate that?

```
1          A.    No.

2          Q.    Do you have the power to cancel legal visits?

3          A.    No, I don't.

4          Q.    Okay.  So assuming an inmate agrees to go to their

5    legal visit, what happens next?

6          A.    Okay.  So prior -- you heard the description yesterday

7    of what a wicket is; correct?

8          Q.    Correct.

9          A.    So it's an opening -- a food aperture is what we call

10   it.  So it's an opening about waist-level at the cell door.

11   Prior to opening that, I would visually look inside of the cell

12   and make sure that the inmate inside doesn't have anything in

13   his hands that he could throw or any other kind of item that he

14   could, you know, do harm to me or the other officer that is part

15   of the escort.

16               At that point, the inmate would be given direction to

17   take part in a strip search, which is policy as required by the

18   DOC.  The strip search would then be conducted with both

19   officers present.  Each piece of clothing would have been handed

20   out, you know, one at a time.  And as I'm going through them,

21   I'm keeping my eyes on what's going on and handing them to the

22   other officer to double-check them.

23         Q.    Okay.  So is this procedure always performed with two

24   officers?

25         A.    An escort is -- yes, any -- yeah.
```

```
1        Q.    What's the reason for that?

2        A.    It's a safety thing.

3        Q.    Okay.  And then the strip search that you're

4   performing, is this also for safety?

5        A.    Yes, for the inmate and staff and his visitor.

6        Q.    So I think I interrupted you.  You were saying the

7   inmate will hand their clothing out of the wicket to you?

8        A.    Yes.

9        Q.    Okay.  What do you do next?

10        A.    Okay.  So after all of the clothing, and if any

11   documentation was being brought to the visit, that would also be

12   searched through and made sure that nothing, you know, was

13   inappropriate, then the search of the inmate's body would be

14   conducted, a visual search.

15        Q.    You might have said this.  For a legal visit, are they

16   permitted to take legal materials with them?

17        A.    Yes, pertaining to that.

18        Q.    You searched those as well?

19        A.    Yes.

20        Q.    Okay.

21        A.    It's done as a team, you know.

22        Q.    So you would be -- would you be watching in the cell

23   while your --

24        A.    Absolutely.

25        Q.    -- partner is doing the search of clothing and legal
```

```
 1  materials?
 2       A.    Yes, ma'am.
 3       Q.    Okay.  Then you said you do a visual search --
 4       A.    Yes.
 5       Q.    -- of the inmate?
 6       A.    Right, to make sure that nothing is hidden.  It would
 7  be, you know, started at the hands, you know, upside, downside.
 8  And arms raised up in the air to check underneath the armpits.
 9            At that time, you know, a direction would be given to
10  the inmate to do a gum sweep of the uppers and lowers if he has
11  any dentures or false teeth.  Those -- I would ask him to remove
12  those just to make sure that nothing is hidden on to those.
13            And then the strip search just goes down from there,
14  you know.  The bottoms of the feet are checked, the underneath
15  of the private areas, and front and back.
16       Q.    So are inmates required, as part of this visual
17  inspection, to part their butt cheeks --
18       A.    Yes.
19       Q.    -- so you can inspect --
20       A.    Yes.
21       Q.    -- so there's nothing hidden?
22       A.    Correct.
23       Q.    And then if it is a male inmate, are they required to
24  lift their penis and testicles to display there's nothing hidden
25  in there?
```

Washington000163

```
1       A.   Yes.   Correct.

2       Q.   Okay.   Is that every inmate that undergoes this

3    search?

4       A.   Per policy.

5       Q.   Per policy.

6            What's the reason for that?

7       A.   It's a safety thing.   And to ensure contraband isn't

8    moved from one area to another.

9       Q.   And that's a place that people hide contraband --

10      A.   Yes.

11      Q.   -- in your experience?

12      A.   Yes, absolutely.

13      Q.   What do you do once the strip -- sorry.   Let me back

14   up.   While this strip search is occurring, the inmate is nude;

15   correct?

16      A.   Uh-huh yes.

17      Q.   What do you do once -- are you outside the cell or

18   inside the cell?

19      A.   Outside of the door.

20      Q.   Is the door closed?

21      A.   Yes.

22      Q.   Once the strip search is finished, what do you do?

23      A.   The clothing items would then be handed back to the

24   inmate inside and he would get dressed.

25      Q.   Do you watch them get dressed?
```

Washington000164

```
 1        A.    Yes.

 2        Q.    What's the reason for that?

 3        A.    ·It's also a safety thing.  You know, there -- with the

 4   door being in front of me, you know, there's two very small

 5   windows at the top that -- it's sometimes it's hard to see

 6   what's on -- directly behind the door.  So I'm paying attention

 7   to that just to make sure that nothing is picked up while the

 8   inmate's getting dressed.

 9        Q.    So is the concern that something might be hidden up

10   against the door?

11        A.    Yes.

12        Q.    And the inmate would retrieve it while getting

13   dressed?

14        A.    Right.

15        Q.    What kinds of things do inmates hide up against the

16   door?

17        A.    Anything they don't want us to see, or containers

18   filled with liquids, bodily fluids.  Just it can be anything,

19   general contraband.

20        Q.    When you say "bodily fluids," do you mean urine and

21   feces?

22        A.    Yes.

23        Q.    Why would they be doing that?

24        A.    To throw it.

25        Q.    To throw it?
```

1     A.    On myself or the other officer.   Whoever they want to
2  throw it on.

3     Q.    Okay.   What happens if an inmate throws feces or urine
4  on you?

5     A.    Well, it depends on the -- like, where it would, you
6  know, come into contact with you.  If it was, what do they call
7  it, a significant exposure, if it comes into contact with the
8  eyes, nose, mouth you would -- if you were struck by this, you
9  would be evaluated by medical personnel, obviously, which would
10 most -- would definitely involve an outside hospital to where
11 you -- if it was deemed a significant exposure, you would be put
12 on a medication protocol, as far as I know.

13    Q.    And you don't have access to any given inmate's
14 medical records, so you don't know what type of diseases you
15 might be exposed to?

16    A.    No, I don't.

17    Q.    Okay.   So going back to the search.   So you watch the
18 inmate get dressed.   Would they then come out of the cell?

19    A.    After being restrained.

20    Q.    Okay.   For legal visits, how are they restrained?

21    A.    For -- at the time for legal visits, we would use a
22 waist belt and your typical hand restraints, handcuffs.   The --
23 there's a metal D-Ring attached to the waist belt and the
24 handcuffs are fed through that.   The inmate is cuffed in front
25 with his hands in front of him.   And then the waist belt is put

1    on like -- like a normal belt.  That's so that, you know, you

2    can write and hand documents and other things.

3         Q.   Do you go into the inmate's cell to cuff them?

4         A.   No.   That's done at the door.

5         Q.   So do you cuff them through the wicket then?

6         A.   Yes, correct.

7         Q.   They would --

8         A.   Hands would be stuck out, hand restraints would be

9    applied.   The inmate would then be given direction to -- to spin

10   to where, enough, I could, you know, the other officer or myself

11   could maintain positive control of that -- of that waist belt.

12        Q.   Okay.  Did you hear Mr. Washington testify yesterday

13   that you had had a tether attached to him?

14        A.   Yeah.  I -- I remember.

15        Q.   Is that used in this type of escort?

16        A.   Not for this one.  It's for -- that would be for a

17   separate sort of escort.

18        Q.   What type of escort would it be used for?

19        A.   Tethers are used for disciplinary custody of inmates

20   and can be used for administrative custody of inmates.  A

21   tether's used to ensure that the inmate doesn't take our

22   equipment.  It's that -- a tether's not used for a waist belt

23   escort to the visiting room.  It just wouldn't be practical.

24        Q.   Okay.  So you cuff the inmate through the wicket.

25   Then they're removed from the cell.  What happens next?

1      A.    The cell door's directed to be opened through a

2  control officer who opens the door via -- remotely via panel.

3  The doors then open.  Like I said, there's policy that demands

4  that there's two -- two staff members there at all times.  The

5  waist belt is then put on just like a regular belt or it's

6  connected.  The belt buckle would be in the back, though, like

7  the small of the back.

8      Q.    And then you walk to the visit?

9      A.    Uh-huh.  Yeah.

10     Q.    Do you have standard positions that you're in when

11 you're walking and escorting?

12     A.    Usually 45 and 45.  Either side of the inmate, at

13 45 degrees.

14     Q.    Is there a certain way that you would, I guess,

15 maintain control of the inmate?

16     A.    Yeah.  Yeah.  My -- if I was on the left-hand side, my

17 right arm would be -- my right hand would be directly, I'd say,

18 above the elbow.

19          MS. GOODRICH:  Your Honor, could I have him

20 demonstrate this on Mr. Bradley?

21          THE COURT:  Yes.  Yes, he can.

22          Any objection, Mr. Washington?

23          MR. WASHINGTON:  Yes.

24          THE COURT:  What's your objection?

25          MR. WASHINGTON:  My objection is this is all being

```
1    said to something that never occurred and anyone can say this

2    occurred anytime they want.  We got nowhere proof that it

3    occurred that way.  This is fiction they're cooking up here.

4              THE COURT:  You can lay the foundation this would have

5    occurred with Mr. Washington.

6              MR. WASHINGTON:  That wouldn't have occurred.

7    BY MS. GOODRICH:

8         Q.   So to back up, you said that it's quite possible that

9    you did escort Mr. Washington on August 1, 2013, to his legal

10   visit; correct?

11        A.   Yes.

12        Q.   If you had escorted him, is this how you would have

13   performed the escort?

14        A.   Yes.

15        Q.   He would have been cuffed in the front?

16        A.   Yes.  Going to a visit, yes.

17        Q.   Going to a legal visit?

18        A.   Yes.

19        Q.   And is there any reason you would have deviated from

20   that procedure?

21        A.   No.

22             MS. GOODRICH:  Was that sufficient, Your Honor?

23             THE COURT:  Any objection, Mr. Washington?

24             MR. WASHINGTON:  Yes.

25             THE COURT:  What's your --
```

```
1                MR. WASHINGTON:  No one --

2                THE COURT:  What's your objection?

3                MR. WASHINGTON:  My objection is you can easily say

4   this occurred during that time but there's no way to prove it.

5   So you can just make it up as you go along.  I wasn't handcuffed

6   in front and never have been.

7                THE COURT:  Do you have any particular recollection,

8   Officer Oswald, that this occurred with Mr. Washington?

9                THE WITNESS:  I'm sorry.  Particular recollection?

10               THE COURT:  Do you have any recollection as that this

11  is the way you transported Mr. Washington?

12               THE WITNESS:  Yes.

13               THE COURT:  On August 1, 2013?

14               THE WITNESS:  If he was going to a legal visit, this

15  would have been done that way.

16               THE COURT:  That's not what I asked you.  Do you have

17  any recollection, sitting here today, that that is the way you

18  transported Mr. Washington?

19               THE WITNESS:  Yes.

20               THE COURT:  On August 1st?

21               THE WITNESS:  Yes, Your Honor.

22               THE COURT:  Okay.  I'll allow it.

23  BY MS. GOODRICH:

24     Q.    Lieutenant Oswald, I'm going to have you step down and

25  demonstrate this.
```

```
1                    MS. GOODRICH:  If that's all right with Your Honor?

2                    THE COURT:  Yes, that's fine.

3     BY MS. GOODRICH:

4          Q.    So assuming that Mr. Bradley is an inmate being

5     transported, is that the position that his hands would have been

6     in?

7          A.    Exactly like that (indicating.)

8          Q.    Okay.  And if I'm understanding correctly, the cuffs

9     that he's in are attached to a belt that goes around his waist?

10         A.    Correct.  Yeah.  It's just like a leather belt.  It

11    has a D-Ring on the front of it.  We feed the handcuffs through

12    the D-Ring and it's -- it's held in place by the linking chain.

13    And then once the handcuffs are applied to the inmate's wrist,

14    you know, it -- it's attached to the belt through.

15         Q.    Okay.  And for legal visits, I think you said they get

16    to take their documents with them.  Do they hold them or do you

17    or the other CO carry those for them?

18         A.    After the search is complete, we would hand the

19    documents back to the inmate.

20         Q.    Okay.  And then they come out of this cell.  What are

21    the positions that you would be standing or walking in during

22    the escort?

23         A.    Myself would be on this side (indicating).

24                    THE COURT:  If you can just tell us which side, just

25    so the record is clear.
```

```
1              THE WITNESS:  Left side.  My hand would be positioned
2    on the -- on the inmate's elbow to maintain control.
3    BY MS. GOODRICH:
4         Q.    Okay.  And is there a usual distance that you maintain
5    between your body and the inmate's body?
6         A.    About here, you know (indicating).  Enough to where
7    I'm not really close but enough to where if he decides to pull
8    away or to, you know, suddenly twitch backwards to where I
9    wouldn't -- I would have enough time to, to react.
10        Q.    Okay.  And the other guard that would be escorting
11   with you?
12        A.    The other side.
13        Q.    Identical?
14        A.    Other side, 45-degree angle.  Slightly -- slightly to
15   the back and behind.  So I would be over here, the other officer
16   would be here (pointing).
17        Q.    Okay.  And would you mind just demonstrating, like,
18   turning to the side so that the jury can see how far, I guess,
19   like back and behind you are from Mr. Bradley.
20        A.    (Demonstrating).
21        Q.    Thank you.  You can get back on the stand.
22              So you testified that you maintained a certain
23   distance.  What is the reason for that?
24        A.    My safety and the other officer's safety and the
25   inmate's safety.
```

```
1         Q.    Where do legal visits take place?
2         A.    We have a designated area in our institution.  We --
3    what we call L5 visiting area.
4         Q.    About how long of a walk would it be from --
5         A.    From G Block, after the strip search procedure, you
6    know, that takes, you know, a few minutes, less than a minute.
7         Q.    And when you get to the room where legal visits occur,
8    how is that set up?
9         A.    It's like -- excuse me.  So the L5 visiting area, the
10   L5 complex is sort of like -- built like a wagon wheel with the
11   officer visiting station in the center of that.
12              That housing unit's pretty much surrounded, like a
13   wagon wheel goes F, G, H, and I.  G being where, you know, he
14   was housed, he was taken out of the front door, walked to the
15   visiting area.
16              The restraints at the time would have been left on
17   him.  He had enough, you know, freedom of movement to where he
18   could do any writing or whatever handling of documents that he
19   would need to.  He would then be secured in the visiting booth.
20        Q.    Do the visiting rooms have doors on them that are the
21   same as the cell doors?
22        A.    No, they are different.
23        Q.    Do they have wickets?
24        A.    Yes, they do.
25        Q.    So if you were going to uncuff him, which I know you
```

```
1    said you did not, but if you were, would he be unhandcuffed

2    through the wicket?

3         A.    Yes.

4         Q.    You would not go into the cell with him?

5         A.    No, I would not.

6         Q.    Okay.  During the legal visit, do you stay?

7         A.    No.  No, ma'am.

8         Q.    So he would have had his legal visit and then you

9    would have come back?

10        A.    Yes.  He, he would have been monitored by the L5

11   visiting officer during the duration of his visit; correct.

12        Q.    When you do an escort, is it always the same officers

13   who escort to and back?

14        A.    It could be different.  Whoever is available at the

15   time usually is the ones that go.

16        Q.    During these escorts, are there security cameras?

17        A.    Everywhere.

18        Q.    Are there security cameras everywhere in prisons?

19        A.    For the most part, yes.

20        Q.    Is someone always watching the security feed?

21        A.    Yes.

22        Q.    Do you know who's watching the security feed?

23        A.    No.

24        Q.    Do you know who controls the cameras?

25        A.    There are some cameras that are controlled by what we
```

1  call PTZ; pan, tilt, zoom.  And then there are other ones that

2  are stationary, that are not controlled.  They -- you know,

3  they're cameras.  They pretty much see everything.

4      Q.   The PTZ cameras, is that like a person who would be,

5  like, in a control center?

6      A.   Yes, yes.  Pan, tilt, zoom cameras, those are the ones

7  that they can be rotated.  Some of them are 360 degrees these

8  days.  But, yeah, if something would be needed to be focused on,

9  if we were looking for something in a particular area, mainly in

10 a recreation yard or a housing unit, that's when that -- those

11 cameras could be moved.

12     Q.   The people who are monitoring these camera feeds, is

13 it a fellow CO?  Is it the superintendent?

14     A.   Superintendents, both deputies.  The majors all have

15 access in their offices to monitor these, these cameras.  Our

16 security team.  Our shift commander.  There are numerous people

17 that can -- the CCTV officer in control.  There are numerous

18 people that -- that monitor these cameras throughout the day.

19     Q.   So do you have any way of knowing who is watching?

20     A.   No.

21     Q.   At any given time?

22     A.   No.

23     Q.   So if you were sexually touching an inmate in the

24 hallway, you have no idea who would see that?

