# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

**HENRY UNSELD WASHINGTON**,

*Plaintiff-Appellee,*

**v.**

**ROBERT GILMORE et al.,**

*Defendant-Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA 2:15-cv-01031

## PLAINTIFF-APPELLEE'S OPENING BRIEF

Amaris Montes
Samuel Weiss
RIGHTS BEHIND BARS
416 Florida Ave. #26152
Washington D.C. 20001
Amaris@rightsbehindbars.org
*Counsel for Plaintiff-Appellee Henry Washington*

Dated: May 28, 2024

# TABLE OF CONTENTS

**STATEMENT OF THE ISSUES** ........................................................... 1

**STATEMENT OF RELATED PROCEEDINGS** .............................. 2

**STATEMENT OF THE CASE** ............................................................ 2

    A.    MR. WASHINGTON'S TESTIMONY REGARDING THE AUGUST 1, 2013 .... 3
ASSAULT ................................................................................................. 3

    B.    MR. WASHINGTON'S TESTIMONY REGARDING THE APRIL 2, 2015
ASSAULT ................................................................................................. 6

    C.    DEFENDANT OSWALD'S TESTIMONY REGARDING THE ASSAULTS ......... 8

**SUMMARY OF ARGUMENT** ......................................................... 15

**STANDARD OF REVIEW** ............................................................... 17

**ARGUMENT** .................................................................................... 19

    I.    THE COURT DID NOT ERR IN HOLDING THAT MR. WASHINGTON'S
TESTIMONY REGARDING DEFENDANT OSWALD'S SEXUAL ABUSE WAS
SUFFICIENT TO MAINTAIN THE JURY'S VERDICT. ......................................... 19

    II.    THE DISTRICT COURT WAS CORRECT IN DECLINING TO SECOND GUESS
THE JURY'S WELL-REASONED DAMAGES AWARD, AND IT WOULD BE
IMPROPER FOR THIS COURT TO DO SO. ......................................................... 30

**CONCLUSION** ................................................................................. 54

**COMBINED CERTIFICATIONS** .................................................. 55

# TABLE OF AUTHORITIES

**Federal Cases**

*Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488 (3d Cir. 2002) ............................................... 25

*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996)...........................................39, 42, 51

*Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802 (3d Cir. 1984) ............................ 27

*Brand Mktg. Grp. LLC v. Intertek Testing Servs.*, N.A., Inc., 801 F.3d 347 (3d Cir. 2015) .. 47, 50

*Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257 (1989) ............. 49

*Burlington v. News Corp.*, No. CV 09-1908, 2016 WL 1221426 (E.D. Pa. Mar. 29, 2016)........ 20

*CGB Occup. Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375 (3d Cir. 2004) .................. 21

*Coleman v. Vinson*, 2019 WL 4644261 (S.D. Ill. Sept. 24, 2019)............................................... 50

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.,* 532 U.S. 424 (2001)................................... 36

*Cooper v. Morales*, 535 F. App'x 425 (5th Cir. 2013) ................................................................ 50

*Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d Cir. 2010)................................................... 35, 36

*Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008) ........................................................33, 34, 45

*Farmer v. Brennan*, 511 U.S. 825 (1994) .................................................................................. 40

*Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171 (3d Cir. 1976) ...................... 18, 21

*Gov't of the V.I. v. Mills*, 821 F.3d 448 (3d Cir. 2016) ............................................................... 53

*Hale v. Tennis*, No. 206CV1530, 2009 WL 1324158 (W.D. Pa. May 12, 2009) ...................... 26

*Hall v. Terrell*, 648 F. Supp. 2d 1229 (D. Colo. 2009)............................................................... 51

*In re Bayside Prison Litig.*, 331 F. App'x 987(3d Cir. 2009) ....................................................... 35

*In re Prosse*r, 534 Fed. App'x 126 (3d Cir. 2013) ..................................................................... 27

*Johnson v. Howard*, 24 F. App'x 480 (6th Cir. 2001) ................................................................ 50

*Klein v. Hollings*, 992 F.2d 1285 (3d Cir. 1993)........................................................................ 30

*Kunz v. DeFelice* 538 F.3d 667 (7th Cir. 2008) .................................................................. 34, 35

*Laymon v. Lobby House, Inc.,* 613 F. Supp. 2d 504 (D. Del. 2009) ........................................... 51

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993)........................................ 18, 19

*Lowenstein v. Pepsi-Cola Bottling Co. of Pennsauken*, 536 F.2d 9 (3d Cir. 1976).................... 19

*Mallick v. Int'l Bhd. Elec. Workers*, 644 F.2d 228 (3d Cir. 1981) ............................................. 19

*Marra v. Phila. Hous. Auth.*, 497 F.3d 286 (3d Cir. 2007)...........................................18, 21, 25

*Motter v. Everest & Jennings, Inc.* 883 F.2d 1223 (3d Cir. 1989)............................................. 32

*Murray v. Fairbanks Morse*, 610 F.2d 149 (3d Cir. 1979)......................................................... 32

*Pryer v. C.O. 3 Slavic*, 251 F.3d 448 (3d Cir.2001) .................................................. 18

*Richardson v. Marsh*, 481 U.S. 200 (1987) ............................................................ 30

*Ricks v. Shover*, 891 F.3d 468 (3d Cir. 2018) .................................................. 38, 42

*Scully v. Borough of Hawthorne*, 58 F. Supp. 2d 435 (D.N.J. 1999) ......................... 20

*Sporish v. Harlow*, No. CV 12-4142, 2015 WL 10939692 (E.D. Pa. May 7, 2015) ......... 26

*Springer v. Henry*, 435 F.3d 268 (3d Cir.2006) ...................................................... 17

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ................................ *passim*

*Swineford v. Snyder Cnty. Pa.,* 15 F.3d 1258 (3d Cir. 1994) ...................................... 18

*TXO Poduction Corp. v. Alliance Resources Corp.* 509 U.S. 443 (1993) ...................... 49

*United States v. Parshall*, 600 F. App'x 485 (8th Cir. 2015) ................................... 26

*Williams v. Martin Marietta Alumina, Inc.*, 817 F.2d 1030 (3d Cir. 1986) ................. 32

*Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224 (3d Cir. 2005) ............ 50, 53

*Wilson Freight Forwarding Co.*, 348 F.2d 129 (3d Cir. 1965) .................................. 19

*Wontor v. Neenan*, No. 92–1588 (M.D. Pa. June 28, 1996) ...................................... 32

*Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917 (7th Cir. 2004) ........... 50

*Wright v. Cacciutti*, No. 3:12-CV-1682, 2015 WL 3654553 (M.D. Pa. June 11, 2015) ...... 33

*Yohannon v. Keene Corp.*, 924 F.2d 1255 (3d Cir.1991) .......................................... 19

**State Cases**

*Campbell v. State Farm Mut. Auto. Ins. Co.,* 98 P.3d 409 (Utah 2010) ..................... 51, 52

*Commonwealth v. Gooding*, 818 A.2d 546 (Pa. Super. 2003) .................................. 30

*Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757 (1981) ...................................... 55

*Haines v. Raven Arms*, 640 A.2d 367 (Pa. S. Ct. 1994) .......................................... 36

**Statutes**

18 Pa. Cons. Stat. §§ 3101 .................................................................................. 48

34 U.S.C. § 30302(1) ..................................................................................... 47, 48

**Other Authorities**

Matthew Hag, *7 Prison Guards in Pennsylvania Charged With Sexually Abusing Inmates*, New York Times (Feb. 16, 2018) ............................................................................ 47

U.S. Dep't of Just., Office of Just. Programs, Bureau of Just. Stat., Sexual Victimization Reported by Adult Correctional Authorities, 2016–2018 1 (June 2021) ..................... 46

U.S. Senate Perm. Sub. On Investigations, Sexual Abuse of Female Inmates in Federal Prisons

(Dec. 13, 2022) ................................................................................................................. 47

**STATEMENT OF THE ISSUES**

I.      Whether the district court correctly preserved the jury's finding that

        Defendant Oswald was liable for repeated incidents of sexual abuse?


II.     Whether the district court correctly preserved the jury's punitive damages

        award when it held it was within constitutional limits under the Due

        Process Clause?

## STATEMENT OF RELATED PROCEEDINGS

This Court dismissed Washington's *pro se* attempt to file an interlocutory appeal on December 7, 2017. No. 17-3151. Order, December 7, 2017. Appellee Oswald filed a cross-appeal at No. 23-2277 which is pending and presents separate issues from this appeal.

## STATEMENT OF THE CASE

Henry Unseld Washington was incarcerated at SCI-Greene. Defendant Oswald sexually abused Washington on August 1, 2013, and April 2, 2015. A77-79, Doc.76 at 26-28. These assaults psychologically damaged Mr. Washington—he no longer likes to be touched and embraced and feels uncomfortable when he is too close to others. A112, Doc. 276 (Tr: 15:7-12). It also has caused him severe mental anguish, as he continues to repeat the incidents of his abuse over and over in his head. *Id.*

Mr. Washington filed the present case on September 1, 2015, proceeding *pro se* and *in forma paueris*. A52-91, Doc. 76. Mr. Washington claimed *inter alia*, that officials at SCI-Greene, including Defendant Oswald, violated his rights under the Eighth Amendment by sexually assaulting him. A77-78, Doc. 76 at 26-27. The Magistrate Judge dismissed some of the officers, including Defendants Jin, Dacani, Nelson, and Suhan because their harassment, which included making lewd comments while they touched themselves, "did not raise to a constitutional

violation" because there was no physical contact. Doc. 96 at 17-18. The court denied Defendants' Motion to Dismiss for Defendants Oswald, Smith, Farrier, and Stump. Doc. 96 at 22. After discovery, defendant medical providers and Defendant Vihlidal, a health care administrator, moved for summary judgment, and the Magistrate Judge granted the motion. Doc. 168A.