25     A.   I would not.

```
1        Q.    Is that something that you would be fired for doing?

2        A.    Yes.

3        Q.    Did you hear Mr. Washington testify yesterday that he

4   believes the reason you were harassing him and abusing him was

5   because he had previously complained about the conditions of his

6   confinement?

7        A.    Yes.

8        Q.    Is it common for inmates to complain about the

9   conditions of their confinement?

10       A.    Yes.

11       Q.    Does it bother you?

12       A.    No, not particularly.

13       Q.    Would you risk your job to retaliate against one of

14  them?

15       A.    No.

16       Q.    So to go back to the escort.  You don't -- do you

17  recall if you were the same officer that would have escorted him

18  from the end of his legal visit back to his cell?

19       A.    It could have been.

20       Q.    Could have been.

21             So when you go to pick him up at the legal visit to

22  take him back, what happens?

23       A.    Going back, I checked -- I checked with the bubble

24  officer first, because he's the one that has to open that door

25  up.  He's the one that has a set of keys.  So the keys would be
```

```
1    retrieved from -- from that officer.  And then I visually
2    inspect the inside of the door, just looking around just to see,
3    you know, checking hands.  It's something that I've always done.
4    And at that point, if I didn't see anything alarming I would
5    open the door.  The inmate would be told to back out of the
6    cell.  I -- if I didn't mention that before, he would back out
7    of the visiting booth.  And then that's where we would assume
8    the escort position of 45 and 45.
9        Q.   And then do you walk back to the cell?
10       A.   Yeah.
11       Q.   Do you need to do a strip search when you remove them
12   from the legal visit?
13       A.   No, because they -- he was restrained during -- during
14   the visit.
15       Q.   When you get back to the cell, how do you place the
16   inmate back into there?
17       A.   The inmate steps into the cell door.  The belt buckle
18   is undone, you know, to where you can loosen it to where it's
19   not connected through -- through the house.  The door is then
20   closed -- closed halfway to where we can move the belt buckle
21   through the feeding aperture.  The doors then close, the
22   inmate's hands come out of the top of the wicket, and then the
23   handcuffs are removed.
24       Q.   Would you ever go into the cell to uncuff them?
25       A.   No.  Emergency situations, you know, if -- but not --
```

```
1   not for this, no.

2        Q.   Why not?

3        A.   It's not necessary.

4        Q.   Is it safe to go into --

5        A.   No.

6        Q.   -- an inmate's cell?

7        A.   Well, to further explain that --

8             THE COURT:   I'm sorry.  Can you repeat that?  I don't

9    know that we picked up anything.

10       A.   Oh.  Can you repeat the question?

11       Q.   Is it safe for a CO to go into an inmate's cell to

12   uncuff them?

13       A.   It's not -- it's not recommended, no.

14       Q.   And then, did you hear Plaintiff testify yesterday

15   that -- sorry, Mr. Washington testify yesterday that he asked

16   for medical treatment but no one came?

17       A.   I have heard him say that, yes.

18       Q.   Is that likely?

19       A.   No.

20       Q.   Why is that?

21       A.   Nurses do rounds on these -- on all of these housing

22   units several times a day.  And if an inmate, you know, needs

23   medical attention, we're going to make sure that happens.

24       Q.   So when you say nurses do rounds, does the RHU have

25   its own medical staff?
```

1    A.    No.  No.  It's -- they have a centralized location to

2    where they work at in building 3.

3        Q.    So medical staff comes on to the unit?

4        A.    Yeah.

5        Q.    And they do rounds; what does that mean?

6        A.    Med rounds, they're required to do, you know, just

7    rounds in the area just to pick up sick call slips.  You know,

8    just -- just -- they go in there to, to do their job, you know,

9    to be nurses.

10        Q.    Do they go to each cell?

11        A.    They walk by each cell, yes.

12        Q.    So if an inmate had a medical complaint, they could

13    raise it directly with medical staff?

14        A.    Right then and there, yes.

15        Q.    Do you have any authority over medical staff as a

16    corrections officer?

17        A.    No.  Not in the direction of their jobs, I don't.

18        Q.    Could you stop them from doing rounds?

19        A.    No.

20        Q.    Could you stop them from seeing an inmate?

21        A.    No.

22        Q.    So I want to talk about, I guess, let's sort of pivot

23    over to you heard -- did you hear Plaintiff testify regarding

24    what he alleges occurred on April 2nd of 2015?

25        A.    I heard.

```
1        Q.   Were you working at the DOC at that time?

2        A.   Yes.

3        Q.   Were you still a corrections officer or a CO-1, I

4   guess is what you said?

5        A.   2013, I would have been.

6        Q.   What about 2015?

7        A.   Probably was a sergeant by then.

8        Q.   Okay.  Is that a promotion?

9        A.   Yes.

10        Q.   How are the job duties different?

11        A.   A sergeant's essentially a lead worker.  A corrections

12   officer is assigned.  He assists and adds to their daily duties.

13   It's not technically a supervisor position, but it often is

14   that, the security needs of that housing unit or, if it's an

15   outside area, like, a recreation yard.

16        Q.   And do you recall if you were working on April 2nd of

17   2015?

18        A.   Not 100 percent.  Not off the top of my head.  I

19   probably was but if --

20        Q.   Would a sergeant normally -- did you hear

21   Mr. Washington testify that you escorted him to the showers on

22   that date?

23        A.   Yes.

24        Q.   Is that an escort that a sergeant would normally do?

25        A.   A sergeant can do, yes.
```

1    Q.   Did you do them regularly?

2    A.   Yes, I did.

3    Q.   Do you know if you -- so you said -- you did say you

4    probably were working.  You're not sure?

5    A.   I -- I say probably because I don't have a roster in

6    front of me that says, you know, a hundred percent.  I don't --

7    you know, it's 13 years ago or however, you know.  I have days

8    off.

9    Q.   Did you hear Mr. Washington testify that you were not

10   assigned to his housing unit that day but you came on to the

11   housing unit to do the escort?

12   A.   I heard the claim.  I read it.

13   Q.   Is that something that you would have -- like, would

14   you leave your assigned unit to escort an inmate on another

15   block?

16   A.   Not -- it's not usually, but it could be done, you

17   know.  But it's very -- very rarely or unlikely.

18   Q.   Okay.  Is there a procedure for shower escorts?

19   A.   Yes.

20   Q.   Let's walk through it.  What do you first?

21   A.   Okay.  So a shower escort is different than a legal

22   visit escort because of the clothing that is worn during this.

23   Inmates go to the shower in a T-shirt, boxers, and shower shoes.

24   And, you know, a bar of soap.  You know, some shampoo or some

25   stuff like that.

| 1 | | But essentially, it's the same process.  You know, you |
|---|---|---|
| 2 | | approach the door, visually check inside before you open the |
| 3 | | cell aperture, and then the strip search is performed. |
| 4 | Q. | Would you be doing this by yourself? |
| 5 | A. | No. |
| 6 | Q. | Two officers? |
| 7 | A. | Yes. |
| 8 | Q. | Would you ever do this by yourself? |
| 9 | A. | No. |
| 10 | Q. | Why? |
| 11 | A. | It's a safety concern.  And I could get in trouble for |
| 12 | | doing it if I did. |
| 13 | Q. | Okay.  So the strip search, that procedure's going to |
| 14 | | be identical to the legal visit strip search? |
| 15 | A. | Yes. |
| 16 | Q. | And then when you cuff them, do they get cuffed in |
| 17 | | front or in back? |
| 18 | A. | In back for the shower. |
| 19 | Q. | Would you use a tether for this escort? |
| 20 | A. | Yes, I would. |
| 21 | Q. | When you get to the shower, do inmates have to shower |
| 22 | | with handcuffs on? |
| 23 | A. | No. |
| 24 | Q. | So how do you get them uncuffed once you get to the |
| 25 | | shower? |

```
 1        A.    If -- using a tether, the shower door is sort of like
 2   a cell door.  It does have a cell aperture or a wicket in the
 3   middle of the door about waist-high.  The tether would -- the
 4   door -- the door would be opened before we even get there.
 5   Before we -- officers start showers, the shower area is searched
 6   to make sure that there's no -- nothing left inside, weapons,
 7   other contraband that inmates, you know, or anything that could
 8   be in there that we, you know, is out of place.
 9             So when we get there, the door's open.  So the inmate
10   takes a step in.  We would open the wicket, feed the tether
11   through it, and then close the door.  And then at that point in
12   time, the other officer would take the handcuffs off while I
13   maintained control of that tether.
14        Q.    Through the wicket?
15        A.    Yes.
16        Q.    Do you stay and watch them shower?
17        A.    No.
18        Q.    They're given privacy for that?
19        A.    Yes.
20        Q.    Is there a certain amount of time that they get for
21   showers?
22        A.    10, 15 minutes.  A reasonable amount of time.
23        Q.    And so they are clothed for the whole escort?
24        A.    Yes, while they're -- during the escort, yes.
25        Q.    You are never -- there's always a door between you and
```

1    the inmate if they are unclothed?

2        A.    Yes.

3        Q.    Once the shower is over, do you -- is it the same

4    guards that would do the return escort?

5        A.    It can be.   Typically it is, because at the time we

6    would do them in teams.   It could be -- could be two other guys,

7    too.   You know, the way it's set up is there's two showers on

8    the top tier, two showers on the bottom tier.   You need two

9    officers for each escort.

10            So if, you know, we put one guy into a shower, we

11   then -- and go get another one if there's just two of us, you

12   know.   That's the way it would have to be done.   If there's --

13   you know, if we have the staff available, there could be four of

14   us doing this work here.

15            So while we put the first inmate in the shower stall,

16   the second group of guys could be coming behind and putting the

17   other guy in.   And then we just go to the bottom and kind of

18   follow the same routine until we're done.

19       Q.    So everyone gets a shower?

20       A.    Yeah.

21       Q.    And do you need to do a strip search on the inmate

22   after they shower but before you escort them back to their cell?

23       A.    Not -- not after.   We strip search them before they

24   came out of their cell.   We searched the shower stall area to

25   ensure that there was nothing in there.   I mean, the only thing

1  that he would have in that shower stall with him is what he

2  would have had during the escort, which is a bar of soap and,

3  you know, his T-shirt, boxers, shower shoes.

4      Q.  Okay.  So you do the escort back.  You're back at the

5  cell.  How do you place the inmate back at the cell at the end

6  of the shower escort?

7      A.  The inmate takes a step inside of the cell.  The

8  tether is then fed through the cell aperture, the door is

9  closed.  The other -- whoever doesn't have the tether at the

10  time takes the -- uses his keys to take the handcuffs off.

11     Q.  So when you say you feed the tether back through the

12  wicket, is the door all the way open?

13     A.  Not -- no, not -- there's -- we have to pull it enough

14  to where -- when you completely push open this door, the cell

15  aperture is blocked by the wall.

16     Q.  Okay.

17     A.  So you have to pull it a little bit to create an

18  opening to where you could feed that through.

19     Q.  I guess would step -- would you be required to step

20  into the cell in order to get the tether through the wicket?

21     A.  Maybe half a step.

22     Q.  Okay.

23     A.  Just, like, a half a step inside to where, yeah, I

24  could have enough room to feed that through.

25     Q.  About how big are the wickets?

1      A.    Let's see.   Eight inches tall by about 16 inches wide.

2    You know, about yea or about this high and this long

3    (indicating).

4      Q.    Okay.   And did you hear Mr. Washington testify

5    yesterday that you were reaching your arm through the wicket to

6    poke him?

7      A.    I heard him say that, yes.

8      Q.    Would you ever reach your hand into a wicket into a

9    cell?

10     A.    No, not unless the inmate was -- not unless I was

11   doing the shower escort and I had complete control over the

12   situation.

13     Q.    Is it --

14     A.    Just randomly sticking my hand into a cell -- into a

15   cell aperture, that's -- no, that's not a thing to do.

16     Q.    And did you hear Mr. Washington testify yesterday that

17   during this escort you continually poked him in the rectum with

18   your finger?

19     A.    Yes, I heard him.

20     Q.    Did you do that?

21     A.    No, I did not.

22     Q.    Did you do any of the things that he accused you of

23   doing?

24     A.    I took him to a legal visit.

25     Q.    During the shower escort?

Washington000186

```
 1        A.    None of the things he claimed.  No, I did not.

 2              MS. GOODRICH:  Could I just have one moment, Your

 3   Honor?

 4              THE COURT:  Yes.

 5        (Pause.)

 6   BY MS. GOODRICH:

 7        Q.    Do you recall yesterday that Mr. Washington testified

 8   that he didn't call out or didn't resist some of your advances

 9   because he was scared he would be sprayed?

10        A.    I heard him say that, yes.

11        Q.    And what is your understanding of what he means by

12   sprayed?

13        A.    Oleoresin capsicum.  OC, that's the abbreviation.

14   Pepper spray.

15        Q.    Would you, I guess -- do you regularly carry OC spray

16   on your person?

17        A.    We do now.

18        Q.    Did you in 2013?

19        A.    No.

20        Q.    Did you in 2015?

21        A.    No.

22        Q.    When did you start regularly carrying?

23        A.    I forget the exact date that it was -- legislation was

24   put into -- authorizing corrections officer to carry OC was

25   2018, '19, somewhere around there.
```

```
 1        Q.    So pretty much more recently than 2013?

 2        A.    Yeah.  We didn't -- we didn't carry OC back then.  Not

 3   as -- not as line staff.  That was only accessed by commissioned

 4   officers.

 5        Q.    So if I'm understanding correctly, that wasn't -- that

 6   was legislation, not even a DOC policy?

 7        A.    Correct, yeah.  We weren't allowed to carry that until

 8   legislation authorized us to.  I think that was from Pam Snyder,

 9   50th District of Western Pennsylvania.

10        Q.    Okay.  And in both incidents, the 2013 incident and

11   the 2015 incident, did you hear Mr. Washington testify that you

12   had rubbed your penis against him?

13        A.    I heard him.

14        Q.    Is it safe to get that close to an inmate?

15        A.    No.

16        Q.    So, first of all, I believe it was your testimony that

17   you did not do that?

18        A.    Correct, I didn't.

19        Q.    But would you place your body that close to an

20   inmate's body during an escort?

21        A.    No.

22        Q.    Why not?

23        A.    I don't want to be that close.  I want to be close

24   enough to where I can control -- I -- close enough to where I

25   can react if something were to occur.  If it's an everyday
```

```
 1    escort, I'm just -- I'm going to be as close as I have to be.
 2         Q.    Have you been attacked by inmates before?
 3         A.    They've tried, yes.  I've been -- they've been
 4    unsuccessful, but I have taken part in uses of force over the
 5    years, planned and unplanned ones.
 6         Q.    Okay.
 7               MS. GOODRICH:  I have nothing further, Your Honor.
 8               THE COURT:  Okay.  Mr. Washington, cross-examination.
 9               MR. WASHINGTON:  Would you please let me get a pen
10    that I can write with?  She gave me one but he took it.
11               THE COURT:  If I can see one of the security officers
12    at sidebar.
13               MR. WASHINGTON:  I'm having trouble.  That's cramping,
14    causing me to cramp.  That's what I'm saying.  I had a pen that
15    she gave me that was working fine.
16               SECURITY OFFICER:  You're going to have to use this
17    one (indicating).
18               MR. WASHINGTON:  I was using one yesterday that was
19    working fine.
20               THE COURT:  Let me just -- is the pen working?
21               SECURITY OFFICER:  Yes, Your Honor.  The pen is
22    working.
23               THE COURT:  Okay.  Let the record reflect that the pen
24    works.
25               MR. WASHINGTON:  Let me see.  You see this writing at
```