A two-day jury trial occurred on June 12 and 13, 2023 against Defendants Smith, Farrier, Stump, and Oswald regarding Plaintiff's Eighth Amendment claims. Doc. 276, Doc. 277. Mr. Washington requested from the court an appointment of pro bono counsel for his case, Doc. 10, Doc.11, but was denied and therefore proceeded *pro se* at trial. Doc. 13. He expressed a limited understanding of the proper process to present evidence. *See e.g.*, A143-45, Doc. 276 (Tr. 46-48). He also repeatedly told the court and jury that he requested various information from the Defendants throughout the pendency of the proceedings, such as additional incarcerated witnesses and video footage, but was denied. A140, Doc. 276 (Tr. 44:4-13). Despite these limitations, Mr. Washington presented the following facts through his testimony and was subject to cross-examination by the Defendant. Defendant Oswald testified following Mr. Washington's testimony.

## A.     Mr. Washington's Testimony Regarding the August 1, 2013 Assault

Mr. Washington testified that while he was held in the Restricted Housing Unit (RHU) at SCI-Greene, two officers came to inform him he had a legal visit on

August 1, 2013. A109, Doc. 276 (Tr.12:14-25); A120, Doc. 276 (Tr: 23:20-24). On cross-examination, he clarified that this event occurred in the G block during the first shift of the day for officers, between 6 am and 2 pm. A117-18, Doc. 276 (Tr. 20:19-25, 21:6-10). He testified that they did not allow him to clean himself after using the toilet, and they ordered him to put on his jumpsuit without cleaning himself, or else the visit was cancelled. A109, Doc. 276 (Tr.12:14-25). Mr. Washington was hooked by a tether to his handcuffs, and both officers had sticks and sharp objects. A110, Doc. 276 (Tr. 12:24-25, 13:1-2). Mr. Washington testified that once he was outside of the cell, one of the officers started to "rub and touch [him] in a very sexual manner." A109, Doc. 276 (Tr. 12:24-25). They continued "rubbing and touching [his] back and placing [their] hands on his rear end." A110, Doc. 276 (Tr. 13:2-5). Throughout the escort to the visiting room, they stuck Mr. Washington with a sharp, riot stick and needle-like object, "trying to insert it into his rectum" and "if [he] tried to move, [he] was jerked with the tether or poked with a pin." A110, Doc. 276 (Tr.13: 6-14).

Once he was placed in the visiting booth, Mr. Washington felt one of the officers "insert their finger into the cleavage of [his] buttocks" so he jumped, and the officers snatched the tether back. A110, Doc. 276 (Tr. 13:15-18). Mr. Washington testified that "[o]nce they closed the door to the visiting room door, someone took the tether—and the person I believe was doing this was Mr.

Oswald—he pulls it so tight that it caused my arms to come through the wicket." A110, Doc. 276 (Tr.13:18-21). He continued, "[t]he other gentleman with him, which was a sergeant, has a stick and started to prod me like an animal. And they did it so vigorously that it was pretty much—it touched my testicles." A110, Doc. 276 (Tr. 13:22-25). Mr. Washington testified that he could not get up for 20 minutes. A111, Doc. 276 (Tr. 14:4-6). "[O]n the way back, some of the same things happened: the sticking me and prodding me and acting as though I'm some type of prostitute, calling me names, and specifically would infer to a black person. And I'm not talking about a racial slur. I mean honey and sugar and this type of – blackberry and, you know, that type of stuff." A111, Doc. 276 (Tr. 14:4-18). Mr. Washington stated that, in total, the officers poked him 4 times on the way to the visitation room with the needle-like object, and 10 times on the way back. A111, Doc. 276 (Tr. 14:13-15).

When Mr. Washington returned to his cell, he felt blood running down the back of his leg, and his genital area was soaked with blood. A112, Doc. 276 (Tr.15:7-9). He attempted to press the button in his cell to obtain medical relief, but staff muted the button, so Mr. Washington never received care on the day of the assault. A112, Doc. 276 (Tr. 15:5-12). Mr. Washington testified, "[t]his was such a humiliating thing for me that I pretty much lost my mind there" and "[e]ven today, I don't like for people to touch me or embrace me or stand near me because

I may be going through the same thing. And it's not uncommon for me to—to envision that this is happening to me over and over again." A112, Doc. 276 (Tr. 15: 13-19).

**B.      Mr. Washington's Testimony Regarding the April 2, 2015 Assault**

Mr. Washington testified about Defendant Oswald sexually assaulting him again while leaving the showers on April 2, 2015. Mr. Washington testified, "[o]ne of the guys that was in the first event had became [sic] a sergeant." A113, Doc. 276 (Tr. 16:3-5). He continued, "[t]he sergeants don't usually do showers. This is during showers then all of a sudden he appears. And he wasn't assigned to the block. How did he get over there? I don't know. But he come [sic] to get me from the shower and right away he starts. And I'm saying, 'Don't touch me.'" A113, Doc. 276 (Tr. 16:5-10). Mr. Washington testified that this officer was touching his back and rear end, and "[c]alling [him] his blackberry and sweet dark sugar and all this stuff." A113, Doc. 276 (Tr. 16:11-14). He was escorted to his cell and, as he tries to get away, the officer groped his buttocks again.  A113, Doc. 276 (Tr. 16:15-19). Mr. Washington stated that he tried to get away, but he was attached on the tether, and the officer continued to assault him, stating "'Oh, it's soft as cotton,' talking about rubbing [his] rear end and squeezing [his] rear end. And as [he got] inside the door, he [took] and [shoved] his finger into [his] buttocks." A113, Doc. 276 (Tr. 16:19-23). Mr. Washington testified that the officer told him

he was going to spray him with mace if he ran to the back of the cell. A114, Doc.

276 (Tr. 17: 1-2). He attempted to get free, but the officer kept him in the

handcuffs with the tether, and again attempted to poke him in the rectum. A114,

Doc. 276 (Tr. 17: 3-6). Washington reiterated to the jury, "And that was one of the

guys that was involved in the first event. He had became [sic] a sergeant then."

A114, Doc. 276 (Tr. 17:8-9).

Following Mr. Washington's case in chief, the Defendants moved for a

judgment of acquittal of all Defendants, "particularly Farrier, Smith, and Stump."

A140, Doc. 276 (Tr. 43:16-25). Defendants argued that there was insufficient

evidence because Mr. Washington had not sufficiently identified the Defendants in

his testimony, but admitted there were references to Oswald. A140-41, Doc. 276

(Tr: 43:16-25, 44:1-2). Mr. Washington expressed confusion and concern about

this motion, stating that he did not "see this in any instructions or anything that [he

had] to point [Defendants] out" (A143, Doc. 276 (Tr. 46: 3-5)) and that, without

counsel, he mistakenly thought the judge and Defendants would ask him more

information about the identities of Defendants if they were unclear. A142-43, Doc.

276 (Tr. 45: 23-25, 46: 1-9). He thought naming Defendants in his complaint and

their very presence in the courtroom made it clear who he was talking about.

A141-42, Doc.276 (Tr. 44-45). He requested to amend his testimony and stated he

could have identified individuals more clearly with instruction, but the court

denied his requests to provide additional testimony. A143, Doc. 276 (Tr. 46:19-20;

A144, Doc. 276 (Tr. 47:23-25). He pleaded to the court, "I don't have a counselor.

You wouldn't let me have a counselor. They would have—they would have helped

me. I'm not—I'm not—I'm a pro se litigator." A145, Doc. 276 (Tr. 48:20-23).

Distraught, he told the court "now you're letting the villains get away on a

technicality there. They're getting away on a technicality. They poked [me with]

needles." A144, Doc. 276 (Tr. 47: 4-8). The court denied his requests, and granted

the motion as to Farrier, Smith, and Stump, but retained the claims against

Defendant Oswald because there was sufficient information to move forward.

A145-46, Doc. 276 (Tr. 48:24-25, 49:1-2).

The court gave instructions for the jury to protect against prejudice regarding

dismissing the Defendants. First, it stated to the parties, "I don't want to tell them

that [the other defendants] have been dismissed because that will somehow

impact—I don't want to impact your case against Defendant Oswald." A152, Doc.

277 (Tr: 5:21-24). The court then instructed the jury, "Defendants Stump, Farrer,

and Smith are no longer a part of this case. You're not to concern yourselves with

why that is or let that factor into your decision-making. Plaintiff's claims against

Defendant Oswald are the only claims remaining in the case." A154, Doc. 277 (Tr:

7:7-10).

### C.    Defendant Oswald's Testimony Regarding the Assaults

Defendant Oswald testified as the sole witness for the Defendant, despite being well-counseled. Defendant relied on no documentary evidence, no video or audio recordings, and provided no testimony from other staff members or prisoners. Defendant Oswald confirmed that his rank in August 2013 was Correctional Officer 1. A157, Doc. 277 (Tr. 10:1-4). Defendant Oswald explained in his testimony that Mr. Washington was indeed housed in G block in 2013, that he was working in the G block in August 2013, and "[d]uring that time, [he] was pretty much assigned to the RHU housing units." A158, Doc. 277 (Tr. 11:16-23). In his testimony, Defendant Oswald confirmed conducting Mr. Washington's escort.

> Q. "So you heard Plaintiff's testimony yesterday. He testified that you came to his cell on August 1st of 2013 to escort him to a legal visit. Is that the type of escort that you would typically have been doing in that role as a CO?
> A. Yes, it would have been.
> Q: Do you know if you did, in fact, escort Plaintiff to a legal visit on that date?
> A. It's possible. Most likely I did."