Washington000189

```
1    the top here (pointing)?

2              THE COURT:  Yes.

3              MR. WASHINGTON:  That's the pen that the young lady

4    gave me that write fine.  He give me one that I'm having trouble

5    writing with.  It's painful.  It's painful.

6              THE COURT:  You have to use the pen that they

7    provided.

8              MR. WASHINGTON:  Well, what was wrong with the one

9    that I had yesterday?

10             THE COURT:  I don't know.  Is there a pen that he had

11   yesterday, Jamille?

12             THE DEPUTY CLERK:  I don't know which pen that would

13   be, Your Honor.  I did provide him with the same pen from the

14   box of pens that I had.

15             MR. WASHINGTON:  It worked fine.

16             THE COURT:  Can I see one of the officers at sidebar?

17       (Discussion off the record.)

18             THE COURT:  We're going to go with that pen,

19   Mr. Washington.

20             Cross-examination.

21             MR. WASHINGTON:  All right.  I won't be able to keep

22   any notes or anything because this --

23             THE COURT:  The pen absolutely writes.  I just

24   witnessed it writing.  So that is the pen that you're going

25   with.
```

```
1              MR. WASHINGTON:  I won't be able to keep no notes.
2   I'm telling you, it's painful.
3              THE COURT:  It's just an ordinary pen.
4              MR. WASHINGTON:  It's painful.  You can't write with
5   it.
6              THE COURT:  Okay.
7                          CROSS-EXAMINATION
8   BY MR. WASHINGTON:
9       Q.  Listen, what would be the penalty for anyone to
10  sexually assault someone?  Would they lose their job?  Would
11  they lose their pension or anything like that?
12      A.  Yes.
13      Q.  And the reason I'm saying this is, you have reason to
14  not to admit to this.
15             Policy changes every so often in the penitentiary.
16  You're saying two people escort people.  That wasn't always the
17  policy.  And there's nothing that you can show me or this Court
18  here --
19             THE COURT:  Mr. Washington, if you have a question you
20  can ask it.  It's not testimony.
21             MR. WASHINGTON:  I'm trying to ask the question.
22  BY MR. WASHINGTON:
23      Q.  You -- what is -- do you have any paper that shows
24  when the policy changed, where you escort -- where two people
25  escort people?  Do we have any paperwork that gives us a
```

```
 1   stipulation of dates?
 2        A.    That's policy.  That's the way --
 3        Q.    No, no.  Do you have anything --
 4              MS. GOODRICH:  Your Honor, I'm going to object to
 5   this.  Lieutenant Oswald testified from his own knowledge.
 6              THE COURT:  No speaking objections, Ms. Goodrich.  The
 7   question is, is there a policy?
 8              THE WITNESS:  Yes, Your Honor, there is a policy that
 9   covers this.
10              THE COURT:  Okay.  And I believe he's asking you when
11   was that policy.
12   BY MR. WASHINGTON:
13        Q.    I would like to see that.
14        A.    There -- policies are revised and updated as needed.
15   But there is an issue date and effective date.
16        Q.    And am I --
17        A.    Which --
18        Q.    Go ahead.
19        A.    So the effective date would be any -- any revisions
20   that were made to this policy.  And the -- I think I have that
21   written down.  But there's, like, an older date to where the
22   policy would have been issued.
23        Q.    Listen, here's my question to you again.  And I'm
24   asking your lawyers to help you with it.  Give us anything that
25   documents, that shows the date when this policy changed.  It was
```

```
1    not escorting two at a time.
2            THE COURT:  Mr. Washington, you can ask when the
3    policy changed but we're not -- we're not giving out documents
4    here right now.  If you want to ask him if there's a document,
5    that's fine.  But --
6    BY MR. WASHINGTON:
7        Q.   Well, that's a good question, if there's a document
8    that shows when this policy changed.
9        A.   The two-on-one procedure for escorts has been, been
10   that way for the entirety --
11       Q.   No, no.
12           THE COURT:  Let him finish his answer, Mr. Washington.
13   Go ahead.
14           THE WITNESS:  Thank you, Judge.
15           The escort -- the escort two-on-one protocol has been
16   that way since I've been at SCI-Greene since 2005.
17           MR. WASHINGTON:  Objection, Your Honor.  Here's why I
18   was interrupting:  He's giving a speech there.  And I asked him
19   a question, is there a policy, and he went on to give a speech.
20           THE COURT:  Okay.  Your objection is noted.  The
21   question is, is there policy?  I think he's answered that
22   already, that there is a policy.
23           MR. WASHINGTON:  But he went on to make a speech to
24   claim that he was -- since he's been there, that's been the
25   policy.  I am saying just the opposite.  I'm saying the policy
```

```
1   changed.
2            THE COURT:  Well, you can ask him questions about
3   that, but your testimony is over, Mr. Washington.  So you can
4   ask him questions, that's what this time is for, but your time
5   to give testimony has passed.  If you have some rebuttal after
6   the Defendant puts in their case, you can talk about that, to
7   the extent that it concerns an issue here.  But this is about
8   questions of the officer.
9            MR. WASHINGTON:  I understand.
10  BY MR. WASHINGTON:
11       Q.   Do you -- could you show -- what date did -- nobody's
12  been sprayed prior to 2018, you're saying?
13       A.   I never said that.
14       Q.   I'm asking has anybody been sprayed prior to that
15  date?
16       A.   Yes.
17       Q.   Uh-huh.
18            MR. WASHINGTON:  And at the same time, I wasn't able
19  to keep no notes here.  Judge, that's got me at a loss.
20            THE COURT:  Just to be clear, you had a pen the entire
21  time.
22            MR. WASHINGTON:  It's painful.  I can't write with
23  that.
24            THE COURT:  Okay.  Well, that is a pen that you're
25  permitted to have; so --
```

```
1                  MR. WASHINGTON:   There ain't nothing --
2    BY MR. WASHINGTON:
3        Q.   You also stated that nurses or medical are always on
4    and off the block.  When do they pick up the sick call slips?
5        A.   Usually in the morning.
6        Q.   And --
7        A.   Back then, probably.
8        Q.   Wait a minute.  When do they pick up the sick call
9    slips?  That's all I want to know.
10       A.   As far as I remember, they do it in the morning.
11       Q.   And you also implied, and I'm asking the question
12   here, do they make -- when they come back to the block, do they
13   make a round on every block every time?
14       A.   Yes.  Yeah, they hand out medication --
15       Q.   Wait a minute.  That's all I was asking.
16                THE COURT:  If you can just answer the question that
17   he poses.
18                THE WITNESS:  I apologize, Your Honor.
19   BY MR. WASHINGTON:
20       Q.   And they -- there's no nurse or doctor or PA stationed
21   in the RHU?
22       A.   No.
23       Q.   And there's a button inside the cell that you can hit
24   for emergency calls, am I correct?
25       A.   You are.
```

```
1         Q.     And the people that control can put that on mute
2    anytime they choose?
3         A.     No.
4         Q.     What would prevent them from doing that?
5         A.     They are not supposed to do that.
6         Q.     No.   What would prevent them from doing that?
7         A.     Getting in trouble.
8         Q.     Oh, all right.   Getting in trouble, you say, to
9    prevent them from doing that.
10            If -- what would prevent -- and I'm asking, the word
11   "prevent," a corrections officer -- you are the one I'm talking
12   about -- from not allowing me to seek medical, what would
13   prevent you from doing that?
14        A.     I don't understand your question.
15        Q.     Yeah, sure you don't.
16            There's nothing that would prevent you from -- I asked
17   about sick call and you just gone about your business.   That
18   would be nothing to prevent you, am I right or not?
19        A.     I don't supervise nursing staff.
20        Q.     No, I didn't say that.
21            What would prevent you from doing that?
22        A.     There's nothing that --
23        Q.     Nothing would prevent it.
24            And you have and -- you also say that people, when
25   they go to legal visit, they are handcuffed in front.   When
```

```
1    did -- no.

2             Do you have any written policy, and I'm just asking a

3    yes or no -- did -- that would state when that started?

4    A.   I didn't bring any policies with me.

5    Q.   No, I didn't ask you that.

6             Is there a policy that would state that?

7    A.   Post orders.

8    Q.   I didn't hear you.

9    A.   Post orders.

10   Q.   Post orders?

11   A.   Yes.

12   Q.   That mean -- which mean?

13   A.   That tells staff members what their jobs are, specific

14   duties.

15   Q.   So you saying that's posted on the wall where you work

16   at.  Because there ain't no such policy -- listen, at the same

17   time, you're saying that officers -- am I correct that you said

18   that there's two officers take people back and forth to the

19   shower?

20   A.   Correct.

21   Q.   When did the policy, and I'm talking about documented

22   policy, is there a policy stating when that started?

23   A.   Security manual -- facility security manual 6.3.1.

24             MR. WASHINGTON:  If I ask a question and you give a

25   speech, Your Honor, it's going to be recorded as something else.
```

```
1              THE COURT:  I'm not sure I understand what you mean.

2              MR. WASHINGTON:  Well, I asked him when did that

3    start, and he gave a speech.

4              THE COURT:  You didn't ask him that.  You asked him is

5    there a policy.  He answered your question.

6    BY MR. WASHINGTON:

7        Q.    When did that start?

8        A.    Do you mean when was the security manual written?  Is

9    that --

10       Q.    When -- what was the date of that policy?

11       A.    I don't have it in front of me.  I couldn't tell you

12   that.

13       Q.    Yeah.

14             On August 1st, you -- do you have anything that would

15   state that you were assigned to G Block?

16       A.    There are rosters kept.  Yes.

17       Q.    Uh-huh.

18       A.    Actually, I brought one with me.

19       Q.    Wait a minute.  Don't keep going.  I don't need a

20   speech.

21             Is it possible that you could leave from your assigned

22   block and go to another block anytime you want?

23       A.    Yes.

24       Q.    I didn't ask if it was a violation.  Can you do that?

25       A.    Yes, I can.
```

```
 1        Q.    Uh-huh.   Now, at the same time, have you by any chance
 2   been accused in the past of touching inmates?
 3        A.    No.
 4              MS. GOODRICH:   Objection.
 5              THE COURT:   The objection's sustained.   This is only
 6   about your case, Mr. Washington.
 7              MR. WASHINGTON:   That's exactly where I'm going.
 8   That's exactly where I'm going.
 9              THE COURT:   The objection is sustained, so move along.
10              MR. WASHINGTON:   All right.
11   BY MR. WASHINGTON:
12        Q.    Were you -- it's just the same question.   Were you at
13   any time accused of touching me prior to that date?
14        A.    I've never received any discipline for what you claim.
15        Q.    No, that ain't what I asked you.
16              Were you at any time accused of touching me prior to
17   that?
18        A.    Yesterday.
19        Q.    No, no.   Prior to the date of?
20        A.    No, I wasn't.
21        Q.    That is -- there is an investigation where it was on
22   film --
23              MS. GOODRICH:   Objection.
24              MR. WASHINGTON:   This is about him.
25              THE COURT:   The objection is overruled.   Go ahead,
```

| 1 | Mr. Washington. |
|---|---|
| 2 | BY MR. WASHINGTON: |
| 3 | Q.   The objection was you being questioned for touching me |
| 4 | when I was on H block and putting your finger in me and you were |
| 5 | investigated by that.  So you didn't just start there. |
| 6 | THE COURT:  Is there a question, Mr. Washington? |
| 7 | Again, you'll be allowed some rebuttal at the appropriate time. |
| 8 | But this is your time to ask questions. |
| 9 | MR. WASHINGTON:  All right. |
| 10 | BY MR. WASHINGTON: |
| 11 | Q.   Listen.  Cameras are not -- am I correct, there are |
| 12 | places in the prison because those -- there is no camera view, |
| 13 | that they had to add cameras; am I correct about that? |
| 14 | A.   Cameras are added and removed as needed. |
| 15 | Q.   Say this again. |
| 16 | A.   I said cameras can be added and removed as -- as they |
| 17 | see -- as facility management see fit to maintain overall -- |
| 18 | Q.   And -- all right, all right, all right.  There are |
| 19 | places in the prison that the cameras don't see is why they |
| 20 | would add a camera; am I correct? |
| 21 | A.   Sure, there can be some blind spots. |
| 22 | Q.   Uh-huh.  So am I correct that you said earlier that |
| 23 | you don't know when you been on camera but you are aware -- you |
| 24 | just said it a few minutes ago -- that there are places that are |
| 25 | blind spots.  Am I correct that you just said that? |

```
1        A.    Yeah, there can be.

2        Q.    No.  Are there?

3        A.    Yes, there can be blind spots.

4        Q.    Wait a minute.

5        A.    Not every square inch of the facility can be covered.

6        Q.    Wait a minute.

7              THE COURT:  If he has to answer the question, if you

8    want him to answer the question --

9        Q.    I'm not asking for a speech.  You are there, and I'm

10   asking a yes or no -- are there places -- you said this a few

11   minutes ago.  Are there places that there are not camera views?

12   Well, you don't have to answer.

13       A.    Cameras or blind spots?  I don't understand what

14   you're asking.  Specifics.

15       Q.    Are there places in the RHU -- and you said this a few

16   minutes ago, that there are -- am I correct that you said that

17   there are places that the cameras cannot view?

18       A.    I said there can be blind spots.

19       Q.    When we use terms like "can," it doesn't mean that

20   it's not definitive.

21             Are there places that the camera cannot view?

22       A.    I just said that.

23       Q.    No, you said "can," which mean there's a possibility.

24             At the same time, sir, sick call, I'm going back to

25   medical there, do -- do we have any medical professionals that
```

1    would just come on the block every hour?

2        A.    Every hour?

3        Q.    Yes.

4        A.    Not every hour.

5        Q.    Uh-huh.  They don't come every hour?

6        A.    No.

7        Q.    I just wanted to make that clear.  I agree with you,

8    they don't come.

9             At the same time, if an inmate is down in the cell,

10   and am I correct that you say an emergency like that, you can go

11   inside the cell?

12       A.    What?

13       Q.    Earlier you said if there's an emergency, that you can

14   go inside the cell.

15       A.    Yes.

16       Q.    Uh-huh.  So in this instance you're -- based on my

17   testimony yesterday, I was telling you the testimony was that I

18   fell to the floor, and the doors opened for you to come in and

19   take the handcuffs off.  Now, I don't know how many times you

20   tried but you can't really write nothing like that.

21            Those -- that would be a situation, if it's an

22   emergency, that you could go in.  Am I correct that you did say

23   that?

24       A.    Yes.  If there was an emergency, I would contact my

25   supervisor.

1        Q.    And if you would -- and I'm --

2              MR. WASHINGTON:  Your Honor, I'm trying to see if I

3     can get her to read back my testimony yesterday about me

4     going -- being escorted from the shower.  I never said he

5     escorted me to the shower.

6              THE COURT:  If you can ask the question.  We're not

7     reading back testimony from yesterday.

8              MR. WASHINGTON:  Well, here's why I was doing that:

9     Because it's been said that on direct there -- it implied that I

10    was saying that he escorted me to the shower.  And I'm saying

11    that that -- that didn't occur.

12             THE COURT:  Whatever you said, the jury can decide

13    whether you said it or not, Mr. Washington.

14    BY MR. WASHINGTON:

15        Q.    And prior to the policy change, would there -- prior

16    to the policy change, one person escort one person back and

17    forth, one person, prior to the policy change?

18        A.    That's never been the case in the RHU.

19        Q.    Wait a minute.  You don't know that.  You -- I was

20    there when you got there.  So you don't know that.

21        A.    Yes, I do.

22        Q.    And prior to policy change, there was one person -- if

23    a person violates that policy, that's no -- am I correct to say

24    that there's no way that an inmate can have him disciplined for

25    going one-on-one?  Is there any way he could have him

```
1   disciplined?
2       A.    Who can have who disciplined?
3       Q.    The inmate can have the -- the staff member
4   disciplined for taking him --
5       A.    No, inmates cannot hand out discipline to staff
6   members.
7       Q.    All right.  All right.  That's all I wanted to hear.
8             And at the same time, if you're assigned as sergeant,
9   there's no one to prevent you -- am I correct, there's no one
10  that can prevent you from coming up and taking an inmate out of
11  the shower by yourself?  Is there anyone that can prevent you
12  from doing that that's on the pod, particularly an inmate?  Can
13  he prevent you from doing that?
14      A.    Yes.
15      Q.    How can he -- explain how could he prevent you from
16  coming and taking him out of the shower.
17      A.    By refusing to come out.  It happens all the time.
18      Q.    All right.  And in this instance, are you -- are you
19  implying that I refused to come out of the shower?
20      A.    No.
21      Q.    Uh-huh.  So there was nothing that prevents you from
22  coming up that day by yourself and taking me out of the shower?
23      A.    Are you asking if I did take you out by myself?
24      Q.    No, no.  I'm asking did -- are you saying that I did
25  something to prevent you?
```

```
1        A.    No.

2        Q.    All right.

3        A.    I didn't.

4        Q.    All right.  There's nothing I did that would prevent

5   you from doing that.

6              Let me also say that -- am I correct to say that when

7   you put the guy back in the cell after a shower, the door is

8   open, that you can't stick your hand in there and touch the guy?

9   You got a tether on him too now.

10       A.    I'm sorry.  What?

11       Q.    Once the door is open to the -- we're done the showers

12  now.

13       A.    Uh-huh.

14       Q.    Once the door is open, are you saying that the door's

15  not open wide enough for you to put your hand in and touch a

16  person?  Remember there's a tether on this person.

17       A.    Yes.  Yes, I do.  I do.

18       Q.    So you could touch the person?

19       A.    I would drop my tether if I did that.

20       Q.    But you could touch the person, couldn't you?  Even if

21  you closed the door and the person -- you got a tether and the

22  person put his hands through the wicket, could you not touch the

23  person?

24       A.    Your hands are in the wicket now, or are they not?

25       Q.    He's sticking his hands out for you to -- you got the
```

1  tether on him.