A159, Doc. 277 (Tr. 12:4-11).

He confirmed this again a few minutes later. A160, Doc. 277 (Tr. 12:8-11) ("Q: So to back up, you said that it's quite possible that you did escort Mr. Washington on August 1, 2013, to his legal visit; correct? A. Yes."). When asked specifically, Defendant Oswald then confirmed to the court that he had specific recollection of transporting Mr. Washington on August 1, 2013:

> Q. Do you have any recollection that this is the way you transported
> Mr. Washington?
> THE WITNESS: Yes.
> THE COURT: On August 1, 2013?
> THE WITNESS: If he was going to a legal visit, this would have been
> done that way.
> THE COURT: That's not what I asked you. Do you have any
> recollection, sitting here today, that that is the way you transported
> Mr. Washington?
> THE WITNESS: Yes.
> THE COURT: On August 1st?
> THE WITNESS: Yes, Your Honor.

A170, Doc. 277 (Tr. 23:10-13, 16-20).

Throughout his testimony, he affirmed recognition of the specific allegations by Mr. Washington against him regarding the August 1, 2013 incident. *See* A155, Doc. 277 (Tr. 8:2-8; 8:16-18) ("Q. And did you hear the Plaintiff's testimony? A. I did. Q. You heard what he's accused you of doing? A. I have.); A160, Doc. 277 (Tr. 22:8-11) ("Q. Did you hear Mr. Washington testify yesterday that you told him if you did not get off the toilet you would cancel his legal visit? A. I did"); A168, Doc. 277 (Tr. 20:12-13) ("Q. Did you hear Mr. Washington testify yesterday that you had had a tether attached to him? A. I did"); A176, Doc. 277 (Tr. 29:3-7) ("Q. Did you hear Mr. Washington testify yesterday that he believes the reason you were harassing him and abusing him was because he had previously complained about the conditions of his confinement? A: Yes.").

Regarding the April 2, 2015 event, Defendant Oswald also corroborated various information regarding Mr. Washington's allegations. Counsel asked about his position in 2015:

> Q. Were you still a corrections officer or a CO-1, I guess is what you said?
> A. 2013, I would have been.
> Q. What about 2015?
> A. Probably was a sergeant by then.

A180, Doc. 277 (Tr. 32:22-25).

They continued,

> Q. [D]id you hear Mr. Washington testify that you escorted him to the showers on that date?
> A. Yes.
> Q. Is that an escort that a sergeant would normally do?
> A. A sergeant can do, yes.
> Q Did you do them regularly?
> A. Yes, I did.

A180, Doc. 277 (Tr. 33:20-25, 24:1-2).

Defense counsel asked if Defendant Oswald heard Mr. Washington testify that he was not assigned to the unit but that he came to the housing unit to do the escort anyway. Oswald confirmed that he had, and that is something that "could be done." A180-81, Doc. 277 (Tr. 32: 20-25, 34:1-17). Defendant Oswald also confirmed on many occasions that he heard the accusations specific to him throughout Mr. Washington's testimony regarding the specific assault in April 2015. *See* A186, Doc. 277 (Tr. 39:4-7) ("Q. And did you hear Mr. Washington

testify yesterday that you were reaching your arm through the wicket to poke him? A. I heard him say that, yes"); A186-87, Doc. 277 (Tr. 39:16-25; 40:1) ("Q. And did you hear Mr. Washington testify yesterday that during this escort you continually poked him in the rectum with your finger? A. Yes, I heard him"); A187, Doc. 277 (Tr. 40:7-10) ("Q. Do you recall yesterday that Mr. Washington testified that he didn't call out or didn't resist some of your advances because he was scared he would be sprayed? A. I heard him say that, yes"); A188, Doc. 277 (Tr. 41: 10-13) ("Q. Okay. And in both incidents, the 2013 incident and the 2015 incident, did you hear Mr. Washington testify that you rubbed your penis against him? A. I heard him.") Throughout his testimony, Defendant Oswald summarily denied Mr. Washington's allegations. *See e.g.* A155, Doc. 277 (Tr. 8:2-8, 16-18); A186-87, Doc. 277 (Tr. 39: 16-25, 40:1-2).

At the close of Oswald's case, the court affirmatively asked if the Defendant had any other motions, and counsel stated that they did not. A243, Doc. 277 (Tr. 96:20-22).

The district court gave its jury instructions regarding considerations for damages. It instructed, "[c]ompensatory damages must not be based on speculation or sympathy. They must be based on the evidence presented at trial, and only on that evidence. Plaintiff has the burden of proving compensatory damages by a

preponderance of the evidence." A271, Doc. 224 at 11. In describing punitive damages, the court instructed that the jury:

> may award punitive damages to punish a defendant, or to deter defendant and others like the defendant from committing such conduct in the future. Where appropriate, the jury may award punitive damages even if the plaintiff suffered no actual injury and thus receives nominal rather than compensatory damages. You may only award punitive damages if you find that Defendant Oswald acted maliciously wantonly in violating Plaintiff's federally protected right.

A272, Doc. 224 at 12.

It then continued to define maliciousness or wonton disregard in great detail and explained that punitive damages are discretionary and not mandatory. A272-73. The court also explained that "[i]n deciding the amount of punitive damages, you should consider the degree to which Defendant Oswald should be punished for his wrongful conduct toward Plaintiff," "the nature of Defendant's action," and the "amount of harm actually caused." A274, Doc 224 at 14. Defendant Oswald did not object to any instruction by the court. A257.

The jury ruled for Mr. Washington. A51, Doc. 263. The jury awarded Mr. Washington compensatory damages of $20,000 for Oswald's actions on August 1, 2013 and compensatory damages of $20,000 for Defendant Oswald's actions on August 1, 2013. It awarded punitive damages of $25,000 for Oswald's actions on August 1, 2013 and punitive damages of $200,000 for Oswald's actions on April 2, 2015. A46-50, Doc. 262.

Defendant Oswald renewed his motion for judgment as a matter of law and motion for a new trial, and moved for remittitur to reduce the punitive damages award, arguing the verdict was contrary to the clear weight of evidence and that the punitive damages were excessive. Doc. 268, Doc. 269.

The district court denied Defendant Oswald's motion, holding that Washington presented sufficient evidence for the jury's verdict against Oswald. A3-7, Doc. 287 at 1-4. The court stated that "[t]he jury disagreed, and there is no basis to disturb its decision." A3, Doc. 287 at 1. The court explained:

> Plaintiff did not enjoy the benefit of legal counsel. Unsurprisingly, his testimony was less clear than it would have been on direct examination by an attorney. The Court cannot say, however, that Plaintiff's testimony was so unclear that it failed to support the verdict. The jury was able to compare the assertions of Plaintiff, against those of Oswald, in determining what transpired. The jury found Plaintiff more credible. He presented enough evidence, and Defendant's liability-based arguments are unpersuasive. A3-4, Doc. 287 at 1-2.

Furthermore, the court denied Defendant's motion for remittitur. It stressed that Plaintiff was not subject to isolated incidences, but was subject to repeated sexual assaults, and "there is something particularly reprehensible about a law enforcement officer assaulting an inmate under his care," given the "outrageous abuse of power and authority." A5, Doc. 287 at 3. Furthermore, the court explained that "[b]y definition" sexual abuse evinced indifference and is the result of intentional malice. *Id.* The court held that the low compensatory award made

concerns regarding the ratio to punitive damages less salient, and similar punitive damage awards were "not unprecedented." A5-6, Doc. 287 at 3-4. The court explained that "the jury award[ing] different amounts of punitive damages, in connection with the separate incidents, evinces its measured consideration of the evidence." A6, Doc. 287 at 4. It concluded, "the jury's award of punitive damages was just that—the jury's award" and it "decline[d] Defendant's invitation to second guess." *Id.*

Defendant timely appealed. A1-2, Doc. 288.

## SUMMARY OF ARGUMENT

Defendant Oswald wishes to disturb the time-honored tradition of allowing the jury to make its determinations regarding liability and adequately determine appropriate damages awards simply because he disagrees with its finding.

Defendant Oswald argues there is insufficient evidence for the jury's holding that he was liable for sexual assault on August 1, 2013 and April 2, 2015. But in doing so, Defendant Oswald is requesting that this Court inappropriately perform the job of the jury in weighing evidence, determining credibility, and substituting its facts in order to reach the high standard necessary for a judgment as a matter of law. There is no need to do that here, where there is sufficient evidence for its determination. Despite being *pro se* and having a limited means to present evidence, Mr. Washington testified regarding two officers who subjected him to

horrific abuse on August 1, 2013, and concretely identified Defendant Oswald as one of those officers. He identified Defendant Oswald as a correctional officer during the August 1, 2013 incident who was later promoted to sergeant by the second incident of sexual assault on April 2, 2015. The second incident of sexual abuse involved one officer, Officer Oswald, who escorted him from the shower and verbally and sexually abused him during transport. Defendant Oswald in his own testimony corroborated his rank throughout these two periods and confirmed having specific recollections of escorting Mr. Washington. Defendant Oswald also repeatedly confirmed throughout his testimony that he heard Mr. Washington testify that he specifically accused him of this abuse. Defendant Oswald—who was counselled—presented no other documentation, video, or testimonial evidence to rebut Mr. Washington's case. Ultimately, the case was left to the jury's discretion on credibility to determine who it believed, and it believed Mr. Washington. Defendant Oswald has not met his high burden of showing that there was no possible way the jury could find for Mr. Washington, and there is no question he has also failed to show a grave miscarriage of justice for this Court to grant a new trial.