2      A.   Okay.

3      Q.   And now did the man stick his hands through the wicket

4  to be uncuffed?

5      A.   If your hands are through the wicket, then the door

6  would be closed and the restraints would be removed.

7      Q.   All right.  And that ain't what I asked you.  Can

8  you -- do you have the ability to touch the person?

9      A.   You have the ability to touch a person at any time.

10     Q.   Speak up.

11     A.   I said I'm touching you during the escort.  So

12 there's --

13     Q.   No.

14     A.   There's the ability to touch somebody the entire

15 time --

16          THE COURT:  One at a time.  If you ask a question, you

17 have to let him answer, Mr. Washington.

18          MR. WASHINGTON:  Yeah, well, it shouldn't be that I

19 asked him about his shoes and he tell me something about a shoe

20 store.

21          THE COURT:  That was not what happened.

22 BY MR. WASHINGTON:

23     Q.   Do you have the capabilities of touching a person once

24 the door's closed and the person -- you then feed the tether

25 through the wicket?

```
 1        A.    The hands.

 2        Q.    You don't have the ability to touch the person's butt?

 3        A.    Not unless I reached inside of the cell aperture.

 4        Q.    That's right.  And if you would read the testimony

 5   back, you'd find out that that exactly was my testimony.  You do

 6   have the ability to do that and you did, Mr. --

 7              THE COURT:  Again, questions, Mr. Washington.

 8              MR. WASHINGTON:  I don't know how to put it any other

 9   way.

10   BY MR. WASHINGTON:

11        Q.    Am I right that you're under investigation for putting

12   your finger in me?  At the same time, prior to August, do you

13   have any way --

14              MR. WASHINGTON:  Give me a second here, Your Honor.

15   This is really hurting my feelings.

16        (Pause.)

17        Q.    Sir, there is no roster showing -- am I right, there

18   is no roster that shows who went to the legal visit on certain

19   dates, there's no way that you can obtain that?  I'm not asking

20   you to do so, but would there be a way to obtain that?

21        A.    Records are kept, yes.

22        Q.    Uh-huh.

23              MR. WASHINGTON:  Your Honor, by me not being able to

24   keep notes over here, this just didn't --

25              THE COURT:  Again, you absolutely have the ability to
```

```
1    keep notes.
2              MR. WASHINGTON:  I can't do it.  I'm painful.  I can't
3    write with this.
4              THE COURT:  It's just a regular pen.
5              MR. WASHINGTON:  I was writing with this pen you gave
6    me.
7              THE COURT:  It's just a regular pen.
8              MR. WASHINGTON:  No, it's not.  Boy.
9    BY MR. WASHINGTON:
10        Q.   Mr. Oswald, what block -- were you ever assigned to
11   H block?
12        A.   Yes.
13        Q.   And as a regular officer, what would prevent you from
14   coming to G block?
15        A.   What wouldn't -- nothing would prevent me.
16        Q.   Now, a person that -- earlier you're saying that a
17   person -- you wouldn't risk your job about someone complaining
18   about prison conditions?
19        A.   I'm sorry?  I don't understand your question.
20        Q.   Am I correct you saying that you wouldn't risk your
21   job if an inmate complained about prison conditions?
22        A.   I wouldn't risk my job, no.
23        Q.   Is that what you said earlier?
24        A.   I did say that.  I said I wouldn't risk my job.
25        Q.   All right.  Now, to just show a motive here, when a
```

```
 1   person complain about you, that could easily inflame you to want
 2   to retaliate against a person. Am I correct, anger could cause
 3   a retaliation? I didn't say you. Anger could, could cause a
 4   person to retaliate?
 5             MS. GOODRICH:  Objection.
 6             THE COURT:  Objection overruled.
 7             You can answer the question.
 8             THE WITNESS:  Are you saying anger can make someone
 9   retaliate?  Is that your question?
10   BY MR. WASHINGTON:
11        Q.   Yes.
12        A.   Of course.
13        Q.   Uh-huh.  More than -- more than once, and I'm sure
14   you're aware of it, that I complained about you.  And I'm saying
15   had your anger overruled your better judgment and you did this,
16   would that get you fired?
17        A.   If I got angry?
18        Q.   No.  If your anger overruled your better judgment and
19   you acted on it, would that get you fired?
20        A.   It depends on the circumstances.
21        Q.   Uh-huh.  And being on the stand here today, if you
22   admitted to something you did, would it get you into trouble?
23        A.   If I admitted to what?
24        Q.   Anything wrong you did.
25        A.   What -- what -- what am I admitting to?  Context.
```

```
1    Give me an example.
2        Q.    One example is inserting your finger in my rectum.
3    Would that get you in trouble?
4        A.    If -- if I did that, yes, it would.
5        Q.    And so there's reason that you wouldn't admit to this.
6              THE COURT:   Again, you have to ask him a question.
7              MR. WASHINGTON:   All right.   Well, he -- he -- he's
8    the one that gave me the admonition here.
9    BY MR. WASHINGTON:
10       Q.    At the same time, young man, prior to coming to this
11   courtroom, at any time did you and I ever have a physical
12   confrontation?
13       A.    Not that I remember, no.
14       Q.    So it could have happened, you don't remember?
15       A.    No.   I don't ever remember using force on you, ever.
16       Q.    So it could have happened and you don't remember?
17       A.    I don't remember using force on you.
18       Q.    All right.   So it could have happened, you don't
19   remember?
20       A.    I said, I don't remember using force on you.
21       Q.    All right.   Which means --
22       A.    I have been employed for 18 years.
23       Q.    All right.
24       A.    There's a long way.
25       Q.    All right.   Allow me to answer your question.   By your
```

```
 1   response, it should be interpreted that it could have happened
 2   and you do not remember it?
 3        A.    No.
 4        Q.    So did it happen or not?
 5        A.    No, it did not happen.
 6        Q.    So you changed.  Now you're saying it did not happen.
 7        A.    It didn't.
 8        Q.    But just a few minutes ago you were saying -- am I
 9   correct to say a few minutes ago you said you don't remember?
10   That's what you said a few minutes ago.
11        A.    I did.
12        Q.    But now you're saying it did not happen?
13        A.    I have never used force on you.
14        Q.    All right.  So you would have been cautious to come
15   take me out of the shower -- because I was not that type of
16   inmate, I wasn't -- did you ever use force on me so you could
17   have just seen me to be violent?
18        A.    You're -- repeat the question, please.
19        Q.    An inmate -- an inmate that you thought was going to
20   cause trouble, you wouldn't dare take the chance to taking him
21   out of the shower by himself?
22        A.    I would never do that under any circumstances.  It's
23   against policy.
24        Q.    That's not what I asked you.  If an inmate that you
25   perceived to be a troublemaker or you observed to have a
```

1   confrontation with you, you would not attempt -- and I want a

2   yes or no -- would you attempt to take him out of the shower by

3   yourself?

4       A.   No.

5       Q.   All right.  Good.

6            Now as a sergeant, there's nobody on the pod to tell

7   you, don't take an inmate out of the shower.  You can do that on

8   your own if you so desire?  And I'm asking yes or no if you so

9   desired.

10      A.   It's against policy.  I wouldn't do it.

11      Q.   No, that's not what I asked you.

12           Yes or no, as a sergeant, there's nobody on the pod to

13  tell you not to take him out of the shower.  If you decided to

14  do that, could you do it?

15      A.   I wouldn't.

16      Q.   No.  You're still not answering.

17           Yes or no.  If there's nobody on the pod that's

18  saying -- you were the sergeant, nobody there to prevent you or

19  tell you not to take him out of the shower.  Now, what would

20  stop you from doing --

21      A.   If -- if I took you out of the shower by myself, what

22  you claim --

23      Q.   No, that ain't --

24           THE COURT:  Let's stop.  You asked what would stop

25  him, he's answering your question.  That's the question.  Let

```
1    him answer.
2              MR. WASHINGTON:  All right.  But that's --
3              THE COURT:  Let him answer the question, unless you're
4    withdrawing the question.  You can withdraw the question.
5              MR. WASHINGTON:  Well, I withdraw that question.
6              THE COURT:  All right.
7    BY MR. WASHINGTON:
8         Q.   You're the sergeant on the block.  You decided to take
9    a person out of the shower by yourself.  There's -- yes or no,
10   there's nobody there to stop you from doing it.
11        A.   Again, let me answer.  Okay, I'm the sergeant on the
12   block, as you -- as you say, okay.  I am not going to do
13   something that is against policy which you -- removing you from
14   the shower, taking you out of the shower by myself --
15             MR. WASHINGTON:  Objection.  Objection.
16        A.   I'm showing a bad example for my other staff.
17             THE COURT:  The objection is sustained.  He's asking
18   you, is there anybody there to stop you?
19             THE WITNESS:  No.
20             THE COURT:  Okay.  Let's move on.
21   BY MR. WASHINGTON:
22        Q.   That wasn't hard, was it?  There's nobody to stop you
23   from doing that.
24             In the case, you had taken it upon yourself, and I'm
25   not saying -- I'm not trying to get you to say that you did it.
```

1  I'm only asking this question.  If you had taken it upon

2  yourself to take me, in this case, out of the shower and

3  escorted to my door, there would be nobody there to say, come

4  down, you're off the pod?  There's nobody there to say that?

5          THE COURT:  Okay.  That's been asked and answered now.

6  We're going to move on.  So if you have another area of inquiry.

7  He's already answered that question.

8      Q.    What -- give me a couple examples of what a staff

9  member, if he's retaliating, would he be retaliating against.

10          MS. GOODRICH:  Objection.

11          THE COURT:  Objection's sustained.  So let's move on.

12          MR. WASHINGTON:  That means that I can't ask that?

13          THE COURT:  That's correct.

14          MR. WASHINGTON:  All right.  For a little clarity

15  there, what was wrong with that question?  I'm trying get a

16  little clarity.

17          THE COURT:  It asks for him to speculate about things.

18          MR. WASHINGTON:  Can I come back later, after they ask

19  more questions?

20          THE COURT:  Well, only if they have some questions,

21  you can ask about the questions they ask.  These are the

22  questions you have to ask him now.  If they don't have any

23  questions, then no, there's not going to be any additional

24  questioning of him.  So this is your time.

25  BY MR. WASHINGTON:

```
1         Q.    Is there a possible way that someone can retain a copy
2    of the policy pertaining to the way people are handcuffed?
3         A.    Who can?
4         Q.    Well, anyone.
5         A.    Yes.  Like, you mean a staff member?  Of course.  I
6    look at every policy all the time.
7         Q.    So in this instance, in discovery, could I retain a
8    policy?
9         A.    There are public policies and then there are
10   procedures manuals that are not given to the public.  You can
11   look -- you're well aware that you can look up policies
12   yourself, too.
13        Q.    Is there a way that I can retain that as discovery?
14        A.    You can go back to your law library and get a copy.
15   Yes.
16        Q.    Sir, the policy didn't start during that time.
17              THE COURT:  Again, if you have a question, then ask
18   the question.  You'll have an opportunity -- you've had an
19   opportunity to testify.  This is not the purpose of what we're
20   doing right now.
21        Q.    I'm not asking you to give me your actual age, but are
22   you over 50?
23        A.    I'm 42.
24        Q.    You didn't have to give me that, but thanks.
25        A.    It's okay.
```

```
 1        Q.    Just a guess, you ain't got to give me a direct
 2   number, what would you say my age is?
 3        A.    That you're in your 70s.
 4        Q.    Uh-huh.   And this happened about, what, ten years ago?
 5   Allegedly ten years ago?
 6        A.    What you're claiming?
 7        Q.    Yeah.
 8        A.    2013 was one of the dates you said -- claimed that
 9   this happened.
10        Q.    So that's, like, ten years ago, which means you would
11   probably be in your 30s and I would be in my 60s, on your
12   estimation.
13              Which --
14        A.    You're asking how old I was in 2013?
15        Q.    No.   Here's what I'm getting to:   Do you believe that
16   normally an older guy would have better strength than the
17   younger guy?
18        A.    An older -- you're asking me if an older person's
19   stronger than a younger guy?
20        Q.    A typical older guy and a typical younger guy.
21        A.    It could be.
22        Q.    The typical guy.   Okay.   I asked and you said could
23   be, all right, which mean it might be.
24              And my point I'm getting to is, there would be nothing
25   that would prevent the demonstration that you gave there with
```

1   the attorney, that would prevent you from getting as close to

2   someone as you wanted to.   There's nothing to prevent that.

3   What would -- am I right to say that no alarm would go off, no

4   type of shock or anything to say get back?

5        A.   No.   No, that wouldn't happen.

6        Q.   So you could get as close to the person as you wanted.

7   And all that stuff about the left hand and the right hand, that

8   don't -- nothing would prevent you from taking a person from a

9   shower or to a legal visit, nothing would prevent you from

10  getting as close as you wanted.   No alarm would go off.   He

11  couldn't be -- the doors wouldn't refuse to open or anything

12  like that.   There would be nothing to stop it.

13       A.   The doors are controlled remotely.

14       Q.   There would be nothing to stop it, you're right.

15            And am I correct, you're saying because of a danger to

16  you and a danger to the inmate is the reason why you look inside

17  bags and stuff or look inside the cell?

18       A.   Yes.   Yes, that's the reason why I do that.

19       Q.   Uh-huh.   Now, as we sit here today, there is no way

20  that you can definitively show that I came out of the cell with

21  a bag as far as legal stuff?

22       A.   Inmates typically take legal materials to visits.   But

23  no, I don't.

24       Q.   Uh-huh.   And there's no camera footage, at least I was

25  told there was no camera footage, that would show you taking me

```
1   to a legal visit?
2        A.    I wouldn't know that.
3        Q.    Well, I was told there wasn't.
4              And all of this stuff about handcuffs in front, you
5   don't have it on film of you doing that; am I correct or not?
6        A.    I don't have it on film.  I don't have anything.
7        Q.    So you could easily say something happened years ago,
8   you can say that today, which it never occurred.  You can easily
9   say that?
10       A.    So could you.
11       Q.    Am I -- would you agree that denial is not a fact?
12             MS. GOODRICH:  Objection.
13             THE COURT:  I'm not sure I understood the question.
14   Can you repeat it?
15             MR. WASHINGTON:  By denying something don't mean it's
16   a fact.
17             THE COURT:  Denial is not a fact.  The objection is
18   sustained.
19             MR. WASHINGTON:  So you're saying don't ask that?
20             THE COURT:  Correct.
21             MR. WASHINGTON:  Well, I'm trying to get some leeway
22   from you, Your Honor.  If a person's saying they didn't do
23   something, that doesn't mean it didn't happen.  That's what I'm
24   trying to get to by asking about is it a denial of fact.  Am I
25   making myself clear?
```

| 1 | THE COURT:  Not really, no. |
| 2 | MR. WASHINGTON:  Well, that's what I'm trying to |
| 3 | establish there because a person is taking the stand and saying |
| 4 | he didn't do something, that doesn't mean it actually happened |
| 5 | that way. |
| 6 | THE COURT:  Okay.  Well, you're free to -- if you have |
| 7 | a question of this witness about the facts and circumstances |
| 8 | surrounding this case, that's fine.  I'm not sure I understand |
| 9 | your question so -- |
| 10 | MR. WASHINGTON:  Well -- |
| 11 | THE COURT:  Are you suggesting that you're asking him |
| 12 | whether people can lie?  Is that what you're asking him? |
| 13 | MR. WASHINGTON:  Well, definitely. |
| 14 | THE COURT:  Okay.  You can ask the question.  Go |
| 15 | ahead. |
| 16 | BY MR. WASHINGTON: |
| 17 | Q.   Denying something, does that mean it's a fact? |
| 18 | A.   I don't understand the question.  What -- what are you |
| 19 | asking? |
| 20 | Q.   You say that now. |
| 21 | A.   Are you saying, can people lie?  Is that what you're |
| 22 | asking?  Like -- like -- like the judge said? |
| 23 | Q.   What would be your answer to that? |
| 24 | A.   Yes, people can lie. |
| 25 | Q.   One of the motives for lying is that people trying to |

1    avoid being punished or losing something, am I right or not?

2        A.    Okay.

3        Q.    Am I right?

4        A.    You could be.

5        Q.    No.   Am I right?

6              THE COURT:   You have his answer.   His answer is could

7    be.   That's his answer.

8              MR. WASHINGTON:   Which mean he don't want to say yes.

9    BY MR. WASHINGTON:

10       Q.    Sir, am I correct, you're saying that a person that

11   violates someone in an Eighth Amendment way in this case, sexual

12   assault, would they lose more than -- would they lose a pension

13   or holidays?

14       A.    Holidays?

15       Q.    Well, would they get fired and lose their pension?

16       A.    If they got found guilty of that, yes.

17       Q.    And they -- would they be quick to admit to something

18   like that if they did it?