Defendant Oswald also argues that the district court erred in denying his motion for remittitur, because the punitive damages were excessive. As an initial matter, Defendant Oswald argues that Supreme Court guidance in *Exxon Shipping*

*Co. v. Baker*, 554 U.S. 471 (2008) suggests a lower ratio or even 1:1 ratio is necessary to comport with constitutional limitations, but in doing so he misapplies guidelines arising from federal common law when only constitutional limits to punitive damages are at issue. Even in analyzing the constitutional guideposts here, the jury could have well-believed that its punitive damages award was necessary here for a number of reasons including (1) repeated incidents of sexual assault of a prisoner is a reprehensible action that must be punished and deterred; (2) the low compensatory damages, especially in a prisoner case where compensatory damages are often low, gives reason to provide a higher punitive award; and (3) similar ratios and awards have been provided in similar cases. Again, Defendant Oswald does not meet the high burden necessary to disturb the jury's well-reasoned award, and, as the district court stated, "it smacks of temerity to assume the Court knows better" to determine "the amount necessary to punish and deter." A6, Doc. 287 at 4.

## STANDARD OF REVIEW

The court's review of a motion for judgment as a matter of law is plenary, and the court applies the same standard as did the district court. *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir.2006) (citing *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir. 2003). As to questions of fact, this Court's "review ... is limited to determining whether some evidence in the record supports the jury's verdict." *Id.*

This Court "may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). "This Court, in its own appellate review, must expose the evidence to the strongest light favorable to the party against whom the motion is made and give him the advantage of every fair and reasonable inference." *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1178 (3d Cir. 1976). "A jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict." *Swineford v. Snyder Cnty. Pa.,* 15 F.3d 1258, 1265 (3d Cir. 1994).

The denial of a motion for new trial is reviewed for abuse of discretion, but questions of law are reviewed de novo. *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir.2001). A new trial may be granted "because the verdict is against the weight of the evidence" only "when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Marra v. Phila. Hous. Auth*., 497 F.3d 286, 309 n.18 (3d Cir. 2007) as amended (Aug. 28, 2007) (internal quotation marks omitted).

# ARGUMENT

## I. The Court Did Not Err in Holding that Mr. Washington's Testimony Regarding Defendant Oswald's Sexual Abuse Was Sufficient to Maintain the Jury's Verdict.

### A. Defendant Oswald Failed to Preserve This Issue on Appeal.

"A motion for judgment as a matter of law pursuant to Rule 50(b) must be preceded by a Rule 50(a) motion sufficiently specific to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make its case legally insufficient*." Lightning Lube. Inc. v. Witco Corp.*, 4 F.3d 1153, 1173 (3d Cir. 2019). This Court's conclusion that "the failure to move for a directed verdict at the *close of all evidence* does more than limit an aggrieved party's remedy to a new trial. In this Circuit, it wholly waives the right to mount any post-trial attack on the sufficiency of the evidence." *Yohannon v. Keene Corp.*, 924 F.2d 1255, 1262 (3d Cir.1991) (emphasis added). This holding applies to Rule 59 motions based on sufficiency of the evidence for the same reason it applies to Rule 50(b). *Id.* This Court has "repeatedly held that 'that the introduction of evidence after the denial of a motion for a directed verdict constitutes a waiver of the error, if any, in the denial unless the motion is renewed at the close of all of the evidence.'" *Lowenstein v. Pepsi-Cola Bottling Co. of Pennsauken*, 536 F.2d 9, 10-12 (3d Cir. 1976); *see also Yohannon*, 924 F.2d at 1262; *Mallick v. Int'l Bhd. Elec. Workers*, 644 F.2d 228, 233 (3d Cir. 1981); *Gebhardt v. Wilson Freight Forwarding Co.*, 348 F.2d 129, 132 (3d Cir. 1965);

*Burlington v. News Corp.*, No. CV 09-1908, 2016 WL 1221426, at *4 (E.D. Pa. Mar. 29, 2016); *Scully v. Borough of Hawthorne*, 58 F. Supp. 2d 435, 445 (D.N.J. 1999).

Counsel failed to preserve its motions for judgment notwithstanding the verdict (JNOV) and its motion for a new trial. Counsel moved to dismiss all defendants from the case at the close of Mr. Washington's testimony, which the court granted to three defendants but denied as to Defendant Oswald. A140, Doc. 276 (Tr.43:16-5). Defendant Oswald then took the stand to testify and was subject to cross-examination by Mr. Washington. At the close of all evidence, Defendant Oswald did not move for a directed verdict. The court specifically asked at the close of trial whether there were "[a]ny additional motions from the Defendant" and counsel affirmatively said no. A243, Doc. 277 (Tr. 96:20-22). Defendant waived his motions when he failed to renew their motions at the close of evidence after additional evidence was presented by Defendant Oswald who was subject to cross-examination. Accordingly, Defendant has waived his ability to raise either a motion for JNOV or a motion for a new trial on appeal.

### B. Even if Defendant Oswald Preserved the Issue on Appeal, the Jury's Verdict Was Based on Sufficient Evidence Presented at Trial.

Defendant Oswald seeks the exceptionally tall remedy of a judgment notwithstanding the verdict, or, in the alternative, a new trial. As a preliminary issue, Defendant Oswald confuses and collapses the distinct standards necessary

for a judgment as a matter of law and a motion for a new trial. For a judgment notwithstanding the verdict, the court "must be able to say not only that there is sufficient evidence to support the finding [sought by the moving party] ... but additionally that there is insufficient evidence for permitting any different finding." *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976). Entry of judgment as a matter of law is a "sparingly" invoked remedy. *CGB Occup. Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 383 (3d Cir. 2004). In order for a judge to grant a motion for a new trial, on the other hand, it may only do so when "when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 309 n.18 (3d Cir. 2007) as amended (Aug. 28, 2007) (internal quotation marks omitted). Defendant Oswald has failed to provide any analysis arguing that the verdict resulted in a grave miscarriage of justice or that the verdict "shocks the conscience." He has also failed to provide reason to show that there is "insufficient evidence permitting any different finding."

Defendant Oswald argues that the evidence Mr. Washington presented was insufficient because he "failed to identify specific actions taken by Oswald against him."' Op. Br. 14. While Mr. Washington, a *pro se* incarcerated plaintiff, had a less sophisticated presentation of his case than would legal counsel, it is clear from

the jury's verdict and award amount that it clearly attributed liability to Defendant Oswald for his actions in Mr. Washington's sexual assault. Defendant Oswald cannot conjure legal error simply because he disagrees with the jury's verdict—it was the jury's verdict to make.

Mr. Washington's testimony described a gruesome account of a sexual assault that occurred on August 1, 2013 by Defendant Oswald and one other officer where the officers prodded his testicles with a sharp object, attempted to stick their fingers in his buttocks, continuously injured him by pulling on his tether, made sexually explicit and racial comments, and continuously stuck him with a stick while being transported to and from his legal visit. A109-10, Doc. 276 (Tr. 12-14). As a result of this assault, he was left with bloody genitalia and without medical care. A112, Doc. 276 (Tr.15:7-12).

Mr. Washington identified that only two officers were involved with his transport and the assault, A109, Doc. 276 (Tr.12:14-19), and that one of these officers was Defendant Oswald, who pulled on his tether so hard it made his arm go through the wicket, causing him severe injury. A110, Doc. 276 (Tr. 13:15-21). Mr. Washington testified that unlike Defendant Oswald, "[t]he other gentleman with him, which was a sergeant, had a stick and started to prod me like an animal." A110, Doc. 276 (Tr. 13-22-25). In doing so, Mr. Washington differentiated Defendant Oswald's rank (a line officer) with the other officer who was a sergeant.

Mr. Washington continued to describe the assault that occurred as a result of a combined action between the officers who both were present, participating, and aiding in Mr. Washington's assault. He repeatedly used the word "they" to describe the actions of both officers, including Defendant Oswald, making it clear that both officers were consistently present and contributing to the abuse. *See*, *e.g.*, A110, Doc. 276 (Tr. 13:6-14) ("*They* keep shoving me along with the stick, and it's not just my arm or anything; all of it tended to be on my rear end, trying to insert it into my rectum. And if I tried to move, I was jerked with the tether or poked with a pin"); A110, Doc. 276 (Tr:13:22-25) (describing the officer's prodding, saying that "*they* did it so vigorously that it was pretty much—it touched my testicles").

Furthermore, Defendant Oswald, in his own testimony, corroborated some of the information that Mr. Washington testified about. For example, Mr. Washington testified that this assault occurred in the first shift of the day between 6 am and 2 pm, A120-21, Doc. 276 (Tr. 23:20-25; 24:1-3), and that it occurred in the RHU in the G block. A116, Doc. 276 (Tr: 19:13-16). Defendant Oswald confirmed he was working in the RHU in the G block at that time. A158, Doc. 277 (Tr. 11:16-23). Defendant Oswald also stated not only that he had a general memory that he may have escorted incarcerated people on August 1, 2013, but that

he has a specific memory of escorting Mr. Washington on this day. A170, Doc. 277 (Tr: 23:10-13, 16-20).

Regarding the April 2, 2015 assault, Mr. Washington again provided sufficient evidence for the jury to make its determination. Washington described that on April 2, 2015, a single officer escorted him out of a shower, sexually rubbed his body, made explicit sexual comments, and inserted his finger in his rectum. A113-14, Doc. 276 (Tr. 16-17). Mr. Washington identified Defendant Oswald by ranks on multiple occasions, stating that "one of the guys that was in the first event had become a sergeant." A113, Doc. 276 (Tr. 16:3-25). Because the other officer that assaulted Mr. Washington on August 1, 2013 was already a sergeant at the time, this only leaves Defendant Oswald as the potential perpetrator, as he is the only officer with these credentials who fits the description.