19       A.    I don't know.

20       Q.    I can't hear you.

21       A.    I said I don't know.

22       Q.    No.   Would they be quick -- would it be the typical

23   person, would they be quick to admit to that knowing that

24   they're going to lose their job?

25       A.    Are you asking if I'm doing that or somebody else?   I

```
1    don't have a way to answer.
2        Q.   I'm asking would any person that's going to lose their
3    job and their pension be quick to admit that they committed such
4    an act?
5             MS. GOODRICH:   Objection.
6             THE COURT:   Objection sustained.   Again, that calls
7    for speculation.
8             MR. WASHINGTON:   All right.   Give me a second here,
9    Your Honor.
10            THE COURT:   Sure.
11       (Pause.)
12   BY MR. WASHINGTON:
13       Q.   Listen.   If you escorted someone to a visit, is the
14   chances are that you'd be the one to escort them back to their
15   cell?
16       A.   Could be.
17       Q.   Well, listen.   I'm asking yes or no, not could be.
18   I'm asking yes or no.   Are the chances high that you would
19   escort that person back to their cell?
20       A.   I'm saying it could be.
21       Q.   You -- so you -- you're not capable of saying yes or
22   no?  I'm not asking you -- I'm asking yes or no.   Is it --
23       A.   I --
24       Q.   Is it high, and did you -- you can't answer this with
25   a could be, yes or no, is it high that you would be the one that
```

```
1   escort them back to the cell?
2             THE COURT:  You have the witness' answer to the
3   question.  You can't insist he answer yes or no to a question
4   like that.
5             MR. WASHINGTON:  That's speculation, too?
6             THE COURT:  No, but he's given you his answer.
7             MR. WASHINGTON:  But he refuses to say yes or no,
8   which leaves this big gray area.
9             THE COURT:  That's his answer.
10            MR. WASHINGTON:  A big gray area.  Uh-huh.  All right.
11            All right.  Up until -- unless they ask more
12  questions, then I can ask questions, right?
13            THE COURT:  You can ask questions about the questions
14  that they ask.  So now is your time to ask questions.  I don't
15  know if they're going to ask questions.  You can ask questions
16  about what they ask.
17  BY MR. WASHINGTON:
18        Q.   Mr. Oswald, how many times did you report to security
19  that you mistreated someone?
20        A.   I've never done that.
21        Q.   You've never done that?
22        A.   I've never mis -- no.
23        Q.   No, that's not what I asked you.  How many times did
24  you report to security when you mistreated someone?
25        A.   I've never done that.
```

```
1          Q.    Uh-huh.
2                MR. WASHINGTON:  My point in asking that, Your Honor,
3     is --
4                THE COURT:  No testimony.  If you have questions, just
5     ask questions.
6                MR. WASHINGTON:  I'm -- I'll follow them if they do
7     anything.
8                THE COURT:  Okay.  Any redirect?
9                MS. GOODRICH:  Yes, Your Honor.
10               THE COURT:  Okay.
11                        REDIRECT-EXAMINATION
12    BY MS. GOODRICH:
13         Q.    Lieutenant Oswald --
14               THE COURT:  If you have redirect, why don't I give the
15    jury just a quick ten minute break here?
16               MS. GOODRICH:  Absolutely.
17               THE COURT:  We'll give a ten-minute break.
18               Ladies and gentlemen of the jury, we're not done with
19    the case.  Please don't talk about it.  I'll give you a
20    ten-minute break.
21               Please rise for the jury.
22           (Jury exits courtroom.)
23               THE COURT:  Be seated.  Lieutenant Oswald, I'll just
24    instruct you that during this time you're still on the stand,
25    you're not to have any discussion about your testimony with your
```

1    lawyers during this break.  Okay?

2         THE WITNESS:  Yes, Your Honor.

3         THE COURT:  All right.  We'll stand in a brief recess.

4         (Whereupon, a recess was taken.)

5         THE COURT:  Okay.  Please be seated.  Just to end this

6    discussion about the pen, outside the presence of the jury,

7    Mr. Washington, I've been informed by the security officers in

8    the courtroom today that notwithstanding the fact you had a

9    different pen yesterday, that pen is not permitted in terms of

10   their assessment of security matters.

11        You have been afforded a pen that is permitted, and

12   that is the pen that you will be provided in the matter.  I

13   recognize that you have a preference for a different pen.  I may

14   have a preference for a different pen.  But for legitimate

15   security reasons, that is the pen that you have.

16        MR. WASHINGTON:  All right.  It's not just a

17   preference.  I'm telling you, that's painful.

18        THE COURT:  It's just a pen.

19        MR. WASHINGTON:  It also bothers me when I try to

20   write.

21        THE COURT:  I understand it might bother you.  Lots of

22   pens bother me.  But it is only a pen.  It's a pen that's held

23   like any other pen.  I understand that you prefer a different

24   pen, but that is the pen that you are permitted to have.

25        MR. WASHINGTON:  This is painful.  It ain't just

```
1    preference.  This is painful.
2               THE COURT:  It's just a pen.
3               MR. WASHINGTON:  Well, I'm just saying that -- I'm
4    saying it's painful.
5               THE COURT:  It's just a pen.
6               All right.  Jamille.
7               MR. WASHINGTON:  That's RHU.  That's an RHU pen.
8               THE COURT:  We can get the jury.
9          (Jury enters courtroom.)
10              THE COURT:  Please be seated.
11              Okay.  Officer Oswald, you're still under oath.  You
12   can proceed, Ms. Goodrich.
13   BY MS. GOODRICH:
14        Q.   Lieutenant Oswald, are you lying today?
15        A.   No, ma'am, I am not.
16        Q.   There has been a lot of questions about if there is
17   anyone to stop you from doing certain activities by yourself,
18   escorts by yourself, generally.  Do you recall that?
19        A.   Yes.
20        Q.   Would you stop yourself?
21        A.   Yes, I would.
22        Q.   Why?
23        A.   Because it's against the rules.
24        Q.   And are there other people around in prison?
25        A.   Yes.  Yes, other staff members and my supervisors.
```

1    Other inmates that could -- if I would do something wrong, they
2    could perceive it as a problem and make my day harder than it
3    has to be.
4        Q.    Mr. Washington asked you if you had ever reported
5    yourself for a misconduct.  Do you recall that?
6        A.    Yes.
7        Q.    Have you ever reported yourself for a misconduct?
8        A.    I -- I honestly don't understand what that meant.
9        Q.    Have you ever had a misconduct?
10       A.    I have -- I haven't -- never had any discipline.
11       Q.    And with regard to the cameras in prison, it was your
12   testimony that there are, there might be blind spots in certain
13   places?
14       A.    Very few.  Corners, you know.  But the way -- the way
15   that our facility was designed, along with many others that were
16   built in the late '90s, we call that a prototypical facility, it
17   kind of lessens the amount of dead spaces.  No right angles,
18   that kind of thing.  Very little.
19       Q.    Do you recall in Mr. Washington's testimony yesterday,
20   he stated that this began -- the August 1, 2013 incident, the
21   touching began immediately outside of his cell?
22       A.    I remember that's what he said.
23       Q.    Would there be a blind spot directly outside of his
24   cell?
25       A.    No.

```
1         Q.    And is it your recollection that he also testified
2    that the touching continued during the escort?
3         A.    Yes.
4         Q.    Where in the facility would you be during an escort?
5    The hallway?
6         A.    Yeah, hallways.   The L5 visiting room area in this
7    case.
8         Q.    Generally, do hallways have lots of blind spots?
9         A.    Yes, they do.
10        Q.    Lots of blind spots?
11        A.    No.
12        Q.    Did you take him into any of the blind spots?
13        A.    No, I did not.
14        Q.    Then the L5 visitor door, is that a blind spot?
15        A.    No.   That's the door to -- that goes -- is connected
16   to the -- to the wagon wheel hallway I was mentioning.
17        Q.    So is there a camera pointing there?
18        A.    Yeah.   There's a camera facing this way and the other
19   way down the hallway.
20        Q.    And similarly for an escort to the showers, I assume
21   there's not a camera in the shower?
22        A.    No, of course not.
23        Q.    Is there one?
24        A.    There's a camera, a PTZ camera that's directly in the
25   center of the roof and there are multiple fixed stationary
```

```
 1   cameras, too.
 2        Q.    And you've never taken Mr. Washington into a blind
 3   spot?
 4        A.    No.
 5        Q.    During an escort?
 6        A.    No.
 7              MS. GOODRICH:  I have nothing further.
 8              THE COURT:  Okay.  Mr. Washington, you can recross on
 9   any of the areas that were raised by Ms. Goodrich.
10                        RECROSS-EXAMINATION
11   BY MR. WASHINGTON:
12        Q.    You did say that there are blind spots?
13        A.    In the facility?
14        Q.    In the RHU.  You did say that.
15              At the same time, am I correct, that you said that
16   this August 1st stuff was not on camera?
17        A.    I never said that.
18        Q.    Oh, you said that.  It is on camera?
19        A.    I said there's cameras in the hallway.
20        Q.    No, no.  Is the August 1st, is that on camera?
21        A.    I don't know.
22        Q.    Uh-huh.  So today, is there any way that you can
23   retrieve camera footage from that day?
24        A.    Me, myself?
25        Q.    Anybody.
```

```
1          A.    I can't.

2          Q.    You can?

3          A.    I said I can't.

4          Q.    Can anybody do it?

5          A.    I don't know.

6          Q.    You said you got how many years in, 18?

7          A.    Uh-huh.

8          Q.    How long do camera footage stay on the camera?

9          A.    I'm not allowed to answer that.

10               THE COURT:  We're going to have to take a brief break.

11   I apologize.  A juror needs a break.

12               All rise for the jury.

13         (Jury exits courtroom.)

14               THE COURT:  My apologies.  Juror number one needed a

15   break.  We can just sit down.  We'll just sit here until they

16   come back.

17         (Short pause.)

18         (Jury enters courtroom.)

19               THE COURT:  Please be seated.  You can continue,

20   Mr. Washington.

21   BY MR. WASHINGTON:

22         Q.    Do you by any chance remember the question I was

23   asking?

24               THE COURT:  The question was already answered; how

25   long do camera footage stay on the camera.
```

```
1          Q.    And what was your answer?
2                THE COURT:  The answer is, I'm not allowed to answer
3    that.
4          A.    I'll rephrase if you'd like.
5          Q.    No, no.  Based on -- and I'm asking you this -- does
6    camera footage stay on the camera forever?
7                MS. GOODRICH:  Objection.
8                MR. WASHINGTON:  That's not a --
9                THE COURT:  Objection sustained.
10               MR. WASHINGTON:  Well, Your Honor, that's -- everyone
11   knows it doesn't.
12               THE COURT:  The objection is sustained.
13   BY MR. WASHINGTON:
14         Q.    Camera footage, would it -- let me stop and rephrase
15   this.  If you gave testimony today about something that happened
16   three, five years ago, would anyone be able to bring that up on
17   camera footage to verify it?
18               MS. GOODRICH:  Objection.
19               THE COURT:  The objection is sustained.  There's no
20   foundation with this witness that he knows anything about camera
21   footage.
22   BY MR. WASHINGTON:
23         Q.    There are -- did you say cameras are everywhere,
24   mostly everywhere?
25         A.    There's a lot of them.  Yes.
```

```
1         Q.    And does -- I'm not asking you to tell me what date,
2    but does it keep there, if someone puts a grievance in or say
3    they was abused, that someone else can come and view it?
4               MS. GOODRICH:   Objection.
5         A.    Yes.
6               THE COURT:   Objection is overruled.
7         A.    Yes.   Camera footage can and is used to investigate
8    claims of abuse, grievances, and uses of force.
9    BY MR. WASHINGTON:
10        Q.    All right.   A year ago, would they be able to verify a
11   year ago from now?
12        A.    Would they be able to investigate it?   Yes.
13        Q.    By using the camera footage from a year ago?
14        A.    It would be looked at.
15        Q.    So based on what you just said --
16        A.    Uh-huh.
17        Q.    -- that it would stay around at least a year?
18        A.    I said -- I said it would be looked at.   It would be
19   investigated.
20        Q.    Which mean that camera footage would be around a year.
21   Based on what you're saying there, the inference can be drawn
22   from that.
23        A.    Okay.
24        Q.    I filed more than one grievance --
25              MS. GOODRICH:   Objection.
```

```
1          Q.    -- but you didn't give --
2               THE COURT:  Let him ask the question first.
3               MR. WASHINGTON:  Well, let me see what she wants to
4     object.
5               THE COURT:  What's your question?
6     BY MR. WASHINGTON:
7          Q.    I filed more than one grievance.  And as for camera
8     footage, their claim is it only --
9               MS. GOODRICH:  Objection.
10              THE COURT:  The objection is sustained.  This is not a
11    question.
12              MR. WASHINGTON:  I'm going --
13              THE COURT:  So if you have a question, ask the
14    question.  This is not the time for testimony.
15              MR. WASHINGTON:  I am going to ask the question.  But
16    it was beginning with, does he disagree with what the grievance
17    coordinator's said, it only stays around 90 days.
18              MS. GOODRICH:  Objection.
19              THE COURT:  The objection is sustained.  Again, you've
20    not established foundation with this witness.
21              MR. WASHINGTON:  All right.  Now, you're saying I can
22    ask questions behind what she asked, and she did ask something
23    about the camera.
24              THE COURT:  She did, that's true.
25              MR. WASHINGTON:  And that's what I was trying to
```

```
1    follow up, the stuff about the camera.
2              THE COURT:  I understand.  But you've not established
3    that this witness has any sort of expertise or knowledge about
4    how long the camera footage is kept at all.
5              MR. WASHINGTON:  All right.  The grievance -- his
6    supervisor, not just the grievance coordinator --
7              THE COURT:  Again, no testimony.  You have not
8    established with this witness that he knows anything about how
9    long camera footage is kept, when it's destroyed.  You've not
10   established that.
11             MR. WASHINGTON:  Well, it appears --
12             THE COURT:  You can ask him if he knows.
13             MR. WASHINGTON:  Well, it appears that he made the
14   inference himself that it's staying around a year.  He made that
15   inference.
16             THE COURT:  You can follow up on your questions,
17   Mr. Washington.  I'm not here to tell you what questions to ask.
18   I'm just telling you what questions you can ask.
19   BY MR. WASHINGTON:
20        Q.   There also was some testimony about what I've said
21   yesterday, about being touched the moment I come out my cell.
22   That would be -- if you actually did that, that would be a
23   violation that could get you in big trouble, am I right or not,
24   if you did that?
25        A.   Yes.  You asked that before.  And I said yes, if you
```

1   were caught doing that and you were convicted of it, yes, you

2   would get in trouble for doing that.

3       Q.   Only if you're convicted, huh?

4       A.   I'm not a legal expert.

5       Q.   My point is that today you can deny that, and there

6   would be no way that we could verify it.  Am I right or not?

7       A.   You're asking me if I'm denying what you're saying?

8       Q.   No.  Would there be a way of verifying that it

9   happened or not?

10      A.   I don't -- I don't know.

11      Q.   So that's your answer?

12      A.   I -- what are you asking?

13      Q.   If something happened August 1, 2013, on June 13th,

14  would we be able to verify it?

15      A.   Okay, okay.  Let's say -- all right.  You -- let's say

16  this is June 13th.  You make the claim that, you know, X, Y, or

17  Z happened.  That claim will -- would be investigated, video

18  footage would be reviewed, and whatever evidence came to light

19  through that investigation would determine the outcome of it.

20      Q.   That would be ten years ago.

21      A.   It's -- it's any investigation.

22      Q.   So based on what you just saying, the footage would at

23  least stay around ten years?