Defendant Oswald confirmed, in his own testimony, that he was a correctional officer in 2013, and that in April 2015 he was a sergeant. A157, Doc. 277 (Tr. 10:1-4); A179-80, Doc. 277 (Tr. 32:22-25; 33:1-7). In his testimony about the April 2015 assault, Mr. Washington stated that this sergeant was not assigned to his block at the time and that sergeants don't usually do shower escorts, yet the officer did so anyway. A113, Doc. 276 (Tr.16 :3-25). Defendant Oswald confirmed that while he worked as a sergeant, sergeants didn't usually do shower escorts like

the one at issue in the April 2015 assault, but that he had every ability to do them. A180-81, Doc. 277 (Tr. 22:20-25, 34:1-2; 35:19-20).

While Defendant Oswald blanketly denied committing these acts, the jury was free to make its determination about whether to believe Defendant Oswald or not. The jury was left with Mr. Washington's version of the facts against Defendant Oswald's in a case where there were no other witnesses at trial or conflicting evidence. The jury did its duty in reaching a verdict based on their interpretation of the testimony and it would be improper for this Court to disturb its verdict. *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 492 (3d Cir. 2002) ("In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version.") The verdict must remain "particularly when [the court considers], as [it] must, that the verdict may have been based in part on the jurors' evaluation of each witness' credibility and demeanor." *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 304-05 (3d Cir. 2007), as amended (Aug. 28, 2007).

This is especially salient in cases of sexual assault, where sometimes all that is weighed is the survivor's account of the events against the potential perpetrators. In criminal cases in the state of Pennsylvania, a survivor's testimony—even testimony that is unclear or unpolished— is sufficient to establish a guilty finding

for a jury. This is true even though in the criminal context, there is a much higher

burden to meet (beyond a reasonable doubt) than in the civil context. Indeed, the

state has affirmatively held "the uncorroborated testimony of a sexual assault

victim, if believed by the trier of fact, is sufficient to convict a defendant, despite

contrary evidence from defense witnesses." *Sporish v. Harlow*, No. CV 12-4142,

2015 WL 10939692, at *18 (E.D. Pa. May 7, 2015), report and recommendation

adopted, No. 2:12-CV-4142, 2016 WL 5390541 (E.D. Pa. Sept. 26, 2016) (citing

*Commonwealth v. Charlton*, 902 A.2d 554, 561 (Pa. Super. 2006)); *see also Hale

v. Tennis*, No. 206CV1530, 2009 WL 1324158, at *7 (W.D. Pa. May 12, 2009)

(holding that the victim's testimony can be the sole basis for a guilty verdict in a

case where the victim was unconscious and did not provide medical evidence,

because the "jury was free to believe or ignore the victim's testimony");

*Commonwealth v. Gooding*, 818 A.2d 546 (Pa. Super. 2003) ("It is the jury's job to

resolve all issues of credibility, resolve conflicts in evidence, and make reasonable

inferences from the evidence, believe all, none, or some of the evidence, and

ultimately adjudge appellant guilty"); *accord United States v. Parshall*, 600 F.

App'x 485, 488 (8th Cir. 2015) ("[A] victim's testimony alone is sufficient to

persuade a reasonable jury of the defendant's guilt beyond a reasonable doubt.").

Defendant Oswald also argues that, because he remained as the only

defendant after the court dismissed the other co-defendants, "the jury was free to

assess liability in a wholesale manner against Oswald for actions generally alleged against corrections officials, but not specifically alleged against Oswald." Op. Br. 14-15. First, Defendant Oswald has forfeited this argument, as Defendants' initial motion at trial was regarding insufficiency as to the identification of Defendant Oswald, not any arguments regarding applying all liability on Defendant Oswald. A140-41, Doc. 276 (Tr. 43:16-25, 44:1-2). He had every ability to move for this alternative argument at the close of all evidence at the end of trial, but he failed to do so. Case law in this Circuit is clear that new issues not raised in an initial 50(a) motion cannot be then raised in a 50(b) motion post-trial when they were not specifically raised before the close of all evidence. *See In re Prosser*, 534 Fed. App'x 126, 131 (3d Cir. 2013) ("Since the post-submission motion is nothing more than a renewal of the earlier motion, however, the party may not raise any new issue that she did not raise in her pre-verdict motion") (citing 9B Charles Wright & Arthur Miller, Federal Practice & Procedure Section 2537 (3d ed. 2013)); *see also Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 814-15 (3d Cir. 1984). Therefore, this argument is forfeited on appeal.

Even assuming the argument was not forfeited, Defendant Oswald offers no evidence whatsoever about how the jury applied all liability regarding these assaults onto Defendant Oswald, nor how the district court allowed this to occur. This argument strains credulity in light of Defendant Oswald's own testimony.

Time and time again during the trial, Defendant Oswald confirmed recognizing that Mr. Washington testified about specific allegations about Defendant Oswald during the trial, not other co-defendants. For example, when Defendant Oswald took the stand, he testified about generally being aware that Mr. Washington accused him specifically of sexual abuse: "Q. And did you hear the Plaintiff's testimony? A. I did. Q. You heard what he's accused you of doing? A. I have." A155, Doc. 277 (Tr.8:2-8; 8:16-18). Defendant Oswald also confirmed his understanding of Mr. Washington's specific allegations Mr. Washington testified about regarding the assault in August 2013: "Q. Did you hear Mr. Washington testify yesterday that you told him if you did not get off the toilet you would cancel his legal visit? A. I did." A160, Doc. 277 (Tr. 13:20-23). He also confirmed his understanding that Mr. Washington believed Defendant Oswald had specific motivation to commit this abuse: "Q. Did you hear Mr. Washington testify yesterday that he believes the reason you were harassing him and abusing him was because he had previously complained about the conditions of his confinement? A: Yes." A176, Doc. 277 (Tr. 29:3-7). Defendant Oswald confirmed that he heard Mr. Washington testify about Defendant Oswald abusing him in April 2015: "Q. Would a sergeant normally – did you hear Mr. Washington testify that you escorted him to the showers on that date? A. Yes," A180, Doc. 277 (Tr. 33:20-25, 34:1-2); "Q. And did you hear Mr. Washington testify yesterday that during this

escort you continually poked him in the rectum with your finger? A. Yes, I heard him." A186-87, Doc. 277 (Tr. 39:16-25).

Defendant and his counsel had every opportunity to attack Mr. Washington's evidence in numerous ways—for example, they could have submitted additional evidence or witnesses at trial to rebut Mr. Washington's testimony. But they never did. Instead, they put on one witness, Defendant Oswald, who explicitly confirmed in his testimony that Washington specifically accused him of various abusive actions and corroborated various details in Mr. Washington's testimony. Defendant Oswald's only defense was blankety denying that he abused Mr. Washington, and the jury was free to determine who they believed to be truthful. Defendant Oswald now chooses to change course and abandon his own testimony, which made up his entire defense, and say that actually Mr. Washington never did accuse Defendant Oswald specifically of any wrongdoing.

Furthermore, the district court was careful at every stage to ensure that the parties would not be prejudiced while dismissing the other co-defendants and not influence the jury in their determination. The court told the parties, "I don't want to tell them that [the other defendants] have been dismissed because that will somehow impact—I don't want to impact your case against Defendant Oswald." A152, Doc. 277 (Tr. 5:21-24). She also gave a specific instruction for the jury to not allow their dismissal to influence their decision. *See* A154, Doc. 277 (Tr: 7:7-

10) ("Defendants Stump, Farrer, and Smith are no longer a part of this case. You're not to concern yourselves with why that is or let that factor into your decision-making. Plaintiff's claims against Defendant Oswald are the only claims remaining in the case").

In general, it is presumed that the juries follow instructions given by the court. *Richardson v. Marsh*, 481 U.S. 200 (1987). There is no reason, and Defendant Oswald does not offer one, why this Court should assume the jury did not listen to the clear instructions from the court.

Here, the question was simple—Did Defendant Oswald sexually assault Mr. Washington? And the jury's answer was a clear "yes." The simplicity of the trial provides even less reason to disturb the jury's verdict because "[w]here the subject matter is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations." *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993). The evidence presented at trial was sufficient, and Defendant Oswald has failed to show any potential miscarriage of justice, outside of having a difference of opinion about the outcome of the verdict.

## II.     The District Court Was Correct in Declining to Second Guess the Jury's Well-Reasoned Damages Award, and it Would Be Improper for This Court to Do So.

The jury awarded Mr. Washington compensatory damages of $20,000 for Oswald's actions on August 1, 2013 and compensatory damages of $20,000 for Defendant Oswald's actions on April 2, 2015. A46-50, Doc. 262. It awarded punitive damages of $25,000 for Oswald's actions on August 1, 2013 and punitive damages of $200,000 for Oswald's actions on April 2, 2015. *Id.* Total damages were therefore $40,000 in compensatory damages and $225,000 in punitive damages. The district court denied Defendant Oswald's motion for remittitur, "[declining] Defendant's invitation to second guess" the jury's award. A4, Doc. 287 at 2. It reasoned that Defendant Oswald's actions were reprehensible, the most important determinant of the appropriateness of punitive damages, because Mr. Washington was subjected to repeated sexual assaults, and sexual abuse "[evinces] indifference or reckless disregard." A5, Doc. 287 at 3. It also held that the disparity between compensatory and punitive damages was permittable in this case because of the relatively low compensatory damages, and similar ratios were "not unprecedented." A3-4, Doc. 287 at 3-4. Finally, it held that the jury's differing awards for the separate incidents "evinces its measured consideration of the evidence" and "the jury determined the amount necessary to punish and deter, and it smacks of temerity to assume the Court knows better." A6, Doc. 287 at 4, n.4.