24      A.   I didn't say that.

25      Q.   Based on what you just said.

1          A.    I didn't say that.  I said if -- if the claim of abuse
2    was alleged, they are all investigated.  Every one of them.
3          Q.    No.  That ain't -- that's not the premise -- that's
4    not the scenario you created.  You created it.  I didn't create
5    it.
6          A.    Okay.
7          Q.    And I'll ask you this question again, and you can give
8    me a yes or no.  If something happened ten years ago, and I'm
9    saying this would be the offense that I allege, and you said no,
10   can you or anybody else go back to this film and verify that
11   it --
12         A.    I don't know that.
13         Q.    Uh-huh.  So it's now you don't know.  All right.  A
14   few minutes ago, sir, you gave a different answer.
15              THE COURT:  Do you have a question?
16              MR. WASHINGTON:  I'm going to go to another question,
17   Your Honor.
18   BY MR. WASHINGTON:
19         Q.    Mr. Oswald, you're saying that you were never
20   disciplined?
21         A.    Correct.
22         Q.    That's different from you reporting a wrongdoing you
23   did.  That's different.
24         A.    Okay.
25         Q.    Were you ever reported for sexually assaulting

```
1    someone?
2        A.    No.
3        Q.    Now by denying, is there any way that we can prove
4    that today?
5        A.    I -- I don't know that.  I don't know how records are
6    kept for those types of things.
7        Q.    Uh-huh.
8        A.    I'm telling you, you're not going to find nothing
9    because it never happened.
10       Q.    I heard your answer.  I heard your answer.
11            If an inmate is saying that he didn't do something and
12   the staff member is saying that he did the opposite, who is
13   going to be believed?
14            MS. GOODRICH:  Objection.
15            THE COURT:  Objection sustained.
16            MR. WASHINGTON:  Well, we do -- they do this every day
17   in the penitentiary.
18            THE COURT:  Objection sustained.
19            MR. WASHINGTON:  Can I get some clarity here, Your
20   Honor?
21            THE COURT:  Still speculation.
22            MR. WASHINGTON:  All right.  I'm trying to get some
23   clarity.
24   BY MR. WASHINGTON:
25       Q.    When you go to a hearing, and I'm talking about inside
```

1   the penitentiary --

2           THE COURT:  We're not hearing testimony from you,

3   Mr. Washington.

4           MR. WASHINGTON:  I'm just trying to get some clarity

5   here to let you know that I wasn't trying to speculate.  They --

6   their judgment is --

7           THE COURT:  That is called testimony.  That's not a

8   question.  You are allowed to ask the witness questions.

9           MR. WASHINGTON:  All right.  All right.  You're saying

10  what I was saying --

11          THE COURT:  If you have some rebuttal, again, you'll

12  be allowed to raise that at the appropriate time.  Now is the

13  time for questioning.

14          MR. WASHINGTON:  And I can bring that up later?

15          THE COURT:  I don't know.  It depends on where this

16  questioning goes.  I have no idea.

17  BY MR. WASHINGTON:

18      Q.   Am I correct -- my memory's not always there.  That's

19  why I'm asking you what you said a few minutes ago.  Am I

20  correct that you said that you've never been disciplined for a

21  wrongdoing?

22      A.   You're right, I have never been disciplined.

23      Q.   Uh-huh.  That doesn't mean that you were never accused

24  of a wrongdoing.  Am I correct?

25      A.   Right.  And you're accusing me.

```
1        Q.    No, I'm not, am I -- have -- that mean that you've

2   never been accused of wrongdoing?

3        A.    I have never -- are you asking have I never been

4   accused of any wrongdoing?

5        Q.    Yes.

6        A.    No.

7        Q.    You've never been accused of wrongdoing?

8        A.    No, I have.

9        Q.    All right.

10       A.    Inmates file grievances all the time.

11       Q.    Well, wait a minute now.  You're saying they file

12  grievances because they believe you did a wrongdoing.  So you

13  have been accused of wrongdoing?

14       A.    I just said that.

15       Q.    No, you said no.  But -- so you have been accused of

16  wrongdoing?

17       A.    Yes, I have.

18       Q.    Uh-huh.  So there is a difference between being

19  disciplined for one and being accused of one?

20       A.    Sure.

21       Q.    There's quite a difference.  And the relationship with

22  you and I, you were accused of doing wrongdoing.  Maybe you

23  didn't get --

24       A.    That's why I'm here.

25       Q.    No.  No, that ain't the only time.  Don't even try it.
```

Washington000238

```
1               All right.  I'm trying to think -- remember what you
2    said earlier pertaining to would you -- you wouldn't do
3    something because you thought it was the wrong thing to do.  Am
4    I correct, that's what you said?
5        A.    That's a fair statement, yes.
6        Q.    Uh-huh.  So if -- but if a staff member, and I'm
7    speaking of you, decided it was the proper thing to do to
8    retaliate against somebody, I'm not -- don't -- your answer
9    shouldn't be, well, I wouldn't do that, if you thought it was
10   the proper thing to do to retaliate against somebody, based on
11   your earlier question, you would do it?
12              MS. GOODRICH:  Objection.
13              MR. WASHINGTON:  He said it.
14              THE COURT:  Objection sustained.
15              MR. WASHINGTON:  He said it.
16   BY MR. WASHINGTON:
17       Q.    Mr. Oswald, did you -- am I correct to -- did I hear
18   you say that inmates attempted to physically attack you?
19       A.    I said I've been involved in uses of force before.
20       Q.    You also said that inmates attempted to attack you?
21              MS. GOODRICH:  Objection.
22              MR. WASHINGTON:  He said it.
23              THE COURT:  You can answer the question.
24              THE WITNESS:  Yes, I've had inmates try to assault me
25   several times.  In fact, urine and feces thrown at me through
```

```
 1   cell wickets, which missed because I followed the proper
 2   procedures.
 3   BY MR. WASHINGTON:
 4        Q.   Go ahead with your speech.
 5        A.   I'm done.
 6        Q.   And how many times did I throw stuff on you?
 7        A.   I don't remember you ever throwing anything at me.
 8        Q.   So that's a no?
 9        A.   Sure, yeah.  I don't think you've ever thrown anything
10   at me before.
11        Q.   How many times did I ever strike you?
12        A.   Never.
13        Q.   How many times did I ever rip -- take off running away
14   from you?
15        A.   Never.
16        Q.   Do you know of me doing any of those things or any --
17   I'm saying when I say no, I'm talking about a witness to it, an
18   eyewitness to it.
19        A.   What?
20        Q.   Are you an eyewitness to me doing that with anybody?
21        A.   Doing what?
22        Q.   Any of the things that you said I never did them to
23   you.
24        A.   Such as?
25        Q.   Throwing urine on somebody.
```

```
1        A.    I don't know if you've ever done that.

2        Q.    No.  So you've -- you didn't -- never witnessed that?

3        A.    I've never witnessed you throwing anything.

4        Q.    Have you ever witnessed me running away from somebody?

5        A.    I have answered that already.

6        Q.    All right.  Well, if you consider it answering that.

7        A.    Just because you haven't done it doesn't mean I'm

8  going to give you a chance to.

9        Q.    All right.  Keep going with your speech.  Come on.

10             Here's what there -- by supervisors being on the

11  block, they don't follow staff members around.  Am I right or

12  not?

13             MS. GOODRICH:  Objection.

14             MR. WASHINGTON:  He would know.

15             THE COURT:  Objection sustained.

16             MR. WASHINGTON:  Is -- is that something I got to wait

17  to ask about?

18             THE COURT:  No, that's just -- you're calling for a

19  speculation about whether or not supervisors follow staff

20  around.

21             MR. WASHINGTON:  All right.  I withdraw the question.

22  Is that the better way to do that?

23             THE COURT:  That's fine.  The objection has been

24  sustained.  So he doesn't have to answer it.

25  BY MR. WASHINGTON:
```

```
1          Q.    Is it possible for you to violate the rules and a

2    supervisor never see it?

3                MS. GOODRICH:   Objection.

4                THE COURT:   Objection calls for speculation.   The

5    objection is sustained.

6                MR. WASHINGTON:   All right.   There's been a lot of

7    speeches and you let that go on.   But you won't let this guy

8    answer something simple.

9                THE COURT:   I just follow the federal rules here.

10               MR. WASHINGTON:   I'm waiting for them to ask another

11   question.

12               THE COURT:   There are no more questions.   This is the

13   end.   So either you have another question or we're done.

14               MR. WASHINGTON:   So they're not going to ask?

15               THE COURT:   There are no more questions.

16               MR. WASHINGTON:   All right.   I don't want to keep

17   going then.

18               THE COURT:   I'm sorry.   Are you done with the officer,

19   then?

20               MR. WASHINGTON:   Yeah.   I can't ask him no questions.

21   You're saying they're sustained.

22               THE COURT:   Well, if you have other questions, feel

23   free to ask them.   Now is your chance.

24               MR. WASHINGTON:   Your Honor, I'm just holding up now.

25               THE COURT:   So you're done?
```

```
1                    MR. WASHINGTON:  I'm -- yes.  I don't know any other
2    questions to ask him.
3                    THE COURT:  Officer Oswald, you may step down.
4                    THE WITNESS:  Thank you, Your Honor.
5                    THE COURT:  Does the Defendant have any other
6    witnesses?
7                    MS. GOODRICH:  No, Your Honor.
8                    THE COURT:  Okay.  Ladies and gentlemen, we're going
9    to take a -- it's that time.  Why don't we take our lunch break?
10   It's possible that we may have a little bit of an extended lunch
11   break, at least until a quarter after 1:00.  But potentially it
12   can be a little bit more than that.  Okay?  Just so you know we
13   have some -- we have to go over these jury instructions that I'm
14   going to be giving you and we also have to see where we are in
15   the case.
16                   Again, this case is not close to being over.  So no
17   talking about it until I tell you it is.
18                   All rise for the jury.
19        (Jury exits courtroom.)
20                   THE COURT:  You can be seated.  Does the Defendant
21   have a motion that it wishes to make?
22                   MS. GOODRICH:  No, Your Honor.
23                   THE COURT:  Very good.  All right.  Mr. Washington, as
24   I mentioned to you before, you have the ability to put on any
25   rebuttal testimony that you'd like.  Rebuttal testimony has to
```

```
1    go back to whatever the Defendants put on during their case in
2    chief.  And so I'm going to ask you if you wish to present any
3    rebuttal testimony.
4              MR. WASHINGTON:  I'm going to try to.
5              THE COURT:  Okay.  And that rebuttal testimony will
6    just be you testifying; is that correct?
7              MR. WASHINGTON:  Yeah.  I don't have any witnesses.
8                          - - -
9         (Afternoon session.)
10             THE COURT:  I will ask you, Mr. Washington, that you
11   will have to remove your mask while testifying.  It is a
12   protocol of judges so that the jury can better assess your
13   credibility.
14             With respect to what we discussed prior to the break,
15   did you have any other areas of rebuttal that you want to go
16   through that came to you?
17             MR. WASHINGTON:  Let me see what I got there.
18             THE COURT:  Where?
19             MR. WASHINGTON:  No, I'm trying to see what I said I
20   was going to address.
21             THE COURT:  You had mentioned the policies about how
22   many people should be in an escort and you had mentioned
23   something about the nature of transportation around the
24   facility.
25             MR. WASHINGTON:  All right.  What about security
```

```
1   cameras?
2           THE COURT:  Okay.  What about them?  Just your own
3   observations of security cameras?
4           MR. WASHINGTON:  The security cameras, where they're
5   located at, and the amount of film that was stored.
6           THE COURT:  And you have some knowledge about the
7   amount of film that would be stored?
8           MR. WASHINGTON:  Yes, ma'am.
9           THE COURT:  Okay.  If he has some knowledge about that
10  that he wishes to testify, I think that is fair game.  Any
11  objections?
12          MR. BRADLEY:  I mean, I would object because we didn't
13  bring forth that testimony regarding the storage.  We were only
14  identifying locations in the facility.  It was Mr. Washington's
15  questions that brought up the question of -- I'm drawing a blank
16  on the word -- but keeping the film.
17          THE COURT:  Right.  Although you did permit your
18  witness to testify about the one-year mark.
19          MR. BRADLEY:  Right.  He was -- again, he was
20  responding to questions.  We didn't -- we didn't offer that.
21          THE COURT:  I understand that.  I mean, it was not
22  objected to, and so it came in during his cross.
23          MR. BRADLEY:  Okay.
24          THE COURT:  So you're allowed to testify about
25  whatever your knowledge is about any of those issues,
```

```
1   Mr. Washington.   Okay?

2              MR. WASHINGTON:   All right.

3              THE COURT:   All right.   And, again, if you can move

4   that mic closer to you.

5              MR. WASHINGTON:   Also about the nurses.

6              THE COURT:   About the nurses and what your

7   observations are about the nurses and when they come?

8              MR. WASHINGTON:   Yeah.   And being on the pod all the

9   time.

10             THE COURT:   Okay.   Again that, in my estimation,

11  that's fair game.   That was something that was raised.

12             MR. BRADLEY:   I don't believe the testimony was they

13  were there all the time; that it was that they came on a regular

14  basis.

15             THE COURT:   Well, the jury can decide what the

16  testimony was and what the testimony wasn't.   I mean, so

17  certainly the topic is within the sphere of appropriate

18  rebuttal.

19             Anything else, Mr. Washington?

20             MR. WASHINGTON:   Not at the present time.

21             THE COURT:   Very good.   Okay.   Just so you know, there

22  is no other time.   So this is the only time.   I just want to

23  make that clear.   This is the last time you're going to be

24  talking to the jury, other than in your closing arguments.   But

25  this is the only evidence that you can put on.   Closing
```

```
1    arguments aren't evidence, that's just arguments.
2            MR. WASHINGTON:  Did I say anything about pepper
3    spray?
4            THE COURT:  I'm sorry?
5            MR. WASHINGTON:  Did I say anything about pepper
6    spray?
7            THE COURT:  There was no pepper spray mentioned that I
8    can recall.
9            MR. WASHINGTON:  Yeah, there was some testimony
10   pertaining to they was only starting using it in 2018.
11           THE COURT:  Okay.  Well, there's not been any
12   discussion of pepper spray in terms of any of the allegations in
13   this case.
14           MR. WASHINGTON:  I think -- remember you -- somebody
15   asked about he -- me testifying saying that I was afraid of
16   being sprayed.
17           THE COURT:  Oh, yes.  Okay.  Yes.  Afraid of being
18   sprayed, right.
19           MR. WASHINGTON:  He went on to say they don't even
20   have pepper spray until '18.
21           THE COURT:  Right, right, right.  Any objection to
22   that?
23           MR. BRADLEY:  I don't think that characterizes his
24   testimony, but no objection.
25           THE COURT:  Right.  I mean, again, you can certainly
```

1   speak to what your experience is in that regard.  Obviously,

2   the Defendants can object to the extent that you're

3   mischaracterizing any testimony that had been offered.  But just

4   recognize that that could happen during the course of your own

5   testimony.  But you can talk about whatever your observation is.

6   Okay?

7            MR. WASHINGTON:  Yes, ma'am.

8            THE COURT:  All right.  Very good.  Now, also just a

9   matter of housekeeping, you should have all received a draft of

10  the final jury instructions that I will read to the jury once

11  Mr. Washington is off the stand.

12           Also, the verdict slip, you should all have a copy of

13  that as well.  And that will be ultimately the verdict slip that

14  will go back with the jury that -- again, it's been revised.  So

15  just mention Defendant Oswald and not the other Defendants.

16  Okay?

17           All right.  We're ready to start, Jamille.

18           MS. GOODRICH:  Your Honor, very quickly.

19           THE COURT:  Yes.

20           MS. GOODRICH:  Just also from a procedural standpoint,

21  it was my understanding that closings will be five minutes each

22  and that rebuttal had a time limit as well, although I'm

23  blanking on it.

24           THE COURT:  Yeah.  Closings will be ten minutes each

25  and rebuttal will be five minutes.

```
1              MS. GOODRICH:  Thank you.

2              THE COURT:  Each person will have ten minutes to make

3   their closings.  Rebuttal will be five minutes long.  Okay?  So

4   ten minutes to make your argument.  Not this.  When I say

5   rebuttal, that's confusing.  Sorry.  So once there is a closing

6   argument in the case, so once I'm done reading the jury

7   instructions, you'll be allowed to give your closing arguments

8   in the case saying why you believe you win.  They will also have

9   an opportunity to explain why they believe they won.  Then you

10  will have another opportunity to come back and have any final

11  word to the jury.  So the first thing will take ten minutes,

12  they'll have ten minutes, and then with respect to the final

13  word that you'll have to the jury, you'll have five minutes.  Do

14  you understand?

15             MR. WASHINGTON:  Yes, ma'am.

16             THE COURT:  Now, let's start.

17             MS. GOODRICH:  Thank you, Your Honor.

18             THE COURT:  We will take one more break so we can get

19  him off the stand.

20        (Short pause.)

21        (Jury enters courtroom.)

22             THE COURT:  Okay.  Ladies and gentlemen of the jury,

23  Mr. Washington is entitled to a rebuttal period.  And so,

24  Jamille, I'll ask you if you can please swear in Mr. Washington.

25             THE DEPUTY CLERK:  Mr. Washington, please raise your
```

```
1    right hand.  You don't have to stand up, sorry.  Watch your
2    jacket.
3              HENRY UNSELD WASHINGTON, the Plaintiff herein, having
4    been first duly sworn, was examined and testified as follows:
5              THE COURT:  Okay.  Mr. Washington, if you can tell the
6    jury what you'd like to say in rebuttal to anything you heard
7    from the defense.
8                               REBUTTAL
9              MR. WASHINGTON:  Listen.  When I first come to
10   SCI-Greene, there was less than 500 people in the jail.  It was
11   my experience of sick call, if you put a sick call slip in, the
12   nurse picked it up.  The nurse is not coming back to that pod
13   again until she's picking up a sick call slip unless there's an
14   emergency call over there.  No nurse ever made any rounds.  And
15   they're not over there at all times.  And if they do, they
16   definitely -- you would never notice it.
17             Whenever an officer, you tell them you want to see the
18   nurse or the psych, it's on that officer to report it and he
19   would call them over.  And even then they may not come.
20             You hit your call button, they can put it on mute so
21   you can continuously hit it and nobody respond to it.  That
22   is -- that was my experience.  And I'm telling you that's what
23   happened to me in this situation.
24             I got to the prison.  You were taken out of your cell
25   to go to legal visits with your hands behind your back.  Once
```

1   you got inside the booth, they take the shackle -- they take the
2   handcuffs, I should say, and a tether off so you can write.  You
3   can't write anything with your hands like that.  You got to have
4   your hands free to write.  If your lawyer's saying something or
5   you got to get some paperwork to show him, there's no way you
6   can pick it up and separate it and show it to him without that.
7            The other process, as you heard about, came along
8   later, and they was later than the dates I've brought to you on
9   August 1st.  And the other policy that may have came about as
10  far as one guard escorting people back and forth to the shower,
11  that had to come later.  You -- it wasn't going on when I was
12  there.  And there's nobody on the pod, and I'm speaking of
13  superior officers, that would stop a sergeant from doing
14  one-on-one, because that's what they had been doing in the past.
15           I believe that if you were to -- and going by my
16  experience, I filed more than one grievance, if you --
17           MR. BRADLEY:  Objection, Your Honor.  That was --
18  that's beyond the scope.
19           THE COURT:  Objection sustained.  So we're only
20  talking about the issues that are in this case.  To the extent
21  that they have to do with Officer Oswald, go ahead.
22           MR. WASHINGTON:  That's what I was about to address.
23  He brought up something that the film -- the grievance, in my
24  experience, it was told by the grievance.
25           THE COURT:  Okay.  Are you talking about there was a

1   grievance against Officer Oswald?