Despite the court's holding, Defendant Oswald argues that the punitive damages award is "excessive under both due process and federal common law and

must be reduced." Op. Br. 18. Once again, Defendant Oswald seeks to override

the inherent authority of the jury, and the time-honored deference to their ability to

determine jury awards, simply because he lost at trial.

The trial judge's decision to grant or withhold a remittitur cannot be

disturbed absent a manifest abuse of discretion. *Murray v. Fairbanks Morse*, 610

F.2d 149 (3d Cir. 1979). This deferential standard is part of the recognition that the

trial judge "is in the best position to evaluate the evidence and assess whether the

jury's verdict is rationally based." *Id.* at 153. Indeed, "[a] trial judge must be

extremely reluctant to interfere with the time-honored power of the jury, in the

exercise of its collective judgment, to assess the damages sustained by the

plaintiff." *Wontor v. Neenan*, No. 92–1588, slip op. at 7 (M.D. Pa. June 28, 1996).

(internal quotation and citations omitted).

A court may grant a new trial or a remittitur "only if the verdict is so grossly

excessive as to shock the judicial conscience." *Williams v. Martin Marietta

Alumina, Inc.*, 817 F.2d 1030, 1038 (3d Cir. 1986). Both this Court and the

Pennsylvania Supreme Court have set a high bar for determining what "shocks the

judicial conscience." *Motter v. Everest & Jennings, Inc.* 883 F.2d 1223, 1230 (3d

Cir. 1989) (in order to disturb a jury verdict "the damages assessed by the jury

must be so unreasonable as to offend the conscience of the Court"); *Haines v.

Raven Arms*, 640 A.2d 367 (Pa. S. Ct. 1994) ("Judicial reduction of a jury award is

appropriate only when the award is plainly excessive and exorbitant. The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to *suggest the jury was influenced by partiality, prejudice, mistake, or corruption*.") (citations omitted) (emphasis added). "The fact that a court finds an award to be extremely generous or would have found the damages to be considerably less is not sufficient to shock the conscience." *Wright v. Cacciutti*, No. 3:12-CV-1682, 2015 WL 3654553, at *20 (M.D. Pa. June 11, 2015) (internal citation and quotation marks omitted).

### A. Defendant Oswald Misunderstands the Limits of Punitive Damages Under Constitutional Limitations, Common Law, and Rule 59(e).

Defendant Oswald's invocation of authority for remittitur is vague. Defendant Oswald at various times references the Due Process Clause, Rule 59(e), and "federal common law" generally. Op. Br. 18-19. Although Oswald fails to distinguish the arguments for the three, only one of these sources of authority, Constitutional limitations under the Due Process Clause, both applies here and has been preserved.

Defendant Oswald cites to "federal common law" limiting the damages award here, giving no further explanation and citing to *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008). Op. Br. 18, 19, 22, 23. The federal common law

described in *Exxon*, however, does not apply to Mr. Washington's claim. *Exxon* considered "whether the punitive damages awarded against Exxon in th[at] case were excessive as a matter of maritime common law." *Id.* at 489-90. "[P]unitive damages in maritime law" fell "within a federal court's jurisdiction to decide in the manner of a common law court" because maritime law itself was federal common law. *Id.* at 489.

This case, of course, is different. Washington brought his claim not under federal common law but under a statute, 42 U.S.C. § 1983. While constitutional due process limits apply to statutory causes of action as a matter of course, federal common law does not. Any non-constitutional limits on punitive damages in § 1983 becomes a question of statutory interpretation, not a simple application of maritime federal common law.

The Seventh Circuit in *Kunz v. DeFelice* explained this principle well. 538 F.3d 667, 679 (7th Cir. 2008). When defendants protesting a punitive damages award under § 1983 cited federal common law opinions in addition to constitutional ones, the court wrote that *Exxon*, the same authority Oswald evokes, "underscores the importance of keeping these theories straight." *Id.* at 678. Although § 1983 "requires a certain amount of elaboration, we do not sit, as the *Exxon* Court did, as a 'common law court of last review.' Instead, we must respect the limitations Congress built into the statute." *Id. Kunz* noted that the defendants

could have argued that via some atextual principle "§ 1983 imposes a stricter limitation on awards of punitive damages than the Constitution." *Id.* at 679. Like Oswald, however, they did not do so. And therefore, like in *Kunz*, this Court has "no reason to consider that question," one not addressed on appeal or below. *Id.* As in *Kunz,* this Court is left simply to evaluate whether the "punitive damages [award] exceeds the outer limits established in the Supreme Court's constitutional cases." *Id.*; *see also In re Bayside Prison Litig.*, 331 F. App'x 987, 993 (3d Cir. 2009) (distinguishing between the Supreme Court's holdings as to constitutional limits on damages and *Exxon*'s holding as to the "maximum ratio of punitive to compensatory damages permitted under maritime common law.").

Distinct from limits from federal common law, which as explained above do not apply here, trial courts may also under Rule 59(e) reduce a punitive damages award when the court believes the amount of the award is inconsistent with the evidence in a case. This Court has explained, "[a] remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is unreasonable on the facts. A constitutional reduction, on the other hand, is a determination that the law does not permit the award." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 716 (3d Cir. 2010). Furthermore, "[t]he remedies available to a court when reducing a jury award based upon due process concerns are not necessarily the same as those

available when a court exercises its discretion because it believes the amount of the award is inconsistent with the evidence in a case. The latter is conditional, and the court must offer a new trial as an alternative to a reduction in the award in order to avoid depriving the plaintiff of his/her Seventh Amendment right to a jury trial." *Id.* The stakes are particularly high in conditional remittiturs, as the Supreme Court has held that "a plaintiff in federal court ... may not appeal from a remittitur order he has accepted" even where the plaintiff accepted the remitted award under protest. *Id.* at 71 (quoting *Demeretz v. Daniels Motor Freight, Inc.*, 307 F.2d 469 (3d Cir. 1962)).

Defendant Oswald cannot be invoking Rule 59(e) authority because he never asked for such a "conditional remittitur" and does not ask for one now. To the contrary, he dedicated a subsection of his brief to clarifying he was not seeking a new trial on punitive damages but instead only an order of a reduction in damages. Op. Br. 28-29. He cites to the Supreme Court's statement that such "appellate review … does not implicate the Seventh Amendment" but the ellipsis covers the critical qualifier: "that an award is consistent with due process." Op. Br. 28; *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.,* 532 U.S. 424, 437 (2001). As *Cortez* held, while constitutional limitations on punitive damages do not implicate the Seventh Amendment, discretionary remittiturs for lack of consistency with the evidence do. 617 F.3d at 716. By invoking *Cooper* and explicitly arguing against

the conditional remittitur that a Rule 59(e) ruling would require, Defendant has affirmatively waived any argument that it was invoking the discretion of Rule 59(e) rather than the limits of the constitutional limits of the Due Process Clause.

**B.     The Jury's Award Does Not Violate the Due Process Clause, and There Is No Reason to Disturb the Jury's Power to Determine the Appropriate Award for Defendant Oswald's Reprehensible Conduct.**

In reviewing constitutional limits for a punitive damages award under the Due Process Clause, the Supreme Court has instructed courts to consider "(1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, (3) the difference between the punitive damages award by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). Defendant Oswald has failed to show that the jury's award violates Due Process when (1) Defendant Oswald's actions were especially reprehensible which gives reason for a higher punitive award to deter similar conduct; (2) the ratio between compensatory and punitive damages is appropriate especially when there are low compensatory damages in *pro se* prisoner cases; and (3) there are comparable cases with similar awards.

**(1) The Degree of Reprehensibility Is High in This Case, When Defendant Oswald's Abuse Involved Repeated Instances of Malicious Sexual Assault.**

"The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm*, 538 U.S. at 419. In reviewing punitive awards, a court should consider whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference or reckless disregard of the health and safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.*

In determining that Defendant Oswald was liable for sexual assault in violation of the Eighth Amendment, this jury found this case reprehensible. This Court recently held that the "sexual abuse of prisoners, once overlooked as a distasteful blight on the prison system, offends our most basic principles of just punishment" and "invades the most basic of dignity interests: to be treated as a human being." *Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018). Indeed, the district court recognized this societal value when it denied Defendant's motion for remittitur, stating "there is something particularly reprehensible about a law enforcement officer assaulting an inmate under his care," given the "outrageous abuse of power and authority." A5, Doc. 287 at 3.

Defendant argues that (1) Oswald's actions were not reprehensible because "there was no record evidence that Washington was financially vulnerable" or that

it played a part in the assault and (2) there was no evidence that Defendant

"Oswald's actions were the result of intentional malice, trickery, or deceit." Op.