2           MR. WASHINGTON:  And I'm asking about the film.

3   That's how I find the information out.  They're saying

4   there's -- there's only 90 days that the film would stay there.

5   And I'm sure that the members of the jury know that no film

6   stays on the doorbell cameras that they got forever.  That just

7   is not possible.  And there's been some talk about inference of

8   ten years, one year.  That's impossible.  And I'm telling you,

9   it's been my experience doing grievances, that's not so.

10          And I can sit here as a witness and say something

11  happened 20 years ago and no one knows how to prove it because

12  there ain't no proof.  Just my word against his.  And I'm saying

13  that's what happened of -- of here.

14          If you were to escort one from the shower and take

15  them back to their cell, how can you take the handcuffs off the

16  person without your hand being within reach of the man's butt

17  when he's handcuffed from behind?  All of this stuff, you can't

18  reach him, it's just psychobabble.

19          And at the same time, the doors are sliding doors.

20  When a person steps inside, he's not -- with handcuffs and a

21  tether on, he's not going to turn sideways to get in the door.

22  That's not the practice.  They go straight in.  That's how

23  someone can reach in and squeeze your rear end.

24          If there's one-on-one, and this has been in my

25  experience, one-on-one from the shower or going to the shower,

1    there's -- there's nobody there.  That came later.  When I said

2    later, I'm talking about after the 2/15 incident.  And I

3    couldn't even say this is now because I haven't been to

4    SCI-Greene RHU since then.  But when I left there, they wasn't

5    doing that.

6         And everyone, every sergeant, lieutenant, and all has

7    pepper spray.  And you got out of line, you got sprayed.  Now,

8    all this stuff about it didn't happen until 2018, that's just

9    not accurate.

10        It has been my experience that a lieutenant does

11   not -- or a warden or anyone else sits around watching their

12   camera.  He wouldn't be a warden if he did that, sit around

13   watching to see if anybody does anything.  If they was doing

14   that, they wouldn't have to go back and review stuff to see that

15   such and such happened.  They would see it already.  So those

16   two contradict itself.

17        A lieutenant leaves the block and he comes back -- and

18   when I say "leaves the block," I mean the RHU -- and he goes out

19   and do things in the prison population, then he comes back and

20   the sarge reports things to him.  The lieutenant has an office.

21   He isn't always in his office.

22        When I first got there, the lieutenant was running the

23   whole RHU.  So he can hardly do -- the RHU consists of F block,

24   G block, H block, and I block.  How he's been to all of those

25   places at one time?  So all of this stuff about he's watching

```
1   him, how is he going to do that?  He goes through one block --
2   he got an office in every one of those blocks.  They're just
3   inaccurate.
4           As an inmate, if an inmate is known to be violent
5   towards inmates, they would pretty much put a shield in front of
6   his door.  None of that never happened to me.  And the reason
7   I'm bringing that up is that's why he didn't need help to come
8   get me out of the shower.  He went there on his own.  Plus he
9   came from another block.  He wasn't assigned to my block.  He
10  came from another block.
11          When he brought me -- took me to -- on a legal visit,
12  he was -- it was -- they was not assigned to my block.  They
13  were not assigned to my block.
14          It has been my experience that, time and time again,
15  the same Defendant, I had to complain about him about the same
16  thing more than four or five times.  So there's a history of
17  doing that.
18          It is not an easy thing for me to talk about.  But if
19  you were to examine -- you probably remember my testimony.  I
20  never said --
21          MR. BRADLEY:  Objection, Your Honor.  Beyond the
22  scope.
23          MR. WASHINGTON:  I didn't hear you.
24          THE COURT:  I'm not sure what he's about to say, so
25  let me understand it.  Go ahead, Mr. Washington.  What were you
```

```
1   going to say?  Again, it has to refer back to what Defendants
2   put on.
3              MR. WASHINGTON:  Well --
4              THE COURT:  But go ahead.
5              MR. WASHINGTON:  You want me to go ahead?
6              THE COURT:  I just need to understand what you're
7   about to get into.
8              MR. WASHINGTON:  No.  According to his testimony
9   there, he was questioned that I was going back -- he was taking
10  me to the shower and back and forth to the shower.  And I'm
11  saying I never said that.  I said he was escorting me from the
12  shower to my cell.
13             THE COURT:  The objection is overruled.  That's fine.
14  Go ahead.
15             MR. WASHINGTON:  And I'm saying that's when this
16  occurred.  And it was a habitual thing of touching me.
17             And even though I'm a couple of days older than that
18  now, the last thing I wanted to do was tussle with the person.
19  I can barely talk now.  So I definitely wasn't trying to die in
20  the penitentiary.
21             THE COURT:  Anything more, Mr. Washington?
22             MR. WASHINGTON:  Give me a second, Your Honor.
23        (Pause.)
24             MR. WASHINGTON:  As an inmate that needed medical care
25  inside the cell, and I'm talking about why -- doing a legal
```

1    visit, that was pretty much thought of as an emergency by the

2    Defendant because he came in and took the handcuffs off and the

3    tether.   That was my experience there.

4              I don't know.

5              I'm done, Your Honor.

6              THE COURT:   Okay.   Any cross-examination?

7              MR. BRADLEY:   No, Your Honor, thank you.

8              THE COURT:   Okay.   We're going to take a brief break,

9    ladies and gentlemen.   And a brief break.   So don't go too far.

10   Jamille.   All rise for the jury.

11        (Jury exits courtroom.)

12             THE COURT:   Mr. Washington, no other witnesses;

13   correct?   Am I correct?

14             MR. WASHINGTON:   They wouldn't let me contact any

15   witnesses.

16             THE COURT:   Okay.   But you have no other witnesses to

17   present today; correct?

18             MR. WASHINGTON:   I don't know of anybody here.

19             THE COURT:   No other witnesses?   If you can answer me.

20   No other witnesses to present today, correct, in rebuttal?

21             MR. WASHINGTON:   Yeah, nobody's here.

22             THE COURT:   Okay.   Very good.   All right.   Yes, you

23   can take him down.   Thank you.

24             We're just going to go right into jury instructions

25   here.

```
 1              Any additional motions from the Defendant?

 2              MS. GOODRICH:  No, Your Honor.

 3              THE COURT:  Okay.  As soon as we're done with jury

 4   instructions, we're going right into closing.  Just so

 5   everybody's prepared.

 6                              -  -  -

 7

 8

 9

10

11

12

13

14

15

16

17

18

19                  C E R T I F I C A T E

20

21         I, SHARON SIATKOWSKI, RMR, CRR, CBC, CBI, certify that the
     foregoing is a correct transcript from the record of proceedings in
22   the above-entitled matter.

23   s/Sharon Siatkowski
     SHARON SIATKOWSKI, RMR, CRR, CBC, CRI
24   Official Court Reporter

25
```

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HENRY UNSELD WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 15-1031 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| ROBERT D. GILMORE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff's Motion (Doc. 264) for amendment or relief from judgment, under Federal Rules 59 and 60, will be denied.

Plaintiff requests a new trial as to Defendants J. M. SMITH, D. FARRIER and M. STUMP, while wishing to keeping intact his judgment, on jury verdict, against Defendant T. S. OSWALD. The Court entered Judgment as a Matter of Law in favor of Defendants J. M. SMITH, D. FARRIER and M. STUMP, under Federal Rule of Civil Procedure 50(a), because Plaintiff failed to present a legally sufficient evidentiary basis for the claims against them. *See* text-Order dated Jun. 14, 2023 (Doc. 256) (memorializing ruling made on the record at trial). At no point during Plaintiff's case did he offer any testimony or other evidence regarding these Defendants. He failed to mention them.

There is a "general presumption against partial new trials," and one will be granted "only in those cases where it is plain" that error "has crept into one element of the verdict [that] did not in any way affect the determination of any other issue." Elcock v. Kmart Corp., 233 F.3d 734, 758 (3d Cir. 2000) (citation to quoted source omitted). Assuming there was error – which there was not – Plaintiff is unable to meet the high burden of showing that it did not in any way

affect the case against Defendant Oswald. Thus, were Plaintiff able to establish that the Court

committed error, the appropriate remedy would be a retrial of the case against *all* Defendants.

Plaintiff's jury verdict against Defendant Oswald would be invalidated, and this result brings to

mind the adage, "be careful what you wish for."

The Court need not indulge these issues further, however, because there was no error.

Plaintiff failed to present *any* evidence in support of his claims against the other Defendants,

and his Motion does nothing to refute that conclusion. The mistake or excusable neglect

standards under Rule 60(b) do not extend to failures at trial based on Plaintiff's lack of legal

acumen. And while some leniency is extended to pro se litigants, in terms of construing their

court filings, the Court's duties do <u>not</u> extend to providing legal advice or assisting pro se

litigants at trial. <u>Mala v. Crown Bay Marina, Inc.</u>, 704 F.3d 239, 244-47 (3d Cir. 2013)

(holding same). In these regards, all parties before the Court are on equally footing. *Id.* at 244

("Judges must be impartial, and they put their impartiality at risk—or at least might appear to

become partial to one side—when they provide trial assistance to a [pro se] party.") (citations

omitted).[1]

Plaintiff's Motion (**Doc. 264**) lacks merit, and it is **DENIED.**

---

[1] Plaintiff's reference to the lack of a "*Kloiber* instruction," in this context, is meaningless. *Kloiber* is a creature of Pennsylvania criminal law, and it contemplates cautioning the jury regarding eyewitness testimony when the witness was "not in a position to clearly observe the assailant, . . . he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by failure to identify [the] defendant on one or more prior occasions." *See* <u>Jacobs v. Superintendent Mahanoy SCI</u>, 2023 WL 2525046, *4 (3d Cir. Mar. 15, 2023) (citing and quoting <u>Com. v. Kloiber</u>, 106 A.2d 820 (Pa. 1954)). *Kloiber* is inapplicable.

Washington000259

IT IS SO ORDERED.

June 30, 2023

s\Cathy Bissoon
Cathy Bissoon
United States District Judge

cc *(via ECF email notification):*

All Counsel of Record

cc (via First-Class U.S. Mail):

Henry Unseld Washington
AM-3086
SCI Somerset
1600 Walters Mill Road
Somerset, PA  15510-0001

3

Washington000260

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HENRY UNSELD WASHINGTON,          )
                                  )
              Plaintiff,          )          Civil Action No. 15-1031
                                  )
    v.                          )          Judge Cathy Bissoon
                                  )
J.M. SMITH, T.S. OSWALD,          )
D. FARRIER and M. STUMP,          )
                                  )
            Defendants.          )

## FINAL JURY INSTRUCTIONS

Members of the jury, you have seen and heard all of the evidence in this case. Now I will instruct you on the law.

You have two duties as a jury. Your first duty is to decide the facts from the evidence you have heard and seen in court during this trial. That is your job and yours alone. I play no part in finding the facts. As I've said to you before, you should not take anything I may have said or done during the trial as indicating what I think of the evidence or what I think about what your verdict should be.

Your second duty is to apply the law that I give you to the facts. My role now is to explain to you the legal principles that must guide you in your decisions. You must apply my instructions carefully. Each of the instructions is important, and you must apply all of them. You must not substitute or follow your own notion or opinion about what the law is or ought to be. As I have said before, you must apply the law that I give to you, whether you agree with it or not.

Whatever your verdict, it will have to be unanimous. All of you will have to agree, or there will be no verdict. In the jury room, you will discuss the case among yourselves, but ultimately each of you will have to make up your own mind.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a telephone, a cell phone, smart phone, computer or any similar devices to communicate to anyone any information about the case or to research any aspect of the case until I accept your verdict. By extension, you may not use the Internet, texts, instant messaging services, Internet chat rooms, blogs or websites such as Facebook, Twitter, Snapchat, LinkedIn, Instagram and YouTube, for those purposes either. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this Courtroom. You are only permitted to discuss the case with your fellow jurors during deliberations because they have seen and heard the same evidence you have. In our judicial system, it is important that you are not influenced by anything or anyone outside of the Courtroom.

Perform your duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

You should understand that I am absolutely neutral in presenting these instructions to you. I have not expressed, nor have I intended to express, my opinion as to which witnesses are or are not worthy of belief, which facts are or are not established or what inference or inferences

2

should be drawn from the evidence. If any expression of mine has seemed to indicate an opinion related to any of these matters, I instruct you to disregard it. You are the exclusive, sole judges of all of the questions of fact submitted to you including the credibility of the witnesses. Your authority, however, is not to be exercised arbitrarily; it must be exercised with sincere judgment, sound discretion, and in accordance with the rules of law that I give you. In making your determination of the facts in this case, your judgment must be applied only to that which is properly in evidence.

I have mentioned the word "evidence." As we discussed at the beginning of this case, the "evidence" in this case consists of the testimony of witnesses, documents and other things received as exhibits.

As I told you before, certain things are not evidence:

1. Opening statements, closing statements, and comments made by attorneys or Mr. Washington, except for his sworn testimony, are not evidence; however, you may give consideration to their arguments in making up your mind on what inferences to draw from the facts that are in evidence.

2. Objections are not evidence. Defendant's lawyers and Mr. Washington have a right to object when they believe something is improper. You should not be influenced by the objection. If I sustained an objection to a question, you must ignore the question and must not try to guess what the answer might have been.

3. To the extent that I struck any testimony from the record, or told you to disregard it, it is not evidence and must not be considered by you.

4. Anything you saw or heard about this case outside the Courtroom is not evidence.

3

To remind you, there are, generally speaking, two types of evidence from which you may properly find the truth as to the facts of the case. One is "direct evidence," such as the testimony of an eyewitness to an event. The other is "indirect" or "circumstantial" evidence, which is proof of a chain of circumstances pointing to the existence or non-existence of certain facts.

An example of "direct evidence" is when a witness testifies about something that the witness knows through his own senses – something the witness has seen, felt, touched or heard or did. You will recall my example of a witness testifying that he saw it raining outside. If you believed the witness, that would be direct evidence that it was raining. Another form of direct evidence is an exhibit where the fact to be proved is the exhibit's existence or current condition.

As for "circumstantial evidence," recall that if, for example, someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining. As a general rule, the law makes no distinction between direct and circumstantial evidence. The law makes no distinction in the weight to be given to either direct or circumstantial evidence. You are to decide how much weight to give any evidence.

You are to consider only the evidence in the case. But in your consideration of the evidence, you are not limited to the bald statements of the witnesses. In other words, you are not limited to what you see and hear as the witnesses testify. You are permitted to draw, from facts that you find to have been proved, such reasonable inferences as seem justified in light of your experience.

Inferences are deductions or conclusions that common sense and reason lead you to draw from facts established by the evidence in the case. In other words, you may reach conclusions that common sense and reason lead you to reach from the facts established by the evidence in the

4

case. A reasonable inference is not a suspicion or a guess. It is a reasoned, logical decision to find that a disputed fact exists on the basis of another fact.