Br. 21-22.[1]

Defendant Oswald is incorrect on both points. First, Defendant errs in

arguing that financial vulnerability is an element that is *required* to show that a

particular illegal act is sufficiently reprehensible for a substantial punitive damage

award. The Supreme Court has always stated that the reprehensibility factors are

"guideposts" that are weighed—they are not each required in order to retain a large

damages award. *See State Farm*, 538 U.S at 419 (describing that all factors are

weighed and considered collectively), *BMW of North America, Inc. v. Gore*, 517

U.S. 559, 574-75 (1996) (weighing all factors but not requiring each). Second,

Defendant is confused in his understanding of this factor, as financial vulnerability

is often assessed when considering a case dealing with economic harm caused by

businesses, whereas this case considers the physical and emotional harm caused by

sexual assault. *Id.* at 576 (financial vulnerability is considered in determining

---

[1] Defendant also argues that there was not sufficient evidence that Defendant
Oswald abused him in the August 2013 incident, meaning his award should be
reduced. This argument has already been addressed, *supra*, in Section I.

penalties when "infliction of economic injury, especially when done intentionally through affirmative misconduct").[2]

Mr. Washington was indeed immensely vulnerable, and Defendant Oswald took advantage of this vulnerability. Defendant Oswald seems to suggest that Mr. Washington was not vulnerable if he was not financially vulnerable and that a jury would not believe Defendant Oswald's actions were sufficiently reprehensible to account for the high award. This is misguided. As a factual matter, Defendant Oswald is mistaken that there is no record of Mr. Washington being financially vulnerable. Mr. Washington proceeded *pro se* and *in forma pauperis*, which by definition shows a deep financial need and vulnerability. A16, Doc. 4 (granting Mr. Washington's motion to proceed in forma pauperis). More importantly, Defendant overemphasizes the importance of wealth here—even if Mr. Washington was wealthy, he would still be immensely vulnerable to sexual assault if a prison staff member was intent on doing so. As the Supreme Court has acknowledged, incarcerated people are especially at risk of harm by sexual abuse because society has "stripped them of virtually every means of self-protection and foreclosed their access to outside aid." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Sexual assault of prisoners often involves a multitude of layers of

---

[2] Defendant cites to *Exxon* for this notion, which only concerns federal common law determinations of punitive damages under maritime law, not applicable here. *See supra* Section II (A).

vulnerability and misuse of power, including financial, physical, and mental factors that allow sexual assault to proliferate unpunished. Here, Defendant Oswald was inherently in a place of vulnerability, without an ability to escape from his abusers, seek outside aid, or self-protect while prison officers like Defendant Oswald have practically indiscriminate access to prisoners' lives.

Defendant Oswald's abuse meets every other category of reprehensibility in the Supreme Court's guidelines as well. First, the Supreme Court in *State Farm* has suggested that physical harm or trauma, the harm here, may be considered more reprehensible than economic harm alone. 538 U.S. at 426. As the district court correctly pinpointed, Mr. Washington was not subject to isolated incidences, but was subject to multiple sexual assaults over years. A5-6, Doc. 287 at 3-4. In each of these assaults, Defendant Oswald groped Mr. Washington's genitals, inserted his finger in his rectum, injured Mr. Washington with his restraints or sharp objects, and sexually harassed him using racially derogatory terminology. A109-114, Doc. 276 (Tr.12-17). Defendant Oswald kept Mr. Washington handcuffed and tethered while he assaulted Mr. Washington and yanked his arms to keep him under control so intensely that it came through the wicket causing injury. A110, Doc. 276 (Tr. 13: 15-21). Mr. Washington was forced to experience the degrading experience of being sexually assaulted and harassed while handcuffed, tethered, and in fear that he would be pepper sprayed or injured if he resisted. *Id.* Each time,

Mr. Washington was left without care, and the assaults caused lasting physical and emotional injury. *Id.* This is the definition of reprehensible action.

Defendant's argument that there was no evidence of malice is contrary to the definition of a violation of the Eighth Amendment for sexual assault, which requires showing that the officer "acted 'maliciously and sadistically for the very purpose of causing harm.'" *See Ricks v. Shover*, 891 F.3d 468, 475 (3d Cir. 2018) (quoting *Whitley v. Albers*, 475 U.S. 312, 318 (1986)). The district court gave clear jury instructions mirroring the *Whitley v. Albers* standard. A269. So, as the district court explained, "[b]y definition" sexual abuse evinced indifference and is the result of intentional malice, *Id.* When the jury found in favor of Mr. Washington, it established that Defendant Oswald's abuse was malicious and sadistic in order to meet the necessary mens rea element for the Eighth Amendment.

 It does not "shock the conscience" to consider that the jury believed it was important to deter officers from committing similar heinous abuses to incarcerated people in the future. It is well-established that the purpose of punitive damages is "to further a State's legitimate interest in punishing unlawful conduct in deterring its repetition." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568 (1996). Juries today treat prisoner sexual assault cases with increased care, and rightfully so—the problem is worsening. Sexual assault in prisons in the United States rose 180% from 2011 to 2015 and a further 14% from 2015 to 2018. *See* U.S. Dep't of

Just., Office of Just. Programs, Bureau of Just. Stat., Sexual Victimization

Reported by Adult Correctional Authorities, 2016–2018 1 (June 2021),

https://bjs.ojp.gov/library/publications/sexual-victimization-reported-adult-

correctional-authorities-2016-2018. Nearly two-thirds of these incidents occurred

at the hands of correctional officers or supervisory staff. *Id.* Public awareness is

also growing, as information is shared about abuse in media stories, or through

investigations by elected officials. *See* U.S. Senate Perm. Sub. On Investigations,

Sexual Abuse of Female Inmates in Federal Prisons (Dec. 13, 2022),

https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-

13%20PSI%20Staff%20Report%20-

%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prison

s.pdf, *See also* Matthew Hag, *7 Prison Guards in Pennsylvania Charged With

Sexually Abusing Inmates*, New York Times (Feb. 16, 2018),

https://www.nytimes.com/2018/02/16/us/pennsylvania-prison-guards-sexual-

abuse.html.

Congress established the reprehensibility of committing sexual assault in

prison when it unanimously passed the Prison Rape Elimination Act (PREA) to

shine a spotlight on the high rate of sexual assault in prison which "endangers the

public safety" both inside and outside prisons. Congress therefore established a

"zero tolerance standard" for sexual abuse in prisons. 34 U.S.C. § 30302(1)

("Sexual violence, against any victim, is an assault on human dignity and an affront to American values."). Congress enacted such protections because people who are incarcerated face an immense risk of assault, with over one million prisoners experiencing sexual assault in the 20 years prior to PREA's enactment. *Id.* Pennsylvania also criminalizes sexual abuse by guards, including "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any purpose." 18 Pa. Cons. Stat. §§ 3101; 3124.2. That both federal and state guidance shows "consistency of the direction of change towards outlawing such contact assures us that our society no longer accepts sexual abuse." *Ricks v. Shover*, 891 F.3d 468, 478 (3d Cir. 2018). Against that backdrop, a jury's punitive damages award in this case should be respected, as Defendant Oswald's actions were considered especially reprehensible, and the jury determined that punishment was necessary and the award was needed to deter similar conduct by other officers in the future.

### (2) This Case Falls Within Comparable Punitive Awards, and the Ratio of Punitive Damages to Compensatory Damages Does Not Exceed Limits.

The court did not err in holding that the jury's award did not violate principles of proportionality. In its decision to deny the Defendant's motion for remittitur, the district court held that the low compensatory award made concerns regarding the ratio to punitive damages less salient, and similar punitive damages

were "not unprecedented." A5-6, Doc. 287 at 3-4. As the court explained, that "the jury awarded different amounts of punitive damages, in connection with the separate incidents, evinces its measured consideration of the evidence." A6, Doc. 287 at 4. It concluded, "the jury's award of punitive damages was just that—the jury's award" and it "decline[d] Defendant's invitation to second guess." *Id.*

Defendant Oswald believes the court erred in denying his motion for remittitur and relies upon cases that are inapposite to argue a single digit ratio, or even a 1:1 ratio, is necessary to comport with constitutional limits. Defendant Oswald is misguided. As discussed previously, Defendant Oswald argues that the Supreme Court's decision in *Exxon* specified that damages should "rarely exceed 'a single-digit ratio between punitive and compensatory damages' and 'an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety' and that where federal common law governed punitive damages, a 1:1 ratio, is a fair upper limit." Op. Br. 18. Again, this is based on a fundamentally flawed understanding of limitations to punitive damages, as *Exxon* was a case regarding common law limits under maritime law for punitive damages, not constitutional limitations. *Exxon Shipping Co.*, 554 U.S. at 501-02 (the Court's inquiry "differs from due process review because the case arises under federal maritime jurisdiction, and [the court was] reviewing a jury award for conformity with maritime law, rather than the outer limit by due process." ).

Therefore, Defendant's reliance on *Exxon* is inappropriate here, along with its guidance for restricting punitive damages to a 1:1 ratio.

Furthermore, the Defendant relies heavily on *State Farm*, and in doing so overly emphasizes its dicta in this case regarding ratios for punitive damages. While it provided some usual ratios that conform with constitutional standards, it was clear that the Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm or potential harm, to the plaintiff and the punitive damages award," and the Court "[declined] again to impose a bright-line ratio which a punitive damages award cannot exceed." *State Farm*, 538 U.S. at 424.

This dicta regarding ratios was used in order to analyze the specific case before it, which was dissimilar in important respects. There, the case was brought by plaintiffs who presented bath faith actions on the part of a national insurance company, State Farm Insurance, in their handling of collision cases. *Id.* at 412-414. The Court held the punitive damages award ratio of 145:1 was excessive, in large part because the case was used as a method to "condemn [State Farm] for its nationwide policies rather than for the conduct directed toward [the plaintiffs]," which included actions that occurred outside of the court's jurisdictions in other states where their actions may have been lawful in those jurisdictions. *Id.* at 420-24. Here, Mr. Washington's case addresses the specific harm caused by this

specific defendant, and the jury found that Mr. Oswald owed Mr. Washington punitive damages for his specific actions—this case does not overreach into extra-jurisdictional issues to account for a larger punitive award. *See Brand Mktg. Grp. LLC v. Intertek Testing Servs*., N.A., Inc., 801 F.3d 347, 365 (3d Cir. 2015) (rejecting defendants' request for remittitur where they relied heavily on *State Farm*, explaining that a punitive damages award is appropriate deterrent where the punitive damages addresses the specific Defendant's actions, because "[t]hat decision does not prohibit the consideration of potential public harm in addition to the plaintiff's injury. It prohibits only the consideration of conduct that is unrelated to plaintiff's case.")