Sometimes different inferences may be drawn from the same set of facts. Plaintiff may ask you to draw one inference, and Defendant may ask you to draw another. You, and you alone, must decide what reasonable inferences you will draw based on all the evidence and your reason, experience and common sense.

Occasionally during the trial, I have been called upon to rule on the admissibility of certain evidence. You should have no concern with the reasons for any such rulings and you are not to draw any inferences from them. Whether offered evidence is admissible is purely a question of law within my province. In admitting evidence to which an objection has been made, I do not determine what weight should be given to such evidence, nor do I pass on the credibility of the evidence. As I mentioned earlier, you must dismiss from your minds completely and entirely any evidence and questions that have been ruled out of the case by me, and you will refrain from speculation, conjecture or guesswork about the nature or effect of any discussions between me, counsel and Mr. Washington that were held out of your hearing or sight. In this case, on multiple occasions, you have heard me sustain objections. You must not consider, in any way, any information for which an objection was sustained.

You, as jurors, are the sole judges of the credibility of the witnesses and their testimony. As you will recall, "credibility" means whether a witness is worthy of belief. You may decide whether to believe all, or part, or none of that witness's testimony. You may be guided by the appearance and conduct of a witness, or the manner in which the witness testifies or by the character of the testimony given or by evidence contrary to the testimony given. You should carefully scrutinize all the testimony given, the circumstances under which each witness has

5

testified, and every matter in evidence that tends to show whether a witness is worthy of belief.
Consider each witness's intelligence, motive, state-of-mind, and demeanor while on the witness
stand. Consider the witness's ability to observe matters and consider whether he or she
impresses you as having an accurate recollection of these matters. Consider also any relation
each witness may bear to each side of the case; the manner in which each witness might be
affected by the verdict; and the extent to which, if at all, each witness's testimony is supported or
contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony
of different witnesses, may or may not cause you to discredit such testimony. Even actual
contradictions in the testimony of witnesses do not necessarily mean that any witness
intentionally has been untruthful. As I said to you at the beginning of this case, lapses in
memory are not uncommon. Sometimes a witness forgets; sometimes he remembers incorrectly.
It is also true that two persons witnessing an incident may see or hear it differently.

If different parts of the testimony of any witness or witnesses appear to be inconsistent,
you should try to reconcile the conflicting statements, whether of the same or different witnesses,
and you should do so if it can be done fairly and satisfactorily. However, if you decide that there
is a genuine and irreconcilable conflict of testimony, it is your function and duty to determine
which, if any, of the contradictory statements you will believe. In sum, you may accept or reject
the testimony of any witness in whole or in part.

The law does not require a party to call as witnesses all persons who may have been
present at any time or place involved in the case, or who may appear to have some knowledge of
the matters at issue in this trial. Nor does the law require a party to produce as exhibits all papers

6

and things mentioned in the evidence in this case. Therefore, you should not draw any adverse inferences from a person's failure to come in and testify.

Additionally, the number of witnesses offered by one party or the other does not, in itself, determine the weight of the evidence. Whether the witnesses appear to be biased or unbiased and whether they are interested or disinterested persons, are among the important factors that go to the reliability of their testimony. The important thing is the quality of the testimony of each witness. In short, the test is not which side brings the greater number of witnesses, but which witnesses you consider most worthy of belief.

No witness should be believed solely because of his position. Every witness takes the stand and subjects his testimony to the same examination and the same tests as any other witness. Thus, you must evaluate the testimony of all witnesses on the same basis.

The instructions I have given you so far are more or less of a general nature and apply to all civil lawsuits before this Court. I will now discuss the law specific to this case. On the first day of trial, I gave you preliminary instructions regarding the legal issues involved in this case. These final instructions will be more comprehensive to assist you in your deliberations.

As you know, in this lawsuit Plaintiff alleges that Defendant Oswald subjected him to cruel and unusual punishment, by sexually abusing him, on two separate occasions, on August 1, 2013 and April 2, 2015, while Plaintiff was housed at the Pennsylvania State Correctional Institution at Greene. Defendant Oswald denies having any sexual contact with Plaintiff.

Plaintiff's claims are brought pursuant to Section 1983 of the Civil Rights Act. Section 1983 provides that a person may seek relief in this Court by way of damages against any person or persons who, under color of any state law or custom, subjects such person to the deprivation of any rights, privileges or immunities secured or protected by the Constitution.

7

In order to prove his claim, Plaintiff must prove both of the following elements by a preponderance of the evidence:

First: that Defendant Oswald acted under the color of state law; and

Second: that, while acting under color of state law, Defendant Oswald deprived Plaintiff of a federal constitutional right.

Plaintiff has the burden of proving his case by what is called the preponderance of the evidence. That means Plaintiff has to prove to you, in light of all the evidence, that what he claims is more likely so than not so. To say it differently: if you were to put the evidence favorable to Plaintiff and the evidence favorable to the Defendant on opposite sides of the scales, Plaintiff would have to make the scales tip somewhat on his side. If Plaintiff fails to meet this burden, the verdict must be for Defendant. If you find after considering all the evidence that a claim or fact is more likely so than not so, then the claim or fact has been proved by a preponderance of the evidence.

In determining whether any fact has been proved by a preponderance of evidence, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

You may have heard of the term "proof beyond a reasonable doubt." That is a stricter standard of proof and it applies only to criminal cases. It does not apply in civil cases such as this. You should put it out of your mind.

8

The first element of Plaintiff's claim is that Defendant Oswald acted under color of state law. This means that Plaintiff must show that Defendant was using power that he possessed by virtue of state law.

Because Defendant Oswald was an official of the state of Pennsylvania at the relevant time, I instruct you that he was acting under color of state law. In other words, this element of Plaintiff's claim is not in dispute, and you _must_ find that this element has been established.

As to the second element, the constitutional right in question is Plaintiff's right under the Eighth Amendment to be free from cruel and unusual punishment. Under the law, this right protects inmates from sexual abuse at the hands of those entrusted with the care, custody and control of inmates.

Allegations of physical sexual assault meet the standard of impermissible punishment under the Eighth Amendment, because sexual assault cannot and does not serve a legitimate governmental objective. To be clear, however, Plaintiff cannot rely on verbal harassment alone. There needs to have been sexualized physical contact or touching.

To establish an Eighth Amendment claim for sexual abuse, a plaintiff must establish both a subjective aspect and an objective aspect.

As for the subjective part, the official must have a culpable state of mind. That is, the official's intention cannot have been to serve a legitimate penological purpose. Rather, he must have acted maliciously or sadistically for the very purpose of causing harm. Because this inquiry involves a mental state, it often must be inferred rather than plainly observed.

The required mental state can be inferred from circumstances surrounding the incident, and the nature of the conduct itself may be enough to demonstrate a defendant's culpable state of

9

mind. Actions taken with the intention to arouse or gratify the officer's sexual desire or to humiliate the inmate may be sufficient to establish the subjective aspect of Plaintiff's claim.

As for the underline: objective aspect, the incident or incidents must be objectively, sufficiently intolerable and cruel, and thus capable of causing harm. Not every malevolent, that is, mean-spirited, touching by a prison guard gives rise to a compensable injury. The law does not apply a "zero tolerance" policy for all sexualized touching in prison, such that every claim is objectively serious to a constitutional degree. Rather, the prison official's conduct must be repugnant to the conscience of mankind, as based on contemporary – that is, current – standards of decency.

The number of alleged incidents of sexual abuse is not determinative. A single incident of sexual abuse, if sufficiently serious or severe, can violate the Eighth Amendment as surely as can multiple, less serious incidents. While a pattern of harassment and sexualized touching more clearly may be considered objectively cruel and unusual, that does not diminish the harm that may arise from a single, isolated act.

Although physical injury to a plaintiff certainly may be a signal as to severity, it is not required for there to be objective seriousness. An abusive sexual encounter may not leave any marks, and it is well known that sexual abuse may cause significant mental distress and lasting psychological harm.

The objectiveness inquiry is context and fact-specific, and there is no mechanical test for determining when sexual contact is objectively, sufficiently serious. The scope, place and timing of the offensive conduct will bear on its severity, as will the details of the alleged contact. Objectively serious sexual contact would include sexualized fondling, coerced sexual activity, combinations of ongoing harassment and abuse, and exchanges of sexual activity for special

10

treatment or to avoid discipline. This is not a comprehensive list, however, and other sexualized touching may also be objectively serious.

I am now going to instruct you on damages. Just because I am instructing you on how to award damages does not mean that I have any opinion on whether or not Defendant Oswald should be held liable.

If you find Defendant Oswald liable, then you must consider the issue of compensatory damages. You must award Plaintiff an amount that will fairly compensate him for any injury he actually sustained as a result of Defendant Oswald's conduct.

Plaintiff must show that the injury would not have occurred without Defendant Oswald's action(s). Plaintiff also must show that Defendant Oswald's action(s) played a substantial part in bringing about the injury, and that the injury was either a direct result or a reasonably probable consequence of Defendant's action(s). There can be more than one cause of an injury. To find that Defendant's act caused Plaintiff's injury, you need not find that his act was the nearest cause, either in time or space. However, if Plaintiff's injury was caused by a later, independent event that came between Defendant Oswald's act and Plaintiff's injury, Defendant is not liable unless the injury was reasonably foreseeable by Defendant.

Compensatory damages must not be based on speculation or sympathy. They must be based on the evidence presented at trial, and only on that evidence. Plaintiff has the burden of proving compensatory damages by a preponderance of the evidence.

Plaintiff claims the following items of damages:

•      Physical harm to Plaintiff during and after the events at issue, including ill health, physical pain, disability, disfigurement or discomfort and any such physical harm that Plaintiff is

11

reasonably certain to experience in the future. In assessing such harm, you should consider the nature and extent of the injury and whether the injury is temporary or permanent.

• Emotional and mental harm to Plaintiff during and after the events at issue, including fear, humiliation and mental anguish, and any such emotional and mental harm that Plaintiff is reasonably certain to experience in the future.

If you return a verdict for Plaintiff, but Plaintiff has failed to prove compensatory damages, then you must award nominal damages of $1.00. A person whose federal rights were violated is entitled to a recognition of that violation, even if he suffered no actual injury. Nominal damages, of $1.00, are designed to acknowledge the deprivation of a federal right, even where no actual injury occurred.

However, if you find actual injury, you must award compensatory damages, as I instructed you, rather than nominal damages.

In addition to compensatory or nominal damages, you may consider awarding Plaintiff punitive damages. A jury may award punitive damages to punish a defendant, or to deter a defendant and others like the defendant from committing such conduct in the future. Where appropriate, the jury may award punitive damages even if the plaintiff suffered no actual injury and thus receives nominal rather than compensatory damages.

You may only award punitive damages if you find that Defendant Oswald acted maliciously or wantonly in violating Plaintiff's federally protected rights.

• A violation is malicious if it was prompted by ill will or spite towards Plaintiff. A defendant is malicious when he consciously desires to violate federal rights of which he is aware, or when he consciously desires to injure a plaintiff in a manner he knows to be unlawful. A conscious desire to perform the physical acts that caused a plaintiff injury, or to fail to

12

undertake certain acts, does not by itself establish that a defendant had a conscious desire to violate rights or injure the plaintiff unlawfully.

> • A violation is wanton if the person committing the violation recklessly or callously disregarded Plaintiff's rights.

If you find it more likely than not that Defendant Oswald acted maliciously or wantonly in violating Plaintiff's federal rights, then you may award punitive damages against Defendant. However, an award of punitive damages is discretionary. That is, if you find that the legal requirements for punitive damages are satisfied, then you may decide to award punitive damages, or you may decide not to award them. I will now discuss some considerations that should guide your exercise of this discretion. But remember, you cannot award punitive damages unless you have found that Defendant Oswald acted maliciously or wantonly in violating Plaintiff's federal rights.

If you have found that Defendant Oswald acted maliciously or wantonly in violating Plaintiff's federal rights, then you should consider the purposes of punitive damages. The purposes of punitive damages are to punish a defendant for a malicious or wanton violation of a plaintiff's federal rights, or to deter the defendant and others like the defendant from doing similar things in the future, or both. Thus, you may consider whether to award punitive damages to punish a defendant. You should also consider whether actual damages, standing alone, are sufficient to deter or prevent the defendant from again performing any wrongful acts he may have performed. Finally, you should consider whether an award of punitive damages in this case is likely to deter other persons from performing wrongful acts similar to those that the defendant is alleged to have committed.

13

If you decide to award punitive damages, then you should also consider the purposes of punitive damages in deciding the amount of punitive damages to award. In deciding the amount of punitive damages, you should consider the degree to which Defendant Oswald should be punished for his wrongful conduct toward Plaintiff, and the degree to which an award of one sum or another will deter Defendant or others from committing similar wrongful acts in the future.

In considering the purposes of punishment and deterrence, you should consider the nature of Defendant's action. For example, you are entitled to consider whether Defendant's act was violent or non-violent; whether Defendant's act posed a risk to health or safety; whether Defendant acted in a deliberately deceptive manner; and whether Defendant engaged in repeated misconduct, or a single act. You should also consider the amount of harm actually caused by Defendant's act, as well as the harm Defendant's act could have caused, and the harm that could result if such acts are not deterred in the future.

That concludes my instructions regarding the claims in this case and your consideration of the evidence. Following the parties' closings, I will have a few additional instructions.

**[BREAK FOR CLOSINGS]**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In a few minutes, you will begin deliberations in this case. During deliberations, you must continue to observe all the restrictions I have instructed you on throughout the trial. That is, you must not discuss this case with anyone, including other people involved in the trial; members of your family; friends; or anyone else. Do not speak at all with any of the parties, the witnesses, or the attorneys. Do not permit anyone to discuss the case with you. Do not even remain in the presence of anyone discussing the case. If anyone approaches you and tries to talk

14

to you about the case, please report that to me, through my Courtroom Deputy, Ms. Biggs, immediately.

Once you start deliberating, do not talk, communicate with, or provide any information about this case by any means to the court officials, or to me, or to anyone else except each other.

While I do not know whether there is any news coverage of this case, do not watch or listen to any news reports concerning this trial on television or radio and do not read any news accounts of this trial in a newspaper or on the Internet. Do not use the Internet to search for information about the parties, witnesses, lawyers or anything else associated with the trial. The only information you will be allowed to consider in deciding this case is what you learned in this Courtroom during the trial.

Now let me explain some things about your deliberations in the jury room, and your verdict.

Your verdict in this case will consist of answers to written questions that I will provide to you. This method is common in civil cases, and I have determined that it is appropriate in this case.

Written questions will be submitted to you in connection with your verdict that will have to be answered. Your verdict must represent the considered judgment of each juror, and all of you will be asked to sign the verdict form. In order to return a verdict, it is necessary that each juror agree to it. In other words, your verdict must be unanimous.

Upon retiring to the jury room, the first thing that you should do in the jury room is choose someone to be your foreperson. This person will speak for the jury here in court. He or she will also preside over your discussions. However, the views and vote of the foreperson are entitled to no greater weight than those of any other juror.

15

Washington000275

Once you have selected your foreperson, you should begin discussing the case. It is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. You should all feel free to speak your minds.

Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong. But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that – your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience. Listen carefully to what the other jurors have to say, and then decide for yourself whether the parties have carried their respective burdens of proof.

As I have said before, your verdict must be based only on the evidence received in this case and the law I have given to you. You should not take anything I may have said or done during trial as indicating what I think of the evidence or what I think your verdict should be. What the verdict should be is the exclusive responsibility of the jury.

When you retire to the jury room to deliberate, you may take with you these instructions, your notes and certain exhibits that the court has admitted into evidence. As I instructed you earlier, do not use your notes, or any other juror's notes, as authority to persuade fellow jurors. In your deliberations, give no more and no less weight to the views of a fellow juror just because that juror did or did not take notes. As I mentioned earlier, your notes are not official transcripts. They are not evidence, and they are by no means a complete outline of the proceedings or a list

16

Washington000276

of the highlights in the trial. They are valuable, if at all, only as a way to refresh your own memory.

When you have reached a unanimous agreement as to your verdict, you will have the foreperson fill in the verdict form, date it and each of you will sign it. Then, notify the Courtroom Deputy that you have reached a verdict.

If, during your deliberations, you have any questions or messages, your foreperson should write them down on a piece of paper, sign them, and then give them to Ms. Biggs, who will give them to me. I will first talk to the lawyers and Mr. Washington about what you have asked, and I will respond as soon as I can. In the meantime, if possible, continue with your deliberations on some other subject.

One more thing about messages. Do not ever write down or tell anyone how you or anyone else voted. That should stay secret until you have finished your deliberations. If you have occasion to communicate with the court while you are deliberating, do not disclose the number of jurors who have voted or how they have voted.

Ms. Biggs will explain to you once you are inside the jury room how to alert the court that you have a question, message or verdict. Remember, if your decisions as to each question on the verdict slip are not unanimous, there is no verdict.

17