Even after the Supreme Court in *State Farm* remanded the case below to determine the appropriate punitive amount at the trial court, the Utah court declined to set a restricted ratio of damages awards and instead awarded the plaintiffs over $9 million dollars in punitive damages, a ratio of 9:1 which is similar to the ratio in the present case. *Campbell v. State Farm Mut. Auto. Ins. Co.,* 98 P.3d 409 (Utah 2010). The defendants on remand, like Defendant Oswald, attempted to argue that the Supreme Court in its decision broadly defined a "mandate rule" to provide a 1:1 award. *Id.* at 411. But the court disagreed, stating that it did not "interpret the Supreme Court's mandate to be as restrictive as [defendant] claims" and is "skeptical of claims that [its] duties can be reduced to

an enumerated task list imposed by a 'mandate rule.'" *Id.* It stressed that the Supreme Court in many cases, including *Campbell II* and *Gore*, "resisted the impulse to draw bright lines or create categorical classification in fixing punitive damages awards, electing instead to adopt general standard and guide points." *Id.* at 412. It instead interpreted the Supreme Court to vest in the trial court discretion to achieve its legitimate interest in punishing unlawful conduct because trial courts are best equipped to make this determination. *Id.* Similarly here, the Court should resist Defendant's arguments to impose strict rules regarding punitive damages awards, and allow the jury and the trial court below to determine the appropriate award, considering its goals of deterring such reprehensible conduct as sexual assault by guards.

Furthermore, "because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those [the court has] previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *State Farm,* 538 U.S. at 425 (citation omitted). While Defendant argues this is not one of those cases, the district court disagreed. Here, the jury awarded $20,000 compensatory relief, a relatively low number. The district court reasoned, that "[g]iven the relatively low amount of compensatory damages awarded, however, concerns regarding the ratio are less than salient." A5, Doc. 287 at 3. It also explained that

"a jury award of nominal damages ($1) paradoxically may have made a punitive

damages award less susceptible to challenge. The Court believes that the $20,000

compensatory award should be viewed on a continuum. Obviously, it is higher

than an award of nominal damages; but it is not so high as to invite a second-

guessing of the jury's determination regarding the amount necessary to punish and

deter." A5 n. 3, Doc. 287 at n.3.

Conserving the jury's award is particularly important in *pro se* prisoner

cases, where compensatory damages will often inherently be lower. Incarcerated

people often have low economic damages because they only have prison jobs

paying cents per hour (or have no job at all while incarcerated), and access to

medical experts who can assess physical and psychological harm is extremely

limited. It would be perverse to further limit the potential awards of *pro se*

incarcerated plaintiffs by being highly restrictive in punitive ratios, when they are

already unable to access comparable compensatory damages as other plaintiffs.

As the district court already explained in its holding, similar ratios are not

unprecedented and in fact regularly occur. *See e.g. TXO Poduction Corp. v.*

*Alliance Resources Corp.* 509 U.S. 443 (1993) (affirming an award of 526 times

greater than the award by the jury); *Browning-Ferris Indus. of Vermont, Inc. v.*

*Kelco Disposal, Inc.*, 492 U.S. 257, 262 (1989) (ratio of punitive to compensatory

damages over 100 to 1); *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224

(3d Cir. 2005) (upholding a $150,000 punitive damages award despite merely $2,000 in compensatory damages in an insurance dispute); *Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 366 (3d Cir. 2015) (permitting a 5:1 ratio in a negligent misrepresentation award, which had never been awarded previously); *accord Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 920 (7th Cir. 2004) (awarding 1.5 million in punitive damages and $250,000 in compensatory damages in a case of inappropriate medical care of a prisoner); *Johnson v. Howard*, 24 Fed. App'x 480, 487 (6th Cir. Dec. 12, 2001) (affirming $300,000-punitive to $30,000-compensatory ratio in prisoner civil rights case); *Coleman v. Vinson*, 2019 WL 4644261, at *2 (S.D. Ill. Sept. 24, 2019) (collecting cases, including ones where $54,000 in punitive damages were permitted alongside $6,000 compensatory, and $90,000 punitive alongside $10,000 compensatory).

Sexual assault cases or cases of physical abuse have had similar awards and resulting ratios where the conduct is particularly reprehensible. *See Cooper v. Morales*, 535 F. App'x 425 (5th Cir. 2013) (reinstating a jury verdict with a ratio of 100:1 in a case of assault against a prisoner); *Johnson v. Howard*, 24 F. App'x 480 (6th Cir. 2001) (permitting a $300,000 award of punitive damages despite $30,000 in compensatory damages in an excessive force case, where a prisoner was beaten "by someone in a position of authority" while he was handcuffed which "exhibits a high degree of reprehensibility"); *Hall v. Terrell*, 648 F. Supp. 2d 1229

(D. Colo. 2009) (awarding 1 million dollars in punitive damages and roughly $350,000 in compensatory damages in a case where a male officer sexually assaulted a prisoner on multiple occasions); *Laymon v. Lobby House, Inc.,* 613 F. Supp. 2d 504, 516 (D. Del. 2009) (awarding a ratio of 30:1 punitive to compensatory damages in a sexual harassment case); *Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 818–19 (1981) (awarding $125 million to $3.5 million, a more than 30:1 ratio).

Even if there were no similar jury awards to point to, a jury's punitive damages award should not be considered presumptively excessive, and therefore a violation of due process, simply because other, earlier cases with somewhat related fact patterns resulted in smaller awards or that the ratio was different. The Due Process Clause does not create a singular "correct" amount of punitive damages for a given type of case. *See Gore*, 517 U.S. at 582–83 (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18 (1991)) (refusing to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case").

Furthermore, the jury award should especially not be disturbed here where, as the district court noted, "the jury awarded different amounts of punitive damages in connection with separate incidents, evinc[ing] its measured consideration of the evidence." A6, Doc. 287 at 4. The court was clear in its jury

instructions as to the particular considerations and goals of each type of damages

award. The court instructed, "[c]ompensatory damages must not be based on

speculation or sympathy. They must be based on the evidence presented at trial,

and only on that evidence. Plaintiff has the burden of proving compensatory

damages by a preponderance of the evidence." A271. In describing punitive

damages, the court instructed that jury that it:

> may award punitive damages to punish a defendant, or to deter
> defendant and others like the defendant from committing such
> conduct in the future. Where appropriate, the jury may award punitive
> damages even if the plaintiff suffered no actual injury and thus
> receives nominal rather than compensatory damages. You may only
> award punitive damages if you find that Defendant Oswald acted
> maliciously wantonly in violating Plaintiffs federally protected right.

A272.

It then continued to define maliciousness or wonton disregard in great detail

and explained that punitive damages are discretionary and not mandatory. A272-

73. The court also explained that "[i]n deciding the amount of punitive damages,

you should consider the degree to which Defendant Oswald should be punished for

his wrongful conduct toward Plaintiff," "the nature of Defendant's action," and the

"amount of harm actually caused." A274. Defendant Oswald did not object to any

instruction by the court, A257, and the jury provided its damages award for the

jury, allocating different punitive awards for the two incidents. The jury is

presumed to have followed these instructions. *See Gov't of the V.I. v. Mills*, 821

F.3d 448, 463 (3d Cir. 2016). The jury's careful decision as to the appropriate award for different incidents, coupled with the trial court's attentive instructions to the jury suggests that there is no valid reason to overwrite the jury's determination.

Two years after *State Farm*, this Court held that "[w]hile due process demands that states guide the discretion of juries contemplating punitive damages awards, concerns of judicial overreaching dictate that trial judges view jury determinations of appropriate punitive damages with a measure of deference." *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 231 (3d Cir. 2005) (citations omitted). Thus, where a punitive damages award is "free of irrationality, passion, and prejudice, and falls within the broad discretion in authorizing and limiting permissible punitive damages awards lodged with state legislatures, a trial judge should not substitute his or her view of the appropriate amount of punitive damages for the jury's determination." *Willow Inn*, 1 F.3d at 1381 (citations and quotations omitted). Defendant provides no evidence why, given the court's detailed instruction, the heightened reprehensibility, and the jury's intentional consideration of the award for each incident, the jury's punitive damages award here deserves anything less than substantial deference.

**CONCLUSION**

For the reasons above, this Court should affirm the district court's order denying Defendant Oswald's motion for judgement as a matter of law, motion for a new trial, and remittitur.

Respectfully submitted,

*/s/ Samuel Weiss*

Amaris Montes
Samuel Weiss
RIGHTS BEHIND BARS
416 Florida Ave. #26152
Washington D.C. 20001
Amaris@rightsbehindbars.org
*Counsel for Plaintiff-Appellee Henry Washington*

## COMBINED CERTIFICATIONS

## CERITICATE OF BAR MEMBERSHIP

I hereby certify under Local Appellate Rule 46.1 that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit, having been duly admitted.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complied with the type-volume requirements and limitations of Federal Rule Appellate Procedure 32(a). This brief contains 12,958 words in 14-point Time New Roman font.

## IDENTICAL PDF & HARD COPY CERTIFICATE

I hereby certify that the text of the electronic brief is identical to the text in the paper copies.

## VIRUS SCAN CERTIFICATE

I hereby certify that this brief complies with Local Appellate Rule 31.0 (c) because a virus detection program has been run on the file and no virus was detected.

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are

registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

Dated: May 28, 2024

*/s/ Samuel Weiss*
Samuel Weiss
RIGHTS BEHIND BARS
416 Florida Ave. #26152
Washington D.C. 20001
sam@rightsbehindbars.org
*Counsel for Plaintiff-Appellee Henry Washington*
